UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. **07-21221**



CIV-ALTONAGA

MAGISTRATE JUDGE
TURNOFF

RENEE BLASZKOWSKI,
AMY HOLLUB and
PATRICIA DAVIS,
individually and on behalf of
others similarly situated,

vs.

FILED by ____ D.C.

MAY 0 9 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.

MARS INC.,
PROCTOR AND GAMBLE CO.,
COLGATE PALMOLIVE COMPANY,
DEL MONTE FOODS, CO.,
NESTLE U.S.A. INC.,
NUTRO PRODUCTS INC.,
MENU FOODS, INC.,
MENU FOODS INCOME FUND,
PUBLIX SUPERMARKETS, INC.,
WINN DIXIE STORES, INC.,
PETCO ANIMAL SUPPLIES, INC.,
PET SUPERMARKET, INC.,
PETSMART INC.,
TARGET CORP.,
WAL-MART STORES, INC.,
_____/

### CLASS ACTION COMPLAINT

Plaintiffs, Renee Blaszkowski ("Blaszkowski"), Amy Hollub ("Hollub") and Patricia

Davis ("Davis") (hereinafter collectively referred to as Plaintiffs/Class Representatives"),

individually and on behalf of others similarly situated, file this Class Action Complaint against

Defendants, Mars Inc., Proctor & Gamble Co., Colgate Palmolive Company, Del Monte Foods

Co., Nestle U.S.A., Nutro Products, Inc., Menu Foods, Inc., Menu Foods Income Fund, Publix

Supermarkets, Inc., Winn Dixie Stores, Inc., Petco Animal Supplies, Inc., Pet Supermarket, Inc.,

1

Dockets.Justia.com

Petsmart, Inc., and Target Corp., Wal-Mart Stores, Inc., (hereinafter collectively referred to as the "Defendants") and allege as follows:

## PARTIES

### Plaintiffs/Class Representatives

1.      Plaintiff/Class representative Blaszkowski is a resident of Michigan, who has three (3) cats of different ages and has purchased various brands of commercial cat food over the lives of her cats that are in the group of products that were manufactured, produced, distributed, advertised and sold by the Defendants.

2.      Plaintiff/Class representative Hollub is a resident of Florida, who has a dog and has purchased various brands of commercial dog food over the lifespan of her dog that are in the group of products that were manufactured, produced, distributed, advertised and sold by the Defendants.

3.      Plaintiff/Class representative Davis is a resident of Florida, who has or has had cats and has purchased various brands of commercial cat food over the lives of her cats that are in the group of products that were manufactured, produced, distributed, advertised and sold by the Defendants.

### Defendants

4.      Defendant, Mars, Inc. ("Mars") is a Delaware Corporation with its principal place of business in Virginia. Mars is in the business of manufacturing, producing, and/or selling dog and cat food under various brands or labels, including, but not limited to, Pedigree®, Sheba®, Goodlife Recipe® and Royal Canin.

5.      Defendant, Proctor & Gamble Co. ("Proctor & Gamble"), is an Ohio corporation with its principal place of business in Ohio. Proctor & Gamble is in the business of

2

manufacturing, producing, marketing, advertising and/or selling dog and cat food under various labels, including but not limited to, Iams® and Eukanuba®.

6.      Defendant, Colgate Palmolive Company ("Colgate"), is a Delaware corporation with its principal place of business in New York. Colgate is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food under various brands or labels, including, but not limited to, Science Diet® and Prescription Diet®.

7.      Defendant, Del Monte Foods Co. ("Del Monte"), is a Delaware corporation with its principal place of business in California. Del Monte is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food under various brands or labels, including, but not limited to, 9 Lives®, Amore®, Gravy Train®, Kibbles-n-Bits® and Nature's Recipe®, Snausages®, Milk Bone®, Pup-Peroni®, Meaty Bone®, Canine's Carry Outs®, Jerky Treats® and Wagwells®.

8.      Defendant, Nestle U.S.A. Inc. ("Nestle") is a Connecticut Corporation with its principal place of business in California. Nestle is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food under various brands or labels, including, but not limited to, Alpo®, Beneful®, Beggin' Strips®, Dog, Cat, Puppy and Kitten Chow®, Fancy Feast®, Friskies®, Mighty Dog®, Deli-Cat®, Pro Plan®, and Purina One®.

9.      Defendant, Nutro Products, Inc. ("Nutro") is a California corporation with its principal place of business in California. Nutro is in the business of manufacturing, producing, marketing, distributing, advertising, and/or selling dog or cat food under various brands or labels, including but not limited to, Natural Choice® Dog and Cat Products, Max® Dog Products, Max® Cat Gourmet Classics, Natural Choice® Complete Care® for cats, Ultra™ Products for dogs

3

10.     Defendant Menu Foods, Inc. is a New Jersey corporation with its principal place of business in the State of New Jersey.

11.     Defendant Menu Foods Inc. is ultimately owned or controlled by Defendant Menu Foods Income Fund, an unincorporated company with its principal place of business in the Province of Ontario, Canada.  Some of the Defendant Menu Foods, Inc.'s high managerial officers or agents are also high managerial officers and agents of Defendant Menu Foods Income Fund.  Defendant Menu Foods, Inc., and Defendant Menu Foods Income Fund are collectively referred to as "Menu Foods."

12.     The Menu Foods Defendants are in the business of manufacturing, producing, and/or selling dog and cat food under various brands or labels, and/or for third party firms, including, but not limited to, Americas Choice Preferred Pets, Authority, Award, Best Choice, Big Bet, Big Red, Cadillac, Companion, Compliments, Demoulus Market Basket, Eukanuba, Fine Feline Cat, Food Lion, Food Town, Giant Companion, Hannaford, Hill Country Fare, Hy-Vee, Iams, J.E. Mondou, Laura Lynn, Li'l Red, Loving Meals, Medi-Cal,  Meijer's Main Choice, Mighty Dog Pouch, Mixables, Natural Life, Nutriplan, Nutro Max, Nutro Max Gourmet Classics, Nutro Natural Choice, Ol' Roy, Paws, Pet Essentials, Pet Pride, President's Choice, Price Chopper, Priority US, Publix,  Roche Brothers, Save-a-Lot Special Blend, Schnucks, Science Diet Feline Savory Cuts Cans, Sophistacat, Special Kitty, Springfield Prize, Sprout, Stop and Shop Companion, Tops Companion, Wegmans, Weis Total Pet, Western family US, White Rose, Winn Dixie, and Your Pet.

13.     The Menu Foods Defendants manufacture pet food for many North American retailers, including but not limited to, Defendant Wal-Mart Stores, Inc.'s Ol' Roy and Special Kitty brands.

14.    Defendant Menu Foods is also a contract manufacturer of the Iams® and Eukanuba® brand pet food products for Defendant Proctor & Gamble.

15.    Defendant, Target Corp., is a Minnesota corporation with its principal place of business in Minnesota. Target is in the business of manufacturing, marketing, producing, distributing, advertising and/or selling its own brands of pet food including, but not limited to, LIFELong™.

16.    Defendant, Wal-Mart Stores Inc.("Wal-Mart"), is a Delaware corporation with its principal place of business in Arkansas. Wal-Mart is in the business of manufacturing, producing, distributing, advertising and/or selling its own brands of pet food, including, but not limited to, Ol' Roy and Special Kitty.

17.    Defendant, Publix Supermarkets, Inc. ("Publix"), is a Florida corporation with its principal place of business in Florida. Publix is in the business of manufacturing, producing, distributing, advertising and/or selling  its own brand of pet food as well as Defendants' pet food products.

18.    Defendant, Winn Dixie Stores, Inc. ("Winn Dixie") is a Florida corporation with its principal place of business in Florida. Winn Dixie is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as Defendants' pet food products.

19.    Defendant, Petsmart, Inc. ("Petsmart"), is a Delaware corporation with its principal place of business in Arizona. Petsmart is in the business of advertising, distributing, selling and making recommendations to consumers regarding the Defendants' dog and/or cat food.

20.     Defendant, Pet Supermarket, Inc. ("Pet Supermarket"), is a Delaware corporation with its principal place of business in Florida. Pet Supermarket is in the business of advertising, distributing, selling and making recommendations to consumers regarding dog and/or cat food.

21.     Defendant, Petco Animal Supplies, Inc. ("Petco"), is a Delaware corporation with its principal place of business in Arkansas. Petco is in the business of advertising, distributing, selling and making recommendations to consumers regarding dog and/or cat food.

### JURISDICTION AND VENUE

22.     This court has jurisdiction over this action pursuant to 28 U.S.C. §1332 and the Class Action Fairness Act of 2005, Pub. L. 109-2 (Feb. 18, 2005) and over supplemental law claims pursuant to 28 U.S.C. §1367.

23.     Venue is proper in this Court and judicial district pursuant to 28 U.S.C. §1391 and/or the Class Action fairness Act because some or all of the Plaintiffs/Class Representatives have purchased commercial pet food manufactured, produced, distributed, sold, marketed and advertised by the Defendants in this Jurisdiction and elsewhere.

### FACTS GIVING RISE TO THE CLAIMS

24.     Manufacturing, producing, marketing, selling and distributing pet food is a $16,000,000,000 a year industry in the United States alone. *See* American Pet Products Manufacturers Association Industry Trends & Statistics attached hereto as Exhibit "A." Most of the of the 163,000,000 companion cats and dogs in the United States derive whatever nutritional content they can obtain from commercial pet food. *See* Humane Society of the U.S. Ownership Statistics attached hereto as Exhibit "B."

6

25.    The Defendants marketing materials lead consumers to believe that commercial pet food has choice chicken and beef, fresh grains and all of the other nutrients that a cat or dog needs to lead a healthy and happy life.

