UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 07-21221 CIV ALTONAGA/Turnoff

RENEE BLASZKOWSKI, AMY HOLLUB, PATRICIA DAVIS,
SUSAN PETERS,  DEBORAH HOCK, MIKE FLOYD,
BETH WILSON, CLAIRE KOTZAMPALTIRIS,
DONNA HOPKINS-JONES, NICOLE PIAZZA,
MARIAN LUPO, JANE HERRING, JO-ANN MURPHY,
STEPHANIE STONE, PATRICIA HANRAHAN,
DEBBIE RICE, ANN QUINN, SHARON MATHIESEN,
SANDY SHORE, CAROLYN WHITE, LOU WIGGINS,
MICHELLE LUCARELLI, RAUL ISERN, DANIELE VALORAS
individually and on behalf of
others similarly situated,

       Plaintiffs/Class Representatives,

vs.

MARS INC., MARS PETCARE US, INC.,
PROCTER AND GAMBLE CO., THE IAMS CO.,
COLGATE PALMOLIVE COMPANY,
DEL MONTE FOODS, CO.,
NESTLÉ USA INC., NESTLÉ PURINA
PETCARE CO., NESTLE S.A., NUTRO PRODUCTS INC.,
MENU FOODS, INC., MENU FOODS INCOME FUND,
DOANE PET CARE ENTERPRISES, INC.,
PUBLIX SUPER MARKETS, INC.,
NEW ALBERTSON'S INC., ALBERTSON'S LLC,
THE KROGER CO. OF OHIO, SAFEWAY INC.,
H. E. BUTT GROCERY COMPANY,
MEIJER INC., MEIJER SUPER MARKETS, INC.,
THE STOP & SHOP SUPERMARKET COMPANY,
PETCO ANIMAL SUPPLIES STORES, INC.,
PET SUPERMARKET, INC., PET SUPPLIES "PLUS,"
PET SUPPLIES PLUS/USA INC.,
PETSMART INC., TARGET CORP.,
WAL-MART STORES, INC.,

       Defendants.
_____/

Dockets.Justia.com

**AMENDED CLASS ACTION COMPLAINT**

1.      Plaintiffs/Class Representatives, Renee Blaszkowski ("Blaszkowski"), Amy Hollub ("Hollub"), Patricia Davis ("Davis"), Susan Peters ("Peters"), Deborah Hock ("Hock"), Mike Floyd ("Floyd"), Beth Wilson ("Wilson"), Claire Kotzampaltiris ("Kotzampaltiris"), Donna Hopkins-Jones ("Hopkins-Jones"), Nicole Piazza ("Piazza"), Marian Lupo ("Lupo"), Jane Herring ("Herring"), Jo-Ann Murphy ("Murphy"), Stephanie Stone ("Stone"), Patricia Hanrahan ("Hanrahan"), Debbie Rice ("Rice"), Ann Quinn ("Quinn"), Sharon Mathisen ("Mathiesen"), Sandy Shore ("Shore"), Carolyn White ("White"), Lou Wiggins ("Wiggins"), Michelle Lucarelli (Lucarelli), Raul Isern (Isern") and Danielle Valoras ("Valoras") (hereinafter collectively referred to as Plaintiffs/Class Representatives"), individually and on behalf of others similarly situated, file this Class Action Complaint against Defendants, Mars Inc., a Delaware corporation, Mars Petcare U.S. Inc., a Delaware corporation, Procter & Gamble Co., an Ohio corporation, the Iams Co., an Ohio Corporation, Colgate Palmolive Company, a Delaware corporation, Del Monte Foods Co.,  a Delaware corporation, Nestlé USA, Inc., a Connecticut corporation, Nestlé Purina Petcare Co., a Missouri corporation, Nestlé, S.A., a Swiss corporation, Nutro Products, Inc., a California corporation, Menu Foods, Inc., a New Jersey corporation, Menu Foods Income Fund, a Canadian unincorporated open-ended trust, Doane Pet Care Enterprises, Inc., a Delaware corporation, Publix Super Markets, Inc., a Florida corporation, New Albertson's, Inc., a Delaware corporation, Albertson's LLC, a Delaware corporation, The Kroger Co. of Ohio, an Ohio corporation, Safeway Inc., a Delaware corporation, H.E. Butt Grocery Company, a Texas corporation, Meijer Inc., a Michigan corporation, Meijer Super Markets Inc., a Michigan corporation, Mars Petcare US, Inc., a Delaware corporation, The Stop & Shop Supermarket Co., a Delaware corporation,  Petco Animal Supplies Stores, Inc., a Delaware corporation, Pet

Supermarket, Inc., a Delaware corporation, Pet Supplies "Plus," a Michigan corporation, Pet Supplies Plus/USA Inc., a Michigan corporation, Petsmart, Inc., a Delaware corporation, Target Corp., a Minnesota corporation and Wal-Mart Stores, Inc., a Delaware corporation (hereinafter collectively referred to as the "Defendants") and allege as follows:

**PARTIES**

**Plaintiffs/Class Representatives**

2.      Plaintiff/Class Representative Blaszkowski is a resident of Michigan, who has three (3) cats of different ages.  Blaszkowski also had a fourth cat during the relevant time period of this action, now deceased. During the Class Period, Blaszkowski was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Michigan.  Blaszkowski has purchased various brands of commercial cat food over the lives of all of her cats that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

3.      Plaintiff/Class Representative Hollub is a resident of Florida, who has a dog and also had a cat during the relevant time period of this action, now deceased. Hollub purchased various brands of commercial dog and cat food over the lifespan of her cat and dog that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the Defendants. During the Class Period, Hollub was induced by the Defendants' representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in this District.   Plaintiff/Class Representative Davis is a resident of Florida, who has, or has had,

3

cats and dogs and has purchased various brands of commercial cat and dog food over the lives of her cats and dogs that are in the group of products that were manufactured, produced, distributed, advertised and sold by the Defendants during the Class Period.  During the Class Period, Davis Davis was induced by the Defendants' representations and marketing materials on the internet, on television, in print, in retail stores and on bags, pouches and cans to buy the Defendants' commercial pet food in Florida.

4.      Plaintiff/Class Representative Peters is a resident of Oklahoma, who has one dog and two cats of different ages. During the Class Period, Peters was induced by the Defendants' representations and marketing materials on the internet, on television, in print, in retail stores and on bags, pouches and cans to buy the Defendants' commercial pet food in Oklahoma.  Peters has purchased various brands of commercial cat and dog food over the lives of all of her cats and dogs that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

5.      Plaintiff/Class Representative Hock is a resident of California, who has one cat. During the Class Period, Hock was induced by the Defendants' representations and marketing materials on the internet, on television, in print, in retail stores and on bags, pouches and cans to buy the Defendants' commercial pet food in California. Hock has purchased various brands of commercial cat and dog food over the life of her cat that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the time period relevant to this lawsuit.

6.      Plaintiff/Class Representative Floyd is a resident of Texas, who has two (2) dogs of different ages. During the Class Period, Floyd was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of

purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Texas. Floyd has purchased various brands of commercial dog food over the lives of his dogs that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

7.      Plaintiff/Class Representative Wilson is a resident of Indiana, who has one cat. During the Class Period, Wilson was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Indiana. Wilson has purchased various brands of commercial cat food over the life of her cat that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

8.      Plaintiff/Class Representative Kotzampaltiris is a resident of Massachusetts, who has one dog. During the Class Period, Kotzampaltiris was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Massachusetts. Kotzampaltiris has purchased various brands of commercial dog food over the life of her dog that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

9.      Plaintiff/Class Representative Hopkins-Jones is a resident of Massachusetts, who has one cat. During the Class Period, Hopkins-Jones was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Massachusetts. Hopkins-Jones has purchased various brands of commercial cat food over the life

of her cat that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

10.    Plaintiff/Class Representative Piazza is a resident of New York, who has two (2) cats of different ages.  Piazza also had a third cat during the relevant time period of this action, now deceased. During the Class Period, Piazza was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in New York.  Piazza has purchased various brands of commercial cat food over the lives of all of her cats that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

11.    Plaintiff/Class Representative Lupo is a resident of Ohio, who has seven (7) cats of different ages. During the Class Period, Lupo was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Ohio. Lupo has purchased various brands of commercial cat food over the lives of all of her cats that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

12.    Plaintiff/Class Representative Herring a resident of South Carolina, who has two (2) dogs and ten (10) cats of different ages. During the Class Period, Herring was induced by the Defendants' representations and marketing materials on the internet, on television, in print, in retail stores and on bags, pouches and cans to buy the Defendants' commercial pet food in South Carolina.  Herring has purchased various brands of commercial cat and dog food over the lives

of all of her cats and dogs that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

13.     Plaintiff/Class Representative Murphy is a resident of Tennessee, who has two (2) dogs of different ages. During the Class Period, Murphy was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Tenessee.  Murphy has purchased various brands of commercial dog food over the lives of her dogs that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

14.     Plaintiff/Class Representative Stone a resident of Virginia, who has one dog and one cat of different ages. During the Class Period, Stone was induced by the Defendants' representations and marketing materials on the internet, on television, in print, in retail stores and on bags, pouches and cans to buy the Defendants' commercial pet food in Virginia. Stone has purchased various brands of commercial cat and dog food over the lives of her cat and dog that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

15.     Plaintiff/Class Representative Hanrahan is a resident of Washington, who had one dog. During the Class Period, Hanrahan was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Washington. Hanrahan purchased various brands of commercial dog food over the life of her dog that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

16.     Plaintiff/Class Representative Rice is a resident of Wisconsin, who has two (2) cats of different ages.   During the Class Period, Rice was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Wisconsin.   Rice has purchased various brands of commercial cat food over the lives of her cats that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

17.     Plaintiff/Class Representative Quinn is a resident of Nevada, who has three (3) cats of different ages.   During the Class Period, Quinn was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Nevada.   Quinn has purchased various brands of commercial cat food over the lives of all of her cats that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

18.     Plaintiff/Class Representative Mathiesen is a resident of Kansas, who has three (3) dogs of different ages. During the Class Period, Mathiesen was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Kansas.   Mathiesen has purchased various brands of commercial cat food over the lives of all of her dogs that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

19.     Plaintiff/Class Representative Shore is a resident of Arizona, who has one dog. Shore also had another dog during the relevant time period of this action, now deceased. During

the Class Period, Shore was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Arizona. Shore has purchased various brands of commercial cat food over the lives of all of her cats that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

20.     Plaintiff/Class Representative White is a resident of West Virginia, who has two (2) cats. Shore also had one dog during the relevant time period of this action, now deceased. During the Class Period, White was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in West Virginia. White has purchased various brands of commercial cat and dog food over the lives of her cats and dog that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

21.     Plaintiff/Class Representative Wiggins is a resident of Nebraska, who had one dog, now deceased. During the Class Period, Shore was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Nebraska. Wiggins has purchased various brands of commercial cat food over the life of her dog that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

22.     Plaintiff/Class Representative Lucarelli is a resident of Pennsylvania, who has five (five) dogs of different ages and four (4) cats of different ages. During the Class Period,

Lucarelli was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Pennsylvania. Lucarelli has purchased various brands of commercial dog and cat food over the lives of all of her pets that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

23.    Plaintiff/Class Representative Isern is a resident of Florida, who has one (1) dog. During the Class Period, Isern was induced by the Defendants representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Florida. Isern has purchased various brands of commercial dog food over the lives of his dog that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

24.    Plaintiff/Class Representative Valoras is a resident of Florida who has one cat. During the Class Period, Valoras was induced by the Defendants' representations and marketing materials on the internet, on television, in print, in retail stores at point of purchase and on bags, pouches and cans to buy the Defendants' commercial pet food in Florida. Valoras has purchased various brands of commercial cat food over the life of her cat that are in the group of products that were manufactured, marketed, produced, distributed, advertised and sold by the various Defendants during the Class Period.

## DEFENDANTS

## Defendant Manufacturers

25.     Defendant, Mars, Inc. is a Delaware corporation with its principal place of business in Virginia and Defendant Mars Petcare U.S. Inc., is a Delaware corporation with its principal place of business in Tennessee (collectively "Mars"). As of 2005, Mars had 25.2% of the market share of the global pet food market with over $10,000,000,000 in retail sales. Exhibit "1" at p. 2. Mars is in the business of manufacturing, producing, and/or selling dog and cat food under various brands or labels, including, but not limited to, Pedigree®, Cesar®, Sheba®, The Goodlife Recipe® and Royal Canin, to be purchased by the Plaintiffs/Class Representatives and the Class in this District and nationwide. Mars has spent millions of dollars in obtaining by acquisition and/or promoting a sense of trust and confidence on behalf of the consumer in its commercial pet food products with the intent that consumers will rely upon this trust and confidence to purchase Mars' pet food brands ("Whether it's the simple pleasure of savouring the world's best-loved chocolate and confectionery, the satisfaction of a drink delivered efficiently from a vending machine, *a contented pet* or the reward of a delicious hot meal, *Mars is the name behind the brands they've grown to know and trust*."). Exhibit "2" Mars' knowingly and intentionally conducts market research and uses same to market and advertise its commercial pet food products to induce consumers to purchase its products.

26.     Defendant, Procter & Gamble Co., is an Ohio corporation with its principal place of business in Ohio and Defendant, Iams Company, is an Ohio corporation with its principal place of business in Dayton, Ohio (collectively "Procter and Gamble") As of 2005, Procter & Gamble had 6.9% of the market share of the global pet food market with almost $3,000,000,000 in retail sales. Exhibit "1" at p. 2. Procter & Gamble is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food under various labels, including but not limited to, Iams® and Eukanuba®, to be purchased by the Plaintiffs/Class Representatives

and the Class in this District and nationwide. Procter & Gamble has spent millions of dollars in obtaining by acquisition and/or promoting a sense of trust and confidence on behalf of the consumer in its commercial pet food products with the intent that consumers will rely upon this trust and confidence to purchase Procter & Gamble's pet food brands.  Procter & Gamble knowingly and intentionally conducts market research and uses same to market and advertise its commercial pet food products to induce consumers to purchase its products.

27.    Defendant, Colgate Palmolive Company, is a Delaware corporation with its principal place of business in New York and Defendant, Hill's Pet Nutrition, Inc., is a Delaware Corporation with its principal place of business in Kansas (collectively "Colgate"). As of 2005, Colgate had 6.2% of the market share of the global pet food market with over $2,500,000,000 in retail sales. Exhibit "7" at pp. 2-3. Colgate is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food under various brands or labels, including, but not limited to, Science Diet® and Prescription Diet®, to be purchased by the Plaintiffs/Class Representatives and the Class in this District and Nationwide. Colgate has spent millions of dollars in obtaining by acquisition and/or promoting a sense of trust and confidence on behalf of the consumer in its commercial pet food products with the intent that consumers will rely upon this trust and confidence to purchase Colgate pet food brands.  Colgate knowingly and intentionally conducts market research and uses same to market and advertise its commercial pet food products to induce consumers to purchase its products.

28.    Defendant, Del Monte Foods Co. ("Del Monte"), is a Delaware corporation with its principal place of business in California. As of 2005, Colgate had 3.5% of the market share of the global pet food market with almost $1,500,000,000 in retail sales. Exhibit "1" at pp. 2-3.  Del Monte is in the business of manufacturing, producing, marketing, distributing, advertising and/or

selling dog and cat food under various brands or labels, including, but not limited to, 9 Lives®, Amore®, Gravy Train®, Kibbles-n-Bits® and Nature's Recipe®, Snausages®, Milk Bone®, Pup-Peroni®, Meaty Bone®, Canine's Carry Outs®, Jerky Treats® and Wagwells®, to be purchased by the Plaintiffs/Class Representatives and the Class in this District and nationwide. Del Monte has spent millions of dollars in obtaining by acquisition and/or promoting a sense of trust and confidence on behalf of the consumer in its commercial pet food products with the intent that consumers will rely upon this trust and confidence to purchase Del Monte pet food brands. Del Monte knowingly and intentionally conducts market research and uses same to market and advertise its commercial pet food products to induce consumers to purchase its products.

29. Defendant, Nestlé U.S.A. Inc. ("Nestlé") is a Connecticut corporation with its principal place of business in California and Defendant, Nestle Purina Petcare Co., is a Missouri corporation with its principal place of business in Missouri (collectively "Nestlé"). As of 2005, Nestlé had 23.7% of the market share of the global pet food market with almost $10,000,000,000 in retail sales. Exhibit "1." at p. 2. Nestle is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food under various brands or labels, including, but not limited to, Alpo®, Beneful®, Beggin' Strips®, Dog, Cat, Puppy and Kitten Chow®, Fancy Feast®, Friskies®, Mighty Dog®, Deli-Cat®, Pro Plan®, and Purina One®, to be purchased by the Plaintiffs/Class Representatives and the Class in this District and nationwide. Nestlé has spent millions of dollars in obtaining by acquisition and/or promoting a sense of trust and confidence on behalf of the consumer in its commercial pet food products with the intent that consumers will rely upon this trust and confidence to purchase Nestlé pet food brands. Nestlé knowingly and intentionally conducts market research and uses same to market and advertise its commercial pet food products to induce consumers to purchase its products.

30.     Defendant, Nutro Products, Inc.[1] ("Nutro") is a California corporation with its principal place of business in California. As of 2005, Nutro had 1.3% of the market share of the global pet food market with almost $500,000,000 in retail sales. Exhibit "1." at pp. 2, 4. Nutro is in the business of manufacturing, producing, marketing, distributing, advertising, and/or selling dog or cat food under various brands or labels, including but not limited to, Natural Choice® Dog and Cat Products, Max® Dog Products, Max® Cat Gourmet Classics, Natural Choice® Complete Care® for cats, Ultra™ Products for dogs, to be purchased by the Plaintiffs/Class Representatives and the Class in this District and nationwide. Nutro has spent millions of dollars in obtaining relationships with the Defendant Pet Specialty Retailers and/or promoting a sense of trust and confidence on behalf of the consumer in its commercial pet food products with the intent that consumers will rely upon this trust and confidence to purchase Nutro pet food brands. Nutro knowingly and intentionally conducts market research and uses same to market and advertise its commercial pet food products to induce consumers to purchase its products.

31.     Based upon 2005 results, Defendants Mars and Nestle and a combined 48.9% of the _global_ market share of the pet food industry.

### Defendant Co-Packers

32.     Defendant Menu Foods, Inc. is a New Jersey corporation with its principal place of business in the state of New Jersey.

33.     Defendant Menu Foods Inc. is ultimately owned or controlled by Defendant Menu Foods Income Fund, an unincorporated open-ended trust with its principal place of business in the Province of Ontario, Canada. Some of the Defendant Menu Foods, Inc.'s high managerial officers or agents are also high managerial officers and agents of Defendant Menu Foods Income

---

[1] On May 1, 2007, Nutro announced that Mars will acquire Nutro. See Exhibit "3".