26.    The Plaintiff/Class Representatives, like all other pet food consumers, believe that they are buying "quality" food with all of the nutrients needed to keep their companion dogs and cats happy and healthy.  However, pet food is far from the "quality" product that consumers are lead to believe it is.

27.    The $58,000,000,000 spent by consumers on pet food over the last four years has been without the knowledge that the "quality," "prescription," "premium" or "gourmet" food that they are feeding their companion animals was made of garbage unfit for human consumption, including, but not limited to, restaurant grease, roadkill, hair, blood, pus, esophagi, chicken heads, feet and intestines, cow brains, excrement, fetal tissue, moldy grains, hulls, styrofoam packaging from discarded supermarket meat, euthanized animals, including cats and dogs, ground up flea collars, and diseased, dying, disabled and dead animals.

### The Pet Food Industry's deliberate "Humanization" of Pet Food to Obtain Greater Market Share and even more Staggering Profits

28.    The $16,000,000,000 a year pet food industry spends over $300,000,000 in advertising each year targeted at the consumer to increase sales and boost profits. Exhibits "A" and "B." *See also* Packaged Facts, *Pet Food in the U.S.: Riding the Premium Wave,* attached hereto as Exhibit "C."

29.    The Plaintiff/Class Representatives and the Class have formed deep attachments to their companion cats and dogs and think of them not just as an "animal" or a "pet," but as a treasured member of the family. Exhibit "A." *See also* American Pet Association website attached hereto as Exhibit "D." The American Pet Association reports there are 139,949,912

7

companion dogs and cats in the United States. Exhibit "D." "More than half of American dog owners are more attached to their pets than to at least one other human being, including best friends, children and spouses." Exhibit "D." Moreover, 39% of Americans display their cat or dog's picture in their home. Exhibit "D." 16% of Americans have a picture of their dog or cat in their wallet or purse. Exhibit "D." Americans celebrate their companion dogs and cats birthdays and give them Christmas presents. Exhibit "D." Americans do not treat companion dogs and cats like a member of the family, their dogs and cats are family.

30.    Companion pet lovers are passionate about their cats and dogs and want to ensure that they eat well to prolong their life span. The pet food industry is well aware of this and deliberately and intentionally capitalizes on these emotional bonds through "humanization":

> The depth of response [to the 2007 Menu Foods pet food recall] may baffle the petless but comes as no surprise to industry insiders, who identify **"humanization" as a principal feature of the sector. Many owners think of their pets as children—childless consumers accounted for 60% of pet-related expenditure in America in 2005—and treat them more like people than animals**. Trends in human food are quickly replicated in pet products, says Bob Vetere, president of the American Pet Products Manufacturers Association.

*See* The Economist, *A Dog's Dinner*, March 21, 2007 attached hereto as Exhibit "E."

31.    The Defendants sell billions of dollars of commercial pet food to consumers who believe that they are feeding a balanced, healthy, human-like diet to their companion cats and dogs that the Defendants *know* are loved by consumers like children.

> The U.S. pet food market is experiencing healthy growth as ***marketers continue to convert pet owners*** to better quality, ***higher priced***, more upscale fare. Premium pet foods cover all bases—natural/organic, fortified/functional, weight control, lifestage, breed-/size-specific, gourmet, etc.—***and are increasingly being positioned not just as human style but as human grade***. As a result, much of the growth is occurring at the upper-income tier of the pet owner spectrum, with U.S. households earning $70,000 or more now accounting for an impressive 44% of the aggregate pet food expenditure—up from just 15% in 1994.

Top marketers including Nestlé Purina, Mars, Iams, Hill's, Nutro, and S&M NuTec **clearly have their fingers on the emotional pulse of American pet owners, as well as some very big advertising guns**. During 2005, ***they spent nearly $300 million on national advertising for pet food, virtually all of it encouraging the deep attachment Americans feel for their pets,*** while also launching the biggest surge of new products in the history of the market.

Exhibit "C." This "humanization" is deceiving and the consumer is the victim:

… **"cuts and gravy", [is] designed to mimic the food people eat** (wheat gluten, the probable source of the contamination [of the major 2007 Menu Foods recall], is used to thicken the gravy). **Health foods are fast spreading from dinner tables to doggie bowls**: Wal-Mart and Target, America's two biggest retailers, both introduced **natural** pet-food lines last year.

Exhibit "E." While the Defendants manufacture, market, advertise and sell these commercial pet foods as "complete," wholesome, "human-like" "nutritional" diets to prey upon the emotional bonds that consumers have for their companion dogs and cats, the matter contained in bags, pouches and cans is instead the product of recycling the inedible garbage of the human food industry.

### The Defendants' Marketing of Commercial Pet Food Misleads Consumers

32.    The pet food that the Plaintiffs/Class Representatives purchase in grocery stores, pet stores and/or veterinarian offices generally states somewhere on the label "complete and balanced nutrition," "perfect," natural," "veterinarian recommended," and "guaranteed," among many other positive inducements to buy the pet food.  The intent is to make the consumer feel good about purchasing quality food for their companion cat or dog.

33.    Commercials showing healthy, vibrant pets enjoying "the good life," wholesome fresh meats and vegetables on bags, cans and pouches induce consumers to buy the Defendants' pet food.  These same photos are on websites where the Defendants make representations such as

"Give your dog the perfect balance of high quality nutrition…" *See* Beneful® website page attached hereto as Exhibit "F."

34.     Commercial pet foods such as "Beneful®," "Natural Choice®," "Prescription Diet®," among many others, are intentionally named to lead consumers to believe that they are wholesome, nutritional, natural and/or and healthy for cats and dogs.

35.     Consumers buy commercial cat and/or dog food because of the Defendants' nutritional guarantees, because it is advertised as "complete," "balanced" and because it is intentionally made to look like human quality food either when advertised, sold, distributed and/or placed into the stream of commerce to induce consumers to purchase it.

36.     The Defendants' "humanization" marketing technique is evident in all of the commercials and other marketing media for commercial pet food and makes consumers want to buy this allegedly wholesome and healthy food for their cats and dogs so that their dogs and cats will be happy, healthy and lead long lives.

**Mars' "Good Life Recipe"**™

37.     An example of the manner in which Mars misleads consumers as to only one of its products is the "Good Life Recipe"™ brand. The "Good Life Recipe"™ is a recently launched commercial pet food. The "humanization" of this brand is patent in every aspect of this commercial pet food's marketing and is intended to capitalize on the emotional bond between consumers and their cats and dogs by falsely and/or negligently representing what the consumer is purchasing for the companion animal:

> Good food inspired by pet-loving people like you.
>
> We don't believe people are pet owners. People own TVs, cars and vacation homes. But they don't own pets. They have a relationship with their pets. They enjoy bonds that are sometimes stronger than family. So it's not surprising that people want to provide their pets with the healthiest

> and best tasting food. That's where The Goodlife Recipe™ pet food comes in. We use the best ingredients in the right balance to create great food and snacks for cats and dogs. Because we believe, pets that eat well are pets that live well. And when your pet is living well, you're living well.

*See* the Goodlife Recipe™ "Our Mission" web page attached hereto as Exhibit "G." The "Good Life Recipe"™ website further states:

> A healthy, balanced diet your four-legged friends will love!.
>
> Every bag of The Goodlife Recipe™ food for cats or dogs is a perfect blend of six tasty ingredient groups like real chicken, beef or salmon, healthy vegetables and hearty whole grains - created with our nutritionally balanced "pet food pyramid" as a guide. It's our way of giving your pets all the enjoyable taste and essential nutrients they need without any of the artificial additives they don't. And who wouldn't love that?

*See* the "Goodlife Recipe™" "What's Inside" website page attached hereto as Exhibit "H." This commercial pet food is designed to appeal to consumers' understanding of the human food pyramid and to lead people to believe that they are purchasing quality food for their special companion cats and dogs that is nutritionally complete and primarily made of "real" meat, fish, wholesome grains and vegetables.

38. The wildly popular "Good Life"™ commercials show beautiful dogs with Frank Sinatra or Jewel singing in the background.[1] While the commercial is showing large chunks of meat with carrots and green vegetables, an announcer states, "Six key ingredients for the tastes that dogs crave without the artificial additives they don't."[2] On the website, the six key ingredients are listed as tomatoes, garden peas and spinach, "real natural chicken, beef or salmon," "healthy carrots" and "natural whole grain brown rice packed with vitamins" and pictures of same. Exhibit "H" (can be seen by pressing "Rollover to see what's inside").

---

[1] See http://www.youtube.com/watch?v=QMnUU2Zh9hE.
[2] *Id.*

**Mars' Pedigree®**

39.    The name "Pedigree"®, another of Defendant Mars' brands, implies a food fit for

an expensive pure bred companion dog. This is reinforced by the claims on the website:

> Help your dog be the best he can be with PEDIGREE® Dry Food.
>
> Not only does PEDIGREE® Brand Dry Food For Dogs provide your dog with a <u>balanced diet of vitamins, minerals, essential fatty acids, fiber and protein</u>, it's a delicious <u>foundation to your dog's overall diet</u>. It's also helpful in <u>preventing the accumulation of dental tartar and plaque</u>. And dry food has the added benefit of being very convenient for you.

*See* Pedigree™ website "Dry Products" attached hereto as Exhibit "I."   The website leads

consumers to believe that their companion dogs are eating healthy nuggets of chicken, rice and

vegetables:

> New, improved PEDIGREE WITH CHICKEN, RICE & VEGETABLES™ Food For Dogs (formerly PEDIGREE COMPLETE NUTRITION® Meaty Chunks With Rice & Vegetables) offers a way for dogs to get the **healthy benefits of real vegetables and real chicken** in **a tasty balanced meal owners can feel good about feeding every day**. It's made up of five different components to offer a variety of flavors and textures that dogs love.