Fund.  Defendant Menu Foods, Inc., and Defendant Menu Foods Income Fund are collectively referred to as "Menu Foods."

34.    The Menu Foods Defendants are in the business of manufacturing, producing, and/or selling dog and cat food under various brands or labels, and/or for third party firms, including, but not limited to, Americas Choice Preferred Pets, Authority, Award, Best Choice, Big Bet, Big Red, Cadillac, Companion, Compliments, Demoulus Market Basket, Eukanuba, Fine Feline Cat, Food Lion, Food Town, Giant Companion, Hannaford, Hill Country Fare, Hy-Vee, Iams, J.E. Mondou, Laura Lynn, Li'l Red, Loving Meals, Medi-Cal,  Meijer's Main Choice, Mighty Dog Pouch, Mixables, Natural Life, Nutriplan, Nutro Max, Nutro Max Gourmet Classics, Nutro Natural Choice, Ol' Roy, Paws, Pet Essentials, Pet Pride, President's Choice, Price Chopper, Priority US, Publix,   Roche Brothers, Save-a-Lot Special Blend, Schnucks, Science Diet Feline Savory Cuts Cans, Sophistacat, Special Kitty, Springfield Prize, Sprout, Stop and Shop Companion, Tops Companion, Wegmans, Weis Total Pet, Western family US, White Rose, Winn Dixie, and Your Pet.

35.    The Menu Foods Defendants manufacture pet food for many North American retailers, including but not limited to, Defendant Wal-Mart Stores, Inc.'s Ol' Roy and Special Kitty brands.

36.    Defendant Menu Foods is also a contract manufacturer of the Iams® and Eukanuba® brand pet food products for Defendant Procter & Gamble.

37.    Defendant, Doane Petcare Enterprises, Inc. ("Doane"), is a Delaware corporation with its principal place of business in the State of Tennessee. As of 2005, Doane was the second largest manufacturer of dry pet food in the United States.  Exhibit "4.", at p. 1.  Doane is in the business of manufacturing, producing, and/or selling dog and cat food under various brands or

labels, and/or for third party firms, including, but not limited to, Albertson's store brand, Bi-Lo store brand, Bruno's store brand, Food Lion store brand, Trail Blazer Dog Foods, Kozy Kitten, Ol' Roy, Safeway store brand, Wal-Mart store brand and Kroger store brand. Doane manufactures pet food for many North American retailers, including but not limited to, Defendants Wal-Mart, Albertson's and Kroger. Doane also claims to manufacture dry pet food for "four of the six largest national branded pet food companies through co-manufacturing agreements." Exhibit "5." at p. 1.

### Defendant Retailers

38.    Defendant, Target Corp., is a Minnesota corporation with its principal place of business in Minnesota. Target is in the business of manufacturing, marketing, producing, distributing, advertising and/or selling its private label brands of pet food including, but not limited to, LIFELong™.   Target markets and sells its own brands and the Defendant Manufacturer's brands of commercial pet food on the internet and in its retail stores in Florida and nationwide. Target makes its own representations for its own profit and gain and adopts the marketing representations of the Defendant Manufacturers' by placing point of purchase advertising at or near the Defendant Manufacturers' pet food and treats in its retail stores. See Composite Exhibit "6."  Target also markets and advertises its private label commercial pet food products with the intent to induce consumers to purchase its products.

39.    Defendant, Wal-Mart Stores Inc. ("Wal-Mart"), is a Delaware corporation with its principal place of business in Arkansas. Wal-Mart is in the business of manufacturing, producing, distributing, advertising and/or selling its private label brands of pet food, including, but not limited to, Ol' Roy and Special Kitty.  Wal-Mart markets and sells its own brands and the

Defendant Manufacturers' brands of commercial pet food in its retail stores in Florida and nationwide. Wal-Mart adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers' pet food and treats in its retail stores. Wal-Mart markets and advertises its commercial pet food products with the intent to induce consumers to purchase its products.

40.     Defendant, Publix Supermarkets, Inc. ("Publix"), is a Florida corporation with its principal place of business in Florida. Publix is in the business of manufacturing, producing, distributing, advertising and/or selling its private label brands of pet food as well as distributing, advertising and/or selling the Defendant Manufacturers' pet food products. Publix markets and sells its private label brands and the Defendant Manufacturers' brands of commercial pet food in its grocery stores in Florida and other states. Publix adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores. Publix markets and advertises its commercial pet food products with the intent to induce consumers to purchase its products.

41.     Defendant, Albertson's LLC, is a Delaware corporation with its principal place of business in Boise, Idaho and Defendant, New Albertsons Inc., is a Delaware Corporation with its principal place of business in Boise, Idaho (collectively "Albertson's"). Albertson's is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendants' pet food products. Albertson's markets and sells its own brands and the other Defendants' brands of commercial pet food at issue in its grocery stores in Florida and other states. Albertson's adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or

near the Defendant Manufacturers pet food in its retail stores. Albertson's markets and advertises its commercial pet food products with the intent to induce consumers to purchase its products.

42.     Defendant, The Kroger Co. of Ohio  ("Kroger"), is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Kroger is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendants' pet food products.  Kroger markets and sells its own brands and the other Defendants' brands of commercial pet food at issue in its grocery stores in Michigan and other states. Kroger adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores. See e.g., Composite Exhibit "7."  Kroger markets and advertises its commercial pet food products with the intent to induce consumers to purchase its products.

43.     Defendant, Safeway Inc. ("Safeway"), is a Delaware corporation with its principal place of business in Pleasanton, California. Safeway is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendants' pet food products.  Safeway markets and sells its own brands and the other Defendants' brands of commercial pet food at issue in its grocery stores in California and other states. Safeway adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores. Safeway markets and advertises its commercial pet food products with the intent to induce consumers to purchase its products.

44.     Defendant, H.E. Butt Grocery Company ("HEB"), is a Texas corporation with its principal place of business in San Antonio, Texas. HEB is in the business of distributing,

advertising and/or selling Defendant Manufacturers' pet food products in its grocery stores in Texas and other states. HEB adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores. HEB markets and advertises the Defendant Manufacturers' commercial pet food products with the intent to induce consumers to purchase its products.

45.    Defendant, Meijer Inc., is a Michigan corporation with its principal place of business in Grand Rapids, Michigan and Defendant Meijer Supermarkets, Inc., is a Michigan corporation with its principal place of business in Grand Rapids, Michigan ("collectively "Meijer"). Meijer is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendants' pet food products. Meijer markets and sells the Defendant Manufacturers' brands of commercial pet food in its grocery stores in Michigan and other states. Meijer adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores. Meijer markets and advertises its commercial pet food products with the intent to induce consumers to purchase its products.

46.    Defendant, The Stop & Shop Supermarket Company ("Stop 'N Shop"), is an Delaware corporation with its principal place of business in Braintree, Massachusetts. Stop 'N Shop is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendants' pet food products.  Stop 'N Shop markets and sells its own brands and the other Defendants' brands of commercial pet food at issue in its grocery stores in Massachusetts and other states. Stop 'N Shop adopts the marketing representations of the Defendant Manufacturers by placing point of

purchase advertising at or near the Defendant Manufacturers pet food in its retail stores. Stop 'N Shop markets and advertises its commercial pet food products with the intent to induce consumers to purchase its products.

**Defendant Pet Specialty Retailers**

47.    Defendant, Petsmart, Inc. ("Petsmart"), is a Delaware corporation with its principal place of business in Arizona. Petsmart is in the business of marketing, advertising, distributing, selling and making recommendations to consumers regarding the Defendant Manufacturers' dog and/or cat food. Petsmart makes its own marketing representations and adopts the marketing representations of the Defendant Manufacturers' both on the internet and by placing point of purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores in Florida and other states. *See* Composite Exhibit "8."  Petsmart makes its own marketing representations to consumers and markets, sells and makes recommendations to consumers regarding the Defendant Manufacturers' and its own  private label commercial pet food on the internet through its Smart Nutrition Selector™  and elsewhere on its website where it offers the Defendant manufacturers' and its own pet food.  Petsmart also makes its own marketing representations to consumers and markets, sells and makes recommendations to consumers regarding the Defendant Manufacturers' and its own  private label commercial pet food in its retail stores in Florida and nationwide. Petsmart markets and advertises the Defendants' commercial pet food products with the intent to induce consumers to purchase these products. Petsmart also manufactures, markets, sells and distributes its own brand of commercial pet food – Authority.  Exhibit "9.".

48.    Defendant, Pet Supermarket, Inc. ("Pet Supermarket"), is a Delaware corporation with its principal place of business in Florida and other states. Pet Supermarket is in the business

of advertising, distributing, marketing, selling and making recommendations to consumers regarding dog and/or cat food. Pet Supermarket adopts the marketing representations of the Defendant Manufacturers' by placing point of purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores. Pet Supermarket markets, sells and makes recommendations to consumers regarding the Defendants' commercial pet food in its retail stores in Florida and in other states. Petsupermarket markets and advertises the Defendants' Manufactureres' commercial pet food products with the intent to induce consumers to purchase these products.

49.    Defendant, Petco Animal Supplies, Inc. ("Petco"), is a Delaware corporation with its principal place of business in Arkansas. Petco is in the business of advertising, distributing, selling and making recommendations to consumers regarding the Defendant manufactureres' dog and/or cat food. Petco markets, sells and makes recommendations to consumers regarding the commercial pet food in its retail stores in Florida and other states. Petco makes its own marketing representations and adopts the marketing representations of the Defendant Manufacturers' by placing the Defendant Manufacturers' and its own point of purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores. See Composite Exhibit "10." Petco markets and advertises the Defendant Manufactuers' commercial pet food products with the intent to induce consumers to purchase these products.

50.    Defendant, Pet Supplies "Plus" ("Pet Supplies Plus"), is a Michigan corporation with its principal place of business in Michigan. Pet Supplies is in the business of advertising, distributing, selling and making recommendations to consumers regarding dog and/or cat food. Pet Supplies Plus markets, sells and make recommendations to consumers regarding the commercial pet food at issue in its retail stores in Florida and other states. Pet Supplies Plus

adopts the marketing representations of the Defendant Manufacturers' by placing point of purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores. Pet Supplies Plus markets and advertises the Defendant Manufacturers' commercial pet food products with the intent to induce consumers to purchase these products.

## JURISDICTION AND VENUE

51.     This Court has diversity jurisdiction over the subject matter of this Amended Complaint pursuant to 28 U.S.C. §1332, as amended by the Class Action Fairness Act.  The matter in controversy between the Class and the Defendants exceeds $5,000,000, and at least one of the Plaintiffs/Class representatives and many Class members are citizens of a State different than the Defendants.  This court has also has jurisdiction over supplemental law claims pursuant to 28 U.S.C. §1367.

52.     Venue is proper in this Court and judicial district pursuant to 28 U.S.C. §1391 and/or the Class Action Fairness Act because the Defendants have systematically manufactured for sale, marketed, advertised and sold commercial pet food in this District.  A substantial part of the events or omissions giving rise to the claim occurred in this district. Moreover, the conduct that is the subject of the lawsuit occurred in this District.

## FACTS GIVING RISE TO THE CLAIMS

53.     Manufacturing, producing, marketing, selling, and distributing pet food is a $16,000,000,000 a year industry in the United States alone. *See* American Pet Products Manufacturers Association Industry Trends & Statistics attached hereto as Exhibit "11."  The majority of the 163,000,000 companion cats and dogs in the United States derive most or all of whatever nutritional content they can obtain from the Defendants' various brands of commercial pet food. *See* Humane Society of the U.S. Ownership Statistics attached hereto as Exhibit "12."

54.     The Defendants' marketing leads consumers to believe that their pet food has choice chunks of chicken and beef, fresh fish, whole stalks of grains, other human-quality food ingredients and all of the other nutrients that a cat or dog needs to lead a healthy and happy life. Moreover, the marketing also leads consumers to believe that the Defendants' cat and dog food has health, medical, hygienic and other benefits which are not adequately supported by scientific data.   The Defendant Manufacturers have spent millions of dollars over the years to build a relationship of trust and confidence with consumers concerning their respective brands and consequently intend that consumers rely on these representations believing them to be scientifically supported. This relationship of trust and confidence is fostered by the Retailers and Pet Specialty Retailers, on which the Defendant Manufacturers have spent considerable time and effort in cultivating mutually profitable relationships to market, advertise and sell their cat and dog food to trusting consumers.   The Defendant Retailers and Pet Specialty Retailers not only adopt the point of purchase marketing of the Defendant Manufacturers, but also market and advertise the Defendant Manufacturers' cat and dog food through their own marketing programs and incentives and make recommendations to consumers both in stores and on the internet regarding the ingredients, quality and nutritional content, health and other benefits, of the Defendant Manufacturers' and Petsmart's private label pet food.

55.     The Defendant Manufacturers', Retailers and Pet Specialty Retailers' marketing materials actively encourage consumers to purchase _only_ commercial pet food and represent that a given brand is sufficient to satisfy all of a cat or dog's nutritional needs throughout the cat or dog's life time. Moreover, the Defendant Manufacturers', Retailers' and Pet Specialty Retailers' marketing actively encourage consumers to buy "premium" pet food by representing that the

expenditure of additional monies for "premium" pet foods provides nutritional, health, medical, hygienic and other benefits that non-premium pet foods do not have.

56.     Mars through its Royal Canin brand markets, manufactures, produces, advertises, distributes and sells breed specific and age specific pet food by making numerous claims of benefits relating to feeding dogs and cats this type of pet food with little to no scientific support for breed specific benefits and Retailers and Pet Specialty retailers adopt these claims for their own profit and gain. The Defendant Manufacturers and Pet Specialty retailers also specifically discourage consumers from feeding their cats and dogs any food other than the Defendant Manufacturers' commercial pet food, claiming that cats and dogs will not receive the nutrients that they need and/or other benefits necessary for the health and well being of dogs and cats.

57.     Based upon the Defendant Manufacturers', Retailers and Pet Specialty Retailers' extensive and expensive marketing, the Plaintiff/Class Representatives, like the Class, believe that when they purchase the Defendant Manufacturers' or any of the Retailers'/Petsmart private label brands from the Defendant Retailers and Pet Specialty Stores, they are buying "quality" and "premium" pet food with all of the nutrients and other claimed "benefits" needed to keep their companion dogs and/or cats well fed, happy and healthy.  However, the Defendant Manufacturers' and Petsmart's pet food is far from the type of "quality" and beneficial product that the Defendants lead consumers to believe. The Defendant Manufacturers', Retailers and Pet Specialty Retailers have made consumers _believe_ that claims relating to content, health, medical, hygienic, hairball, dietetic, breed and age specific benefits are accurate and are based upon _valid_ scientific studies proving same because the Defendant Manufacturers' hold themselves out as experts on dog and cat food nutrition and make substantial representations about the pet food's content, medicinal and other benefits.

58.     Moreover, consumers who have purchased prescription diets from Defendants Colgate, Nestlé and Procter & Gamble for medical and other reasons have been lead to believe that these brands of pet food are "super-premium" specialty foods and have been willing to spend more money believing that their cats and dogs were receiving medical and health-related benefits based upon the consumer's trust of these brands and the marketing representations when these foods are largely untested in any meaningful way, unhealthy for consumption by cats and dogs and either fail to provide the promised benefit or cause other health problems.  For example, dry food diets packed with carbohydrates purport to treat urinary and kidney problems may assist with deterring the formation of some crystals, but actually promote the formation of other crystals or stones.

59.     Consumers who purchase "light" or diet cat and dog food believe that they are buying pet food that provides a health benefit, when in fact this pet food still largely consists of carbohydrates and other fillers that cause obesity, allergies and other known health problems.

60.     The approximate $58,000,000,000 spent by consumers on pet food over the last four years has been without the knowledge that the "quality," "prescription," "premium" or "gourmet" food that they are feeding their companion animals was made wholly or partially of inedible garbage unfit for human consumption, including, but not limited to, restaurant grease, roadkill, hair, blood, pus, esophagi, chicken heads, feet and intestines, cow brains, excrement, fetal tissue, moldy grains, hulls, styrofoam packaging from discarded supermarket meat, euthanized animals, including cats and dogs, and/or diseased, dying, disabled and dead animals.

### The Defendants' deliberate "Humanization" of Pet Food to Obtain Greater Market Share and even more Staggering Profits

61.     The $16,000,000,000 a year pet food industry spends over $300,000,000 in advertising each year targeted at the consumer to increase sales and boost profits. Exhibits "11."

and "12." *See also* Packaged Facts, *Pet Food in the U.S.: Riding the Premium Wave,* attached hereto as Exhibit "13."

62.     The Defendants are well aware that the Plaintiff/Class Representatives and the Class have formed deep attachments to their companion cats and dogs and think of them not just as an "animal" or a "pet," but as family members. Exhibit "14." *See also* American Pet Association website attached hereto as Exhibit "D." The Defendant Manufacturers, Retailers and Pet Specialty Retailers conduct market research to further promote these feelings and to induce consumers to purchase premium, prescription, breed specific, age specific, "light" food, among others, to gain a purported benefit for consumers' cats and/or dogs, because the Defendants exploit these feelings, without regard to the actual or scientific veracity, to increase their profits. "More than half of American dog owners are more attached to their pets than to at least one other human being," including best friends, children and spouses. Exhibit "14."  Moreover, 39% of Americans display their cat or dog's picture in their home. Exhibit "14." 16% of Americans have a picture of their dog or cat in their wallet or purse. Exhibit "14."  Americans celebrate their companion dogs and cats birthdays and give them Christmas presents. Exhibit "14." Americans do not treat companion dogs and cats like a member of the family, their dogs and cats are family.

63.     Companion pet lovers are passionate about their cats and dogs and want to ensure that they eat well to prolong their life span and will go to any expense if they are lead to believe that a certain pet food promotes a nutritional, medical, dental or other benefit to a much loved cat or dog.  The pet food industry is well aware of this and deliberately and intentionally capitalizes on these emotional bonds through "humanization":

> The depth of response [to the massive 2007 Menu Foods pet food recall] may baffle the petless but comes as no surprise to industry insiders, who identify **"humanization" as a principal feature of the sector. Many owners think of their pets as children—childless consumers accounted for 60% of pet-related**

**expenditure in America in 2005—and treat them more like people than animals**. Trends in human food are quickly replicated in pet products, says Bob Vetere, president of the American Pet Products Manufacturers Association.

*See* The Economist, *A Dog's Dinner*, March 21, 2007 attached hereto as Exhibit "15."

64.    The Defendants sell billions of dollars of commercial pet food to consumers who believe that they are feeding a balanced, healthy, human-like diet to their companion cats and dogs that the Defendants *know* are loved by consumers like children.