- PEDIGREE WITH CHICKEN, RICE & VEGETABLES™ Food For Dogs now contains a new and improved patented PEDIGREE HEALTHY NUGGETS™ with **Meaty Centers kibble**. Improvements include a golden yellow shell, 25% <u>more cream fill and meaty center</u>.
- **Made with real chicken, a high quality protein source**
- **Made with healthy real vegetables that dogs love**
- Higher guaranteed levels of protein than BENEFUL® Original (Based on guaranteed analysis: PEDIGREE WITH CHICKEN RICE & VEGETABLES™: 26% protein, BENEFUL® Original: 25% protein)
- Nutritionally complete and balanced for both puppies◘ and adult dogs
- Contains patented HEALTHY NUGGETS™ pocket kibbles that have a dual texture- crispy outside with a soft, creamy inner
- Contains the Advanced Antioxidant Recipe with guaranteed levels of vitamins E & C
- Highly digestible ingredients so nutrients are easily absorbed
- Improved taste that dogs love

- Select sizes available with the SLIDE RITE® Zipper for easy opening and resealing between feedings
- No artificial flavors or fillers

*See* Pedigree™ website "Dry Nutrition for Adult Dogs" attached hereto as Exhibit "J."

### Colgate's Iams™

40.     An example of the manner in which Colgate misleads is its Iams™ brand. Under the heading "Friends Forever: How to enhance your cat's health," Colgate's Iams™ website states about the adult cat that "She's your *dearest friend* – your confidante. Giving her the *best of everything has always been your priority, and it's ours, too*. Here we've found the keys to making your cat live well and be happy, with *nutrition* designed to promote her *health and vitality*." *See* Iams™ web page attached hereto as Exhibit "K." Under the "Health & Nutrition" section of the website, Iams™ makes the following representations:

> Ingredients for a healthier pet.
>
> Our mission, just like yours, is to help your pet live a long and *healthy* life. When you feed IAMS premium nutrition, you're nourishing your dog or cat with natural ingredients and added vitamins and minerals. There are IAMS formulas made to support your pet during every life stage, for any lifestyle and for every activity level. We also can help you address other needs your pet may have, like weight management through diet and exercise, mature nutrition and hairball control.

*See* "Health & Nutrition" web page attached hereto as Exhibit "L." Iams™ mission statement is as follows:

> Our mission is to enhance the well-being of dogs and cats by providing ***world-class quality foods*** and pet care products that delight the customer and strengthen the human-pet bond.

*See* Iams™ company website page attached hereto as Exhibit "M."

### Del Monte's Kibbles n' Bits®

41.    Del Monte is yet another brand misleading the consumer and capitalizing on the bond between Americans and their cats and dogs by making representations of meeting 100% nutritional needs.  An example of Del Monte's misleading marketing can be seen in its Kibbles 'n Bits® brand.

> **MORE TASTE.**
> **MORE JOY.®**
>
> <u>Your dog is more than a pet, he's a member of the family</u>. So keep him happy with delicious, nutrition Kibbles 'n Bits dog food.

*See* Kibbles n' Bits® website page attached hereto as Exhibit "N."

> ### Try any one of our delicious canned or dry varieties for a taste your dog will love!
> Kibbles 'n Bits dog food has the great taste dogs love and the <u>100% nutrition dogs need</u>. Your dog will love every delicious bite of Kibbles 'n Bits dog food. And you'll love knowing he's getting <u>complete and balanced nutrition</u>!

*See* Kibbles n' Bits® "variety" website page attached hereto as Exhibit "O."   Del Monte, however, does not stop there, consumers are also lead to believe that this is the <u>only</u> food that their dogs need to eat a balanced diet, citing official looking "standards":

### Kibbles 'n Bits® Dog Food — More Taste. More Joy.®

When it comes to mealtime, your dog deserves as much consideration as anyone else. That's where Kibbles 'n Bits® comes in. Treat your dog to a crunchy, chewy, great-tasting meal packed with 100% complete and balanced nutrition. It's everything your dog needs at every meal. And with Kibbles 'n Bits®, there's something for every dog. New Kibbles 'n Bits Brushing Bites™ cleans your dog's teeth and freshens his breath. New Kibbles 'n Bits Golden Years™ gets your older dog excited about mealtime again. So pick up some Kibbles 'n Bits® dog food. You'll enjoy serving it as much as your dog will enjoy eating it.

**Kibbles 'n Bits® dry and canned dog foods meet all AAFCO standards for complete and balanced nutrition.**

Exhibit "N."

### Nestle's Beneful®

42.     Like the other Defendants, Nestle also makes representations about 100% complete nutritional requirements in the commercial pet food that it manufactures, produces, markets, advertises and sells. An example of Nestle's misleading advertising is its Beneful® brand pet food.

### Beneful® Brand Dog Food

Discover Even More Beneful®

So healthy together.  So happy together.

Give your dog the **perfect balance of nutrition** and great taste for a happy healthy life.

Exhibit "F." The marketing materials show wholesome looking meat and vegetables and, like so many other Defendants, the container in which the food is packaged displays the same healthy looking food that is in Nestle's other marketing media. *See* website page for Beneful® Original attached hereto as Exhibit "P."  The food itself is marketed in cute shapes with colors designed to

make the consumer want to buy it for their dog and to reinforce to the consumer that the food is healthy and nutritious.

## Beneful® Original

**A perfect balance of healthful ingredients, quality nutrition and superb taste for pure contentment for dogs**

 Moist, chewy chunks made with real beef are rich in quality protein to help build strong muscles.

 Omega fatty acids, along with antioxidants like Vitamin E and selenium, help support a healthy immune system.

Enriched with calcium for healthy teeth and strong bones.

 Crunchy corn packed with carbohydrates for energy and linoleic acid for a shiny coat.

Contains vegetables with Vitamin A and other quality vitamins, minerals, and nutrients.

 Contains iron for healthy blood.

Exhibit "P."

### Nutro's® Natural Choice® Complete Care® Indoor Adult Cat

43.     Nutro's marketing makes all of the same misleading statements and guarantees as the other Defendants.  For example, when marketing its commercial cat food, Nutro® represents as follows:

**Benefits of Natural Choice Complete Care Indoor Adult Cat:**

- Scientifically formulated for the unique needs of indoor cats
- Guaranteed to improve skin & coat for less shedding, fewer hairballs
- Reduces litter box and in-home odors
- Natural ingredients with vitamins & minerals

Indoor temperature, lighting and reduced opportunity for exercise can affect the health of your cat's skin and coat, muscle and bone condition and may cause weight gain. If your cat lives indoors most

of the time, then <u>feeding Natural Choice Complete Care Indoor Formula can improve your cat's overall health and well-being</u>. It's not just another cat food. Based on the latest scientific and nutritional research, Complete Care Indoor formula is **guaranteed** to improve the health of your indoor cat's skin and coat, reduce shedding, minimize hairballs, build strong muscles and bones and help limit excess weight gain. It's formulated with unique ingredients like chicken meal, rice, soy protein, sunflower oil and oat fiber, which are especially important for indoor cats. And it's formulated with a blend of <u>natural ingredients</u> to help reduce litter box odor for a fresher indoor environment. Natural Choice Complete Care Indoor Formula will <u>improve the quality of life for your cat and you</u>.

*See* Nutro Natural Choice® Complete Care® Indoor Adult Cat website page attached hereto as Exhibit "Q."

### The Pet Food Purchased by Consumers May Be Manufactured and Processed by a Company Unknown to the Consumer

44.    In addition to the above, the Defendants $300,000,000 a year marketing campaigns establish brand awareness because Mars, Procter & Gamble, Colgate and Nestle have been in the agriculture, human and commercial pet food industry for years. For example, Iams/Eukanuba™ and Hill's Science Diet® are brands formerly only sold at veterinary hospitals and clinics and, therefore, have a brand acceptance and awareness that has been generally accepted as "quality," premium and "veterinarian recommended" pet food. However, some or all of the Defendants distribute, market, advertise and/or sell commercial pet food that is manufactured and produced by Menu Foods. Thus, consumers believe that they are purchasing a trusted brand made by a recognized and trusted pet food "manufacturer," when they are in fact buying a "premium" pet food for a *higher* price that is made by the same manufacturer of at least 100 other foods, including Wal-Mart's *much less expensive* Gourmet Kitty and Ol' Roy. *See* Lists of brands subject to recent recalls manufactured by Menu Foods attached hereto as Composite Exhibit "R."

45.    This is "co-packing." One company makes the food, but puts a "brand" label of another, well known company on it. Co-packers benefit the pet food companies because they can buy ingredients in larger bulk than any one Defendant could on its own, thus making the process cheaper and the profits larger. Thus, many of the ingredients that cross all types of pet foods, including "premium" foods, are the same.   The consumer unfortunately has no idea what company really manufactured the food that he/she buys for treasured companion cats and/or dogs.

## The FDA is only Minimally Involved in Commercial Pet Food Regulation

46.    The Defendants spend hundreds of millions in advertising each year so that Plaintiff's/Class representatives and the class will believe that they are purchasing commercial pet food that is monitored, tested and "complete and balanced," as the packaging states, but these "food" products are not.

47.    The pet food industry makes more statements about the quality and nutritional content of its products than human food manufacturers and producers ever have and contrary to what the industry claims, it is not as regulated as it leads consumers to believe. In truth, pet food regulation is practically nonexistent.