The U.S. pet food market is experiencing healthy growth as **_marketers continue to convert pet owners_ to better quality, _higher priced_, more upscale fare**. Premium pet foods cover all bases—natural/organic, fortified/functional, weight control, lifestage, breed-/size-specific, gourmet, etc.—**_and are increasingly being positioned not just as human style but as human grade_**. As a result, much of the growth is occurring at the upper-income tier of the pet owner spectrum, with U.S. households earning $70,000 or more now accounting for an impressive 44% of the aggregate pet food expenditure—up from just 15% in 1994.

Top marketers including Nestlé Purina, Mars, Iams, Hill's, Nutro, and S&M NuTec **clearly have their fingers on the emotional pulse of American pet owners, as well as some very big advertising guns**. During 2005, **_they spent nearly $300 million on national advertising for pet food, virtually all of it encouraging the deep attachment Americans feel for their pets,_** while also launching the biggest surge of new products in the history of the market.

Exhibit "13." This "humanization" is deceiving and the consumer is the victim:

… **"cuts and gravy", [is] designed to mimic the food people eat** (wheat gluten, the probable source of the contamination [of the major 2007 Menu Foods recall], is used to thicken the gravy). **Health foods are fast spreading from dinner tables to doggie bowls**: Wal-Mart and Target, America's two biggest retailers, both introduced **natural** pet-food lines last year.

Exhibit "15." The attempt to liken these pet foods to human-like quality does not end at appearance. The Defendant Manufacturers' also market their pet food with alleged health, medicinal and other benefits in much the same way that medicinal or other benefits are marketed to the consumer directly for human consumption.  For example, glucosamine is marketed as providing a benefit to human joints and it is also marketed in pet food without sufficient research

studies to demonstrate a benefit to a cat or dog. Likewise, the Defendant Manufacturers' are marketing Omega-3 fatty acids without adequate scientific back-up to support claims that cats and dogs derive a benefit from consuming it. While the Defendants manufacture, distribute, market, advertise and sell these commercial pet foods as "complete," wholesome, "human-like," medical and "nutritional" diets with other benefits to prey upon the emotional bonds that consumers have for their companion dogs and cats, the matter contained in bags, pouches and cans is instead wholly or partially the product of recycling the inedible garbage of the human food industry.

### The Defendants' Marketing of Commercial
### Pet Food Misleads Consumers

65.     The Defendant Manufacturers', Retailers' private label and PetSmart's Authority pet food that the Plaintiffs/Class Representatives and the Class purchase on the internet and in the Defendant Retailer and Pet Specialty retailers' stores and/or other retail stores and/or veterinarian offices generally states somewhere on the label "complete and balanced nutrition," "perfect," natural," "veterinarian recommended," and "guaranteed," among many other positive inducements to buy the pet food. The intent is to make the consumer feel good about purchasing "prescription," "veterinarian recommended," "premium" and/or "quality" food for their companion cat or dog with age, breed, health, medical, dietetic and/or other claimed benefits. The average consumer has no knowledge of the nutritional requirements of cat or dog food and therefore consumers rely upon the Defendants' marketing representations and the recommendations of veterinarians. Moreover, the average consumer is generally unaware of what additives and other chemicals could be harmful to their cats and dogs and believe the Defendants Manufacturers', Retailers and Pet Specialty Retailers when these companies make

factually inaccurate, unsupported, misleading and/or false  representations about the quality, content, nutritional, medical, health and other benefits of  the Defendants' pet food brands and products.

66.    Commercials showing healthy, vibrant cats and dogs enjoying "the good life," choice chunks of fresh meats and wholesome stalks of grains and fresh vegetables on bags, cans and pouches induce consumers to buy the Defendant Manufacturers', Retailers and Petsmart's private label pet food and to believe that these products contain human quality food products and nutritional, health and other benefits. These same photos are on websites where, for example, Nestlé makes representations such as "Give your dog the _perfect_ balance of _high quality nutrition_…" _See_ Beneful® website page attached hereto as Exhibit "16."

67.    The Defendants' pet foods, such as "Beneful®," "Natural Choice®," "Eukanuba Veterinary Diet," "Purina Veterinary Diets®," "Science Diet®," "Prescription Diet®," among many others, are intentionally named to lead consumers to believe that they are wholesome, nutritional, natural, are healthy and/or provide health, medical, dental and other benefits to cats and dogs.

68.    Consumers buy the Defendants' commercial cat and/or dog food because of the Defendants' nutritional guarantees, because it is advertised as "complete," "balanced" and purportedly has human-like health benefits and because it is intentionally made to look like human quality food when advertised, sold, distributed and/or placed into the stream of commerce to induce consumers to purchase it.

69.    The bags, pouches and cans of the Defendants' commercial pet food make many strong representations to the consumer.  For example, the bag of Colgate Palmolive's Science Diet® adult chicken & rice recipe dog food states "**Superior Nutrition** FOR LIFELONG HEALTH™",

followed by claims that this dog food promotes, "Strong Immune System," "Healthy Bones and Muscles," "Strong Clean Teeth & Fresh Breath," Healthy Skin & Radiant Coat," "Overall Health and Vitality" and that it is "Easy to Digest."   The bag also states "Total Nutrition Helps Your Dog Stay Healthy and Live Long."  In fact, there are so many representations on one bag of this one Science Diet® type of dog food, they cannot all be set forth here. The average consumer is thus bombarded with representations on all cat and/or dog food containers that are intended to have consumers rely upon the Defendants' representations to induce them into buying their pet food.

70.    The Defendants' "humanization" marketing technique is evident in all of the commercials and other marketing media for commercial pet food and makes consumers want to buy this allegedly wholesome, healthy and medicinal food for their cats and dogs so that their dogs and cats will be happy, healthy and lead long lives.



**Mars' "Good Life Recipe"™**

71.    Mars knows that consumers have grown to trust the company as a manufacturer of food and pet care products and fosters that trust with consumers. The Mars, Inc. website acknowledges this: "Mars is the name behind the brands [consumers have] grown to know and trust."

Exhibit "2."

72.    An example of the manner in which Mars misleads consumers as to only one of its products is the "Good Life Recipe"™ brand. The "Good Life Recipe"™ is a recently launched commercial pet food. The "humanization" of this brand is patent in every aspect of this commercial pet food's marketing and is intended to capitalize on the emotional bond between

consumers and their cats and dogs by falsely and/or negligently representing what the consumer

is purchasing for the companion animal:

### Good food inspired by pet-loving people like you.

We don't believe people are pet owners. People own TVs, cars and vacation homes. But they don't own pets. They have a relationship with their pets. <u>They enjoy bonds that are sometimes stronger than family. So it's not surprising that people want to provide their pets with the healthiest and best tasting food.</u> That's where The Goodlife Recipe™ pet food comes in. We use the <u>best ingredients</u> in the <u>right balance</u> to create great food and snacks for cats and dogs. <u>Because we believe, pets that eat well are pets that live well. And when your pet is living well, you're living well</u>.

*See* the Goodlife Recipe™ "Our Mission" web page attached hereto as Exhibit "17." The "Good

Life Recipe"™ website further states:

### A healthy, balanced diet your four-legged friends will love!.

Every bag of The Goodlife Recipe™ food for cats or dogs is a <u>perfect blend of six tasty ingredient groups like real chicken, beef or salmon, healthy vegetables and hearty whole grains - created with our nutritionally balanced "pet food pyramid" as a guide.</u> It's our way of giving your pets all the enjoyable taste and <u>essential nutrients</u> they need without any of the artificial additives they don't. And who wouldn't love that?

*See* the "Goodlife Recipe™" "What's Inside" website page attached hereto as Exhibit "18." This

commercial pet food is designed to appeal to consumers' understanding of the human food

pyramid and to lead people to believe that they are purchasing quality food for their special

companion cats and dogs that is nutritionally complete and primarily made of human quality

food items such as "real" meat, fish, wholesome grains and vegetables.

73.     The wildly popular "Good Life"™ commercials show beautiful dogs with Frank

Sinatra or Jewel singing in the background.[2] While the commercial is showing large chunks of

meat with carrots and green vegetables, an announcer states, "Six key ingredients for the tastes

---

[2] *See* http://www.youtube.com/watch?v=QMnUU2Zh9hE.

that dogs crave without the artificial additives they don't."[3] On the website, the six key ingredients are listed as tomatoes, garden peas and spinach, "real natural chicken, beef or salmon," "healthy carrots" and "natural whole grain brown rice packed with vitamins" and pictures of same. Exhibit "18" (can be seen by pressing "Rollover to see what's inside").

### Mars' Pedigree®

74.     The name "Pedigree"®, another of Defendant Mars' brands, implies a food fit for an expensive pure bred companion dog. This is reinforced by the claims on the website:

> Help your dog be the <u>best he can be</u> with PEDIGREE® Dry Food.

> Not only does PEDIGREE® Brand Dry Food For Dogs provide your dog with a <u>balanced diet of vitamins, minerals, essential fatty acids, fiber and protein</u>, it's a delicious <u>foundation to your dog's overall diet</u>. It's also helpful in <u>preventing the accumulation of dental tartar and plaque</u>. And dry food has the added benefit of being very convenient for you.

*See* Pedigree™ website "Dry Products" attached hereto as Exhibit "19." The website leads consumers to believe that their companion dogs are eating healthy nuggets of chicken, rice and vegetables:

> New, improved PEDIGREE WITH CHICKEN, RICE & VEGETABLES™ Food For Dogs (formerly PEDIGREE COMPLETE NUTRITION® Meaty Chunks With Rice & Vegetables) offers a way for dogs to get the **<u>healthy benefits of real vegetables and real chicken</u>** in **<u>a tasty balanced meal owners can feel good about feeding every day</u>**. It's made up of five different components to offer a variety of flavors and textures that dogs love.

- PEDIGREE WITH CHICKEN, RICE & VEGETABLES™ Food For Dogs now contains a new and improved patented PEDIGREE HEALTHY NUGGETS™ with **<u>Meaty Centers kibble</u>**. Improvements include a golden yellow shell, 25% <u>more cream fill and meaty center</u>.
- **<u>Made with real chicken, a high quality protein source</u>**
- **<u>Made with healthy real vegetables that dogs love</u>**

---

[3] *Id.*

- Higher guaranteed levels of protein than BENEFUL® Original (Based on guaranteed analysis: PEDIGREE WITH CHICKEN RICE & VEGETABLES™: 26% protein, BENEFUL® Original: 25% protein)
- Nutritionally complete and balanced for both puppies and adult dogs
- Contains patented HEALTHY NUGGETS™ pocket kibbles that have a dual texture- crispy outside with a soft, creamy inner
- Contains the Advanced Antioxidant Recipe with guaranteed levels of vitamins E & C
- <u>Highly digestible ingredients so nutrients are easily absorbed</u>
- Improved taste that dogs love
- Select sizes available with the SLIDE RITE® Zipper for easy opening and resealing between feedings
- <u>No artificial flavors or fillers</u>

*See* Pedigree™ website "Dry Nutrition for Adult Dogs" attached hereto as Exhibit "20."

**Mars' False, Misleading and/or Negligent Marketing of its Pet Food**

75.    Mars, like other defendant Manufacturers, offers pet food with a number of claims ranging from hairball and tartar control to medicinal and other benefits.  Moreover, Mars deceptively markets its dry food as good for cats despite the lack of  scientific support that dry food is beneficial to an obligate carnivore such as a cat  who has a low thirst drive.  There is equally little support that dry food is beneficial to dogs because it contains ingredients that cause allergies, bloating and gastric upset.  Mars touts its pet food as "healthy" but it is basically corn and other carbohydrate fillers.  See examples of Mars' false, deceptive and or negligent marketing attached hereto as Exhibit "12.", which contain claims for health, breed, age specific and light diets all of which contain representations about the benefits of these pet foods without sufficient support to make these claims.  Moreover, given the predominance of processed carbohydrates, allergenic substances, low grade proteins and known and unknown ingredients and additives with detrimental effects on the health of the dog and cat, the representations that Mars makes are unsupported contrary to what the consumer is lead to believe.

**Procter & Gamble's Iams™**

76.     An example of the manner in which Procter & Gamble misleads is its Iams™ brand. Under the heading **"Friends Forever: How to enhance your cat's health,"** Procter & Gamble's Iams™ website states about the adult cat that:

> **She's your _dearest friend_ – your confidante.   Giving her the _best of everything has always been your priority, and it's ours, too_.  Here we've found the keys to making your cat live well and be happy, with _nutrition_ designed to promote her _health and vitality_."**

*See* Iams™ web page attached hereto as Exhibit "22." Under the "Health & Nutrition" section of the website, Procter & Gamble's Iams™ makes the following representations:

> **Ingredients for a healthier pet.**
>
> **Our mission, just like yours, is to help your pet live a long and _healthy_ life. When you feed IAMS premium nutrition, you're nourishing your dog or cat with natural ingredients and added vitamins and minerals. There are IAMS formulas made to support your pet during every life stage, for any lifestyle and for every activity level. We also can help you address other needs your pet may have, like weight management through diet and exercise, mature nutrition and hairball control.**

*See* "Health & Nutrition" web page attached hereto as Exhibit "23."  Iams™ mission statement is as follows:

> **Our mission is to enhance the well-being of dogs and cats by providing _world-class quality foods_ and pet care products that delight the customer and strengthen the human-pet bond.**

*See* Iams™ company website page attached hereto as Exhibit "24."

### Procter & Gamble's Eukanuba Veterinary Diets

77.     Another of Procter & Gamble's brands, Eukanuba, offers Veterinary Diets™ that purport to pride "important nutritional benefits" to cats with unique needs such as _"weight control_, _intestinal_ and _urinary conditions_ and _critical care_."   Exhibit "25."   Eukanuba's "Restricted Calorie"™ Feline Dry Formula website page claims that:

> Restricted-Calorie formulas are high-quality foods that have been specially developed to help your pet lose excess pounds _safely_.

Exhibit "26." However, in January 2007, the Federal Drug Administration's Center for Veterinary Medicine issued a warning letter regarding this and other similar Colgate pet food products . Exhibit "27." The subject of the warning letter was the unauthorized inclusion of the additive chromium tripicolinate, which the Federal Drug Administration had previously deemed unsafe to add to pet food based upon insufficient and unsubstantiated claims by Colgate. Exhibit "27." The Federal Drug Administration was concerned about the link between this additive and _genetic mutations and tumors_.

### Procter and Gamble's False, Misleading and/or Negligent Marketing of its Pet Food

78. Procter and Gamble, like other defendant Manufacturers, offers pet food with a number of claims ranging from hairball and tartar control to medicinal and other benefits. Moreover, Procter and Gamble deceptively markets its dry food as good for cats despite the lack of scientific support that dry food is beneficial to an obligate carnivore such as a cat who has a low thirst drive. There is equally little support that dry food is beneficial to dogs because it contains ingredients that cause allergies, bloating and gastric upset. Procter and Gamble touts its pet food as "healthy" but it is substantially comprised of corn and other carbohydrate fillers. Moreover, Procter and Gamble ironically offers urinary tract diets in dry cat food yet dry food is known to cause kidney and urinary problems in the first place. See examples of Procter and Gamble's false, deceptive and or negligent marketing attached hereto as Exhibit "28," which contain claims for dental, and urinary tract health, breed and age specific diets, and light diets all of which contain representations about the benefits of these pet foods without sufficient support to make these claims. Moreover, given the predominance of processed carbohydrates, allergenic

substances, low grade proteins and known and unknown ingredients and additives with detrimental effects on the health of the dog and cat, the representations that Procter and Gamble makes are unsupported contrary to what the consumer is lead to believe.

### Colgate Palmolive's Science Diet® and Prescription Diet®

79.    Like the other Defendant Manufacturers, Colgate urges consumers to trust its brands Exhibit "29." Colgate further makes similar representations that its food is nutritionally complete and will ensure the health of the cat or dog in marketing its Science Diet® and Prescription Diet® brands:  "The Best Nutrition", "Great Taste," "Highest Quality" and "Safety First" followed by " You have our word." Exhibit "30."  On its website, Colgate displays its Science Diet® and Prescription Diet® logos, with the Science Diet® logo stating "Veterinarian Recommended" which is followed by Colgate Palmolive's mission statement that it provides "the best, leading edge pet nutrition":



An important message from Hill's Pet Nutrition regarding your pet.

The <u>Leaders</u> in Pet Nutrition and Innovation

Welcome to Hill's Pet Nutrition, <u>your pet nutrition and information source</u>. As the makers of Science Diet® and Prescription Diet® pet foods, <u>our mission is to help enrich and lengthen the special relationships between people and their pets</u>.

We will do this by providing the <u>best, leading-edge pet nutrition technology, products</u>, and <u>expertise</u> to <u>pet owners, veterinary professionals, and other key pet professionals worldwide</u>. And with a simple visit inside, you'll see our commitment to this mission for yourself.

Exhibit "30."  Colgate is thus holding itself out as a cat and dog food expert which advises consumers, veterinarians and "other key pet professionals worldwide." *Id.* Pet food consumers rely upon this claim of specialized knowledge and upon which Colgate intends that the consumers rely. Colgate thus promotes a relation of trust and confidence that exists between the consumer and the company. In these marketing materials, there is no indication, however, as to exactly how Science Diet® became "Veterinarian Recommended."

80.    Nowhere on its website does Colgate Palmolive disclose that it has spent millions marketing its Science Diet® and Prescription Diet® pet foods to veterinary students and veterinarians in order to get an edge over its competitors by having veterinarians endorse and recommend these brands to consumers[4] who Colgate knows rely upon and trust with their cats' and dogs' health and well being.  On its website, Colgate further provides the following information to consumers:

> Would you feed a baby steak? Or eat salty potato chips if you had high blood pressure? Of course not. And just like people, every pet has special nutritional needs. For example, a pet food formulated to meet the requirements of a growing puppy would not be appropriate for an older dog whose heart is stressed from age.
>
> Too little or too much of certain nutrients can be detrimental to a pet's health. And nutrients of importance, and the amount that is ideal, vary by life stage, activity level and health condition.
>
> Nutrient control is the basis of all Hill's products. Our foods are specially formulated to provide proper nutrition specifically for your pet based on age, activity level and physical condition. Read about Hill's® Science Diet® brand pet foods or to learn about Hill's® Prescription Diet® brand pet foods.

---

[4] This is the same marketing technique that Colgate Palmolive used with its toothpaste brands when it engaged in similar marketing inducements to have dentists endorse their toothpaste brands which in turn could be marketed to the consumer.

<u>Ask your veterinarian to assess your pet's health and recommend a food that provides the optimum balance of nutrients</u>. Or, if your pet is healthy, visit our Product Selector to help determine the right food for your pet.