48.    The Food and Drug Administration ("FDA") has nominal authority over commercial pet foods under the Federal Food, Drug, and Cosmetic Act ("FFDCA"). *See* Sharon Benz, *FDA's Regulation of Pet Food,* from the FDA website, attached hereto as Exhibit "S." The FFDCA defines food as "articles issued for food or drink for man or other animals..." and requires that all foods be free of adulteration and misbranding. 21 U.S.C. §321(f) (2006). While this would seem that pet foods are regulated, tested and approved, they are generally not. Based

upon the Defendants' deceptive "humanization" marketing, the consumer is unaware that the website for the FDA's Center for Veterinary Medicine[3] ("CVM") plainly states that "animal feeds provide a practical outlet for plant and animal byproducts *not suitable* for *human consumption*." *See CVM and Animal Food, Feed Ingredients and Additives*, fromth FDA website attached hereto as Exhibit "T." However, the FFDCA does not require pre-approval of new foods, but only that foods be free of adulteration or misbranding.

49.     The FFDCA also provides that a food may be deemed adulterated if it contains "any part or product of a diseased animal." 21 U.S.C. §342(a)(5)(2006).

50.     Misbranded food includes those with a false or misleading label.

51.     Food additives require pre-market approval and are defined as any substance not generally recognized as safe by qualified scientists ("GRAS") if it either directly or indirectly becomes a component or otherwise affects the characteristics of any food. 21 U.S.C. §321(s) (2006). Exhibit "S." For non-GRAS additives the pre-market approval requires the submission of a food additive petition to the FDA. However, contrary to the FFDCA, the FDA's CVM has used "regulatory discretion" and has not required any food additive petitions for substances that do not raise "safety concerns." Exhibit "S." The recent melamine debacle, which resulted in the largest recall of pet food in U.S. history, is a clear example of the disastrous result of "regulatory discretion" and complete lack of "safety concerns." Thousands of consumers have suffered the loss of much loved companion cats and/or dogs, spent thousands in veterinarian bills without any real answers from either the Defendants or the FDA as to how "complete and balanced" food could be so toxic and lethal.

---

[3] The FDA's CVM regulates animal feeds. *See* http://www.fda.gov/cvm/petfoodflier.html.

52.    The CVM has abdicated its regulatory powers and primarily monitors "health claims," which are statements that a product will treat, prevent or reduce the risk of a disease.[4] Exhibit "S." Any food label bearing a claim that "consumption of the product will treat, prevent or otherwise affect a disease or condition, or to affect the structure or function of the body in a manner distinct from what would normally be described as its "nutritive value" is considered to offer the product as a drug. *See* David A. Dzanis, *Interpreting Pet Food Labels* and *Interpreting Pet Food Labels – Special Use Foods,* from the FDA website, attached hereto as Exhibits "U" and "V."   While the Nutrition Labeling and Education Act ("NLEA") requires that the FDA promulgate regulations specifically permitting certain health claims on human foods, by incorporating the NLEA philosophy, CVM attempts to show "meaningful information on health foods." Exhibit "S" at p. 2. The FDA curiously does not, however, require proof of testing that a pet food treats or prevents a disease or a condition. Exhibit "S." *See also* FDA Guideline No. 55 attached hereto as Exhibit "W."

### AAFCO has no Regulatory Authority and Does Not Monitor or Test Pet Food

53.    Members of the FDA work with an organization known as the Association of American Feed Control Officials ("AAFCO") because the FDA has limited "enforcement resources that are focused on human food safety issues." Exhibit "S" at p. 3. AAFCO is a private organization made up of members of state and federal officers of agricultural departments and the Food and Drug Administration ("FDA") with "input" from the pet food industry such as the Pet Food Institute, the Cattleman's Beef Association and the National Renderer's Association. There is thus significant influence of the pet food industry over the regulation of their own products. *See* AAFCO web page of "Committee Advisors" attached hereto as Exhibit "X."

---

[4] E.g., "lowers urine ph," or "hypoallergenic."

54.    AAFCO's stated purpose is "to establish and maintain an association through which officials of any state, dominion, federal or other governmental agency and employees thereof charged with a responsibility in enforcing the laws regulating the production, labeling, distribution, or sale of [pet food] may unite to explore the problems encountered in administering such laws, to develop just and equitable standards, definitions and policies to be followed in enforcing such laws, to promote uniformity in such laws, regulations and enforcement policies, *and to cooperate with members of the industry producing such products in order to promote the effectiveness and usefulness of such products. See* AAFCO webpage attached hereto as Exhibit "Y."

55.    AAFCO is involved with commercial pet food, but it has no enforcement authority and does not perform any analytical testing on pet food nor does it issue any certificate that the pet food is "balanced and complete."

56.    AAFCO's only real requirement is that the manufacturer comply with an extensive list of ingredient definitions, which means that a manufacturer could use old tires as an ingredient as the main source of protein for pet food as long as the ingredient met one of the "approved" definitions.

57.    AAFCO has established "Nutrient Profiles" and feeding trial methods to purportedly guide manufacturers regarding the nutritional adequacy. *See e.g.,* David A. Dzanis, *Selecting Nutritious Pet Foods,* from the FDA website, attached hereto Exhibit "Z." However, the "Nutrient Profiles" system does *not* address the issue of ingredient *quality* whatsoever. If a manufacturer wants to represent that its food is "nutritionally complete," it only needs to:

(a)    establish that the product's formula meets the nutritional requirements of the nutrient profile; *or*

(b)    establish that the product is nutritionally *similar* to the "lead" product in the same product family.

If the manufacturer opts for the "lead" product family option, a simple standard chemical analysis can be performed to show that the product meets AAFCO nutrient profiles. *See* Animal Protection Institute, *What's Really in Pet Food Report* attached hereto as Exhibit "AA."

58.    While AAFCO "nutrient profiles" were previously based on the National Research Council Committee on Animal Nutrition, "[v]alues for specific nutrient requirements were added or modified…supported by [among other things] unpublished data."[5] For example, AAFCO reduced recommended protein from 22% to 18% for adult maintenance in dogs.[6] The pet food industry's influence is not difficult to discern in changes in regulations such as these because animal protein is expensive. According to the a veterinarian with the CVM, the formulation testing method also fails to account for the "availability of nutrients," which means that while the product contains protein, AAFCO nutrient profiles do not ensure that the protein is digestible or available by a cat or dog.[7] In fact, the ineffectiveness of these "guidelines" are evidenced by litigation in which Nutro sued Iams Co. regarding Iams® "modified" feeding instructions that resulted in drastic weight loss in dogs. The food was not sufficient to sustain life at recommended feeding amounts. *See e.g., Iams Co. v. Nutro Prods., Inc.,* 2004 U.S. Dist. LEXIS 15134 (W.D. Oh. July 3, 2004).

59.    As for the AAFCO feeding trials, AAFCO recommended "testing" consists of a protocol for a six-month feeding trial to be conducted by the manufacturers to determine whether a food can sustain life in a target test population (dogs or cats in all life stages, or specific stages of growth of maintenance). The test population is fed nothing but the food in question for six

---

[5] AAFCO, *Official Publication* 73 at 131 (2006).
[6] *Id.* at 133
[7] Douglas Kneuven DVM, *The Five Supplements Every Dog Needs,* Clean Run Magazine, Vol 11 # 12.

months, and if the subjects test normal (on weight and a few blood tests), the food passes. This method at least would help a manufacturer demonstrate that the food is palatable and digestible enough to maintain life in the test population, which the "nutrient profile" system does not. However, the feeding test requires only eight test subjects, and requires that only six finish the trial since they can be removed for non-nutritional or poor food intake reasons.[8] Even if a dog or cat loses 15% of its initial body weight during the trial, the feeding trial is nevertheless considered a success.[9] However, what the consumer does not know is that many nutritional deficiencies or overdoses would not appear in this short period of time. Contrary to the Defendants' advertising claims, the pet food's fitness for maintaining longevity, reproductive, or multi-generational health would not be demonstrated. Growth food testing is similar to maintenance testing except growth food testing lasts only 10 weeks despite the fact that the Defendants' recommend growth pet food for the first year of the kitten or puppies' life.[10]

60.    If a food has met either AAFCO requirement, it may state on the label that the food is "complete and balanced." These label statements are why consumers are under the mistaken impression that AAFCO actually regulates the food industry, or is a governmental agency. Neither is true.   However, the Defendants are very happy to place the claim on their packaging and in their marketing materials in order to sell their product to unsuspecting consumers.

### The Defendants Profit by Recycling the Inedible Garbage of their Human Food Businesses into Commercial Pet Food

61.    Rather than the wholesome pictures shown on the pet food packaging, rendering companies dispose of millions pounds of inedible waste each day including, heads, feet,

---

[8] *See* Note 34, *supra,* at 148.
[9] *Id.*
[10] *Id.* at 151.

stomachs, intestines, spinal cords, tails, restaurant grease, feathers, bones and dead or diseased animals rejected from slaughterhouses for use in manufacturing pet food.    Amazingly, animals from research laboratories are also rendered into pet food.

62.    The pet food industry is an extension of the human food industry, also known as the agricultural industry.  Pet food provides a means to turn slaughterhouse waste and tainted grains considered "unfit for human consumption" into profit.  This waste includes cow tongues, esophagi, bones, pus, blood, etc.  The whole grains used have had the starch removed and oil extracted by chemical processing to make vegetable oil, or they are the hulls and other remnants from the milling process.  Some of the whole grains used may have been deemed unfit for human consumption because of mold, contaminants or poor storage practices.

63.    Common ingredients in commercial pet foods are meat meal and animal by-product meal.  Protein used in commercial pet food comes from a variety of sources. When cattle, swine, chickens, lambs, or other animals are slaughtered, lean muscle tissue is trimmed away from the carcass for human consumption. Pet food labels contain the words "meal" or "by-product" on the ingredient label. Inedible byproducts such as bone, fat, heads, hair, feet, hooves and condemned offal are used in commercial pet food. These materials are sent to a rendering plant for processing into pet food products. *See* Waste Reduction Resource Center website attached hereto as Exhibit "BB," explaining that" inedible materials such as fat, heads, hair and condemned offal" are routinely sent to a rendering plants.