Exhibit "31." Colgate Palmolive funds veterinary schools, provides stipends and discounts its pet food to veterinary students, and arranges for veterinarians to have financial incentives to sell its pet food. The average consumer has no idea that the veterinarian recommending the expensive and premium brands of Science Diet® and Prescription Diet®, allegedly for the health and benefit of the consumer's cat or dog, is profiting from recommending Colgate's pet food and boosting Colgate's profits in the process. The conflict of interest, created and encouraged by Colgate, is patent.

81.    One of the products in Colgate Palmolive's Prescription Diet® line is the W/D brand, which is marketed to medically treat "Diabetes mellitus, colitis, constipation, obesity, hyperlipidemia." Exhibit "32."


w/d® Feline

For Weight Control and the Nutritional Management of Fiber Responsive Diseases

Excess weight, diabetes and digestive troubles can cause real problems for your cat. Feeding the right food can help your pet live a healthier lifestyle. Prescription Diet® w/d® Feline cat food, with its *fiber rich formula*, may be useful as a nutritional aid for cats with fiber responsive diseases such as diabetes mellitus, colitis, diarrhea, constipation, and to help manage overweight cats, including those with struvite urolithiasis. The nutritional formulation of Prescription Diet® w/d® may also be useful for pets with a variety of conditions.

W/D®, however, contains ingredients that the average consumer would *not* consider healthy for their cat or dog.  Prescription Diet® W/D® dry cat food, for example, contains "powdered cellulose," "ethoxyquin," and "BHA" and "BHT."  Powdered cellulose is sawdust or newspapers, which is not what most consumers would want to feed to their cats as "fiber." Ethoxyquin has been used as a rubber preservative and/or pesticide and is listed and identified as a hazardous chemical under the criteria of the OSHA Hazard Communication Standard (29 CFR §§1910, 1220).  The Chemical Toxicology of Commercial Products states that ethoxyquin has a toxic rating of 3 (on a scale of 1 to 6, with 6 being super toxic requiring less than 7 drops to produce death). While the FDA maintains it is "safe," it nevertheless asked the Defendant pet food Manufacturers to "voluntarily" lower the levels previously allowed at 150 ppm to 75 PPM. Exhibit "33."  While BHA and BHT retard rancidity in fats and oils, some studies have indicated that these preservatives have caused cancer in rats.

### Colgate's False, Misleading and/or Negligent Marketing of its Pet Food

82.   Colgate's, like other defendant Manufacturers, offers pet food with a number of claims ranging from hairball and tartar control to medicinal and other benefits. Moreover, Colgate's deceptively markets its dry food as good for cats despite the lack of scientific support that dry food is beneficial to an obligate carnivore such as a cat  who has a low thirst drive. There is equally little support that dry food is beneficial to dogs because it contains ingredients that cause allergies, bloating and gastric upset.  Colgate's touts its pet food as "healthy" but it is substantially comprised of corn and other carbohydrate fillers.  Moreover, Colgate ironically offers urinary tract diets in dry cat food yet dry food is known to cause kidney urinary problems in the first place. See examples of Colgate's false, deceptive and or negligent marketing attached

hereto as Exhibit "34," which contain claims for dental health, treatment of kidney disease, urinary tract, health benefits, and diabetic diets all of which contain representations about the benefits of these pet foods without sufficient support to make these claims.  Moreover, given the predominance of processed carbohydrates, allergenic substances, low grade proteins and known and unknown ingredients and additives with detrimental effects on the health of the dog and cat, the representations that Colgate makes are unsupported contrary to what the consumer is lead to believe.

### Del Monte's Kibbles n' Bits®

83.    Del Monte is yet another brand misleading the consumer and capitalizing on the bond between Americans and their cats and dogs by making representations of meeting 100% nutritional needs.  An example of Del Monte's misleading marketing can be seen in its Kibbles 'n Bits® brand.

### MORE TASTE.
### MORE JOY.®

Your dog is more than a pet, he's a member of the family. So keep him happy with delicious, nutrition Kibbles 'n Bits dog food.

*See* Kibbles n' Bits® website page attached hereto as Exhibit "35."

### Try any one of our delicious canned or dry varieties for a taste your dog will love!

Kibbles 'n Bits dog food has the great taste dogs love and the 100% nutrition dogs need. Your dog will love every delicious bite of Kibbles 'n Bits dog food. And you'll love knowing he's getting complete and balanced nutrition!

See Kibbles n' Bits® "variety" website page attached hereto as Exhibit "36."   Del

Monte, however, does not stop there, consumers are also lead to believe that this

is the <u>only</u> food that their dogs need to eat a balanced diet, citing official looking

"standards"

### Kibbles 'n Bits® Dog Food — More Taste. More Joy.®

When it comes to mealtime, <u>your dog deserves as much consideration as anyone else</u>. That's where Kibbles 'n Bits® comes in. Treat your dog to a crunchy, chewy, great-tasting meal packed with <u>100% complete and balanced nutrition</u>. <u>It's everything your dog needs at every meal</u>. And with Kibbles 'n Bits®, there's something for every dog. New Kibbles 'n Bits Brushing Bites™ cleans your dog's teeth and freshens his breath. New Kibbles 'n Bits Golden Years™ gets your older dog excited about mealtime again. So pick up some Kibbles 'n Bits® dog food. You'll enjoy serving it as much as your dog will enjoy eating it.



Exhibit "35."

### Del Monte's 9Lives®

84.    Del Monte deceptively advises consumers that dry food is <u>*good*</u> for their cats when studies have shown that a dry cat food diet for an obligate carnivore such as a cat with a low thirst drive is detrimental to cats' health.

> With dry food that not only tastes good, <u>*but is good for your cat*</u>, the 9Lives® <u>*brand really cares about your cats health*</u>.  Our dry varietieis are formulated to meet your cat's special nutritional needs while providing great taste.

> With 9Lives® daily essentials™ healthy cat food, you can be confident you are giving your cat essential whole body health from the real meat she craves. 9Lives® daily essentials™ cat food is a savory blend of delicious pieces made with real meat and fish for a wholesome flavor your cat will look forward to.

Exhibit "37."  The ingredients, however, reveal that the "healthy" dry food is basically ground corn, corn gluten meal, poultry by-product-meal, ground wheat, animal digest and poultry fat preserved with BHA, among other things.  Exhibit "38."  Moreover, ironically, Del Monte offers

a "urinary tract health" diet in dry cat food form when dry food is known to cause kidney damaging crystals. Exhibit "38."

### Del Monte's False, Misleading and/or Negligent Marketing of its Pet Food

85.    Del Monte, like other defendant Manufacturers, offers pet food with a number of claims ranging from hairball and tartar control to medicinal and other benefits. Moreover, Del Monte deceptively markets its dry food as good for cats despite the lack of scientific support that dry food is beneficial to an obligate carnivore such as a cat who has a low thirst drive. There is equally little support that dry food is beneficial to dogs because it contains ingredients that cause allergies, bloating and gastric upset. Del Monte touts its pet food as "healthy" but it is substantially comprised of corn and other carbohydrate fillers. Moreover, Del Monte ironically offers urinary tract diets in dry cat food yet dry food is known to cause kidney urinary problems in the first place. See examples of Del Monte's false, deceptive and or negligent marketing attached hereto as Exhibit "39," which contain claims for dental, urinary tract and other health benefits, age specific and light diets and hairball control all of which contain representations about the benefits of these pet foods without sufficient support to make these claims. Moreover, given the predominance of processed carbohydrates, allergenic substances, low grade proteins and known and unknown ingredients and additives with detrimental effects on the health of the dog and cat, the representations that Procter and Gamble makes are unsupported contrary to what the consumer is lead to believe.

### Nestlé's Beneful®

86.    Like the other Defendants, Nestlé also makes representations about 100% complete nutritional requirements in the commercial pet food that it manufactures, produces, markets, advertises and sells. An example of Nestlé's misleading advertising is its Beneful® brand pet food.

### Beneful® Brand Dog Food

Discover Even More Beneful®

So healthy together.  So happy together.

Give your dog the **perfect balance of nutrition** and great taste for a happy healthy life.

Exhibit "16." The marketing materials show wholesome looking meat and vegetables and, like so many other Defendants, the container in which the food is packaged displays the same healthy looking, people quality food that is in Nestlé's other marketing media.  *See* website page for Beneful® Original attached hereto as Exhibit "40."  The food itself is marketed in cute shapes with colors designed to make the consumer want to buy it for their dog and to reinforce to the consumer that the food is similar to human food in quality, composition and/or is healthy and nutritious.

### Beneful® Original

**A perfect balance of healthful ingredients, quality nutrition and superb taste for pure contentment for dogs**

 Moist, chewy chunks made with real beef are rich in quality protein to help build strong muscles.

 Omega fatty acids, along with antioxidants like Vitamin E and selenium, help support a healthy immune system.

 Enriched with calcium for healthy teeth and strong bones.

Crunchy corn packed with carbohydrates for energy and linoleic acid for a shiny coat.

 Contains vegetables with Vitamin A and other quality vitamins, minerals, and nutrients.

 Contains iron for healthy blood.

Exhibit "40."


### Nestlé's False, Misleading and/or Negligent Marketing of its Pet Food

87. Nestlé, like other defendant Manufacturers, offers pet food with a number of claims ranging from hairball and tartar control to medicinal and other benefits. Moreover, Nestlé deceptively markets its dry food as good for cats despite the lack of scientific support that dry food is beneficial to an obligate carnivore such as a cat which has a low thirst drive. There is equally little support that dry food is beneficial to dogs because it contains ingredients that cause allergies, bloating and gastric upset. Nestlé touts its pet food as "healthy" but it is substantially comprised of corn and other carbohydrate fillers. Moreover, Nestlé ironically offers urinary tract diets in dry cat food yet dry food is known to cause kidney and urinary problems in the first place. See examples of Nestlé false, deceptive and or negligent marketing attached hereto as Exhibit "41," contain claims for dental, kidney and urinary diets and other health benefits, "indoor" diets, breed and age specific diets and light diets all of which contain representations about the benefits of these pet foods without sufficient support to make these claims. Moreover, given the predominance of processed carbohydrates, allergenic substances, low grade proteins and known and unknown ingredients and additives with detrimental effects on the health of the dog and cat, the representations that Procter and Gamble makes are unsupported contrary to what the consumer is lead to believe.

 **Natural Choice® Complete Care® Indoor Adult Cat**

88.    Nutro's marketing makes all of the same misleading statements and guarantees as the other Defendants.  For example, when marketing its commercial cat food, Nutro® represents as follows:

**Benefits of Natural Choice Complete Care Indoor Adult Cat:**

- Scientifically formulated for the unique needs of indoor cats
- Guaranteed to improve skin & coat for less shedding, fewer hairballs
- Reduces litter box and in-home odors
- Natural ingredients with vitamins & minerals

Indoor temperature, lighting and reduced opportunity for exercise can affect the health of your cat's skin and coat, muscle and bone condition and may cause weight gain. If your cat lives indoors most of the time, then <u>feeding Natural Choice Complete Care Indoor Formula can improve your cat's overall health and well-being</u>. It's not just another cat food. Based on the latest scientific and nutritional research, Complete Care Indoor formula is **<u>guaranteed</u>** to improve the health of your indoor cat's skin and coat, reduce shedding, minimize hairballs, build strong muscles and bones and help limit excess weight gain. It's formulated with unique ingredients like chicken meal, rice, soy protein, sunflower oil and oat fiber, which are especially important for indoor cats. And it's formulated with a blend of <u>natural ingredients</u> to help reduce litter box odor for a fresher indoor environment. Natural Choice Complete Care Indoor Formula will <u>improve the quality of life for your cat and you</u>.

*See* Nutro Natural Choice® Complete Care® Indoor Adult Cat website page attached hereto as Exhibit "42."

**Nutro's False, Misleading and/or Negligent Marketing of its Pet Food**

89**.**    Nutro, like other defendant Manufacturers, offers pet food with a number of claims ranging from hairball and tartar control to medicinal and other benefits. Moreover, Nutro deceptively markets its dry food as good for cats despite the lack of scientific support that dry food is beneficial to an obligate carnivore such as a cat which has a low thirst drive. There is equally little support that dry food is beneficial to dogs because it contains ingredients that cause allergies, bloating and gastric upset.  Nutro touts its pet food as "healthy" but it is substantially comprised of corn and other carbohydrate fillers.  Moreover, Nutro ironically offers urinary tract diets in dry cat food yet dry food is known to cause kidney urinary problems in the first place. See examples of Nutro false, deceptive and or negligent marketing attached hereto as Exhibit "43," which contain claims for dental health, and other health benefits, age specific diets and diabetic diets all of which contain representations about the benefits of these pet foods without sufficient support to make these claims.  Moreover, given the predominance of processed carbohydrates, allergenic substances, low grade proteins and known and unknown ingredients and additives with detrimental effects on the health of the dog and cat, the representations that Procter and Gamble makes are unsupported contrary to what the consumer is lead to believe.

**PETCO** **Petco's Marketing of the Defendants' Premium Pet Foods**

90.    Petco is a retail seller of pet products, including cat and dog food. Petco has a number of marketing displays at or around ceiling height intended to obtain the attention of potential buyers of cat and dog food.  These signs have the Petco logo and state **"Supreme Nutrition"** and list one of the Defendants' brand name pet food products, including but not

limited to, Iams®, Eukanuba®, Science Diet® and Nutro® products.   *See* photographs attached hereto as Exhibit "10."

91.    In each store, Petco displays information concerning each of the Defendant's cat and/or dog foods that it carries.   Under each specific brand and type of food, Petco displays marketing material that relays representations about each specific type of the Defendants' Cat and/or dog food.   For example, under each specific brand and type of food, a card is inserted on the shelf with marketing information.   Please see composite Exhibit "10."

92.    At point of purchase, Petco not only adopts the representations of the Defendant Manufacturers regarding their cat and dog food, but Petco additionally makes its own representations to consumers regarding the Defendants "premium" pet food products.   For example, when shopping for cat and dog food, Petco retail stores have a number of signs in and around the stacks of cat and dog food, such as the following:

# SUPREME
# NUTRITION
## WHY FEED PREMIUM PET FOOD?

### MORE NUTRITION / FEED LESS

***Only the highest quality ingredients are used in Premium Pet Foods***, so they are ***more nutritious*** and ***digestible*** than Supermarket Brands.   ***It takes less food to meet the nutritional needs of your pet***.

### BETTER VALUE / SPEND LESS

**Rich in nutrients, Premium Pet Food packs more protein and energy per mouthful than Supermarket Brands.   It takes less food to feed your pet, so you get more for your money.**

### EASIER CLEAN UP / LESS WASTE

> **Feeding smaller amounts of highly digestible Premium Pet Food means lower stool volume and easier backyard clean up.**

*See* photograph of Petco signage displayed in retail store attached hereto as Exhibit "44." This "Supreme Nutrition" phrase is at the top of a number of signs for premium pet food sold at Petco retail stores, including, but not limited to, Iams®, Eukanuba®, Royal Canin, Science Diet® and Nutro products.

### PET**SMART**'s Marketing of the Defendants' Premium Pet Foods

93.     Petsmart is a retail seller of pet products, including cat and dog food. Petsmart has a number of marketing displays at or around ceiling height intended to obtain the attention of potential buyers of cat and/or dog food. These signs state PET**SMART** "Advanced Nutrition" followed by one of the Defendants' brand name pet food products, including but not limited to, Iams®, Eukanuba®, Science Diet® and Nutro® products. *See* photographs attached hereto as Composite Exhibit "8."

94.     In each store, Petsmart displays information concerning each of the Defendant's cat and/or dog foods that it carries. Under each specific brand and type of food, Petsmart displays marketing material that relays representations about each specific type of the Defendants' Cat and/or dog food. For example, under each specific brand and type of food, a card is inserted on the shelf with marketing information. Please see composite Exhibit "8."

### Petsupermarket's Marketing of the Defendants' Premium Pet Foods

95.     Pet Supermarket is a retail seller of pet products, including cat and dog food. Petsmart has a number of marketing displays at point of purchase intended to obtain the attention of potential buyers of cat and/or dog food. In each store, Pet Supermarket displays information concerning each of the Defendant Manufacturers' cat and/or dog foods that it carries.

**PET Supplies Plus's Marketing of the Defendants' Premium Pet Foods**

96.    Pet Supplies Plus is a retail seller of pet products, including cat and dog food. Pet Supplies Plus has a number of marketing displays at point of purchase intended to obtain the attention of potential buyers of cat and/or dog food.  In each store, Pet Supermarket displays information concerning each of the Defendant Manufacturers' cat and/or dog foods that it carries.

**The Pet Food Purchased by Consumers May Be Manufactured and Processed by a Company Unknown to the Consumer**

97.    In addition to the above, the Defendants $300,000,000 a year marketing campaigns establish brand awareness because Mars, Procter & Gamble, Colgate Palmolive and Nestlé have been in the agriculture, human and commercial pet food industry for years. For example, Iams/Eukanuba™ and Hill's Science Diet® are brands formerly only sold at veterinary hospitals and clinics and, therefore, have a brand acceptance and awareness that has been generally accepted as "quality," premium and "veterinarian recommended" pet food. However, some or all of the Defendants distribute, market, advertise and/or sell commercial pet food that is manufactured and produced by Menu Foods, American Nutrition and/or other similar companies. Thus, consumers believe that they are purchasing a trusted brand made by a recognized and trusted pet food "manufacturer," when they are in fact buying a "premium" pet food for a _higher_ price that is made by the same manufacturer of at least 100 other foods, including Wal-Mart's _much less expensive_ Gourmet Kitty and Ol' Roy. _See_ Lists of brands subject to recent recalls manufactured by Menu Foods attached hereto as Composite Exhibit "45."  Retailers including, but not limited to, Publix and Kroger, offer their own "brands" to consumers which are manufactured and produced by companies such as Defendant Menu Foods and Doane.

98. This is "co-packing." One company makes the food, but puts a "brand" label of another, well known and trusted company on it. Co-packers benefit the Defendants because they can buy ingredients in larger bulk than any one Defendant could on its own, thus making the process cheaper and the profits larger. Thus, many of the ingredients that cross all types of pet foods, including "premium" foods, are the same. The consumer unfortunately has no idea what company really manufactured the food that he/she buys for treasured companion cats and/or dogs. The lack of oversight that the Defendants exercise over their co-packers was underscored by the recent melamine recall where matter was placed into the Defendants pet food at some point along the food chain, yet it took months for the companies to recall their tainted pet food resulting in what has been estimated by some thousands of deaths of companion animals.

### The FDA is only Minimally Involved in Commercial Pet Food Regulation

99. The Defendants spend hundreds of millions in advertising each year so that Plaintiffs'/Class representatives and the Class will believe that they are purchasing commercial pet food that is monitored, tested and "complete and balanced," as the packaging states, but these are only partial or half-truths since all pet food products are not monitored and/or tested as consumers are lead to believe.