64.    "Meat meal" is the rendered product from mammal tissues, exclusive of any added blood, hair, hoof, horn, hide trimmings, manure, stomach and rumen contents <u>except in such amounts as may occur unavoidably in good processing practices</u>."[11]

65.    "Animal by-product" is rendered product from animal tissues, exclusive of any added blood, hair, hoof, horn, hide trimmings, manure, stomach and rumen contents <u>except in such amounts as may occur unavoidably in good processing practices</u>."[12]

66.    "Poultry meal" is the dry rendered product from a combination of clean flesh and skin with or without accompanying bone, derived from the parts of whole carcasses of poultry … exclusive of feathers, heads, feet and entrails."[13] "Chicken meal" thus need not contain even an ounce of chicken as contemplated by consumers.

67.    Whatever remains of the carcass, including but not limited to, heads, feet, bones, blood, pus, intestines, lungs, spines, spleens, livers, ligaments, fat trimmings, unborn babies, is used in pet food. Due to labor costs, plastic and styrofoam enters the process as expired and/or rotten meat packages from supermarkets are tossed in, still wrapped in the package.

68.    Millions of euthanized cats and dogs are "rendered" and ultimately made into pet food. Drugs used in the euthanasia process have been detected in pet food because the drugs are not destroyed by heat. *See* 1998 study of samples from Laurel, Maryland attached hereto as Exhibit "CC" and 2002 FDA Report on the Risk from pentobarbital in Dog Food attached hereto as Exhibit "DD." Ingredients most commonly associated with the presence of pentobarbital were meat-and-bone-meal and animal fat. There are still no laws or regulations against it. "4D"

---

[11] *See* Feed Ingredient Definition 9.40, *supra,* note 34 at 259.
[12] *Id.*
[13] *Id.* Feed Ingredient Definition 9.71, *supra,* note 34 at 262.

animals (dead, dying, diseased, disabled) *are still legitimate ingredients for pet food*, which is considered adulterated food under the FFDCA.

69.    While the FDA's 2002 report concluded that it was "highly unlikely" that dogs will experience adverse effects from consuming pentobarbital and that it could find no evidence of rendered dogs and cats, the study provided no real explanation as to methods or sampling. Exhibit "DD." Moreover, the study never attempted to address reports of cat and dog illness or deaths from ingestion of pentobarbital or newspaper and television accounts of animal shelters sending thousands of euthanized cats and dogs to rendering plants.[14]

70.    For example, a television report in St. Louis aired video footage of a truck with the motto "Serving the Pet Food Industry" entering a rendering plant where euthanized dogs and cats from local animal shelters were hauled. Exhibit "EE." The report generated a public outcry, regarding this cannibalistic-like practice. A consultant to the rendering company involved stated, "There's too many people out there who think pets are like children." Exhibit "EE."

71.    Rendering is the melting down of animal parts to separate fat soluble ingredients from water soluble and solid materials at high temperatures. *See* chart of rendering process attached hereto as Exhibit "FF." The high heat from processing destroys bacteria, but also destroys nearly all of whatever nutrient quality may remain in the rendering vat.

72.    The nutritional quality of by-products, meals, and digests can vary from batch to batch. Pet food ingredients are generally by-products of the meat, poultry and fishing industries, with the potential for a wide variation in nutrient composition. Claims of nutritional adequacy of pet foods based on the current nutrient allowances do not give assurances of nutritional adequacy

---

[14]3-4,000,000 dogs and cats are euthanized in animal shelters each year. See http://www.hsus.org/pets/ issues_affecting_our_pets/pet_overpopulation_and_ownership_statistics/hsus_pet_overpopulation_estimates.html.

and will not until ingredients are analyzed and bioavailability values, i.e., whether the cat or dog can absorb the food as a nutrient, are incorporated. Exhibit "AA." Meat or poultry "by-products" are very common in wet pet foods. "Meat" refers to only cows, swine, sheep, and goats. Since sheep and goats are rare compared to the 37 million cows and 100 million hogs slaughtered for food every year, nearly all meat by-products come from cattle and pigs. Exhibit "AA."

73.    Most dry foods contain a large amount of cereal grain or starchy vegetables to provide texture and little meat. These high-carbohydrate plant products also provide a cheap source of "energy" or, more appropriately, calories. Gluten meals are high-protein extracts from which most of the carbohydrate has been removed. They are often used to boost protein percentages without expensive animal-source ingredients. Corn gluten meal is the most commonly used for this purpose. Wheat gluten is also used to create shapes like cuts, bites, chunks, shreds, flakes, and slices, and as a thickener for gravy. In most cases, foods containing vegetable proteins are among the poorer quality foods. Exhibit "AA."

74.    The unique, pungent odor to a new bag of dry pet food is most often "rendered" animal fat, or vegetable fats and oils deemed inedible for humans. For example, used restaurant grease was rendered and routed to pet foods for several years, but a more lucrative market is now in biodiesel fuel production. Exhibit "AA."

75.    These fats are sprayed directly onto extruded kibbles and pellets to make an otherwise bland or distasteful product palatable. Exhibit "AA." The fat also acts as a binding agent to which manufacturers add other flavor enhancers such as "animal digests" made from processed by-products. Exhibit "AA." Dogs and cats love the taste of these unhealthy sprayed fats. Exhibit "AA."

76.     Defendants, Colgate Palmolive, Del Monte, Nestle and Mars are subsidiaries of multinational food production companies.

> Many major pet food companies in the United States are subsidiaries of gigantic multinational corporations. From a business standpoint, pet food fits very well with companies making human products. The multinationals have increased bulk-purchasing power; those that make human food products have a captive market in which to capitalize on their waste products; and pet food divisions have a more reliable capital base and, in many cases, a convenient source of ingredients.
>
> The Pet Food Institute — the trade association of pet food manufacturers — has acknowledged the use of by-products in pet foods as additional income for processors and farmers: 'The growth of the pet food industry not only provided pet owners with better foods for their pets, but also *created profitable additional markets for American farm products and for the byproducts of the meat packing, poultry, and other food industries which prepare food for human consumption*.'

Exhibit "AA." These companies recycle the inedible garbage that is not fit for human consumption in the "premium," "quality," "gourmet" and nutritious commercial pet food that they market to consumers.

77.     Dogs and cats are carnivores and should be fed a *meat-based* diet. The Defendants lead consumers to believe that this is what they are feeding their cats and dogs by marketing to consumers photos depicting vegetables and chunks of chicken and beef allegedly found in commercial pet food. The containers also replicate the television and web advertising by showing happy, healthy pets, and wholesome meat and vegetables on the packaging. This is all false and misleading to the consumer.

### How the Defendants Manufacture Dry and Wet Food

78.     After the rendered by-product or meal has been cooked at high temperatures, the product is then cooked again to make dry or wet food. The vast majority of dry food is made with a machine called an extruder. First, materials are blended in accordance with a recipe

created with the help of computer programs that provide the nutrient content of each proposed ingredient. For instance, corn gluten meal has more protein than wheat flour. Because the extruder needs a consistent amount of starch and low moisture to work properly, dry ingredients, such as "rendered" meat-and-bone-meal, poultry by-product meal, grains, and flours, predominate.  The dough is fed into the screws of an extruder. It is subjected to steam and high pressure as it is pushed through dies that determine the shape of the final product, much like the nozzles used in cake decorating. As the hot, pressurized dough exits the extruder, it is cut into tiny pieces. As the dough reaches normal air pressure, it expands or "puffs" into its final shape. The food is allowed to dry, and then is usually sprayed with fat, digests, or other compounds to make it more palatable. Exhibit "AA."

79.    Although the cooking process kills bacteria in the ingredients, the final product can pick up more bacteria during the subsequent drying, coating, and packaging process. Some experts warn that getting dry food wet can allow the bacteria on the surface to multiply and make pets sick.  Exhibit "AA." Semi-moist foods and many pet treats are also made with an extruder. To be appealing to consumers and to keep their texture, they contain many additives, colorings, and preservatives; they are not a good choice for a pet's primary diet, but the Defendants never reveal that to the consumer.  Exhibit "AA."

80.    Wet or canned food begins with ground ingredients mixed with additives. Exhibit "AA." If chunks are required, a special extruder forms them. Then the mixture is cooked and canned.  The sealed cans are then put into containers resembling pressure cookers and commercial sterilization takes place. Some manufacturers cook the food right in the can.

### The Defendants claim that commercial pet food is "Nutritious" Despite the Cooking Processes, Chemical Preservatives  and Contaminants

81.     Cooking and other processing of meat and by-products used in pet food greatly diminished the nutritional value, although cooking increases the digestibility of cereal grains and starchy vegetables.

82.     To make pet food "nutritious," the Defendants must therefore "fortify" it with vitamins and minerals because the ingredients they are using are not wholesome, their quality may be extremely variable, and the harsh manufacturing practices destroy many of the nutrients the food had to begin with.

83.     Proteins are especially vulnerable to heat, and become damaged, or "denatured," when cooked. Exhibit "AA." Because dry foods ingredients are cooked twice, first during rendering and again in the extruder, altered proteins may contribute to food intolerances, food allergies, and inflammatory bowel disease. Exhibit "AA."

### Chemical Preservatives

84.     All commercial pet foods must be preserved so they stay fresh and appealing to cats and dogs. Some preservatives are added to ingredients or raw materials by the suppliers, and others may be added by the manufacturer. The U.S. Coast Guard, for instance, requires fish meal to be heavily preserved with ethoxyquin or equivalent antioxidant. Evidently, spoiling fish meal creates such intense heat that ship explosions and fires resulted. Exhibit "AA."