100. The pet food industry makes more statements about the quality and nutritional content of its products than human food manufacturers and producers make and contrary to what the industry claims, it is not as regulated as it leads consumers to believe. In truth, pet food regulation is practically nonexistent.

101. The Food and Drug Administration ("FDA") has nominal authority over commercial pet foods under the Food, Drug, and Cosmetic Act ("Food and Drug Act"). *See* Sharon Benz, *FDA's Regulation of Pet Food,* from the FDA website, attached hereto as Exhibit

"46."  The Food and Drug Act defines food as "articles issued for food or drink for man or other animals…" and requires that all foods be free of adulteration and misbranding. 21 U.S.C. §321(f) (2006). While this would seem that pet foods are regulated, tested and approved, they are generally not.  Based upon the Defendants' deceptive "humanization" marketing, the consumer is unaware that the website for the FDA's Center for Veterinary Medicine[5] plainly states that "animal feeds provide a practical outlet for plant and animal byproducts *not suitable* for *human consumption*." *See* Center for Veterinary Medicine and Animal Food, Feed Ingredients and Additives, from the FDA website attached hereto as Exhibit "47" at p. 2.  The Food and Drug Act does not require pre-approval of new foods, but only that foods be free of adulteration or misbranding.

102.    The Food and Drug Act also provides that a food may be deemed adulterated if it contains "any part or product of a diseased animal." 21 U.S.C. §342(a)(5)(2006).

Misbranded food includes those with a false or misleading label.

103.    Food additives require pre-market approval and are defined as any substance not generally recognized as safe by qualified scientists if it either directly or indirectly becomes a component or otherwise affects the characteristics of any food. 21 U.S.C. §321(s) (2006). Exhibit "46."  For additives that are not generally recognized as safe, the pre-market approval requires the submission of a food additive petition to the FDA. However, contrary to the Food and Drug Act, the FDA's Center for Veterinary Medicine has used "regulatory discretion" and has not required any food additive petitions for substances that do not raise "safety concerns." Exhibit "46."  The recent melamine debacle, which resulted in the largest recall of pet food in U.S. history, is a clear example of the disastrous result of "regulatory discretion" and complete lack of "safety concerns."  Thousands of consumers have suffered the loss of much loved companion

---

[5] The FDA's Center for Veterinary Medicine regulates animal feeds. *See* http://www.fda.gov/cvm/petfoodflier.html.

cats and/or dogs, spent thousands in veterinarian bills without any real answers from either the Defendants or the FDA as to how "complete and balanced" food that has allegedly been AAFCO feeding trial tested could be so toxic and lethal.

104.    The Center for Veterinary Medicine has abdicated its regulatory powers and primarily monitors "health claims," which are statements that a product will treat, prevent or reduce the risk of a disease.[6] Exhibit "46." Any food label bearing a claim that "consumption of the product will treat, prevent or otherwise affect a disease or condition, or to affect the structure or function of the body in a manner distinct from what would normally be described as its "nutritive value" is considered to offer the product as a drug. *See* David A. Dzanis, *Interpreting Pet Food Labels* and *Interpreting Pet Food Labels – Special Use Foods,* from the FDA website, attached hereto as Exhibits "48." and "49." While the Nutrition Labeling and Education Act requires that the FDA promulgate regulations specifically permitting certain health claims on human foods, by incorporating the Nutrition Labeling and Education Act philosophy, the FDA's Center for Veterinary Medicine attempts to show "meaningful information on health foods." Exhibit "46." at p. 2. The FDA curiously does not, however, require proof of testing that a pet food treats or prevents a disease or a condition that it purports to treat or prevent. Exhibit "46." *See also* FDA Guideline No. 55 attached hereto as Exhibit "50."

### AAFCO has no Regulatory Authority and Does Not Monitor or Test Pet Food

105.    Members of the FDA work with an organization known as the Association of American Feed Control Officials ("AAFCO") because the FDA has limited "enforcement resources that are focused on human food safety issues." Exhibit "46." at p. 3. AAFCO is a private organization made up of members of state and federal officers of agricultural departments and the Food and Drug Administration ("FDA") with "input" from the pet food industry such as

---

[6] E.g., "lowers urine ph," or "hypoallergenic."

the Pet Food Institute, the Cattleman's Beef Association and the National Renderer's Association. There is thus significant influence of the pet food industry over the regulation of their own products. *See* AAFCO web page of "Committee Advisors" attached hereto as Exhibit "51." AAFCO's Official Publication for 2007 specifically states under the heading, "AAFCO Philosophy Regarding Feed Regulation": "The most important aspect of feed regulation is to provide protection for the consumer as well as the regulated industry." 2007 Official Publication of [AAFCO] at p. 75.

106.    AAFCO's stated purpose is "to…develop just and equitable standards, definitions and policies to be followed in enforcing [] laws, to promote uniformity in [] laws, regulations and enforcement policies, *and to cooperate with members of the industry producing such products in order to promote the effectiveness and usefulness of such products*. *See* AAFCO webpage attached hereto as Exhibit "52." *See also* 2007 Official Publication of [AAFCO], By-Laws at p. 71.

107.    AAFCO is involved with commercial pet food, but it has no enforcement authority, does not perform mandatory analytical testing on pet food nor does it issue any certificate that the pet food is "balanced and complete" despite all of the representations on the Defendant's pouches, cans and bags that these pet foods have met with AAFCO standards.

108.    AAFCO's only real requirement is that the manufacturer comply with an extensive list of ingredient definitions, which means that a manufacturer could use old tires as an ingredient as the main source of protein for pet food as long as the ingredient met one of the "approved" definitions.

109.    AAFCO has established "Nutrient Profiles" and feeding trial methods to purportedly guide the Defendant manufacturers regarding the nutritional adequacy of pet food.

*See e.g.,* David A. Dzanis, *Selecting Nutritious Pet Foods,* from the FDA website, attached

hereto Exhibit "53."; *See also* 2007 Official Publication of [AAFCO], at pp. 147-159.

110.    However, the "Nutrient Profile" system does *not* address the issue of ingredient

*quality* whatsoever. If a manufacturer wants to represent that its food is "nutritionally complete,"

it only needs to:

(a)    establish that the product's formula meets the nutritional requirements of the

nutrient profile; *or*

(b)    establish that the product is nutritionally *similar* to the "lead" product in the same

product family.  *See*  2007 Official Publication of [AAFCO],  at pp. 147-159. If the manufacturer

opts for the "lead" product family option, a simple standard chemical analysis can be performed

to show that the product meets AAFCO nutrient profiles. *See id.;* Animal Protection Institute,

*What's Really in Pet Food Report* attached hereto as Exhibit "54."

111.    While AAFCO "nutrient profiles" were previously based on the National

Research Council Committee on Animal Nutrition, "[v]alues for specific nutrient requirements

were added or modified…supported by [among other things] unpublished data."[7]  For example,

AAFCO reduced recommended protein from 22% to 18% for adult maintenance in dogs.[8] The

pet food industry's influence is not difficult to discern in changes in regulations such as these

because animal protein is expensive. According to a veterinarian with the Center for Veterinary

Medicine, the formulation testing method also fails to account for the "availability of nutrients,"

which means that while the product contains protein, AAFCO nutrient profiles do not ensure that

the protein is digestible or available by a cat or dog.[9]  In fact, the ineffectiveness  of these

"guidelines"  are  evidenced  by  litigation  in  which  Nutro  sued  Iams  Co.  regarding  Iams®

---

[7] AAFCO, *Official Publication* 73 at 131 (2006).
[8] *Id.* at 133
[9] Douglas Kneuven DVM, *The Five Supplements Every Dog Needs,* Clean Run Magazine, Vol 11 # 12.

"modified" feeding instructions that resulted in drastic weight loss in dogs. The food was not sufficient to sustain life at recommended feeding amounts. *See e.g., Iams Co. v. Nutro Prods., Inc.,* 2004 U.S. Dist. LEXIS 15134 (W.D. Oh. July 3, 2004).

112.    As for the AAFCO feeding trials, AAFCO recommended "testing" consists of a protocol for a six-month feeding trial to be conducted by the manufacturers to determine whether a food can sustain life in a target test population (dogs or cats in all life stages, or specific stages of growth of maintenance). The test population is fed nothing but the food in question for six months, and if the subjects test normal (on weight and a few blood tests), the food passes. This method at least would help a manufacturer demonstrate that the food is palatable and digestible enough to maintain life in the test population, which the "nutrient profile" system does not. However, the feeding test requires only eight test subjects, and requires that only six finish the trial since they can be removed for non-nutritional or poor food intake reasons.[10] Even if a dog or cat loses 15% of its initial body weight during the trial, the feeding trial is nevertheless considered a success. *See e.g.,* 2007 Official Publication of [AAFCO], at pp. 148.   However, what the consumer does not know is that many nutritional deficiencies or overdoses would not appear in this short period of time. Contrary to the Defendants' advertising claims, the pet food's fitness for maintaining longevity, reproductive, or multi-generational health would not be demonstrated.  Growth food testing is similar to maintenance testing except growth food testing lasts only 10 weeks despite the fact that the Defendants' recommend growth pet food for the first year of the kitten or puppies' life.[11]

113.    If a food has met either AAFCO requirement, it may state on the label that the food is "complete and balanced." These label statements are why consumers are under the

---

[10] *See* Note 34, *supra,* at 148.
[11] *Id.* at 151.

mistaken impression that AAFCO actually regulates the food industry, or is a governmental agency. Neither is true. However, the Defendants are very happy to place the claim on their packaging and in their marketing materials in order to sell their product to unsuspecting consumers.

### The Defendants Profit by Recycling the Inedible Garbage of their Human Food Businesses into Commercial Pet Food

114.    Rather than the wholesome pictures shown on the pet food packaging, rendering companies dispose of millions pounds of inedible waste each day including, heads, feet, stomachs, intestines, spinal cords, tails, restaurant grease, feathers, bones and dead or diseased animals rejected from slaughterhouses for use in manufacturing pet food.   Amazingly, animals from research laboratories may be rendered into pet food as well.

115.    The pet food industry is an extension of the human food industry, also known as the agricultural industry.  Pet food provides a means to turn slaughterhouse waste and/or tainted grains considered "unfit for human consumption" into profit.  This waste includes cow tongues, esophagi, bones, pus, blood, etc.  The whole grains used have had the starch removed and oil extracted by chemical processing to make vegetable oil, or they are substantially comprised of the hulls and other remnants from the milling process.  Some of the whole grains used may have been deemed unfit for human consumption because of mold, contaminants or poor storage practices.

116.    Common ingredients in commercial pet foods are meat meal and animal by-product meal.  Protein used in commercial pet food comes from a variety of sources. When cattle, swine, chickens, lambs, or other animals are slaughtered, lean muscle tissue is trimmed away from the carcass for human consumption. Pet food labels contain the words "meal" or "by-

product" on the ingredient label. Inedible byproducts such as bone, fat, heads, hair, feet and condemned offal are used in commercial pet food. These materials are sent to a rendering plant for processing into pet food products. *See* Waste Reduction Resource Center website attached hereto as Exhibit "55.," explaining that "inedible materials such as fat, heads, hair and condemned offal" are routinely sent to a rendering plants.

"Meat meal" is the rendered product from mammal tissues, exclusive of any *added* blood, hair, hoof, horn, hide trimmings, manure, stomach and rumen contents except in such amounts as may occur unavoidably in good processing practices."[12]

"Animal by-product" is rendered product from animal tissues, exclusive of any *added* blood, hair, hoof, horn, hide trimmings, manure, stomach and rumen contents except in such amounts as may occur unavoidably in good processing practices."[13]

"Poultry meal" is the dry rendered product from a combination of clean flesh and skin with or without accompanying bone, derived from the parts of whole carcasses of poultry … exclusive of feathers, heads, feet and entrails."[14] "Chicken meal" thus need not contain even an ounce of chicken as contemplated by consumers.

117.    Whatever remains of the carcass, including but not limited to, heads, feet, bones, blood, pus, intestines, lungs, spines, spleens, livers, ligaments, fat trimmings, unborn babies, is used in pet food. Due to labor costs, plastic and styrofoam can enter the process as expired and/or rotten meat packages from supermarkets are tossed in, still wrapped in the package. *See* the FDA's draft list of contaminants found in pet food*, including radioactive matter* from implants in animals that were rendered attached hereto as Exhibit "56."

---

[12] *See* Feed Ingredient Definition 9.40, *supra,* note 34 at 259.
[13] *Id.*
[14] *Id.* Feed Ingredient Definition 9.71, *supra,* note 34 at 262.

118.    There have been reports of euthanized cats and dogs that have been "rendered" and ultimately made into pet food that would reach millions.  Not coincidentally, drugs used in the euthanasia process have been detected in pet food because the drugs are not destroyed by heat. *See* 1998 study of samples from Laurel, Maryland attached hereto as Exhibit "57" and 2002 FDA Report on the Risk from pentobarbital in Dog Food attached hereto as Exhibit "58." Ingredients most commonly associated with the presence of pentobarbital were meat-and-bone-meal and animal fat. There are still no laws or regulations against it.  "4D" animals (dead, dying, diseased, disabled) *are still legitimate ingredients for pet food*, which is considered adulterated food under the Food and Drug Act.

119.    While the FDA's 2002 report concluded that it was "highly unlikely" that dogs will experience adverse effects from consuming pentobarbital and that it could find no evidence of rendered dogs and cats, the study provided no real explanation as to methods or sampling. Analysis as to whether long term effects were considered over the life of a cat or dog.  Exhibit "58."  Moreover, the study never attempted to address reports of cat and dog illness or deaths from ingestion of pentobarbital or newspaper and television accounts of animal shelters sending thousands of euthanized cats and dogs to rendering plants.[15]

120.    For example, a television report in St. Louis aired video footage of a truck with the motto "Serving the Pet Food Industry" entering a rendering plant where euthanized dogs and cats from local animal shelters were hauled. Exhibit "59."  The report generated a public outcry, regarding this cannibalistic-like practice.  A consultant to the rendering company involved stated, "There's too many people out there who think pets are like children." Exhibit "59."  In another

---

[15]3-4,000,000 dogs and cats are euthanized in animal shelters each year. See http://www.hsus.org/pets/ issues_affecting_our_pets/pet_overpopulation_and_ownership_statistics/hsus_pet_overpopulation_estimates.html.

story, a reporter in the Baltimore area reported that euthanized cats and dogs had been rendered into pet food.  Exhibit "60."

121.    Rendering melts down animal parts to separate fat soluble ingredients from water soluble and solid materials at high temperatures. *See* chart of rendering process attached hereto as Exhibit "61."  The high heat from processing destroys bacteria, but also destroys nearly all of whatever nutrient quality may remain in the rendering vat, although after the rendering process cross-contamination may occur.

122.    The nutritional quality of by-products, meals, and digests can vary from batch to batch. The Defendants' pet food ingredients are generally by-products of the meat, poultry and fishing industries, with the potential for a wide variation in nutrient composition. Claims of nutritional adequacy of pet foods based on the current nutrient allowances do not give assurances of nutritional adequacy and will not until ingredients are analyzed and bioavailability values, i.e., whether the cat or dog can absorb the food as a nutrient, are incorporated. Exhibit "54." Meat or poultry "by-products" are very common in wet pet foods. "Meat" refers to only cows, swine, sheep, and goats. Since sheep and goats are rare compared to the 37 million cows and 100 million hogs slaughtered for food every year, nearly all meat by-products come from cattle and pigs.  Exhibit "54."

123.    Most dry foods contain a large amount of cereal grain or starchy vegetables to provide texture and little meat. These high-carbohydrate plant products also provide a cheap source of "energy" or, more appropriately, calories. Gluten meals are high-protein extracts from which most of the carbohydrate has been removed. They are often used to boost protein percentages without expensive animal-source ingredients. Corn gluten meal is the most

commonly used for this purpose. Wheat gluten is also used to create shapes like cuts, bites, chunks, shreds, flakes, and slices, and as a thickener for gravy. In most cases, foods containing vegetable proteins are among the poorer quality foods. Exhibit "54."

124.    The unique, pungent odor to a new bag of dry pet food is most often "rendered" animal fat, or vegetable fats and oils deemed inedible for humans. For example, used restaurant grease was rendered and routed to pet foods for several years, but a more lucrative market is now in biodiesel fuel production. Exhibit "54."

125.    These fats are sprayed directly onto extruded kibbles and pellets to make an otherwise bland or distasteful product palatable. Exhibit "54." The fat also acts as a binding agent to which manufacturers add other flavor enhancers such as "animal digests" made from processed by-products. Exhibit "54." Dogs and cats love the taste of these unhealthy sprayed fats. Exhibit "54."

126.    Defendants Manufacturers', Colgate, Del Monte, Nestlé and Mars are subsidiaries of multinational food production companies.

> Many major pet food companies in the United States are subsidiaries of gigantic multinational corporations. From a business standpoint, pet food fits very well with companies making human products. The multinationals have increased bulk-purchasing power; those that make human food products have a captive market in which to capitalize on their waste products; and pet food divisions have a more reliable capital base and, in many cases, a convenient source of ingredients.
>
> The Pet Food Institute — the trade association of pet food manufacturers — has acknowledged the use of by-products in pet foods as additional income for processors and farmers: 'The growth of the pet food industry not only provided pet owners with better foods for their pets, but also ***created profitable additional markets for American farm products and for the byproducts of the meat packing, poultry, and other food industries which prepare food for human consumption***.'

Exhibit "54." Contrary to their advertising and marketing representations, the Defendants manufacture and sell recycled human food waste that is not fit for human consumption into the "premium," "quality," "gourmet" and nutritious commercial pet food that they market to consumers.

127.    Dogs and cats are carnivores and should be fed a _meat-based_ diet. The Defendants lead consumers to believe that this is what they are feeding their cats and dogs by marketing to consumers photos depicting wholesome vegetables and choice cuts of chicken and beef allegedly found in the Defendants' pet food. The containers also replicate the television and web advertising by showing happy, healthy pets, and wholesome meat and vegetables on the packaging.  This is all false and misleading to the consumer.

### How the Defendants Manufacture Dry and Wet Food

128.    After the rendered by-product or meal has been cooked at high temperatures, the product is then cooked again to make dry or wet food. The vast majority of dry food is made with a machine called an extruder. First, materials are blended in accordance with a recipe created with the help of computer programs that provide the nutrient content of each proposed ingredient. For instance, corn gluten meal has more protein than wheat flour. Because the extruder needs a consistent amount of starch and low moisture to work properly, dry ingredients, such as "rendered" meat-and-bone-meal, poultry by-product meal, grains, and flours, predominate.  The dough is fed into the screws of an extruder. It is subjected to steam and high pressure as it is pushed through dies that determine the shape of the final product, much like the nozzles used in cake decorating. As the hot, pressurized dough exits the extruder, it is cut into tiny pieces. As the dough reaches normal air pressure, it expands or "puffs" into its final shape.