85.     Because manufacturers need to ensure that dry foods have a long shelf life (typically 12 months) to remain edible through shipping and storage, fats used in pet foods are preserved with either synthetic or "natural" preservatives. Synthetic preservatives include butylated hydroxyanisole (BHA) and butylated hydroxytoluene (BHT), propyl gallate, propylene glycol (also used as a less-toxic version of automotive antifreeze), and ethoxyquin. Exhibit

"AA." There is little information documenting the toxicity, safety, interactions, or chronic use of these chemicals in pet foods that may be eaten every day for the life of the animal.

### Contaminants

86.     Ingredients used in pet food are often highly contaminated with a wide variety of toxic substances. Some of these are destroyed by processing, but others are not.

- **Bacteria.** Slaughtered animals, as well as those that have died because of disease, injury, or natural causes, are sources of meat, by-products, and rendered meals. An animal that died on the farm might not reach a rendering plant until days after its death. Therefore the carcass is often contaminated with bacteria such as *Salmonella* and *E. coli*. Dangerous *E. Coli* bacteria are estimated to contaminate more than 50% of meat meals. While the cooking process may kill bacteria, it does not eliminate the endotoxins some bacteria produce during their growth. These toxins can survive processing, and can cause sickness and disease. Pet food manufacturers do not test their products for bacterial endotoxins. Because sick or dead animals can be processed as pet foods, the drugs that were used to treat or euthanize them may still be present in the end product. Penicillin and pentobarbital are just two examples of drugs that can pass through processing unchanged. Antibiotics used in livestock production are also thought to contribute to antibiotic resistance in humans.
- **Mycotoxins.** Toxins from mold or fungi are called mycotoxins. Modern farming practices, adverse weather conditions, and improper drying and storage of crops can contribute to mold growth. Pet food ingredients that are most likely to be contaminated with mycotoxins are grains such as wheat and corn, and fish meal.
- **Chemical Residue.** Pesticides and fertilizers may leave residue on plant products. Grains that are condemned for human consumption by the USDA due to residue may legally be used, without limitation, in pet food.

- **GMOs.** Genetically modified plant products are also of concern. By 2006, 89% of the planted area of soybeans, 83% of cotton, and 61% of maize (corn) in the U.S. were genetically modified varieties. Cottonseed meal is a common ingredient of cattle feed; soy and corn are used directly in many pet foods.

- **Acrylamide.** This is a carcinogenic compound formed at cooking temperatures of about 250°F in foods containing certain sugars and the amino acid asparagine (found in large amounts in potatoes and cereal grains). It is formed in a chemical process called the Maillard reaction. Most dry pet foods contain cereal grains or potatoes, and they are processed at high temperatures (200–300°F at high pressure during extrusion; baked foods are cooked at well over 500°F); these are perfect conditions for the Maillard reaction. In fact, the Maillard reaction is considered *desirable* in the production of pet food because it imparts a palatable taste, even though it reduces the bioavailability of some amino acids, including taurine and lysine. The content and potential effects of acrylamide formation in pet foods are unknown.

Exhibit "AA."

**Toxic Pet Food Recalls Demonstrate that the Defendants Do Not Properly Test, Monitor or otherwise Verify the pet food contents that are marketed as "complete and balanced"**

87.     Although largely unknown to the average consumer, commercial pet food that allegedly meets with the Defendants "high standards" and feeding trials and the AAFCO "nutritional guidelines" has been the subject of numerous lethal recalls over the years. One such recall involved "dioxin," a known carcinogen. *See* Assignment to Collect and Analyze Domestic-Import Samples Suspected of PCB and Dioxin Contamination attached hereto as Exhibit "GG." Animal fat from a rendering company in Belgium was contaminated with Dioxin and/or PCB

and then shipped to manufacturers and incorporated into pet food. Exhibit "GG" at attachment "A." The recent massive Menu Foods recall is yet another example of the disastrous effect of the lack of regulations on pet food, the Defendants consist success in profiting by the lack of regulations, and the consequent cost to the consumer. For example, Ol' Roy, Wal-Mart's store brand, has now been involved in *3 serious recalls*. Exhibit "AA." The list of other serious recalls is long and demonstrates the frequency of same:

88.    In 1995, Nature's Recipe recalled almost a million pounds of dry dog and cat food after consumers complained that their pets were vomiting and losing their appetite. The problem was a fungus that produced vomitoxin contaminating the wheat. Exhibit "AA."

89.    In 1999, Doane Pet Care recalled more than a million bags of corn-based dry dog food contaminated with aflatoxin. Products included Ol' Roy (Wal-Mart's brand) and 53 other brands. The toxin killed 25 dogs. Exhibit "AA."

90.    In 2000, Iams recalled 248,000 pounds of dry dog food distributed in 7 states due to excess DL-Methionine Amino Acid, a urinary acidifier. Exhibit "AA."

91.    In 2003, a recall was made by Petcurean "Go! Natural" pet food due to circumstantial association with some dogs suffering from liver disease; no cause was ever found. Exhibit "AA."

92.    In late 2005, a similar recall by Diamond Foods was announced; the moldy corn contained a particularly nasty fungal product called aflatoxin. The toxin killed 100 dogs. Exhibit "AA."

93.    In 2005, 123,000 pounds of cat and dog treats were recalled due to *Salmonella* contamination. Exhibit "AA."

94.     In 2006, more than 5 million cans of Ol' Roy, American Fare, and other dog foods distributed in the southeast were recalled by the manufacturer, Simmons Pet Food, because the cans' enamel lining was flaking off into the food. Exhibit "AA."

95.     Also in 2006, Merrick Pet Care recalled almost 200,000 cans of "Wingalings" dog food when metal tags were found in some samples. Exhibit "AA."

96.     In the most deadly recall of 2006, 4 *prescription* canned dog and cat foods were recalled by Royal Canin. The culprit was a serious overdose of Vitamin D that caused calcium deficiency and kidney disease. Exhibit "AA."

97.     In February 2007, the FDA issued a warning to consumers not to buy "Wild Kitty," a frozen food containing raw meat. Routine testing by FDA had revealed *Salmonella* in the food. FDA specifically warned about the potential for illness in humans, not pets. There were no reports of illness or death of any pets, and the food was not recalled. Exhibit "AA."

98.     The most lethal pet food in history is the continuing subject of the largest and ever expanding recall ever. Menu Foods recalled more than 95 brands including Iams®, Eukanuba®, Hill's Science Diet®, Purina Mighty Dog®, and many store brands including Wal-Mart's, over 60 million individual cans and pouches. Thousands of pets have become sick and an estimated 20% have died from acute renal failure caused by the food. The death toll is believed to be drastically underreported.

**Nutrition-Related Diseases**

99.     Unbeknownst to consumers, the Defendants' nutritionally "balanced and complete" pet foods causes numerous health problems because they are filled with cheap, inedible grains when the Defendants know that cats and dogs are carnivores. The Defendants' commercial pet food is _**not**_ the primarily meat-based diet that cats and dogs need, but rather one filled with grains unfit for human consumption. The unpleasant results of grain-based, processed, year-in and year-out diets are common. Health problems associated with inedible grain-based commercial pet food include:

- **Urinary tract disease.** Plugs, crystals, and stones are more common in cats eating dry diets, due to the chronic dehydration and highly concentrated urine they cause. "Struvite" stones used to be the most common type in cats, but another more dangerous type, calcium oxalate, has increased and is now tied with struvite. Manipulation of manufactured cat food formulas to increase the acidity of urine has caused the switch. Dogs can also form stones as a result of their diet.

- **Kidney disease.** Chronic dehydration associated with dry diets may also be a contributing factor in the development of kidney disease and chronic renal failure in older cats. Cats have a low thirst drive; in the wild they would get most of their water from their prey. Cats eating dry food do not drink enough water to make up for the lack of moisture in the food. Cats on dry food diets *drink* more water, but the *total water intake* of a cat eating canned food is twice as great.[7]

- **Dental disease.** Contrary to the myth propagated by pet food companies, dry food is not good for teeth.[8] Given that the vast majority of pets eat dry food, yet the most common health problem in pets is dental disease, this should be obvious. Humans do not floss with crackers, and dry food does not clean the teeth.

- **Obesity.** Feeding recommendations or instructions on the packaging are sometimes inflated so that the consumer will end up feeding — and purchasing — more food. One of the most common health problems in pets,

obesity, may also be related to high-carb, high-calorie dry foods. Both dogs and cats respond to low-carb wet food diets. Overweight pets are more prone to arthritis, heart disease, and diabetes. Dry cat food is now considered the cause of feline diabetes; prevention and treatment include switching to a high protein, high moisture, low-carb diet.

- **Chronic digestive problems.** Chronic vomiting, diarrhea, constipation, and inflammatory bowel disease are among the most frequent illnesses treated. These are often the result of an allergy or intolerance to pet food ingredients. The market for "limited antigen" or "novel protein" diets is now a multi-million dollar business. These diets were formulated to address the increasing intolerance to commercial foods that pets have developed. Even so, an animal that tends to develop allergies can develop allergies to the new ingredients, too. One twist is the truly "hypoallergenic" food that has had all its proteins artificially chopped into pieces smaller than can be recognized and reacted to by the immune system. Yet there are documented cases of animals becoming allergic to this food, too. It is important to change brands, flavors, and protein sources every few months to prevent problems.

- **Bloat.** Feeding only one meal per day can cause the irritation of the esophagus by stomach acid, and appears to be associated with gastric dilitation and volvulus (canine bloat). Feeding two or more smaller meals is better.