The food is allowed to dry, and then is usually sprayed with fat, digests, or other compounds to make it more palatable. Exhibit "54."

129.     Although the cooking process kills bacteria in the ingredients, the final product can pick up more bacteria during the subsequent drying, coating, and packaging process. Some experts warn that getting dry food wet can allow the bacteria on the surface to multiply and make pets sick.  Exhibit "54." Semi-moist foods and many pet treats are also made with an extruder. To be appealing to consumers and to keep their texture, they contain many additives, colorings, and preservatives; they are not a good choice for a pet's primary diet, but the Defendants never reveal that to the consumer.  Exhibit "54."

130.     Wet or canned food begins with ground ingredients mixed with additives. Exhibit "54." If chunks are required, a special extruder forms them. Then the mixture is cooked and canned. The sealed cans are then put into containers resembling pressure cookers and commercial sterilization takes place. Some manufacturers cook the food right in the can.

**The Defendants claim that commercial pet food is "Nutritious" and has other "benefits"
Despite the Cooking Processes, Chemical Preservatives  and Contaminants**

131.     Cooking and other processing of meat and by-products used in the Defendants' pet food greatly diminishes the nutritional value, although cooking increases the digestibility of cereal grains and starchy vegetables.  Exhibit "54."

132.     To make pet food "nutritious," the Defendants must therefore "fortify" it with vitamins and minerals because the ingredients they are using are not wholesome, their quality may be extremely variable, and the harsh manufacturing practices destroy many of the nutrients the food had to begin with.  Exhibit "54."

133.    Proteins are especially vulnerable to heat, and become damaged, or "denatured," when cooked. Exhibit "AA." Because dry food ingredients are cooked twice, first during rendering and again in the extruder, altered proteins may contribute to food intolerances, food allergies, and inflammatory bowel disease. Exhibit "54."

## Chemical Preservatives

134.    All commercial pet foods must be preserved so they stay fresh and appealing to cats and dogs. Some preservatives are added to ingredients or raw materials by the suppliers, and others may be added by the manufacturer. Ethoxyquin is a preservative that is used in pet food. Exhibit "AA."

135.    Because manufacturers need to ensure that dry foods have a long shelf life (typically 12 months) to remain edible through shipping and storage, fats used in pet foods are preserved with either synthetic or "natural" preservatives. Synthetic preservatives include butylated hydroxyanisole (BHA) and butylated hydroxytoluene (BHT), propyl gallate, propylene glycol (also used as a less-toxic version of automotive antifreeze), and ethoxyquin. Exhibit "AA." There is little information documenting the toxicity, safety, interactions, or chronic use of these chemicals in pet foods that may be eaten every day for the life of the animal. Exhibit "27" and "33."

## Contaminants

136.    Ingredients used in the Defendant's pet food have been contaminated with a wide variety of toxic substances. Some of these are destroyed by processing, but others are not.

- **Bacteria.** Slaughtered animals, as well as those that have died because of disease, injury, or natural causes, are sources of meat, by-products, and rendered meals. An animal that died on the farm might not reach a rendering plant until days after its death. Therefore the carcass is often contaminated

with bacteria such as *Salmonella* and *E. coli*. Dangerous *E. Coli* bacteria are estimated to contaminate more than 50% of meat meals. While the cooking process may kill bacteria, it does not eliminate the endotoxins some bacteria produce during their growth. These toxins can survive processing, and can cause sickness and disease. Pet food manufacturers do not test their products for bacterial endotoxins. Because sick or dead animals can be processed as pet foods, the drugs that were used to treat or euthanize them may still be present in the end product. Penicillin and pentobarbital are just two examples of drugs that can pass through processing unchanged. Antibiotics used in livestock production are also thought to contribute to antibiotic resistance in humans.

- **Mycotoxins.** Toxins from mold or fungi are called mycotoxins. Modern farming practices, adverse weather conditions, and improper drying and storage of crops can contribute to mold growth. Pet food ingredients that are most likely to be contaminated with mycotoxins are grains such as wheat and corn, and fish meal.

- **Chemical Residue.** Pesticides and fertilizers may leave residue on plant products. Grains that are condemned for human consumption by the USDA due to residue may legally be used, without limitation, in pet food.

- **Acrylamide.** This is a carcinogenic compound formed at cooking temperatures of about 250°F in foods containing certain sugars and the amino acid asparagine (found in large amounts in potatoes and cereal grains). It is formed in a chemical process called the Maillard reaction. Most dry pet foods contain cereal grains or potatoes, and they are processed at high temperatures (200–300°F at high pressure during extrusion; baked foods are cooked at well over 500°F); these are perfect conditions for the Maillard reaction. In fact, the Maillard reaction is considered *desirable* in the production of pet food because it imparts a palatable taste, even though it reduces the bioavailability of some amino acids, including taurine and lysine. The content and potential effects of acrylamide formation in pet foods are unknown.

Exhibit "54."

### Toxic Pet Food Recalls Demonstrate that the Defendants Do Not Properly Test, Monitor or otherwise Verify the pet food contents that are marketed as "healthy, wholesome and nutritious"

137.    Although largely unknown to the average consumer, commercial pet food that allegedly meets with the Defendants "high standards" and feeding trials and the AAFCO "nutritional guidelines" has been the subject of numerous lethal recalls over the years.  One such recall involved "dioxin," a known carcinogen. *See* Assignment to Collect and Analyze Domestic-Import Samples Suspected of PCB and Dioxin Contamination attached hereto as Exhibit "62."

Animal fat from a rendering company in Belgium was contaminated with Dioxin and/or PCB and then shipped to manufacturers and incorporated into pet food. Exhibit "62." at attachment "A."  The recent massive Menu Foods recall is yet another example of the disastrous effect of the lack of regulations on pet food which results in the Defendants success in profiting by the lack of regulations and the consequent cost to the consumer in companion animal deaths and exorbitant veterinarian bills to try to save them.  For example, Ol' Roy, Wal-Mart's store brand, has now been involved in *__3 serious recalls__*. Exhibit "54." The list of other serious recalls is long and demonstrates the frequency of same:

138.    In 1995, Nature's Recipe recalled almost a million pounds of dry dog and cat food after consumers complained that their pets were vomiting and losing their appetite. The problem was a fungus that produced vomitoxin contaminating the wheat. Exhibit "54."

139.    In 1999, Doane Pet Care recalled more than a million bags of corn-based dry dog food contaminated with aflatoxin. Products included Ol' Roy (Wal-Mart's brand) and 53 other brands. The toxin killed at least 25 dogs. Exhibit "54."

140.    In 2000, Iams recalled 248,000 pounds of dry dog food distributed in 7 states due to excess DL-Methionine Amino Acid, a urinary acidifier. Exhibit "54."

141.    In 2003, a recall was made by Petcurean "Go! Natural" pet food due to circumstantial association with some dogs suffering from liver disease; no cause was ever found. Exhibit "54."

142.    In late 2005, Diamond Foods recalled pet food contaminated with moldy corn which contained a particularly nasty fungal product called aflatoxin.  The toxin killed at least 100 dogs. Exhibit "54."

143.    In 2005, 123,000 pounds of cat and dog treats were recalled due to *Salmonella* contamination. Exhibit "54."

144.    In 2006, more than 5 million cans of Ol' Roy, American Fare, and other dog foods distributed in the southeast were recalled by the manufacturer, Simmons Pet Food, because the cans' enamel lining was flaking off into the food. Exhibit "54."

145.    Also in 2006, Merrick Pet Care recalled almost 200,000 cans of "Wingalings" dog food when metal tags were found in some samples. Exhibit "54."

146.    In the most deadly recall of 2006, 4 _prescription_ canned dog and cat foods were recalled by Royal Canin. The culprit was a serious overdose of Vitamin D that caused calcium deficiency and kidney disease. Exhibit "54."

147.    In February 2007, the FDA issued a warning to consumers not to buy "Wild Kitty," a frozen food containing raw meat. Routine testing by FDA had revealed *Salmonella* in the food. FDA specifically warned about the potential for illness in humans, not pets. There were no reports of illness or death of any pets, and the food was not recalled. Exhibit "54."

148.    The most lethal pet food in history was the subject of the largest recall ever. Menu Foods recalled more than 100 brands including Iams®, Eukanuba®, Hill's Science Diet®, Purina Mighty Dog®, and many store brands including Wal-Mart's, over 60 million individual cans and pouches. Some estimate the pet illnesses and deaths to be in the thousands. The estimate is that 20-30% died from acute renal failure caused by the food. The death toll reported to the FDA is believed to be drastically underreported due to the volume of calls and consumers' inability to log the deaths and illnesses.

## Nutrition-Related Diseases

149.    Unbeknownst to consumers, the Defendants' nutritionally "healthy", "balanced and complete" pet foods cause numerous health problems because they are filled with cheap, inedible grains when the Defendants know that cats and dogs are carnivores. The Defendants' commercial pet food is ___not___ the primarily meat-based diet that cats and dogs need, but rather one filled with grains unfit for human consumption. Class members are mislead as to what they are buying and what it contains. The unpleasant results of grain-based, processed, year-in and year-out diets are common. Health problems associated with inedible grain-based commercial pet food include:

- **Urinary tract disease.** Plugs, crystals, and stones are more common in cats eating dry diets, due to the chronic dehydration and highly concentrated urine they cause. "Struvite" stones used to be the most common type in cats, but another more dangerous type, calcium oxalate, has increased and is now tied with struvite. Manipulation of manufactured cat food formulas to increase the acidity of urine has caused the switch. Dogs can also form stones as a result of their diet.

- **Kidney disease.** Chronic dehydration associated with dry diets may also be a contributing factor in the development of kidney disease and chronic renal failure in older cats. Cats have a low thirst drive; in the wild they would get most of their water from their prey. Cats eating dry food do not drink enough water to make up for the lack of moisture in the food. Cats on dry food diets *drink* more water, but the *total water intake* of a cat eating canned food is twice as great.

- **Dental disease.** Contrary to the myth propagated by pet food companies, dry food is not good for teeth. Given that the vast majority of pets eat dry food, yet the most common health problem in pets is dental disease, this should be

obvious. Humans do not floss with crackers, and dry food does not clean the teeth.

- **Obesity.** Feeding recommendations or instructions on the packaging are sometimes inflated so that the consumer will end up feeding — and purchasing — more food. One of the most common health problems in pets, obesity, may also be related to high-carb, high-calorie dry foods. Both dogs and cats respond to low-carb wet food diets. Overweight pets are more prone to arthritis, heart disease, and diabetes. Dry cat food is now considered by experts as the cause of feline diabetes; prevention and treatment include switching to a high protein, high moisture, low-carb diet.

- **Chronic digestive problems.** Chronic vomiting, diarrhea, constipation, and inflammatory bowel disease are among the most frequent illnesses treated. These are often the result of an allergy or intolerance to pet food ingredients. The market for "limited antigen" or "novel protein" diets is now a multi-million dollar business. These diets were formulated to address the increasing intolerance to commercial foods that pets have developed. Even so, a cat or dog that tends to develop allergies can develop allergies to the new ingredients, too. One twist is the truly "hypoallergenic" food that has had all its proteins artificially chopped into pieces smaller than can be recognized and reacted to by the immune system. Yet there are documented cases of animals becoming allergic to this food, too.

- **Bloat.** Feeding only one meal per day can cause the irritation of the esophagus by stomach acid, and appears to be associated with gastric dilitation and volvulus (canine bloat). Feeding two or more smaller meals is better.

- **Heart disease.** An often-fatal heart disease in cats and some dogs is now known to be caused by a deficiency of the amino acid taurine. Blindness is another symptom of taurine deficiency. This deficiency was due to inadequate amounts of taurine in cat food formulas, which in turn had occurred due to decreased amounts of animal proteins and increased reliance on carbohydrates. Cat foods are now supplemented with taurine. Experts suggest that some dog breeds are susceptible to the same condition. Supplementing taurine may also be helpful for dogs, but as yet few manufacturers are adding extra taurine to dog food.

- **Hyperthyroidism.** There is also evidence that hyperthyroidism in cats may be related to diet. This is a relatively new disease that first surfaced in the 1970s. Some experts theorize that excess iodine in commercial cat food is a factor. New research also points to a link between the disease and pop-top cans, and flavors including fish or "giblets." This is a serious disease, and treatment is expensive.

150.    Exhibit "54."  Diets composed primarily of low quality grains and rendered meals are not as nutritious or safe as the Defendants have led consumers to believe. Exhibit "54." These "healthy" and "nutritionally" complete diets have taken a toll on companion cats and dogs and the consumer has paid for the Defendants' pet food because they thought it is good for their companion animals based upon the Defendants marketing representations.  In addition to paying for the food that makes their companion cats and dogs ill and otherwise unhealthy, consumers have also had to pay thousands in veterinarian bills as a result of their dogs and cats ingesting this food.

### The Defendants' Dog and Cat Food Contains Ingredients the effects of which are contrary to the Defendants' marketing representations

151.    The Defendants' dog and cat food contains a plethora of harmful and toxic ingredients and chemicals and otherwise lacks the nutritious qualities that the Defendants claim.

152.    The Defendants' are aware that the ingredients and chemicals in their dog and cat food products are not as nutritious as they claim, and are not safe and/or healthy for companion pets.  The Defendants have either willfully, intentionally and/or negligently failed to disclose their existence to consumers.

153.    The Defendants have included dead and diseased animals in their dog and cat food products, mislabeled[16] them, and willfully, intentionally and/or negligently failed to

---

[16] An example of this mislabeling is something called "splitting," which is the listing of the same primary

disclose the composition of their pet foods and/or the existence of harmful ingredients and chemicals contained therein, in order to make the production of dog and cat food products cheaper and to increase the Defendants' profit margins.

### Joinder of the Defendants

154.    The Defendants have been included in this action because there is a separate right to relief against each Defendant arising out of the same or similar conduct on or about the same time and questions of law and fact are common to each Defendant Manufacturer, Co-Packer, Retailer and Pet Specialty Retailer.  The Defendants are part of a largely homogenous industry that is owned and operated in the same or similar manner as to the relevant issues in this lawsuit. The Defendants joined herein have the vast majority of the global market share of pet food sales and thus few companies are involved but many various brands are manufactured, advertised, marketed, tested, regulated, produced, distributed and sold in the same or similar manner.

### CLASS ACTION ALLEGATIONS

155.    Plaintiffs/Class Representatives bring this action on their own behalf and as a Class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

> All consumers in the United States who have purchased pet food produced, manufactured, advertised, marketed, distributed and/or sold by any of the Defendants that was marketed as having certain ingredients or benefits to cats and dogs when the pet food either contained ingredients and/or additives and/or contaminants that were not represented in the Defendants' marketing and/or fails to contain the promised benefits based upon scientifically valid research studies.  The relevant time period for the Class is May 9, 2003 through May 9, 2007.

---

ingredients separately under different names to lead the consumer to believe that the pet food has a prime ingredient of chicken, but also lists corn gluten and corn, corn meal, potatoes and beet product, which is actually only carbohydrates and sugars.  The end result is that there is less chicken and far more corn and carbohydrates and if the manufacturer did not "split" the ingredients, corn would be the primary ingredient.

The Plaintiffs/Class Representatives reserve the right to amend the class definition after more information has been obtained through discovery. Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, directors and officers, and members of their immediate families. Also excluded from the Class are the Court, the Court's spouse, all persons within the third degree of relationship to the Court and its spouse, and the spouse of all such persons.

### Numerosity

156.    According to statistics kept by the Humane Society of the United States, there are approximately 73 million companion dogs in the United States. Exhibit "B." Thirty-nine percent of U.S. households own at least one dog. Exhibit "B." Most owners (60 percent) own one dog, 25% of owners own two dogs, 14% of owners own three or more dogs. Exhibit "B."  There are approximately 90 million owned cats in the United States. Exhibit "B." 34% of U.S. households (or 37.7 million) own at least one cat. Exhibit "B." 50% of owners own more than one cat. Exhibit "B." The majority of consumers who have companion cats and dogs purchase commercial pet food that the Defendants put in the stream of commerce.  The members of the Class are, thus, so numerous and geographically diverse that joinder of all of them is impracticable. While the exact number and identities of the members of the Class are unknown to the Plaintiffs/Class Representatives at this time, and can only be ascertained through appropriate discovery and notices, the Plaintiffs/Class Representatives believe and therefore aver that there are thousands of Class members throughout the United States and know for certain that there are over fifty. As a general rule classes of 40 or more are numerous enough to certify. *See* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* para. 23-05 [1] (2d ed. 1987).

### Commonality

157.    There are questions of fact and law common to members of the Class that predominate over any questions affecting any individual members including, *inter alia*, the following:

(a)    Whether the Defendants advertised, marketed and sold adulterated pet food;

(b)    Whether the Defendants manufactured, marketed, advertised, distributed and/or sold pet food that promised nutritional, medicinal, dietetic, dental or other benefits but which claims are unsupported by valid scientific research studies;

(c)    Whether the Defendants conducted marketing and other surveys to determine how best to "humanize" pet food to induce consumers to buy it;

(d)    Whether the Defendants provide funds to veterinary students and veterinary schools, have contracts with veterinary schools and donate money and pet food in an attempt to obtain the "Veterinarian recommended" endorsement;

(e)    Whether the Defendants knowingly, intentionally and/or negligently manufactured, produced, advertised, marketed, distributed and/or sold pet food that contained toxic, dangerous, unhealthy and/or adulterated ingredients, additives or chemicals;

(f)    Whether the Defendants knew or should have known that valid research studies should be performed prior to making nutritional, health or other claimed benefits to induce consumers to purchase the Defendants' pet food;

(g)    Whether the Defendants advertised, represented or held themselves out as experts in dog and/or cat nutrition and otherwise beneficial effects of pet food;

(h)    Whether the Plaintiffs marketing representations concerning the nutritional and health-related efficacy of the pet food mislead consumers;

(i)       Whether the Defendants failed to warn of risks of which they either knew or should have known concerning the Defendants' pet food;

(j)       Whether the Defendants continued to use ingredients and/or additives or other substances that they either knew or should have known would not have they nutritional or other beneficial qualities claimed in their marketing materials;

(k)       Whether Defendants expressly warranted these pet food products;

(l)       Whether Defendants expressly purported to disclaim any express warranty on these pet food products;

(m)       Whether Defendants purported to disclaim any implied warranty on these pet food products;

(n)       Whether the Defendants intended for consumers to rely on their marketing representations;

(o)       Whether any limitation on any warranty failed to meet its essential purpose;

(p)       Whether the Defendants' intended that the pet food be purchased by Plaintiffs/Class Representatives, Class members, or others;

(q)       Whether Defendants' intended that the Class would feed the pet food to their pets;

(r)       Whether Defendants' were negligent in manufacturing or processing the pet food products;

(s)       Whether the purchase and/or use of pet food to feed cats and dogs resulted in loss, injury, or damages to the Plaintiffs/Class representatives and the Class;

(t)       Whether the Defendants' negligence proximately caused loss or injury or damages to the Plaintiffs/Class Representatives and the Class;

(u)       Whether the Plaintiffs/Class representatives and the Class suffered damages;

(v)    Whether the Defendants were unjustly enriched by selling consumers pet food that was adulterated, did not comport with their own marketing, contained toxic substances, and/or was otherwise not as advertised;

(w)    Whether the Defendants marketing and advertising was false and deceptive under applicable state laws; and

(x)    Whether the Defendants violated applicable consumer statutes requiring the Defendants not to commit deceptive or unfair trade practices to the detriment of the consumer.