- **Heart disease.** An often-fatal heart disease in cats and some dogs is now known to be caused by a deficiency of the amino acid taurine. Blindness is another symptom of taurine deficiency. This deficiency was due to inadequate amounts of taurine in cat food formulas, which in turn had occurred due to decreased amounts of animal proteins and increased reliance on carbohydrates. Cat foods are now supplemented with taurine. New research suggests that some dog breeds are susceptible to the same condition. Supplementing taurine may also be helpful for dogs, but as yet few manufacturers are adding extra taurine to dog food.

- **Hyperthyroidism.** There is also evidence that hyperthyroidism in cats may be related to diet. This is a relatively new disease that first surfaced in the 1970s. Some experts theorize that excess iodine in commercial cat food is a factor. New research also points to a link between the disease and pop-top cans, and

flavors including fish or "giblets." This is a serious disease, and treatment is expensive.

Exhibit "AA." Diets composed primarily of low quality grains and rendered meals are not as nutritious or safe as the Defendants have led consumers to believe. Exhibit "AA." These "healthy" and "nutritionally" complete diets have taken a toll on companion cats and dogs and the consumer has not only paid for the Defendants pet food because they thought it is good for their companion animals based upon the Defendants marketing representations. In addition to paying for the food that makes their companion cats and dogs ill and otherwise unhealthy, consumers have also had to pay thousands in veterinarian bills as a result of their dogs and cats ingesting this food.

### The Defendants' Dog and Cat Food Contain Harmful Ingredients Which the Defendants have Willfully and/or Negligently Concealed from Consumers

100.    The Defendants' dog and cat food contains a plethora of harmful and toxic ingredients and chemicals and otherwise lacks the nutritious qualities that the Defendants claim.

101.    The Defendants' are fully aware that the ingredients and chemicals in their dog and cat food products are not as nutritious as they claim, and are not safe and/or healthy for companion pets. The Defendants have willfully, intentionally and/or negligently failed to disclose their existence to consumers.

102.    The Defendants have included dead and diseased animals in their dog and cat food products, mislabeled[15] them, and willfully, intentionally and/or negligently failed to

---

[15] An example of this mislabeling is something called "splitting," which is the listing of the same primary ingredients separately under different names to lead the consumer to believe that the pet food has a prime ingredient

disclose the existence of harmful ingredients and chemicals contained therein, in order to make the production of dog and cat food products cheaper and to increase the Defendants' profit margins.

### False and/or Misleading Advertising

103.    The inclusion of inedible slaughterhouse garbage, euthanized cats and dogs, pentobarbital, and "other products" in the Defendants' dog and cat food products do not ever appear in any of the Defendants' cute marketing campaigns.

104.    Specifically, Nestle has not demonstrated the "commit[ment] to making pets' lives better" that it claims to have by including inedible human waste, including euthanized cats and dogs, and toxic chemicals, in its dog and cat food products.  Rather, the willful inclusion of these ingredients and the failure to disclose such harmful ingredients to the Plaintiffs/Class Representatives and the Class has damaged the Plaintiffs/Class Representatives and the Class.

105.    Moreover, unless Del Monte believes that human beings should be fed the toxic ingredients and chemicals to which it willfully and/or negligently exposed the Plaintiffs/Class Representatives and Class' companion dogs and cats, Del Monte has been disingenuous and deceptive in stating "[w]hen it comes to mealtime, *your dog deserves as much consideration as anyone else*."

106.    Likewise, Colgate has violated its stated "mission to enhance the well-being of dogs and cats by providing *world-class quality* foods and pet care products that delight the customer and strengthen the human-pet bond."

107.    Finally, the inclusion of including, but not limited to, garbage from slaughterhouses and rendering plants, euthanized cats and dogs,  in its dog and cat food products

---

of chicken, but also lists corn gluten and corn, corn meal, potatoes and beet product, which is actually only carbohydrates and sugars.  The end result is that there is less chicken and far more corn and carbohydrates and if the manufacturer did not "split" the ingredients, corn would be the primary ingredient.

contradicts Mars' representation that "at Pedigree, we've spent the last 60 years developing a range of dog food that gives your dog the variety he wants and loves and just the right balance of vitamins, fiber and protein he needs – at every stage of life."

108.    Unless the Defendants believe that dogs and cats who consume their pet food products receive a health benefit from eating, including but not limited to, spines, hair, hooves, feet, heads, euthanized dogs and cats, roadkill, zoo animals, pentobarbital, etc., their aforementioned representations are not only misleading but are also deceitful all for their own profit and gain and at the expense of the consumer.

## CLASS ACTION ALLEGATIONS

109.    Plaintiffs/Class Representatives bring this action on their own behalf and as a Class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

> All persons in the United States who purchase, or have purchased, pet food produced, manufactured, advertised, marketed, distributed and/or sold by any of the Defendants which lead consumers to believe that they were purchasing, including but not limited to, "wholesome," "gourmet" "premium," "natural," "balanced and complete," pet food that was marketed as having certain ingredients when in fact the pet food contained ingredients that were not represented in the Defendants' marketing of the pet food and which the Defendants never disclosed to the Plaintiffs/Class Representatives or the Class prior to purchase.

The Plaintiffs/Class Representatives reserve the right to amend the class definition after more information has been obtained through discovery. Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, directors and officers, and members of their immediate families. Also excluded from the Class are the Court, the Court's spouse, all persons within the third degree of relationship to the Court and its spouse, and the spouse of all such persons.

## Numerosity

110.    According to statistics kept by the Humane Society of the United States, there are approximately 73 million companion dogs in the United States. Exhibit "B." Thirty-nine percent of U.S. households own at least one dog. Exhibit "B." Most owners (60 percent) own one dog, 25% of owners own two dogs, 14% of owners own three or more dogs. Exhibit "B." There are approximately 90 million owned cats in the United States. Exhibit "B." 34% of U.S. households (or 37.7 million) own at least one cat. Exhibit "B." 50% of owners own more than one cat. Exhibit "B." The majority of consumers who have companion cats and dogs purchase commercial pet food that the Defendants put in the stream of commerce. The members of the Class are, thus, so numerous and geographically diverse that joinder of all of them is impracticable. While the exact number and identities of the members of the Class are unknown to the Plaintiffs/Class Representatives at this time, and can only be ascertained through appropriate discovery and notices, the Plaintiffs/Class Representatives believe and therefore aver that there are thousands of Class members throughout the United States.

## Commonality

111.    There are questions of fact and law common to members of the Class that predominate over any questions affecting any individual members including, *inter alia*, the following:

(a)    Whether the Defendants advertised, marketed and sold pet food as healthy, human-like and nutritionally balanced when it contained, including but not limited to, toxic and dangerous ingredients and chemicals, including but not limited to, animal bones, blood, pus,

intestines, ligaments, tongues, esophagi, cancerous meat, euthanized dogs and cats, sodium barbital, and pentobarbital and failed to fully disclose such facts in its advertising;

(b)     Whether the Defendants knowingly sold pet food that contained toxic, dangerous and adulterated ingredients and chemicals and failed to disclose such facts;

(c)     Whether the Defendants advertised, represented or held itself out as producing or manufacturing pet food products that were, including but not limited to, safe, healthy balanced and complete for pets of the Plaintiffs/Class Representatives and Class members when in fact such pet food was not safe, healthy, balanced or complete;

(d)     Whether Defendants expressly warranted these pet food products;

(e)     Whether Defendants expressly purported to disclaim any express warranty on these pet food products;

(f)     Whether Defendants purported to disclaim any implied warranty on these pet food products;

(g)     Whether any limitation on any warranty failed to meet its essential purpose;

(h)     Whether Defendants' intended that the Products be purchased by Plaintiffs/Class Representatives, Class members, or others;

(i)     Whether Defendants' intended that the Class would feed the products to their pets;

(k)     Whether Defendants' were negligent in manufacturing or processing the pet food products;

(l)     Whether the purchase and/or use of pet food to feed cats and dogs resulted in loss, injury, or damages to the Plaintiffs/Class representatives and the Class;

(m)    Whether the Defendants' negligence proximately caused loss or injury to damages to the Plaintiffs/Class Representatives and the Class;

(n)    Whether the Plaintiffs/Class representatives and the Class suffered damages;

(o)    Whether the Defendants were unjustly enriched by selling consumers pet food that was adulterated, did not comport with their own marketing, contained toxic substances, and was not nutritionally complete as advertised;

(p)    Whether the Defendants marketing and advertising was false and deceptive under applicable state laws; and

(q)    Whether the Defendants violated applicable consumer statutes requiring that the Defendants not to commit deceptive or unfair trade practices to the detriment of the consumer.

### Typicality

112.    The Plaintiffs'/Class representatives claims are typical of the claims of the other members of the Class in that all such claims arise out of the Defendants conduct in manufacturing, producing, marketing, advertising, processing, distributing, selling and entering into the stream of commerce pet food containing undisclosed ingredients contrary to the Defendants claims when marketing the pet food.  The Plaintiffs/Class Representatives and other members of the Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiffs/Class Representatives' claims and those of the Class.

### Adequacy

113.    The Plaintiffs/Class Representatives will fairly and adequately protect the interests of the Class . The Plaintiffs/Class Representatives claims are coextensive with, and not antagonistic to, the claims of others members of the Class and they are willing and able to

vigorously prosecute this action on behalf of the Class. The Plaintiffs/Class Representatives have retained competent counsel who is very experienced in class action litigation.

### Predominace and Superiority

114.    Plaintiffs/Class Representatives bring this action under Rule 23(b)(3) because common questions of law and fact predominate over questions of law and fact affecting individual members of the Class. Indeed, the predominant issue in this action is whether Defendants' pet food and pet food products are deceptively advertised. In addition, the expense of litigating each member of the Class's claim individually would be so cost prohibitive as to deny Class members a viable remedy. Certification under Rule 23(b)(3) is appropriate because a class action is superior to other available methods for the fair and efficient adjudication of this action, and Plaintiffs/Class Representatives envision no unusual difficulty in the management of this action as a class action.