## Typicality

158.    The Plaintiffs'/Class Representatives claims are typical of the claims of the other members of the Class in that all such claims arise out of the Defendants conduct in manufacturing, producing, marketing, advertising, processing, distributing, selling and entering into the stream of commerce pet food that the Defendants claim has nutritional, medicinal and other benefits without sufficient scientific research to back up the claims and/or lacks the benefits marketed to the consumer. The Plaintiffs/Class Representatives and other members of the Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiffs/Class Representatives' claims and those of the Class.

## Adequacy

159.    The Plaintiffs/Class Representatives will fairly and adequately protect the interests of the Class. The Plaintiffs/Class Representatives claims are coextensive with, and not antagonistic to, the claims of others members of the Class and they are willing and able to vigorously prosecute this action on behalf of the Class. The Plaintiffs/Class Representatives have retained competent counsel who are very experienced in class action litigation.

**Predominace and Superiority**

160.    Plaintiffs/Class Representatives bring this action under Rule 23(b)(3) because common questions of law and fact predominate over questions of law and fact affecting individual members of the Class. Indeed, the predominant issue in this action is whether Defendants' pet food and pet food products are deceptively advertised in that the claims made are unsupported by valid scientific research to support them. In addition, the expense of litigating each member of the Class's claim individually would be so cost prohibitive as to deny Class members a viable remedy. Certification under Rule 23(b)(3) is appropriate because a class action is superior to other available methods for the fair and efficient adjudication of this action, and Plaintiffs/Class Representatives envision no unusual difficulty in the management of this action as a class action.

161    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, respectfully requests this Court to:

(a)    Enter an order certifying the Class under Rules 23(a) and (b)(3) and appointing Plaintiff/Class Representatives and their legal counsel to represent the Class;

(b)    Enter an Order granting reasonable attorneys' fees and costs to Class Counsel; and

(c)    Granting such other and further relief as allowed by law.

**COUNT I**

**Fraudulent Misrepresentation and Concealment[17]
As to All Defendants**

---

[17] And other state fraudulent misrepresentation and concealment laws of the various states where Class members reside.

162.    Plaintiffs/Class Representatives hereby adopt and incorporate by reference paragraphs 1-161 as if set forth more fully herein.

163.    During the class period, Defendant Manufacturers, Mars, Procter and Gamble, Colgate, Del Monte, Nestlé and Nutro, Retailers, Publix, Albertson's, Kroger, Safeway, HEB, Meijer, Stop 'N Shop, Petco, Pet Supermarket, Petsmart, Pet Supplies Plus, Target and Wal-Mart and Co-Packers (through association with and/or by agreement with the Manufacturers, Retailers and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

164.    During the class period, Publix, Albertson's, Kroger, Safeway, HEB, Meijer, Stop 'N Shop, Target and Wal-Mart and Petco, Pet Supermarket, Petsmart, Pet Supplies Plus were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.  Publix, Albertson's, Kroger, Safeway, HEB, Meijer, Stop 'N Shop, Target and Wal-Mart and Petco, Pet Supermarket, Petsmart, Pet Supplies Plus adopted the marketing representations  the marketing of Mars, Procter and Gamble, Colgate, Del Monte, Nestlé and Nutro and/or made their own marketing representations regarding pet food ultimately sold to the consumer.

165.    The Defendants made misrepresentations and/or false statements of material fact to, and omitted and/or concealed material facts from, the Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, labeling, and sale of the Defendants' pet foods regarding the scientifically unsubstantiated claims in the Defendants' marketing materials as discussed in detail above throughout the Class Period.

166.    All of the Defendants, through their advertising practices and representations made to their consumers, including the Plaintiffs/Class Representatives and the Class through

their television advertisements, web-site advertisements, in-store advertisements, and representations by staff in retail stores, were representations which were likely to mislead the Plaintiffs/Class Representatives and the Class because they misrepresented the effectiveness, healthiness and other purported benefits of the Defendants' pet food and/or failed to disclose the true ingredients, potential and known health risks, and possible and/or the actual side effects associated with the Defendants' pet foods and/or the lack of substantiation for their marketing claims.

167.    The Defendants' deliberately and/or intentionally misrepresented to, and/or omitted and/or concealed material facts from consumers, including the Plaintiffs/Class Representatives and other Class members, that the Defendants' pet foods were safe and healthy when fed to companion pets and provided nutritional, health and other benefits.  Co-Packers, as the manufacturer and producer of the Defendants' pet food by omission failed to disclose material facts to consumers. Such misrepresentations, omissions, false statements, concealments, and omissions of facts include, but are not limited to:

a.    Failing to disclose, and/or intentionally concealing, ingredients which are not safe or healthy for companion pets;

b.    Failing to disclose, and/or intentionally concealing, the results of tests showing the potential health risks to companion pets associated with the use of Defendants' commercial pet foods;

c.    Failing to adequately test ingredients in the Defendants commercial pet foods to ensure that the ingredients and additives comport with the Defendants' marketing and advertising representations;

d.      Failing to include adequate warnings about the potential actual risks and nature, scope, severity, and duration of adverse effects of the ingredients and contents in the Defendants' pet foods;

e.      Concealing information regarding the known health risks to companion pets associated with the Defendants' pet foods; and

f.      Concealing research showing the deleterious effect of the Defendants pet food and/or failing to conduct valid scientific studies to support the claims while leading consumers to believe that they were accurate;

168.    The Defendants intentionally concealed facts known, or facts which they should have known, as alleged herein, in order to ensure increased sales and profits of the Defendants' pet foods.

169.    The Defendants had a duty to disclose the lack of substantiation for the foregoing marketing claims and/or risks and failed to do so, despite the ability to substantiate them and/or the possession of information concerning those risks. Whether, direct or whether adopted from a Defendant Manufacturer for profit at point of sale, the Defendants' representations that the Defendants' pet foods provided substantiated nutritional, health and other benefits, were safe, balanced, perfect, complete and healthy for their intended purpose were false, as Defendants' do not have scientific substantiation for claims made regarding the Defendants' pet food pet and/or failed to provide the advertised benefits, and/or it is unknown whether they will provide such benefits and/or were, in fact, dangerous to the health of companion pets.

170.    The Defendants intentionally made such misrepresentations through direct marketing and advertising, either directly or by adoption, and concealed material facts about their products in order to induce the Plaintiffs/Class Representatives and the Class to act in

reliance on the misrepresentations and concealments during the Class period so that the Plaintiffs/Class Representatives and the Class would buy the Defendants' pet foods, thus increasing sales and profits for the financial benefit of the Defendants.

171.    Further, the Defendants failed to exercise reasonable care in ascertaining the accuracy of the information marketed to consumers regarding nutritional, health and other beneficial claims and/or regarding the safe use of the Defendants' pet foods. The Defendants also failed to exercise reasonable care in communicating the information concerning the Defendants' commercial pet foods to Plaintiffs/Class Representatives and the Class, and/or concealed facts that were otherwise known to the Defendants or which the Defendants should reasonably have made efforts to discovery prior to making representations to sell these products.

172.    The Plaintiffs/Class Representatives and the Class were not aware of the falsity of the foregoing representations, nor were the Plaintiffs/Class Representatives and the Class aware that one or more material facts concerning the safety and health of the Defendants' pet foods had been purposely concealed.

173.    In reliance upon the Defendants' misrepresentations and false statements (and in the absence of disclosure of health risks), the Plaintiffs/Class Representatives and the Class purchased the Defendants' pet foods for their companion pets. Had the Plaintiffs/Class Representatives and the Class known the true facts concerning the lack of scientific support of the nutritional, health and other beneficial claims and/or risks associated with the Defendants' commercial pet foods, they would not have purchased the pet foods and/or fed the pet foods to their companion pets.

174.    The reliance by the Plaintiffs/Class Representatives and the Class upon the Defendants' misrepresentations was justified because said misrepresentations, false statements,

and omissions were made by individuals and entities that were in a position to know the facts concerning the Defendants' pet foods.

175.    The Plaintiffs/Class Representatives and the Class were not in a position to know the facts because the Defendants have aggressively promoted the use of the Defendants' pet foods and concealed the lack of support for the representations concerning the nutritional, health and other benefits as well as the risks associated with its use, thereby inducing the Plaintiffs/Class Representatives and other Class members to purchase and/or use the Defendants' pet foods.

176.    As a direct and proximate result of the Defendants' misrepresentations, false statements, and/or concealment, the Plaintiffs/Class Representatives and the Class have suffered damages.

177.    The Defendants' conduct in concealing material facts and making the foregoing misrepresentations, as alleged herein, was committed with such reckless disregard that the conduct amounts to a conscious disregard or indifference to the rights of consumers such as the Plaintiffs/Class Representatives and other Class members, thereby entitling the Plaintiffs/Class Representatives and other Class members to punitive damages.

178.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law;

(c)    Awarding punitive damages; and

(d)    Granting such other and further relief as allowed by law.

**COUNT II**

### Fraud in the Inducement[18]
### As to All Defendants

179.     Plaintiffs/Class Representatives and the Class members herby adopt and incorporate by reference paragraphs 1-161 as if set forth more fully herein.

180.     At all material times, Defendant Manufacturers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), Retailers and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

181.     At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

182.     The Defendants, whether directly or by adoption, made misrepresentations and/or false statements of material facts to, and omitted and/or concealed material facts from, Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendants' pet foods regarding their safety and use.

183.     The Defendants intentionally concealed facts known, or facts which they should have known, as alleged herein, in order to ensure increased sales and profits of the Defendant Manufacturers' pet foods.  Further, the Defendants knew that the statements and representations that they made to consumers, including the Plaintiffs/Class Representatives and the Class were false.

184     The Defendants intended the Plaintiffs/Class Representatives and the Class to rely on their false statements and representations in order to induce the Plaintiffs/Class

---

[18] And other state fraudulent inducement laws of the various states where Class members reside.

Representatives and the Class to act upon those statements and representations by purchasing the Defendants' pet foods, thus leading to increased sales and profits for all of the Defendants.

185.    The Plaintiffs/Class Representatives and the Class justifiably relied upon these representations and in doing so were injured.  The Plaintiffs/Class Representatives and the Class purchased the Defendants' pet foods under the mistaken belief that the items being purchased were healthy, beneficial, and safe for their companion pets, when in fact Defendants' products were unfit and dangerous.

186.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law;

(c)    Awarding punitive damages; and

(d)    Granting such other and further relief as allowed by law.

## COUNT III

**Negligent Misrepresentation[19]**
**As to All Defendants**

187.    Plaintiffs/Class Representatives and the Class members herby adopt and incorporate by reference paragraphs 1-161 as if set forth more fully herein.

188.    At all material times, Defendant Manufacturers, Retailers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

---

[19] And other state negligent misrepresentation laws of the various states where Class members reside.

189.    At all material times, Defendant Retailers and Pet Specialty retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

190.    The Defendants owed the Plaintiffs/Class Representatives and the Class a duty to exercise reasonable care in representing the contents, safety and health benefits of its pet food.

191.    The Defendants made representations to Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendant Manufacturers' Retailers and Petsmart's pet foods regarding the nutritional, health, medicinal, dietetic and other benefits of the Defendants' pet food.

192.    The Defendants negligently represented that their pet foods provided these health and other benefits without adequate scientific support and were safe and healthy for consumption by companion pets despite the lack of adequate scientific study leaves the safety or benefit of these products uncertain.

193.    The Defendants' either knew or should have known that their claims of health and other benefits were scientifically unsubstantiated and/or contained ingredients that have not yet been proven to provide a benefit to a cat or dog and/or were harmed the Plaintiffs/Class Representatives and the Class' companion pets.  Thus, the Defendants knew or should have known that their statements and advertisements were unsubstantiated scientifically and/or failed to provide the advertised nutritional or other benefits.

194.    The Defendants intentionally made such misrepresentations about their products in order to induce the Plaintiffs/Class Representatives and the Class to act on the misrepresentations so that the Plaintiffs/Class Representatives and the Class would buy the Defendants' pet foods, thus increasing the sales and profits of Defendants' pet foods.

195.    The Plaintiffs/Class Representatives and the Class reasonably relied on marketing, sales literature, advertisements, the advice of Retailers' and Pet Specialty Retailers' store staff and employees, and other information provided by the Defendants regarding the nutritional, health  and other alleged benefits of their pet food and its safety.

196.    As a proximate cause of the Defendants' negligent representations, which they knew or should have known were scientifically unsubstantiated and/or cause injury, the Plaintiffs/Class Representatives and the Class suffered injuries and damages.

197.    Wherefore, Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT IV

### Violation of the Florida[20] Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 As to All Defendants

198.    The Plaintiffs/Class Representatives and the Class herby adopt and incorporate by reference paragraphs 1-161 as if set forth more fully herein.

199.    At all material times, Defendant Manufacturers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), Retailers, and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

---

[20] And other state deceptive trade practice laws of the various states where Class members reside.

200.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

201.    This is a cause of action for damages due to the Defendants' violation of Florida's Deceptive and Unfair Trade Practices Act, Florida Statute §501.201, *et sequi*.

202.    The Defendants' conduct in making deceptive representations to, and omissions and/or concealing material facts from, the Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendants' pet foods regarding the nutritional, health and other benefits and/or the safety of same is an unfair and/or a deceptive act in violation of § 501.201.

203.    At all material times hereto, the Plaintiffs/Class Representatives and the Class were "interested parties or persons" as said term is defined under Fla. Stat. §501.203(6). Furthermore, the Plaintiffs/Class Representatives and the class were "consumers" as said term is defined under Fla. Stat. §501.203(7).

204.    By virtue of the acts described above, the Defendants were engaged in "trade or commerce" as said term is defined under Fla. Stat. §501.203(8).

205.    The Plaintiffs/Class Representatives and the Class reasonably relied, and acted reasonably under the circumstances, on the marketing, advertising, and other information provided by the Defendants regarding the safety, nutritional, health and other benefits of the Defendants' pet foods.  This reliance was reasonable because the Plaintiffs/Class Representatives and the Class are average consumers who do not possess Defendants' specialized knowledge of pet food and pet food ingredients.

206.    The Defendants' representations that their pet foods are safe and have nutritional, medical, health, dental hygienic and other benefits, when these claims are scientifically unsubstantiated and/or are unproven or otherwise inaccurate, are deceptive and therefore constitute an unlawful, unfair, or deceptive act under Fla. Stat. §501.204, and as a proximate result, the Plaintiffs/Class Representatives and the Class have been damaged.

207.    The Defendants' conduct offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and therefore a violation of § 501.201.[21]

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against Defendants as follows:

(a)    Awarding actual damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law;

(c)    For reasonable attorneys' fees and costs pursuant to Fla. Stat. §501.2105; and

(d)    Granting such other and further relief as it deems just and proper.

## COUNT V

### Violation of Fla.[22] Stat. § 817.41 (2007)
### As to All Defendants

208.    The Plaintiffs/Class Representatives and other Class members herby adopt and incorporate by reference paragraphs 1-161 as if more fully set forth herein.

---

[21] While the Florida legislature does not define what an unfair or deceptive act is, it has mandated that Fla. Stat. chs. 501.204, 501.211(1)-(2) (1997) of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) are to be liberally construed. The legislature has also specifically stated that great weight should be given to federal cases interpreting the federal counterpart of this act. An unfair practice under 15 U.S.C.S. § 45(a)(1) of the Federal Trade Commission Act has been defined as one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. See Samuels v. King Motor Co., 782 So. 2d 489 (Fla. 4th DCA 2001).

[22] And other state false advertising laws of the various states where Class members reside.

209.    At all material times, Defendants Manufacturers, Retailers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart) and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

210.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

211.    The Defendants violated Fla. Stat. §817.41 by disseminating misleading, scientifically unsubstantiated and/or untrue advertising to the Plaintiffs/Class Representatives and the Class by the following actions:

      a.    Representing to the Plaintiffs/Class Representatives and the Class that their products had nutritional, health, medical, dental, hygienic and other benefits that are unsupported by valid scientific studies;

      b.    Representing to the Plaintiffs/Class Representatives and the Class through television commercials, websites, in-store advertisements, and the representations of retail store staff and employees that their products will provide nutritional, medical, dental, hygienic and/or other benefits which are unsupported by valid scientific studies.

      c.    Omitting and/or concealing material facts regarding the benefits and /or ingredients in the pet food from the Plaintiffs/Class Representatives and the Class.

212.    The Defendants knew, or through the exercise of reasonable care or investigation could or might have ascertained, that its advertising was untrue or misleading.

213.    The Defendants intended either directly or indirectly that their advertising would induce the Plaintiffs/Class Representatives and the Class to buy their products.

214.    As a result of the Defendants' actions, the Plaintiffs/Class Representatives and the Class have been injured.

215.    The Defendants', by making misrepresentations of material facts to, and omitting and/or concealing material facts from, the Plaintiffs/Class Representatives and other Class members in the advertising, marketing, distribution, and sale of Defendants' pet foods is unlawful pursuant to §817.41 (2007) since the purpose of the Defendants'' "misleading advertising"[23] is for the Defendants to obtain profits.[24]

216.    Wherefore, Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against Defendants as follows:

(a)    For an order certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing Plaintiff(s) and their legal counsel to represent the Class;

(b)    Awarding actual damages;

(c)    For pre- and post-judgment interest as allowed by law;

(d)    For reasonable attorneys' fees and costs;

(e)    Punitive damages; and[25]

(f)    Granting such other and further relief as allowed by law.

## COUNT VI

---

[23] The phrase "misleading advertising" includes any statements made, or disseminated, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services." Fla. Stat. § 817.40(5) (2007).

[24] "It shall be unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement. Such making or dissemination of misleading advertising shall constitute and is hereby declared to be fraudulent and unlawful, designed and intended for obtaining money or property under false pre-tenses." Fla. Stat. § 817.41 (2007).