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, respectfully requests this Court to:

(a)    Enter an order certifying the Class under Rules 23(a) and (b)(3 and appointing Plaintiff/Class representatives and their legal counsel to represent the Class;

(b)    Enter an Order granting reasonable attorneys' fees and costs to Class Counsel; and

(c)    Granting such other and further relief as allowed by law.

### COUNT I

### Fraudulent Misrepresentation & Fraudulent Concealment

115.    Plaintiffs/Class Representatives hereby adopt and incorporate by reference paragraphs 1-114 as if set forth more fully herein.

116.    At all material times, the Defendants were engaged in the business of manufacturing, marketing, distributing, promoting, and selling Defendants' pet foods.

117.    The Defendants made misrepresentations of material facts to, and omitted and/or concealed material facts from, Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendants' pet foods regarding their safety and use.

118.    The Defendants' deliberately and intentionally misrepresented to, and omitted and/or concealed material facts from consumers, including Plaintiffs/Class Representatives and other Class members, that Defendants' pet foods were safe and healthy when fed to companion pets. Such misrepresentations, omissions, and concealments of facts include, but are not limited to:

a.    Failing to disclose, and/or intentionally concealing, ingredients which are not safe or healthy for companion pets;

b.    Failing to disclose, and/or intentionally concealing, the results of tests showing the potential health risks to companion pets associated with the use of Defendants' commercial pet foods;

c.    Failing to adequately test ingredients in the Defendants commercial pet foods to ensure that the ingredients live up to the Defendants' advertisements;

b.    Failing to include adequate warnings with Defendants' pet foods about the potential actual risks and nature, scope, severity, and duration of serious adverse effects of the ingredients in the Defendants' pet foods;

c.    Concealing information regarding the known health risks to companion pets associated with the Defendants' pet foods and;

The Defendants intentionally concealed facts known to them, as alleged herein, in order to ensure increased sales and profits of the Defendants' pet foods.

119.    The Defendants had a duty to disclose the foregoing risks and failed to do so, despite possession of information concerning those risks. The Defendants' representations that Defendants' pet foods were safe, balanced, perfect, complete and healthy for their intended purpose were false, as Defendants' pet foods were, in fact, dangerous to the health of companion pets.

120.    Further, the Defendants failed to exercise reasonable care in ascertaining the accuracy of the information regarding the safe use of the Defendants' pet foods. The Defendants also failed to exercise reasonable care in communicating the information concerning the Defendants' commercial pet foods to Plaintiffs/Class Representatives and the Class, and/or concealed facts that were otherwise known to the Defendants.

121.    The Plaintiffs/Class Representatives and the Class were not aware of the falsity of the foregoing representations, nor were the Plaintiffs/Class Representatives and the Class aware that one or more material facts concerning the safety and health of the Defendants' pet foods had been purposely concealed.

122.    In reliance upon the Defendants' misrepresentations (and in the absence of disclosure of health risks), the Plaintiffs/Class Representatives and the Class purchased the Defendants' pet foods for their companion pets. Had the Plaintiffs/Class Representatives the Class known the true facts concerning the risks associated with the Defendants' commercial pet foods, they would not have purchased the pet foods and/or fed the pet foods to their companion pets.

123.    The reliance by the Plaintiffs/Class Representatives and the Class upon the Defendants' misrepresentations were justified because said misrepresentations and omissions were made by individuals and entities that were in a position to know the facts concerning the Defendants' pet foods.

124.    The Plaintiffs/Class Representatives and the Class were not in a position to know the facts because the Defendants aggressively promoted the use of the Defendants' pet foods and concealed the risks associated with its use, thereby inducing the Plaintiffs/Class Representatives and other Class members to purchase and/or use the Defendants' pet foods.

125.    As a direct and proximate result of the Defendants' misrepresentations and/or concealment, the Plaintiffs/Class Representatives and the Class suffered damages.

126.    The Defendants' conduct in concealing material facts and making the foregoing misrepresentations, as alleged herein, was committed with such reckless disregard that the conduct amounts to  a conscious disregard or indifference to the rights of consumers such as the Plaintiffs/Class Representatives and other Class members, thereby entitling the Plaintiffs/Class Representatives and other Class members to punitive damages.

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law;

(c)    Awarding punitive damages; and

(d)    Granting such other and further relief as allowed by law.

## COUNT II

### Negligent Misrepresentation

127.    Plaintiffs/Class Representatives and the Class members herby adopt and incorporate by reference paragraphs 1-114 as if set forth more fully herein.

128.    The Defendants owed the Plaintiffs/Class Representatives and the Class a duty to exercise reasonable care in representing the contents, safety and health benefits of its pet food.

129.    The Defendants negligently and/or falsely represented that its pet food was safe and healthy for consumption by companion pets.

130.    The Defendants' either knew or should have known that their pet food contained ingredientsthat were harmful to the Plaintiffs/Class Representatives and the Class' companion pets.

131.    The Plaintiffs/Class Representatives and the Class reasonably relied on marketing and other information provided by the Defendants regarding the safety, health and benefits of Defendants pet food.

132.    As a proximate cause of the Defendants' false representations, the Plaintiffs/Class Representatives and the Class suffered damages.

Wherefore, Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT III

### Violation of the Florida[16] Deceptive and Unfair Trade Practices Act (FDUTPA) Fla. Stat. § 501.201

133.    The Plaintiffs/Class Representatives and the Class herby adopt and incorporate by reference paragraphs 1-114 as if set forth more fully herein.

134.    The Defendants conduct in making misrepresentations of material facts to, and omitted and/or concealed material facts from, the Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendants' pet foods regarding their safety, benefits and health is an unfair and/or a deceptive act in violation of § 501.201.

135.    The Defendants' conduct offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and therefore a violation of § 501.201.[17]

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against Defendants as follows:

(a)    Awarding actual damages;

(b)    Pursuant to § 501.2075, $10,000 for each such violation of willfully using a method, act, or practice declared unlawful under §501.204.[18]

(c)    For pre- and post-judgment interest to the Class, as allowed by law;

(e)    For reasonable attorneys' fees and; and

---

[16] And other state deceptive trade practicelaws of the various states where Class members reside.

[17] While the Florida legislature does not define what an unfair or deceptive act is, it has mandated that Fla. Stat. chs. 501.204, 501.211(1)-(2) (1997) of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) are to be liberally construed. The legislature has also specifically stated that great weight should be given to federal cases interpreting the federal counterpart of this act. An unfair practice under 15 U.S.C.S. § 45(a)(1) of the Federal Trade Commission Act has been defined as one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. See Samuels v. King Motor Co., 782 So. 2d 489 (Fla. 4th DCA 2001).

[18] "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Fla. Stat. § 501.204 (2007).

(f)     Granting such other and further relief as it deems just and proper.

## COUNT IV

### Violation of Fla.[19] Stat. § 817.41 (2007)

136.    Plaintiffs/Class Representatives and other Class members herby adopt and incorporate by reference paragraphs 1-114 as if more fully set forth herein.

137.    Defendants' by making misrepresentations of material facts to, and omitted and/or concealed material facts from, Plaintiffs/Class Representatives and other Class members in the advertising, marketing, distribution, and sale of Defendants' pet foods is unlawful pursuant to §817.41 (2007) since the purpose of the Defendants'' "misleading advertising"[20] is for Defendants to obtain profits.[21]

Wherefore, Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against Defendants as follows:

(a)     For an order certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing Plaintiff(s) and their legal counsel to represent the Class;

(b)     Awarding actual damages;

(c)     For pre- and post-judgment interest as allowed by law;

(d)     For reasonable attorneys' fees and costs;

---

[19] And other state false advertising laws of the various states where Class members reside.

[20] The phrase "misleading advertising" includes any statements made, or disseminated, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services." Fla. Stat. § 817.40(5) (2007).

[21] "It shall be unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement. Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pre-tenses." Fla. Stat. § 817.41 (2007).

(e)     Punitive damages; and[22]

(f)     Granting such other and further relief as allowed by law.

### Count V

### Negligence

138.    The Plaintiffs/Class Representatives and other members of the Class herby adopt and incorporate by reference paragraphs 1-114 as if more fully set forth herein.

139.    The Defendants owed the Plaintiffs/Class Representatives and other Class members a duty to only offer safe, healthy, and non-contaminated pet foods for consumption by household companion pets.

140.    The Defendants also owed a duty to provide that which the Defendants marketed that they would provide in their commercial pet food products.

141.    Through the Defendants failure to exercise the due care, the Defendants breached this duty by producing, processing, manufacturing, marketing, distributing and offering for sale the pet foods in a condition that was unhealthy for the Plaintiffs/Class Representatives and other Class members' companion pets and in a manner that was not consistent with the marketing.

142.    Additionally, the Defendants breached their duty of care to the Plaintiffs/Class Representatives and other Class members by failing to use sufficient quality control, perform adequate testing, proper manufacturing, production, or processing, and failing to take sufficient measures to prevent the pet foods from being offered for sale, sold, or fed to companion pets that was not representative of the manner in which the pet food was marketed.

143.    The Defendants knew or, in the exercise of reasonable care, should have known, that the pet foods presented an unacceptable risk to the Plaintiffs/Class Representatives'

---

[22] "Any person prevailing in a civil action for violation of this section shall be awarded costs, including reasonable attorney's fees, and may be awarded punitive damages in addition to actual damages proven. This provision is in addition to any other remedies prescribed by law." Fla. Stat. § 817.41(6) (2007).