[25] "Any person prevailing in a civil action for violation of this section shall be awarded costs, including reasonable attorney's fees, and may be awarded punitive damages in addition to actual damages proven. This provision is in addition to any other remedies prescribed by law." Fla. Stat. § 817.41(6) (2007).

## Negligence[26]
## As to Defendant Manufacturers

217.    The Plaintiffs/Class Representatives and other members of the Class herby adopt and incorporate by reference paragraphs 1-161 as if more fully set forth herein.

218.    At all material times, Defendant Manufacturers, Co-Packers, Retailers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart) and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

219.    The Defendants Mars, Proctor and Gamble, Colgate, Del Monte, Nestle, Nutro, Co-Packers (through association with and/or by agreement with Defendant Manufacturers Retailers and Petsmart), Retailers and Petsmart owed the Plaintiffs/Class Representatives and other Class members a duty to offer pet food with the advertised  benefits and/or safe, healthy, and pet foods for consumption by household companion pets.

220.    The Defendants Mars, Proctor and Gamble, Colgate, Del Monte, Nestle, Nutro, Co-Packers (through association with and by agreement with Defendant Manufacturers Retailers and Petsmart), Retailers and Petsmart also owed a duty to provide what the Defendants marketed that they would provide in their commercial pet food products.

221.    The Defendants' failure to exercise due care by producing, processing, manufacturing, marketing, distributing and offering for sale the pet foods that had advertised benefits that had not been scientifically validated and/or were in a condition that failed to provide the advertised benefit and/or was unhealthy for the Plaintiffs/Class Representatives and other Class members' companion pets and in a manner that was inconsistent with their marketing.

---

[26] And other state negligence laws of the various states where Class members reside.

222.    Additionally, the Defendants breached their duty of care to the Plaintiffs/Class Representatives and other Class members by failing to use sufficient quality control, perform adequate testing, proper manufacturing, production, or processing, and failing to take sufficient measures to prevent the pet foods from being offered for sale, sold, or fed to companion pets that was not representative of the manner in which the pet food was marketed.

223.    `The Defendants knew or, in the exercise of reasonable care, should have known, that the pet foods presented an unacceptable and unreasonable risk of harm to the Plaintiffs/Class Representatives' and the Class' companion pets, and would result in foreseeable, and reasonably avoidable, damages.

224.    Despite this risk, the Defendants continued to manufacture, market, sell, distribute, and advertise their products to consumers, including the Plaintiffs/Class Representatives and the Class.

225.    The Defendants' conduct, as alleged herein, was therefore negligent, careless, and reckless.

226.    As a direct and proximate result of the Defendants' above referenced negligence, the Plaintiffs/Class Representatives and other Class members have suffered loss and damages.

Wherefore, the Plaintiffs/Class Representatives and other Class members, on behalf of themselves and all others similarly situated, prays relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT VII

### Negligence Per Se[27]
### As to Defendant Manufacturers, Co-Packers, Retailers and Petsmart

227.    The Plaintiffs/Class Representatives and other Class members herby adopt and incorporate by reference paragraphs 1-161 as set forth more fully herein.

228.    At all material times, the Defendants manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

229.    The Defendants had a duty to ensure that their pet foods were manufactured, packaged, distributed, and sold in a manner consistent with governmental regulations and standards, including the Federal Drug and Cosmetic Act 21 U.S.C. §343, 9 C.F.R. 355.52, 59.

230.    The purpose of such governmental regulations is to protect consumers, pet owners, and their pets from pet foods that do not meet health and quality standards and/or pose a danger to companion dogs and cats.

231.    The Defendants Mars, Proctor and Gamble, Colgate, Del Monte, Nestle, Nutro, Co-Packers, Retailers and Petsmart breached their duty by violating such governmental regulations, thus failing to protect the Plaintiffs/Class Representatives and the Class from injury.

232.    This breach directly and proximately caused injury to the Plaintiffs/Class Representatives and the Class.

233.    The Plaintiffs/Class Representatives and the Class have suffered damages due to the Defendants' violations of federal regulations.

234.    Wherefore, the Plaintiffs/Class Representatives and other Class members, on behalf of themselves and all others similarly situated, prays relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

---

[27] And other state negligence per se laws of the various states where Class members reside.

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT X

### Breach of Implied Warranty[28]
### as to All Defendants

235.    The Plaintiffs/Class Representatives and the Class hereby adopt and incorporate by reference paragraphs 1-161 as set forth more fully herein.

236.    At all material times, the Defendant Manufacturers, Co-Packers, Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

237.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

238.    At the time the Defendants advertised, marketed, sold, and distributed the commercial pet food, the Defendants knew of the purpose for which the pet foods were intended and impliedly warranted that the pet foods were of merchantable quality and safe and fit for such use.  In fact, the Defendants marketed, promoted, and advertised their products as being, among other things, "perfect," "nutritious," "healthy," "well balanced," "superior" and has having nutritional, health and other benefits.

239.    Contrary to such implied warranties, the pet foods were not of merchantable quality and were not safe for their intended use.

240.    The Defendants breached the implied warranties because their products, purchased by the Plaintiffs/Class Representatives and the Class, were not of merchantable

---

[28] And other state breach of warranty laws of the various states where Class members reside.

quality, nor safe, nor fit for their intended use because the products were adulterated, and, therefore, were unreasonably dangerous and unfit for their ordinary and/or intended use.

241.    The Plaintiffs/Class Representatives and the Class reasonably relied upon the skill, superior knowledge and judgment of the Defendants as to whether the pet foods were of merchantable quality and safe and fit for their intended use.

242.    Due to the Defendants' wrongful conduct as alleged herein, the Plaintiffs/Class Representatives and the Class did not and could not have know about the risks and side effects associated with the commercial pet food.

243.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT XI

### Breach of Express Warranty[29]
### As to All Defendants

244.    The Plaintiffs/Class Representatives and other Class members herby adopt and incorporate by reference paragraphs 1-161 as if more fully set forth herein.

245.    At all material times, the Defendant Manufacturers, Co-Packers, Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

---

[29] And other state breach of express warranty laws of the various states where Class members reside.

246.    At all material times, Defendants Pet Supermarket, PetCo, PetSmart, Target, and Wal-Mart were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

247.    The Defendants expressly warranted that the pet foods were safe, healthy, perfect, balanced, and nutritious for consumption by companion cats and dogs through their products' labels, packaging, and advertisements.

248.    The Defendants' pet foods did not conform to these express representations because the pet foods are not safe and/or healthy for consumption by the Plaintiffs/Class Representatives companion pets and Class' cats and dogs.

249.    In fact, the Defendants' pet foods are harmful, unhealthy, and not safe for consumption by the Plaintiffs/Class Representatives and the Class' companion pets as evidenced by the pets' deaths and illnesses.  Thus, the Plaintiffs/Class Representatives and the Class have suffered damages as a result of the Defendants' breach of express warranty.

250.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT XII

### Unjust Enrichment[30]
### As to All Defendants

251.    Plaintiffs/Class Representatives and other Class members herby adopt and incorporate by reference paragraphs 1-161 as if more fully set forth herein.

---

[30] And other state unjust enrichment laws of the various states where Class members reside.

252.    At all material times, the Defendant Manufacturers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

253.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

254.    The Plaintiffs/Class Representatives and the Class purchased the Defendants' pet foods because they believed that the pet foods were safe for their pets to consume.

255.    As a direct, proximate, and foreseeable result of the Defendants' acts and otherwise wrongful conduct, the Plaintiffs/Class Representatives and the Class suffered damages. The Defendants profited and benefited from the sale of the pet foods, as the pet foods caused the Plaintiffs/Class Representatives and other Class members to incur damages.

256.    The Defendants have voluntarily accepted and retained these profits and benefits, derived from consumers, including the Plaintiffs/Class Representatives and the Class, with full knowledge and awareness that, as a result of the Defendants' outrageous misrepresentations and wrongdoings, consumers, including the Plaintiffs/Class Representatives and the Class, were not receiving pet foods of quality, nature, fitness, or value that had been represented by the Defendants or that unknowing consumers expected.  The Plaintiffs/Class Representatives and other Class members purchased pet food that they expected would be as the Defendants had represented in their marketing, advertising, and media materials- safe.  According to the packages and containers, the Plaintiffs/Class Representatives and the Class expected the Defendants' products to be healthy for their companion cats and dogs.  Instead, the

Plaintiffs/Class Representatives and the Class and have now had to endure the costs associated with veterinarians, medicines, and treatment for their companion pets.

257.    By virtue of knowing of the wrongdoing as alleged in this Complaint, the Defendants have been unjustly enriched at the expense of the Plaintiffs/Class Representatives and the Class who are entitled to, and hereby seek, the disgorgement and restitution of the Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

258.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against Defendants as follows:

(a)    The return of wrongful, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

(b)    Granting such other and further relief as allowed by law.

## JURY DEMAND

259.    Plaintiffs/Class Representatives and the Class demand a jury trial on all issues triable by a jury.

DATED: July 25, 2007

_____
CATHERINE J. MACIVOR (FBN 932711)
cmacivor@mflegal.com
MALTZMAN FOREMAN, PA
One Biscayne Tower
2 South Biscayne Boulevard – Suite 2300
Miami, Florida 33131
Tel: 305-358-6555 / Fax: 305-374-9077

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the Court via CM/ECF on this 25th day of July, 2007. We also certify that the foregoing was served on all counsel or parties of record on the attached Service List either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Filing.

_____
CATHERINE J. MACIVOR

**SERVICE LIST**

**CASE NO. 07-21221 ALTONAGA/Turnoff**

**CATHERINE J. MACIVOR**
cmacivor@mflegal.com
**JEFFREY B. MALTZMAN**
jmaltzman@mflegal.com
**JEFFREY E. FOREMAN**
jforeman@mflegal.com
**DARREN W. FRIEDMAN**
dfriedman@mflegal.com
MALTZMAN FOREMAN, PA
One Biscayne Tower
2 South Biscayne Boulevard -Suite 2300
Miami, Florida 33131
Tel: 305-358-6555 / Fax: 305-374-9077
*Attorneys for Plaintiffs*

**PHILIP A. SECHLER**
psechler@wc.com
**THOMAS G. HENTOFF**
thentoff@wc.com
**DANE H. BUTSWINKAS**
dbutswinkas@wc.com
**CHRISTOPHER M. D'ANGELO**
cdeangelo@wc.com
**PATRICK J. HOULIHAN**
phoulihan@wc.com
Williams & Connolly LLP
725 12th Street, N.W.
Washington, D.C. 20005
Tel: 202.434.5459 / Fax: 202.434.5029
*Attorneys for Defendant Mars, Inc.*

**KATHLEEN S. PHANG**
kphang@sfklaw.com
**CHARLES PHILIP FLICK**
cflick@sfklaw.com
Seipp, Flick & Kissane
Two Alhambra Plaza -Suite 800
Miami, Florida 33134-5241
Tel: 305.995.5600 / Fax: 305.995-6100
*Attorney for Defendant Target Corp.*

**OMAR ORTEGA**
oortega@dortaandortega.com
Dorta and Ortega, P.A.
Douglas Entrance
800 S. Douglas Road, Suite 149
Coral Gables, Florida 33134
Tel: 305-461-5454 / Fax: 305-461-5226
*Attorneys for Defendant Mars, Inc.*

**ALAN GRAHAM GREER**
agreer@richmangreer.com
Richman Greer Weil Brumbaugh
 Mirabito & Christensen
201 South Biscayne Boulevard – STE 1000
Miami, Florida 33131
Tel: 305.373.4010 / Fax: 305.373.4099
*Attorneys for Defendant Proctor and Gamble Co.*

**JOHN J. KUSTER**
jkuster@sidley.com
**JAMES D. ARDEN**
jarden@sidley.com
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Tel: 212.839.7336 / Fax: 212.839.5599
*Attorneys for Defendant Colgate Palmolive Company*

**D. JEFFREY IRELAND**
djireland@ficlaw.com
**BRIAN D. WRIGHT**
bwright@ficlaw.com
**LAURA A. SANOM**
lsanom@ficlaw.com
Faruki Ireland & Cox P.L.L.
500 Courthouse Plaza, S.W.
10 North Ludlow St.
Dayton, OH 45402
Tel: 937.227.3710 / Fax: 937.227.3717
*Attorneys for Defendant Proctor and Gamble Co.*

**SHERRIL M. COLOMBO**
scolombo@cozen.com
Cozen O'Connor
200 South Biscayne Boulevard
Suite 4410
Miami, Florida 33131-2303
Tel: 305.704.5945 / Fax: 305.704.5955
*Attorneys for Defendant Del Monte Foods, Co.*

**JOHN J. McDONOUGH**
jmcdonough@cozen.com
**RICHARD FAMA**
rfama@cozen.com
Cozen O'Connor
45 Broadway
New York, NY  10006
Tel: 212.509.9400 / Fax: 212-509.9492
*Attorneys for Defendant Del Monte Foods Co.*

**JOHN F. MULLEN**
jmullen@cozen.com
Cozen O'Connor
The Atrium – 3rd Floor
1900 Market Street
Philadelphia, PA  19103
Tel: 215.665.2179 / Fax: 215.665.2013
*Attorneys for Defendant Del Monte Foods Co.*

**OLGA M. VIEIRA**
ovieira@carltonfields.com
**BENJAMINE REID**
breid@carltonfields.com
Carlton Fields, PA
100 SE 2nd Street - #4000
Miami, FL 33131
Tel: 305.530.0050 / Fax:
*Attorneys for Defendant Colgate Palmolive Company*

**KARA L. McCALL**
kmccall@sidley.com
Sidley Austin, LLP
One South Dearborn
Chicago, Illinios  60603
Tel: 312.853.2666 / Fax:
*Attorneys for Defendant Colgate Palmolive Company*

**ROBERT C. TROYER**
rctroyer@hhlaw.com
Hogan & Hartson LLP
One Tabor Center -Suite 1500
1200 Seventeenth Street
Denver, CO 80202
Tel: 303-899-7300 / Fax: 303-899-7333
*Attorneys for Nestle U.S.A., Inc.*

**MIRANDA L. BERGE**
mlberge@hhlaw.com
**CRAIG A. HOOVER**
cahoover@hhlaw.com
Hogan & Hartson, LLP
555 13th Street, NW
Washington, DC  20004
Tel: 202.637.5600 / Fax: 202.637.5910
*Attorneys for Nestle U.S.A., Inc.*

**CHARLES ABBOTT**
cabbott@gibsondunn.com
**BEN BRODERICK**
bbroderick@gibsondunn.com
**GARY L. JUSTICE**
gjustice@gibsondunn.com
**WILLIAM EDWARD WEGNER**
wwegner@gibsondunn.com
**GAIL E. LEES**
glees@gibsondunn.com
Gibson Dunn & Crutcher L.L.P
333 S. Grand Avenue -Suite 4600
Los Angeles, CA 90071
Tel: 213.229.7887 / Fax: 213.229.6887
*Attorneys for Defendant Nutro Products Inc.*

**CAROL A. LICKO**
calicko@hhlaw.com
Hogan & Hartson L.L.P
Mellon Financial Center
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel: 305.459.6500 / Fax: 305.459.6550
*Attorneys for Nestle U.S.A., Inc.*

**MARTY STEINBERG**
msteinberg@hunton.com
**ADRIANA RIVIERE-BADELL**
ariviere-badell@hunton.com
Hunton & Williams, LLP
1111 Brickell Avenue - #2500
Miami, Florida  33131
Tel: 305.810.2500 / Fax: 305.810.2460
*Attorneys for Defendant Nutro Products Inc.*

**HUGH J. TURNER JR.**
Hugh.turner@akerman.com
Akerman Senterfitt & Eidson
Las Olas Centre II, Suite 1600
350 East Las Olas Blvd.
Ft. Lauderdale, Florida 33301-2229
Tel: 954.463.2700 / Fax: 954.463.2224
*Attorneys for Defendant Publix Supermarkets, Inc.*

**JOHN B. T. MURRAY, JR.**
jbmurray@ssd.com
Squire, Sanders & Dempsey LLP
1900 Phillips Point West
777 South Flagler Drive - #1900
West Palm Beach, Florida 33401
Tel: 561.650.7200 / Fax: 561.655.1509
*Attorneys for Defendants Petco Animal Supplies,*
*Inc. and Wal-Mart Stores, Inc.*

**ROLANDO ANDRES DIAZ**
rd@kubickidraper.com
**MARIA KAYANAN**
mek@kubickidraper.com
**CASSIDY YEN DANG**
cyd@kubickidraper.com
Kubicki Draper, P.A.
25 West Flagler Street - Penthouse
Miami, Florida 33130
Tel: 305.982.6722 / Fax: 305.374.7846
*Attorneys for Defendant Pet Supermarket, Inc.*

**ROBIN LEA HANGER**
rlhanger@ssd.com
Squire, Sanders & Dempsey, LLP
200 S. Biscayne Boulevard – 40th Floor
Miami, Florida  33131-2398
Tel: 305.577.7040 / Fax: 305.577.7001
*Attorneys for Defendants Petco Animal Supplies,*
*Inc. and Wal-Mart Stores, Inc.*

**SUSAN ELIZABETH MORTENSEN**
smortensen@coffeyburlington.com
Coffey Burlington
2699 S. Bayshore Drive - Penthouse
Miami, Florida 33133
Tel: 305.858.2900 / Fax: 305.858.5261
*Attorneys for Defendant Petsmart, Inc.*

**ALEXANDER SHAKNES**
Alex.shaknes@dlapiper.com
**AMY W. SCHULMAN**
Amy.schulman@dlapiper.com
DLA PIPER US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: 212.335.4829 / Fax: 212.884.8629
*Attorneys for Menu Foods Income Fund and*
*Menu Foods, Inc.*

**MICHAEL K. KENNEDY**
mkk@gknet.com
**MICHAEL R. ROSS**
mrr@gknet.com
Gallagher and Kennedy, PA
2575 E. Camelback Road - #1100
Phoenix, Arizona 85016
Tel: 602.530.8504 / Fax: 602.530.8500
*Attorneys for Defendant Petsmart, Inc.*

**WILLIAM C. MARTIN**
William.martin@dlapiper.com
DLA PIPER US LLP
203 North LaSalle Street - #1900
Chicago, Illinois 60601-1293
Tel: 312.368.3449 / Fax: 312.630.7318
*Attorneys for Menu Foods Income Fund and*
*Menu Foods, Inc.*

**LONNIE L. SIMPSON**
lonnie.simpson@dlapiper.com
**S. DOUGLAS KNOX**
sdouglas.knox@dlapiper.com
DLA PIPER US LLP
101 E. Kennedy Boulevard - #2000
Tampa, Florida  33602
Tel:   / Fax:
*Attorneys for Menu Foods Income Fund and*
*Menu Foods, Inc.*