UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 07-21221 CIV ALTONAGA/Turnoff

RENEE BLASZKOWSKI, *et al.*,
individually and on behalf of others
 similarly situated,

        Plaintiffs/Class Representatives,

vs.

MARS INC., *et al.,*

        Defendants.

_____/

**SECOND AMENDED CLASS ACTION COMPLAINT**

      Plaintiffs/Class Representatives, Renee Blaszkowski, *et al.,* individually and on

behalf of others similarly situated, file this Second Amended Class Action Complaint against

Defendants, Mars Inc., *et al.,* (hereinafter collectively referred to as the "Defendants") and allege

as follows:

**INTRODUCTION**

      1.    This is a class action brought by the Plaintiffs on behalf of a Class of all

consumers who have purchased commercial pet food from one or more of the Defendants during

the Class Period and relates to the marketing, manufacturing and sale of commercial pet food and

treats.

      2.    As explained more fully below, the Plaintiffs bring this action for injunctive

relief, restitution, and damages for (1) false and deceptive advertising, misrepresentations and

omissions made by the Defendants in the marketing, advertising and sale of the Defendants'

commercial pet food; and (2) for the illness and deaths of the Plaintiffs' cats and dogs from ingesting the Defendants' commercial pet food and treats.

## PARTIES

### Plaintiffs/Class Representatives

3.      Plaintiff/Class Representative, Renee Blaszkowski, is a resident of Michigan who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Michigan during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

4.      Plaintiff/Class Representative, Amy Hollub, is a resident of Florida who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Florida during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

5.      Plaintiff/Class Representative, Patricia Davis, is a resident of Florida, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Florida during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

6.      Plaintiff/Class Representative, Susan Peters, is a resident of Oklahoma, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Oklahoma during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

7.      Plaintiff/Class Representative, Deborah Hock, is a resident of California, who regularly purchased one or more brands of the Defendants' commercial pet food for daily

consumption by her cat(s)/dog(s) in California during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

8.      Plaintiff/Class Representative, Mike Floyd, is a resident of Texas, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by his cat(s)/dog(s) in Texas during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

9.      Plaintiff/Class Representative, Beth Wilson, is a resident of Indiana, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Indiana during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

10.      Plaintiff/Class Representative, Claire Kotzampaltiris, is a resident of Massachusetts, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Massachusetts during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

11.      Plaintiff/Class Representative, Donna Hopkins-Jones, is a resident of Massachusetts, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Massachusetts during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

12.      Plaintiff/Class Representative, Nicole Piazza, is a resident of New York, who regularly purchased one or more brands of the Defendants' commercial pet food for daily

consumption by her cat(s)/dog(s) in New York during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

13.    Plaintiff/Class Representative, Marian Lupo, is a resident of Ohio, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Ohio during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

14.    Plaintiff/Class Representative, Jane Herring, a resident of South Carolina, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in South Carolina during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

15.    Plaintiff/Class Representative, Jo-Ann Murphy, is a resident of Tennessee, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Tennessee during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

16.    Plaintiff/Class Representative, Stephanie Stone, is a resident of Virginia, who purchased regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Virginia during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

17.    Plaintiff/Class Representative, Patricia Hanrahan, is a resident of Washington, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Washington during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

18.     Plaintiff/Class Representative, Debbie Rice, is a resident of Wisconsin, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Wisconsin during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

19.     Plaintiff/Class Representative, Ann Quinn, is a resident of Nevada, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Nevada during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

20.     Plaintiff/Class Representative, Sharon Mathiesen, is a resident of Kansas, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Kansas during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

21.     Plaintiff/Class Representative, Sandy Shore, is a resident of Arizona, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Arizona during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

22.     Plaintiff/Class Representative, Carolyn White, is a resident of West Virginia, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in West Virginia during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

23.     Plaintiff/Class Representative, Lou Wiggins, is a resident of Nebraska, who regularly purchased one or more brands of the Defendants' commercial pet food for daily

consumption by her cat(s)/dog(s) in Nebraska during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

24.     Plaintiff/Class Representative, Michelle Lucarelli, is a resident of Pennsylvania, who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Pennsylvania during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

25.     Plaintiff/Class Representative, Raul Isern, is a resident of Florida, who purchased regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by his cat(s)/dog(s) in Florida during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

26.     Plaintiff/Class Representative, Danielle Valoras, is a resident of North Carolina who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in North Carolina during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

27.     Plaintiff/Class Representative, Lisa MacDonald, is a resident of Georgia who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Georgia during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

28.     Plaintiff/Class Representative, Cindy Tregoe, is a resident of Maryland who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Maryland during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

29.     Plaintiff/Class Representative, Jennifer Damron, is a resident of Kentucky who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Kentucky during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

30.     Plaintiff/Class Representative, Marlena Rucker, is a resident of Arizona who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Arizona during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

31.     Plaintiff/Class Representative, Julie Nelson, is a resident of Kentucky who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Kentucky during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

32.     Plaintiff/Class Representative, Gene Reed, is a resident of Arkansas who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in Arkansas during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

33.     Plaintiff/Class Representative, Yvonne Thomas, is a resident of New York who regularly purchased one or more brands of the Defendants' commercial pet food for daily consumption by her cat(s)/dog(s) in New York during the Class Period that was/were manufactured, marketed, produced, distributed, advertised and/or sold by the Defendants.

**DEFENDANTS**

**Defendant Manufacturers**

34.     Defendant, Mars, Inc. ("Mars"), is a Delaware corporation with its principal place of business in Virginia and is the ultimate parent of Defendants Mars Petcare U.S. Inc. and Nutro Products, Inc. Mars is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food and treats for purchase and use by the Plaintiffs in Florida. Mars markets and advertises pet food which injured the Plaintiffs in Florida and nationwide.  Mars conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Mars has spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing consumer trust and confidence in its brands with the intent that the Plaintiffs and consumers will rely upon this trust and confidence in the Mars' family of brands to purchase Mars' brand pet food and treats ("Whether it's the simple pleasure of savouring the world's best-loved chocolate and confectionery, the satisfaction of a drink delivered efficiently from a vending machine, *a contented pet* or the reward of a delicious hot meal, *Mars is the name behind the brands they've grown to know and trust*.").

35.     Defendant, Mars Petcare U.S., Inc. ("Mars Pet"), is a Delaware corporation with its principal place of business in Tennessee. Mars Pet is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida. On information and belief, Mars Pet also manufactures, produces and distributes dog and cat food and treats for other companies which later attach their label to Mars' Pet products to be sold in Florida and nationwide. Mars' Pet manufactures, markets and advertises pet food and treats which injured the Plaintiffs in Florida.  Mar Pet places pet food products in the stream of commerce that reach Florida consumers. Mars Pet has spent millions of dollars in promoting and developing the trust and confidence in the Mars Pet brands with the intent that the Plaintiffs and consumers will rely upon and trust in the Mars family of brands to

purchase Mars Pet pet food and treats ("With the national recognition of the Waltham Center for Pet Nutrition, Mars also established a scientific authority that unifies the research and development expertise of pet care worldwide, and has a leading reputation among pet owners, breeders, veterinarians and academics.").

36.    Defendant, Procter & Gamble Co. ("P&G"), is an Ohio corporation with its principal place of business in Ohio and is the ultimate parent of Defendant, The Iams Company. P&G is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. P&G manufactures, markets and advertises pet food which injured the Plaintiffs in Florida. P&G conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. P&G has spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing the trust and confidence in the P&G brands with the intent that the Plaintiffs and consumers will rely upon and trust in P&G family of brands to purchase P&G brand pet food and treats ("We will provide branded products and services of superior quality and value that improve the lives of the world's consumers.  As a result, consumers will reward us with leadership sales, profit and value creation, allowing our people, our shareholders and the communities in which we live and work to prosper.").

37.    Defendant, The Iams Company ("Iams"), is an Ohio corporation with its principal place of business in Dayton, Ohio.  Iams is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Iams manufactures, markets and advertises pet food which has injured the Plaintiffs in Florida and places pet food products in the stream of commerce that reach Florida consumers. Iams was established in 1946 and acquired by P&G in 1999 when it "joined

P&G's Health Care global business unit." Iams has spent millions of dollars in promoting and developing the trust and confidence in the Iams brands with the intent that the Plaintiffs and consumers will rely upon and trust in the Iams brands to purchase Iams brand pet food and treats ("Our Mission is to enhance the well-being of dogs and cats by providing world-class quality foods and pet care products that delight the customer and strengthen the human-pet bond.").

38.    Defendant, Colgate Palmolive Company ("Colgate"), is a Delaware corporation with its principal place of business in New York and is the ultimate parent of Defendant, Hill's Pet Nutrition, Inc. Colgate is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Colgate manufactures, markets and advertises pet food which has injured the Plaintiffs in Florida.  Colgate conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Colgate has spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing the trust and confidence in its brands with the intent that the Plaintiffs and consumers will rely upon and trust in the Colgate family of brands to purchase Colgate pet food and treats ("Rely on our family of brands to care for the ones you love.").

39.    Defendant, Hill's Pet Nutrition, Inc. ("Hill's"), is a Delaware Corporation with its principal place of business in Kansas. Hill's is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Hill's manufactures, markets and advertises pet food which has injured the Plaintiffs in Florida. Hill's conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Hill's veterinary diets were originally established in the 1830's and in 1968 Hill's Science Diet® was made available through

veterinarians and pet professionals.  In 1976, Colgate purchased Hill's and Science Diet® which is now generally available at retailers and pet specialty stores. Hill's has spent millions of dollars in promoting and developing the trust and confidence in the Hill's brands with the intent that the Plaintiffs and consumers will rely upon and trust in the Hill's family of brands to purchase Hill's pet food.

40.    Defendant, Del Monte Foods Co. ("Del Monte"), is a Delaware corporation with its principal place of business in California. Del Monte is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Del Monte manufactures, markets and advertises pet food which has injured the Plaintiffs in Florida.  Del Monte conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Del Monte has spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing the trust and confidence in its brands with the intent that the Plaintiffs and consumers will rely upon and trust in the Del Monte family of brands to purchase Del Monte brand pet food and treats. ("We make the foods that nourish and enrich families, including the center of many families – pets.  Just a glance at our products reveals familiar brands that you know and trust.").

41.    Defendant, Nestlé USA., Inc. ("Nestlé USA"), is a Connecticut corporation with its principal place of business in California. Nestlé USA is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Nestlé USA manufactures, markets and advertises pet food which has injured the Plaintiffs in Florida.  Nestlé USA conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers.

Nestlé USA has spent millions of dollars in promoting a sense of trust and confidence in its brands with the intent that the Plaintiffs and consumers will rely upon and trust in the Nestlé brand pet food and treats ("Since its early beginnings, Nestlé has been a trusted source of quality brands and products that are essential to good living.").

42.     Defendant, Nestlé S.A. ("Nestlé SA"), is a Swiss corporation with its principal place of business in Vevey, Switzerland. Nestlé SA is the ultimate parent of numerous Nestlé-related companies, including Defendants, Nestlé USA Inc. and Nestlé Purina Petcare Co., and is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats to be purchased by the Plaintiffs in Florida and nationwide. Nestlé SA markets and advertises pet food which has injured Plaintiffs in Florida and nationwide. Nestlé SA conducts business in Florida through its affiliates and subsidiaries and places pet food products in the stream of commerce that reach Florida consumers. Nestlé SA also owns trademarks and intellectual property that are marketed to the Plaintiffs and consumers in Florida. Nestle SA acquired Ralston Purina pet food company in 2002. Nestlé SA has thus spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing the trust and confidence in its brands with the intent that the Plaintiffs and consumers will rely upon and trust in the Nestlé family of brands to purchase Nestlé brand pet food and treats ("Nutritious food and beverages are Nestlé's business and provide its main opportunity to contribute to society.").

43.     Defendant, Nestlé Purina Petcare Co. ("Nestle Purina"), is a Missouri corporation with its principal place of business in Missouri. Nestlé Purina is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food for purchase by the Plaintiffs in Florida. Nestlé Purina markets and advertises pet food which has injured the Plaintiffs in Florida and nationwide.   Nestlé Purina conducts business in Florida and

places pet food products in the stream of commerce that reach Florida consumers. Ralston Purina, Nestlé Purina's predecessor, was originally founded in 1893 and began selling commercial dog food in 1957. Nestlé Purina has spent millions of dollars in promoting a sense of trust and confidence on behalf of the consumer in its commercial pet food products with the intent that consumers will rely upon this trust and confidence to purchase Nestlé brand pet food brands ("Fore more than 75 years, Purina® brands have been advancing the science of pet nutrition, utilizing cutting-edge technology and research so that you can give your dog or cat what they need to be healthy and happy.").

44.    Defendant, Nutro Products, Inc. ("Nutro"), is a California corporation with its principal place of business in California. Nutro is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Nutro manufactures, markets and advertises pet food which has injured the Plaintiffs in Florida. Nutro conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Nutro has spent millions of dollars in promoting a sense of trust and confidence in its brands with the intent that the Plaintiffs and consumers rely upon and trust in the Nutro brand pet food and treats ("At Nutro products we have more than 80 years of experience creating great-tasting, nutritious pet foods.").

45.    Defendant, Natura Pet Products, Inc. ("Natura"), is a California corporation with its principal place of business in California. Natura is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Natura manufactures, markets and advertises pet food which has injured the Plaintiffs in Florida. Natura conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers.

Natura has spent millions of dollars in promoting a sense of trust and confidence in its brands with the intent that the Plaintiffs and consumers will rely upon and trust in the Natura brand pet food and treats ("No pet food company in the world makes natural pet foods like Natura.  We use only ingredients you'd eat yourself… .").

**Defendant Co-Packers**

46.     Defendant, Menu Foods, Inc., is a New Jersey corporation with its principal place of business in the state of New Jersey.

47.     Defendant Menu Foods Inc. is ultimately owned or controlled by Defendant Menu Foods Income Fund, an unincorporated open-ended trust with its principal place of business in the Province of Ontario, Canada.  Some of the Defendant Menu Foods, Inc.'s high managerial officers or agents are also high managerial officers and agents of Defendant Menu Foods Income Fund.  Defendant Menu Foods, Inc., and Defendant Menu Foods Income Fund are collectively referred to as "Menu Foods."

48.     The Menu Foods Defendants are in the business of manufacturing, producing, and/or selling dog and cat food under various brands and/or for third party firms, including, the Defendants pet food products which has injured the Plaintiffs in Florida.

49.     The Menu Foods Defendants also manufacture pet food for many North American retailers, including but not limited to, Defendant Wal-Mart Stores, for purchase and use by the Plaintiffs in Florida.

50.     Menu Foods is also a contract manufacturer of the Iams® and Eukanuba® brand pet food products for Defendant Procter & Gamble, for purchase and use by the Plaintiffs in Florida.

51.     On information and belief, Mars and/or Mars Petcare are in the business of manufacturing, producing, and/or selling dog and cat food under various brands and/or for third party firms, including, the other Defendants' pet food products, for purchase and use by the Plaintiffs in Florida.

**Defendant Retailers**

52.     Defendant, Target Corp. ("Target"), is a Minnesota corporation with its principal place of business in Minnesota. Target is in the business of manufacturing, marketing, producing, distributing, advertising and/or selling its private label brands and the Defendant Manufacturers' pet food and treat brands which has injured the Plaintiffs in Florida. Target conducts business in Florida and places products in the stream of commerce that reach Florida consumers.  Target makes its own representations for its own profit and gain and adopts the marketing representations of the Defendant Manufacturers' by placing point of purchase advertising at or near the Defendant Manufacturers' pet food and treats in its retail stores with the intent to induce consumers to purchase them. Target also markets and sells its own pet food brands.

53.     Defendant, Wal-Mart Stores Inc. ("Wal-Mart"), is a Delaware corporation with its principal place of business in Arkansas. Wal-Mart is in the business of manufacturing, producing, distributing, advertising and/or selling its own brands and the Defendant Manufacturers' brands of commercial pet food and treats in its retail stores in Florida.  Walmart conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Wal-Mart adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers' pet food and treats

in its retail stores with the intent to induce consumers to purchase them. Wal-Mart also markets and sells its own pet food brands.

54.    Defendant, Publix Supermarkets, Inc. ("Publix"), is a Florida corporation with its principal place of business in Florida. Publix is in the business of manufacturing, producing, distributing, advertising and/or selling its private label brands of pet food and treats as well as distributing, advertising and/or selling the Defendant Manufacturers' pet food and treat products. Publix markets and sells its private label brands and the Defendant Manufacturers' brands of commercial pet food in its grocery stores in Florida and other states. Publix adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores with the intent to induce consumers to purchase its products.

55.    Defendant, Albertson's LLC ("Albertson's"), is a Delaware corporation with its principal place of business in Boise, Idaho. Albertson's is registered to do business in Florida and has a registered agent upon which service has been executed. Albertson's conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Albertson's is in the business of manufacturing, producing, distributing, advertising and/or selling its own private label brands and the Defendant manufacturers' pet food and treat brands which has injured the Plaintiffs in Florida. Albertson's markets and sells its own brands and the Defendants' brands of commercial pet food at issue in Florida.  Albertson's adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores with the intent to induce consumers to purchase its products.

56.     Defendant, New Albertsons, Inc. ("New Albertsons"), is a Delaware Corporation with its principal place of business in Boise, Idaho. New Albertsons is registered to do business in Florida and has a registered agent in Florida upon which service has been executed. Albertson's conducts business in Florida and places products in the stream of commerce that reach Florida consumers. New Albertsons is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendant Manufacturers' pet food products in Florida, which has injured the Plaintiffs in Florida. New Albertson's markets and sells its own brands and the Defendants' brands of commercial pet food in Florida. New Albertsons adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores with the intent to induce consumers to purchase its products.

57.     Defendant, The Kroger Co. of Ohio ("Kroger"), is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Kroger conducts business in Florida and/or places products in the stream of commerce that reach Florida consumers. Kroger is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food and treats as well as distributing, advertising and/or selling the Defendants' pet food products in Florida which has injured the Plaintiffs in Florida. Kroger markets and sells its own brands and the other Defendants' brands of commercial pet food at issue in Florida. Kroger adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores with the intent to induce consumers to purchase its products.

58.    Defendant, Safeway Inc. ("Safeway"), is a Delaware corporation with its principal place of business in California. Safeway conducts business in Florida and/or places products in the stream of commerce that reach Florida consumers. Safeway is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendants' pet food and treat products in Florida, which has injured the Plaintiffs. Safeway markets and sells its own brands and the other Defendants' brands of commercial pet food at issue in its grocery stores. Safeway adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores with the intent to induce consumers to purchase its products.

59.    Defendant, H.E. Butt Grocery Company ("HEB"), is a Texas corporation with its principal place of business in Texas. HEB conducts business in Florida and/or places products in the stream of commerce that reach Florida consumers. HEB is in the business of distributing, advertising and/or selling Defendant Manufacturers' pet food and treat products in Florida which has injured the Plaintiffs in Florida. HEB adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores with the intent to induce consumers to purchase its products.

60.    Defendant, Meijer Inc., ("Meijer"), is a Michigan corporation with its principal place of business in Michigan. Meijer conducts business in Florida and/or places products in the stream of commerce that reach Florida consumers. Meijer is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food products as well as distributing, advertising and/or selling the Defendants' pet food and treat products in Florida which has injured the Plaintiffs. Meijer markets and sells the Defendant Manufacturers' brands

of commercial pet food in its grocery stores in Michigan and other states. Meijer adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores with the intent to induce consumers to purchase its products.

61.    Defendant, The Stop & Shop Supermarket Company ("Stop & Shop"), is a Delaware corporation with its principal place of business in Massachusetts. Stop & Shop conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Stop & Shop is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendants' pet food and treat products in Florida which has injured the Plaintiffs. Stop & Shop markets and sells its own brands and the other Defendants' brands of commercial pet food at issue in its grocery stores in Massachusetts and other states. Stop & Shop adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers pet food in its retail stores with the intent to induce consumers to purchase its products.

### Defendant Pet Specialty Retailers

62.    Defendant, Petsmart, Inc. ("Petsmart"), is a Delaware corporation with its principal place of business in Arizona. Petsmart is in the business of marketing, advertising, distributing, selling and making recommendations to consumers regarding the Defendant Manufacturers' dog and/or cat food and treats in Florida which has caused injury in Florida. Petsmart conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Petsmart makes its own marketing representations and adopts the marketing representations of the Defendant Manufacturers' both on the internet and by placing point of

purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores in Florida. Petsmart makes recommendations to consumers regarding the Defendant Manufacturers' and its own private label commercial pet food on the internet through its Smart Nutrition Selector™ and elsewhere on its website.  Petsmart markets, advertises and sells the Defendants' and its own commercial pet food and treat products with the intent to induce consumers to purchase these products.

63.     Defendant, Pet Supermarket, Inc. ("Pet Supermarket"), is a Delaware corporation with its principal place of business in Florida. Pet Supermarket is in the business of advertising, distributing, marketing, selling and making recommendations to consumers regarding dog and/or cat food and treats in Florida, which has caused injury in Florida. Pet Supermarket conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Pet Supermarket adopts the marketing representations of the Defendant Manufacturers by placing point of purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores. Pet Supermarket markets, sells and makes recommendations to consumers regarding the Defendants' commercial pet food and treats in its retail stores in Florida with the intent to induce consumers to purchase these products.

64.     Defendant, Petco Animal Supplies Stores, Inc. ("Petco"), is a Delaware corporation with its principal place of business in Arkansas.  Petco is in the business of advertising, distributing, selling and making recommendations to consumers regarding the Defendant Manufacturers' dog and/or cat food and treats in Florida. Petco conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Petco markets, sells and makes recommendations to consumers regarding the commercial pet food in its retail stores in Florida, which has caused injury in Florida. Petco makes its own marketing

representations and adopts the marketing representations of the Defendant Manufacturers' by placing the Defendant Manufacturers' and its own point of purchase marketing materials near the Defendant Manufacturers' pet food and treats in its retail stores with the intent to induce consumers to purchase these products.

65.    Defendant, Pet Supplies Plus/USA ("Pet Supplies Plus"), is a Michigan corporation with its principal place of business in Michigan.  Pet Supplies is in the business of advertising, distributing, selling and making recommendations to consumers regarding dog and/or cat food and treats in Florida. Pet Supplies Plus conducts business in Florida and/or places products in the stream of commerce that reach Florida consumers. Pet Supplies Plus markets, sells and makes recommendations to consumers regarding the commercial pet food at issue in its retail stores. Pet Supplies Plus adopts the marketing representations of the Defendant Manufacturers' by placing point of purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores with the intent to induce consumers to purchase these products.

## JURISDICTION AND VENUE

66.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act, in that at least one member of the Class is a citizen of a State different from any defendant named herein and the matter in controversy exceeds the sum or value of $5,000,000.  This court has also has jurisdiction over supplemental law claims pursuant to 28 U.S.C. §1367.

67.    This Court has personal jurisdiction over Publix and Pet Supermarket because they are Florida corporations.

68.    Pursuant to Florida Statute §48.193, each of the remaining named Defendants has subjected itself to the jurisdiction of Florida courts by virtue of engaging in and/or carrying on a business or business venture in Florida; having an office or agency in Florida; committing a tortious and/or deceptive act in Florida; and/or by breaching warranties in this state and/or by committing one or more of the acts enumerated in Florida Statute §48.193.  The Defendants deceptive, tortious and other actionable conduct described herein caused harm to the Plaintiffs in Florida.

69.    Upon information and belief, Nestlé S.A. acted through its United States agents, affiliates and subsidiaries, which exist merely as a conduit for the purpose of doing the business of the foreign entity(ies) and have acted as agents of Nestlé S.A. The various Nestlé Defendants are merely alter egos of one another and all acted as a single corporate entity, disregarding corporate distinctions, failing to observe corporate formalities, sharing common ownership and directorship and commingling funds.  Accordingly, the corporate distinctions should be disregarded by the Court and the Nestlé Defendants treated as one legal entity.

70.    Venue is proper in this Court and judicial district pursuant to 28 U.S.C. §1391 and/or the Class Action Fairness Act because the Defendants have systematically manufactured for sale, marketed, advertised and sold commercial pet food in this District.  A substantial part of the events or omissions giving rise to the claim occurred in this district. Moreover, the conduct that is the subject of the lawsuit occurred in this District.

## FACTS GIVING RISE TO THE CLAIMS

71.    Manufacturing, producing, marketing, selling, and distributing pet food and treats is a $16,000,000,000 a year industry in the United States alone.  The majority of the 163,000,000

companion cats and dogs in the United States are fed commercial pet food and derive most or all of whatever nutritional content they can obtain from the Defendants' commercial pet food.

72.    The Defendant Manufacturers have spent millions of dollars over the years to build consumer confidence with the Plaintiffs and consumers concerning their respective brands and consequently intend that the Plaintiffs and consumers will rely on these representations, believing them to be truthful, scientifically supported and/or otherwise accurate.

73.    This relationship of trust and confidence is fostered by the Defendant Retailers and Defendant Pet Specialty Retailers, on which the Defendant Manufacturers have spent considerable time and effort in cultivating mutually profitable relationships to market, advertise and sell their cat and dog food to trusting Plaintiffs and consumers.  The Defendant Retailers and Pet Specialty Retailers not only adopt the point of purchase marketing of the Defendant Manufacturers, but also market and advertise the Defendant Manufacturers' cat and dog food through their own marketing programs and incentives and make recommendations to consumers both in stores and on the internet regarding the ingredients, quality and nutritional content, health and other benefits, of the Defendant Manufacturers' and Petsmart's private label pet food.

74.    Based upon the Defendant Manufacturers', Retailers and Pet Specialty Retailers' extensive and expensive marketing, the Plaintiffs, like the Class, believe that when they purchase the Defendant Manufacturers' or any of the Retailers'/Petsmart private label brands from the Defendant Retailers and Pet Specialty Stores, they are buying wholesome and/or "premium" pet food with all of the quality and other claimed "benefits" represented in the Defendants' marketing.  Moreover, based upon extensive claims that the Defendant Manufacturers are "world-class" experts in pet food who advise veterinarians concerning pet nutrition, they fail to disclose that the programs to inform veterinarians about pet nutrition are part of an ongoing

marketing scheme to increase sales. The Defendant Manufacturers claim that they promote scientific research as to their pet food products leading the Plaintiffs and consumers to believe that these products' ingredients and claimed benefits are adequately supported by scientific data and that prior to using ingredients in the pet food, each ingredient will be examined to determine the health effect or benefit on a cat or dog. However, the Defendant Manufacturers' and Retailers'/Petsmart's pet food is far from the type of wholesome, "quality," research-supported and/or beneficial product that the Defendants have lead consumers to believe.

75.    The approximate $58,000,000,000 spent by consumers on pet food over the last four years has been without the knowledge that the "wholesome," "quality," "prescription," "premium" or "gourmet" food that they are feeding their companion animals was made wholly or partially of inedible garbage unfit for human consumption, including, but not limited to, restaurant grease, roadkill, hair, blood, pus, esophagi, chicken heads, feet and intestines, cow brains, excrement, fetal tissue, moldy grains, hulls, styrofoam packaging from discarded supermarket meat, euthanized animals, including cats and dogs, and/or diseased, dying, disabled and dead animals.

76.    The Defendants' Manufacturers, Retailers and Pet Specialty Retailers' marketing has mislead, deceived and/or failed to disclose to the Plaintiffs on an ongoing and continuous basis throughout the Class Period material information regarding the pet food products that they have purchased. Some specific examples include, but are not limited to:

- The Defendants' pet food containers deceptively include pictures and/or drawings of human-grade ingredients, but the pet food does not have human-quality food ingredients as depicted on the containers;

- The Defendants' marketing deceptively makes the Plaintiffs believe that they are purchasing wholesome pet food when the Defendants use a food pyramid similar to that used by nutritionists for human-grade food and human nutrition, particularly where the above-described pictures and/or drawings of human-grade ingredients are used

- The Defendants' cat and dog food is deceptively marketed as having health, medical, hygienic and other benefits which are not adequately supported by scientific data;

- The Defendants include ingredients in pet food without first determining whether those ingredients will have a deleterious effect on a cat or dog despite the numerous claims of extensive research that leads the Plaintiffs to believe that the pet food contents are safe for their cat or dog and supported by scientific data prior to sale;

- The Defendants' marketing makes numerous deceptive and/or false claims relating to quality, content, health, medical, hygienic, hairball, dietetic, breed and/or age specific benefits which are inaccurate and/or are not based upon *valid* scientific studies proving same;

- The Defendants deceptively and/or falsely market their pet food as safe and wholesome yet the number and/or extent of recalled pet food products demonstrates the lack of sufficient quality control and traceability analyses which makes the pet food unsafe;

- The Defendants deceptively and/or falsely market themselves as pet food experts in and claim to produce the safest and highest quality of pet food yet their pet food contains substances either known and/or unknown to the Defendants and/or substances that are toxic and/or unhealthy for cats and/or dogs;

- The Defendants Manufacturers market their brands of pet food as "super-premium" but they contain ingredients that are unhealthy for consumption by cats and dogs and either fail to provide the promised benefit or cause other health problems. For example, dry food diets packed with cereal carbohydrates purport to treat urinary and kidney problems may assist with deterring the formation of some crystals, but actually promote the formation of other crystals or stones in cats;

- The Defendants deceptively market "light" or diet cat and dog food as providing a health benefit, when in fact it still largely consists of carbohydrates and other fillers that cause obesity, allergies and other known health problems and may be higher in carbohydrates than is advertised;

- The Defendants marketing leads consumers to believe that the ingredients used in their brands of pet food are human quality but they, or their co-packers, use material other than human-grade "real meat, chicken, lamb," etc., as a nitrogen source to boost "protein" content unbeknownst to the consumer;

- The Defendants omit to advise the Plaintiffs about the true quality and content of the pet food, including rendered product that may contain mad cow disease;

- The Defendants make a number of claims concerning the benefits, content and quality of their pet food without adequate scientific documentation, including but not limited to the bioavailability of their pet food products;

- The Defendants omit to advise the Plaintiffs about the toxins and other substances in the pet food for which there are no known studies to substantiate the use in pet food and/or the long term effect on cats and dogs;

- The Defendants deceptively market product comparisons where one Defendant compares its product to another Defendants' product without disclosing the shortcomings of its own product;

- The Defendant Manufacturers, Retailers and Pet Specialty Retailers' marketing actively encourages consumers to purchase *only* commercial pet food despite the known benefit of diets with higher levels of real protein and without cheap carbohydrate cereal fillers;

- The Defendants market their pet food as suitable to sustain a cat or dog when, in fact, the diet is insufficient and consumers are only told that the pet food is a "snack" when the Plaintiffs specifically request that information from the Defendant and/or are given the wrong information from retailers;

- The Defendant Manufacturers', Retailers' and Pet Specialty Retailers' marketing deceptively encourages the Plaintiffs and consumers to buy "premium" pet food by representing that the expenditure of additional monies for "premium" pet foods provides nutritional, health, medicinal, hygienic and other benefits that non-premium pet foods allegedly do not have when they are comprised of essentially the same material;

- The Defendants deceptively market dry food as "good" for cats despite the fact that studies demonstrate that dry food is associated with a higher incidence of feline lower urinary tract disease;

- The Defendants deceptively market dry food as "good" for dogs but dry food that is comprised of cheap cereal fillers, additives and dyes that contain ingredients that cause allergies, bloating and gastric upset;

- The Defendants tout their pet food as "wholesome" but it is basically corn and other cheap carbohydrate fillers.

- The Defendants marketing omits to advise the Plaintiffs of the predominance of processed carbohydrates, allergenic substances, low grade proteins and known and unknown ingredients and additives that have detrimental effects on the health of dogs and cats contrary to what the consumer is lead to believe.

The Defendants misleading, unfair and deceptive marketing and/or failures to disclose to the

Plaintiffs on an ongoing and continuous basis throughout the Class Period has resulted in damage

to the Plaintiffs because they would not have otherwise purchased these products and/or their cats and/or dogs became ill or died from ingesting the pet food.

**The Defendants' deliberately "Humanize" Pet Food to
Obtain Greater Market Share and even more Staggering Profits**

77.     As described above, the Defendants marketing is intended to entice the Plaintiffs and consumers to purchase pet food that they believe is human-grade quality because the Defendants intentionally depict it as such in their marketing to boost sales because marketing studies have shown that the Plaintiffs and consumers want the best for their pets, including human-grade pet food products. However, the attempt to liken these pet foods to human-like quality does not end at appearance. The Defendant Manufacturers' also market their pet food with alleged health, medical and other benefits in much the same way that medical or other benefits are marketed to the Plaintiffs and consumers directly for human consumption.  For example, glucosamine is marketed as providing a benefit to human joints and it is also marketed in pet food without sufficient research studies to demonstrate a benefit to a cat or dog.  Likewise, the Defendant Manufacturers' are marketing Omega-3 fatty acids without adequate scientific back-up to support claims that cats and dogs derive a benefit from consuming it. While the Defendants manufacture, distribute, market, advertise and sell these commercial pet foods as "human-like," the matter contained in bags, pouches and cans is instead wholly or partially the product of recycling the putrid, inedible garbage of the human food industry, including additives, chemicals, toxins, contaminants and other substances both known and unknown.

**The Defendants' Marketing of Commercial
Pet Food Misleads Consumers**

78.     The Defendant Manufacturers' and Retailers' private label and Petsmart's Authority pet food marketing induces the Plaintiffs and consumers to buy the Defendants' pet

27

food. Examples of such marketing include "Veterinarian Recommended," "real meat, beef, chicken or lamb" "rich in quality protein," "crunchy corn" and "enhanced protein system," among other things. The intent is to make the consumer feel good about purchasing "veterinarian recommended," "premium" and/or "quality" food for their companion cat or dog with age, breed, health, medical, dietetic and/or other claimed benefits.  The Plaintiffs, like the average consumer, are highly vulnerable to these inducements because they have no knowledge of the nutritional and/or other requirements of their cats' and/or dogs' food and therefore the Plaintiffs and consumers rely upon the trust and confidence that the Defendants' have developed in their brands and in acquiring established and trusted pet food companies and the representations and self-proclaimed expertise of the Defendants. Moreover, the Plaintiffs, like the average consumer, are generally unaware of pet food contents, including what additives, contaminants and other chemicals could be harmful to their cats and dogs and believe the Defendant Manufacturers, Retailers and Pet Specialty Retailers when they make factually inaccurate, unsupported, deceptive, misleading, negligent and/or false representations and omissions about the quality, content, medical, health and/or other benefits of the Defendants' pet food brands and products.

79.     Commercials showing healthy, vibrant cats and dogs enjoying "the good life," choice chunks of fresh meats and wholesome stalks of grains and fresh vegetables on bags, cans and pouches induce the Plaintiffs and the class to buy the Defendant Manufacturers', Retailers and Petsmart's private label pet food and to believe that these products contain human quality food products and have health-related and other benefits. These same photos are on websites where, for example, Nestlé makes representations such as "Healthy Harvest® maximizes your dog's health and happiness with our premium dry dog food, featuring soy and other, wholesome ingredients" *See* Beneful® website page attached hereto as ___.  However, studies have

demonstrated problems associated with soy in pet food diets and as discussed above, the Plaintiffs do not consider inedible garbage "wholesome" and would not have purchased the Defendants pet food had they known the true contents and quality.

80.    The Defendants' pet foods, such as "Beneful®," "Natural Choice®," "Science Diet®," and "The Good Life," among many others, are intentionally named to lead consumers to believe that they are wholesome and/or provide benefits to cats and dogs.

81.    The bags, pouches and cans of the Defendants' commercial pet food make many strong representations to the Plaintiffs and the class.   For example, bags of pet food state "**Superior Nutrition** FOR LIFELONG HEALTH," followed by claims that the pet food promotes, "Strong Immune System," "Healthy Bones and Muscles," "Strong Clean Teeth & Fresh Breath," "Healthy Skin & Radiant Coat," "Overall Health and Vitality" and "Easy to Digest."  The containers also state "Total Nutrition Helps Your Pet Stay Healthy and Live Long."  In fact, there are so many representations on a container of pet food, they cannot all be set forth here. The Plaintiffs, like the average consumer, are thus bombarded with representations on the Defendants' cat and/or dog food containers that are intended to have consumers rely upon the Defendants' representations to induce them into buying their pet food. Moreover, these containers omit to advise the Plaintiffs and consumers of the true contents and quality of the food.

### Mars' "Good Life Recipe"™

82.    An example of the manner in which Mars misleads consumers as to only one of its products is the "Good Life Recipe"™ brand. The "Good Life Recipe"™ is a recently launched commercial pet food. The "humanization" of this brand is patent in every aspect of this commercial pet food's marketing and is intended to capitalize on the emotional bond between

consumers and their cats and dogs by deceptively and/or falsely and/or negligently representing what the consumer is purchasing for the companion animal:

> Good food inspired by pet-loving people like you.
>
> We don't believe people are pet owners. People own TVs, cars and vacation homes. But they don't own pets. They have a relationship with their pets. They enjoy bonds that are sometimes stronger than family. So it's not surprising that people want to provide their pets with the healthiest and best tasting food. That's where The Goodlife Recipe™ pet food comes in. We use the best ingredients in the right balance to create great food and snacks for cats and dogs. Because we believe, pets that eat well are pets that live well. And when your pet is living well, you're living well.

See the Goodlife Recipe™ "Our Mission" web page attached hereto as Exhibit "__."  The "Good Life Recipe"™ website further states:

> A healthy, balanced diet your four-legged friends will love!.
>
> Every bag of The Goodlife Recipe™ food for cats or dogs is a perfect blend of six tasty ingredient groups like real chicken, beef or salmon, healthy vegetables and hearty whole grains - created with our nutritionally balanced "pet food pyramid" as a guide. It's our way of giving your pets all the enjoyable taste and essential nutrients they need without any of the artificial additives they don't. And who wouldn't love that?

See the "Goodlife Recipe™" "What's Inside" website page attached hereto as Exhibit "__." This commercial pet food is designed to appeal to consumers' understanding of the human food pyramid and to lead people to believe that they are purchasing quality food for their special companion cats and dogs that is primarily made of human quality food items such as "real" meat, fish, wholesome grains and vegetables.

83.    The wildly popular "Good Life"™ commercials show beautiful dogs with Frank Sinatra or Jewel singing in the background.[1] While the commercial is showing large chunks of meat with carrots and green vegetables, an announcer states, "Six key ingredients for the tastes that dogs crave without the artificial additives they don't."[2] The Good Life™ containers even state "No fillers," yet this pet food's first ingredient is corn followed by a number of cheap fillers

---

[1] See http://www.youtube.com/watch?v=QMnUU2Zh9hE.
[2] Id.

such as corn gluten meal and rice. Moreover, the "real" meat is far from human-grade since it is chicken by-products, which consist of heads, feet, viscera free from fecal content and foreign matter only to the extent that the inclusion of such fecal matter and foreign matter might unavoidably occur in good factory practice. The commercials fail to advise consumers about the real contents of the Good Life™ pet food. On the website, the six key ingredients are listed as tomatoes, garden peas and spinach, "real natural chicken, beef or salmon," "healthy carrots" and "natural whole grain brown rice packed with vitamins" and pictures of same. Exhibit "__" (can be seen by pressing "Rollover to see what's inside"). This is misleading because far from the "healthy carrots depicted," the pet food actually contains carrot, spinach and tomato dust in minor amounts.

### Mars' Pedigree®

84.    The name "Pedigree"®, another of Defendant Mars' brands, implies a food fit for an expensive pure bred companion dog. This is reinforced by the claims on the website:

> Help your dog be the <u>best he can be</u> with PEDIGREE® Dry Food.
>
> Not only does PEDIGREE® Brand Dry Food For Dogs provide your dog with a <u>balanced diet of vitamins, minerals, essential fatty acids, fiber and protein</u>, it's a delicious <u>foundation to your dog's overall diet</u>. It's also helpful in <u>preventing the accumulation of dental tartar and plaque</u>. And dry food has the added benefit of being very convenient for you.

*See* Pedigree™ website "Dry Products" attached hereto as Exhibit "__."  The website leads consumers to believe that their companion dogs are eating healthy nuggets of chicken, rice and vegetables:

> New, improved PEDIGREE WITH CHICKEN, RICE & VEGETABLES™ Food For Dogs (formerly PEDIGREE COMPLETE NUTRITION® Meaty Chunks With Rice & Vegetables) offers a way for dogs to get the **healthy benefits of real vegetables and real chicken** in **a tasty balanced meal owners can feel good about feeding every day**. It's made up of five different components to offer a variety of flavors and textures that dogs love.
>
> - PEDIGREE WITH CHICKEN, RICE & VEGETABLES™ Food For Dogs now contains a new and improved patented PEDIGREE HEALTHY NUGGETS™ with **Meaty Centers**

**kibble**. Improvements include a golden yellow shell, 25% <u>more cream fill and meaty center</u>.

- **<u>Made with real chicken, a high quality protein source</u>**
- **<u>Made with healthy real vegetables that dogs love</u>**
- <u>Higher guaranteed levels of protein than BENEFUL® Original</u> (Based on guaranteed analysis: PEDIGREE WITH CHICKEN RICE & VEGETABLES™: 26% protein, BENEFUL® Original: 25% protein)
- Nutritionally complete and balanced for both puppies and adult dogs
- Contains patented HEALTHY NUGGETS™ pocket kibbles that have a dual texture- crispy outside with a soft, creamy inner
- Contains the Advanced Antioxidant Recipe with guaranteed levels of vitamins E & C
- <u>Highly digestible ingredients so nutrients are easily absorbed</u>
- Improved taste that dogs love
- Select sizes available with the SLIDE RITE® Zipper for easy opening and resealing between feedings
- <u>No artificial flavors or fillers</u>

*See* Pedigree™ website "Dry Nutrition for Adult Dogs" attached hereto as Exhibit "__."

However, the "high quality," "real chicken" is the same non-human-grade product used in the

Good Life™ brand, which consists of which consist of necks, heads, feet, undeveloped eggs,

intestines, viscera free from fecal content and foreign matter and feathers only to the extent that

the inclusion of such fecal matter, foreign matter and feathers might unavoidably occur in good

factory practice. The "real" meat is mammal tissues from non-human grade meat, including

bone, but not added blood, hair, hoof, horn, hide trimmings, manure, stomach and rumen

contents only to the extent that the inclusion of such is unavoidable in good processing practices.

The primary ingredients are cheap carbohydrate fillers, which is inconsistent with the marketing

of this dog food.

### P&G's Iams™

85.     An example of the manner in which P&G misleads is its Iams™ brand.  P&G

holds itself out as a cat and dog food expert whose pet food products are "veterinarian

recommended" – "More vets recommend Iams than the leading grocery brand." Pet food

consumers rely upon this endorsement which P&G intends that the consumers rely. P&G thus

promotes a relationship of trust and confidence that exists between the Plaintiffs and the class and the company. In these marketing materials, there is no indication, however, as to exactly how Iams® became "Veterinarian Recommended" or why, other than a notation in fine print that states a "survey" was conducted.

86.     Another example of the deceptive manner in which Iams has mislead the Plaintiffs is advertising that Iams original cat food: "Helps Maintain Urinary Tract Health Iams research confirms the effectiveness of Iams Original Cat Food in reducing urinary pH while providing low dietary magnesium for urinary tract health."  Iams, however, offers no explanation as to how the research has confirmed same. This deceptive advertising also fails to advise the Plaintiffs of the correlation between a cat's consumption of dry food and urinary tract illness in the first place. The dry pet food is supposedly intended to alleviate the problem which stems from an over abundance of cheap cereal grains that is known to be a major contributing factor to the illness. Iams also markets its "wholesome" pet food: "The wholesome protein sources in Iams naturally provide essential nutrients and amino acids for clear eyes and a strong heart."  The reference to "wholesome protein sources" buttresses the vivid images of wholesome real meat and chicken and leads consumers to believe that they are feeding their dog or cat the same food that they purchase for their family, but they are not.

**Colgate's Science Diet® and Prescription Diet®**

87.     Colgate makes similar representations in marketing its Science Diet® and Prescription Diet® brands.  On its website, Colgate displays its Science Diet® logo, with the Science Diet® logo stating "Veterinarian Recommended." Colgate is thus holding itself out as a cat and dog food expert which advises consumers, veterinarians and "other key pet professionals worldwide." Pet food consumers rely upon this claim of specialized knowledge and upon which Colgate intends that the consumers rely. Colgate thus promotes a relationship of trust and

confidence that exists between the consumer and the company. In these marketing materials, there is no indication, however, as to exactly how Science Diet® became "Veterinarian Recommended" or why.

88.     Nowhere on its website does Colgate Palmolive disclose that it has spent millions marketing its Science Diet® and Prescription Diet® pet foods to veterinary students and veterinarians in order to get an edge over its competitors by having veterinarians endorse and recommend these brands to consumers who Colgate knows rely upon and trust with their cats' and dogs' health and well being.  Colgate Palmolive funds veterinary schools, provides stipends and discounts its pet food to veterinary students, and arranges for veterinarians to have financial incentives to sell its pet food. The average consumer has no idea that the veterinarian recommending the expensive and premium brands of Science Diet® and Prescription Diet®, allegedly for the health and benefit of the consumer's cat or dog, is profiting from recommending Colgate's pet food and boosting Colgate's profits in the process.  The conflict of interest, created and encouraged by Colgate, is patent.

89.     One of the products in Colgate Palmolive's Prescription Diet® line is the W/D brand, which is marketed as follows :

> Prescription Diet® w/d® Feline cat food, with its *fiber rich formula*, may be useful as a nutritional aid for cats with fiber responsive diseases such as diabetes mellitus, colitis, diarrhea, constipation, and to help manage overweight cats, including those with struvite urolithiasis. The nutritional formulation of Prescription Diet® w/d® may also be useful for pets with a variety of conditions.

W/D®, however, contains ingredients that the average consumer would *not* consider healthy for their cat or dog.  Prescription Diet® W/D® dry cat food, for example, contains "powdered cellulose," "ethoxyquin," and "BHA" and "BHT."  Powdered cellulose is essentially sawdust, which is not what most consumers would want to feed to their cats as "fiber."  Ethoxyquin has

been used as a rubber preservative and/or pesticide and is listed and identified as a hazardous chemical under the criteria of the OSHA Hazard Communication Standard (29 CFR §§1910, 1220).  The Chemical Toxicology of Commercial Products states that ethoxyquin has a toxic rating of 3 (on a scale of 1 to 6, with 6 being super toxic requiring less than 7 drops to produce death). While the FDA maintains it is "safe," it nevertheless asked the Defendant pet food Manufacturers to "voluntarily" lower the levels previously allowed at 150 ppm to 75 ppm. Exhibit "33."  While BHA and BHT retard rancidity in fats and oils, some studies have indicated that these preservatives have caused cancer in rats.

### Del Monte's 9Lives®

90.    Del Monte deceptively advises consumers that dry food is *good* for their cats when studies have shown that a dry cat food diet for an obligate carnivore such as a cat with a low thirst drive is detrimental to cats' health.

> With dry food that not only tastes good, *but is good for your cat*, the 9Lives® *brand really cares about your cats health*.  Our dry varieties are formulated to meet your cat's special nutritional needs while providing great taste.
>
> With 9Lives® daily essentials™ healthy cat food, you can be confident you are giving your cat essential whole body health from the real meat she craves.  9Lives® daily essentials™ cat food is a savory blend of delicious pieces made with real meat and fish for a wholesome flavor your cat will look forward to.

Exhibit "__."  The actual ingredients, however, reveal that the "healthy" dry food is comprised of carbohydrate fillers such as ground corn, ground wheat and corn gluten meal. Exhibit "__."  The real "chicken" is comprised of necks, feet, undeveloped eggs, and intestines and exclusive of feathers to the extent that it may be unavoidable in good processing practices. Exhibit "__." This pet food also has animal digest, which is a material that results from chemical or enzymatic hydrolysis of undecomposed animal tissue and is exclusive of hair, horns, teeth, hooves and feathers except in such trace amounts as may be unavoidable. It is also preserved with BHA, among other things.  Exhibit "__."  Moreover, ironically, Del Monte offers a "urinary tract

health" diet in dry cat food form when dry food is known to cause urinary illness, which is deceptive and misleading to the Plaintiffs and consumers.  Exhibit "___."

**Nestlé's  Beneful®**

91.    An example of Nestlé's misleading advertising is its Beneful® brand pet food. Exhibit "___." The marketing materials show wholesome looking meat and vegetables and, like so many other Defendants, the container in which the food is packaged displays the same healthy looking, people quality food that is in Nestlé's other marketing media.  *See* website page for Beneful® Original attached hereto as Exhibit "___."  The food itself is marketed in cute shapes with colors designed to make the consumer want to buy it for their dog and to reinforce to the consumer that the food is similar to human food in quality, composition and/or is healthy and nutritious.

Beneful® Original



**A perfect balance of healthful ingredients, quality nutrition and superb taste for pure contentment for dogs**



Moist, chewy chunks made with real beef are rich in quality protein to help build strong muscles.



Omega fatty acids, along with antioxidants like Vitamin E and selenium, help support a healthy immune system.



Enriched with calcium for healthy teeth and strong bones.

Crunchy corn packed with carbohydrates for energy and linoleic acid for a shiny coat.



Contains vegetables with Vitamin A and other quality vitamins, minerals, and nutrients.

Contains iron for healthy blood.

Exhibit "40."  The  "real beef" is the seventh ingredient, however, which means that there is not much in the dog food.  Moreover, it is limited to the inedible portions of slaughtered mammals, including the striate muscle which is skeletal or the "meat" found in the tongue, diaphragm, the heart and the esophagus with or without the accompanying overlying fat in the skin, sinew, nerve, blood vessels which normally accompany the flesh.  The primary ingredients are cheap

carbohydrate fillers and "chicken," including the necks, heads, feet, undeveloped eggs, intestines, viscera free from fecal content and foreign matter and feathers only to the extent that the inclusion of such fecal matter is unavoidable. These contents are not what the Plaintiffs and consumers believe that they are purchasing.

**Nutro  Natural Choice® Complete Care® Indoor Adult Cat**

92.    Nutro's marketing makes all of the same misleading statements and guarantees as the other Defendants. For example, when marketing its commercial cat food, Nutro® represents as follows:

> **Benefits of Natural Choice Complete Care Indoor Adult Cat:**
>
> - Scientifically formulated for the unique <u>needs of indoor cats</u>
> - <u>Guaranteed to improve skin & coat for less shedding, fewer hairballs</u>
> - <u>Reduces litter box and in-home odors</u>
> - <u>Natural ingredients</u> with vitamins & minerals
>
> Indoor temperature, lighting and reduced opportunity for exercise can affect the health of your cat's skin and coat, muscle and bone condition and may cause weight gain. If your cat lives indoors most of the time, then <u>feeding Natural Choice Complete Care Indoor Formula can improve your cat's overall health and well-being</u>. It's not just another cat food. Based on the latest scientific and nutritional research, Complete Care Indoor formula is **<u>guaranteed</u>** to <u>improve the health of your indoor cat's skin and coat</u>, <u>reduce shedding</u>, <u>minimize hairballs</u>, build strong muscles and bones and <u>help limit excess weight gain</u>. It's formulated with **<u>unique</u> <u>ingredients like chicken meal, rice, soy protein, sunflower oil and oat fiber, which are especially important for indoor cats</u>**. And it's formulated with a blend of <u>natural ingredients</u> to help reduce litter box odor for a fresher indoor environment. Natural Choice Complete Care Indoor Formula will <u>improve the quality of life for your cat and you</u>.

*See* Nutro Natural Choice® Complete Care® Indoor Adult Cat website page attached hereto as Exhibit "__." Nutro has omitted to advise the Plaintiffs and consumers just how it is scientifically formulated for an indoor cat much less why an indoor cat's needs are any different from one who goes outdoors. Nutro also omits to advise consumers that weight gain in cats has largely been attributed to the predominance of cheap carbohydrate fillers nor does the company

advise consumers that soy is not readily digestible by cats or why soy is important for an indoor cat, because it is not.

**Natura Brand Pet Food**

93.    Natura's marketing also makes all of the same misleading statements and guarantees as the other Defendants.  For example, when marketing its commercial cat food, Natura represents that it is the "Healthiest Pet Food in the World." Natura further states:

> No pet food company in the world makes natural pet foods like Natura. We use only ingredients you'd eat yourself: quality meats, whole grains, fresh fruits and vegetables, and complete vitamin and mineral supplements. For us humans, a diet of natural, wholesome food is essential to living a long healthy life. We believe this fundamental principle is true for your pet, too.

Exhibit "__." However, the pet food still contains carbohydrate fillers notwithstanding the representations, including barley, rice and potatoes, and the same by products in chickens described above that the other Defendant manufacturers use and which the Plaintiffs would hardly consider eating themselves. Natura's website indicates that the chicken meal it uses is exclusive of feathers, heads, feet or entrails, but testing has revealed the presence of feathers in the pet food contrary to Natura's representations. Moreover, testing of Natura products has also shown that Natura pet food contains glycoalkaloid toxins from the processing of green potatoes that is at such a high level that it would be toxic to humans, much less animals. Other testing has revealed the presence of acetaminophen, which is highly toxic to cats and makes dogs ill. The ingredients and known and unknown contaminants and additives hardly comport with Natura's claims of the "healthiest Pet Food in the World."

**Petco's Marketing of the Defendants' Premium Pet Foods**

94.    Petco is a retail seller of pet products, including cat and dog food. Petco has a number of marketing displays at or around ceiling height intended to obtain the attention of potential buyers of cat and dog food.  These signs have the Petco logo and state **"Supreme**

38

Nutrition" and list one of the Defendants' brand name pet food products.  *See* photographs attached hereto as Exhibit "██."

95.     In each store, Petco displays marketing material about the Defendants' cat and/or dog food.  For example, under each specific brand and type of food, a card is inserted on the shelf with marketing information.  Please see composite Exhibit "10."   At points of purchase, Petco not only adopts the representations of the Defendant Manufacturers regarding their cat and dog foods, but Petco additionally makes its own representations to consumers regarding the Defendants "premium" pet food products.  For example, when shopping for cat and dog food, Petco retail stores have a number of signs in and around the stacks of cat and dog food, such as the following:

**SUPREME
NUTRITION
WHY FEED PREMIUM PET FOOD?**

**MORE NUTRITION / FEED LESS**

*Only the highest quality ingredients are used in Premium Pet Foods*, so they are *more nutritious* and *digestible* than Supermarket Brands.  *It takes less food to meet the nutritional needs of your pet*.

**BETTER VALUE / SPEND LESS**

Rich in nutrients, Premium Pet Food packs more protein and energy per mouthful than Supermarket Brands.  It takes less food to feed your pet, so you get more for your money.

**EASIER CLEAN UP / LESS WASTE**

Feeding smaller amounts of highly digestible Premium Pet Food means lower stool volume and easier backyard clean up.

*See* photograph of Petco signage displayed in retail store attached hereto as Exhibit "██."  This quality comparison between supermarket brands and "Premium Pet Foods" omits to advise the Plaintiffs that the "highest quality ingredients" are the same or similar to supermarket brands and

the allegedly protein packed premium brands are carbohydrate filled just as the supermarket brands contain primarily carbohydrate filled ingredients.  Such marketing is deceptive to the Plaintiffs and consumers and is not substantiated by adequate scientific data.

### Petsmart's Marketing of the Defendants' Premium Pet Foods

96.    Petsmart is a retail seller of pet products, including cat and dog food. Petsmart has a number of marketing displays at or around ceiling height intended to obtain the attention of potential buyers of cat and/or dog food.  These signs state  **"Advanced Nutrition"** followed by one of the Defendants' brand name pet food products.  *See* photographs attached hereto as Composite Exhibit "8." Petsmart also displays marketing material about each specific type of the Defendants' cat and/or dog food.  For example, under each specific brand and type of food, a card is inserted on the shelf with marketing information.  Please see composite Exhibit "__" Petsmart also markets, sells and makes representations regarding its own brand of pet food, Authority.

### Petsupermarket's and Pet Supplies Plus' Marketing of the Defendants' Pet Foods

97.    Pet Supermarket and Pet Supplies Plus are retail sellers of pet products, including cat and dog food. Pet Supermarket and Pet Supplies Plus have a number of marketing displays at point of purchase intended to obtain the attention of potential buyers of cat and/or dog food.  In each store, Pet Supermarket and Pet Supermarket Plus display information concerning each of the Defendant Manufacturers' cat and/or dog foods that it carries.

### Retailers Marketing of the Defendants' Pet Food

98.    Retailers such as Target, Wal-Mart, Publix, Albertson's, New Abertsons, Kroger, Safeway, HEB, Meijer and Stop & Shop are retail sellers of pet products, including cat and dog food. These retailers have a number of marketing displays at point of purchase intended to obtain

the attention of potential buyers of cat and/or dog food.  In each store, these retailers display information concerning the Defendant Manufacturers' cat and/or dog foods that it carries.

### "Premium" Pet Food is made by the same co-packer of non-premium pet food

99.    Some or all of the Defendants distribute, market, advertise and/or sell commercial pet food that is manufactured and produced by Menu Foods, and/or other similar companies. Thus, consumers believe that they are purchasing a trusted brand made by a recognized and trusted pet food "manufacturer," when they are in fact buying a "premium" pet food for a *higher* price that is made by the same manufacturer of at least 100 other foods, including Wal-Mart's *much less expensive* Gourmet Kitty and Ol' Roy.

100.    This is "co-packing." One company makes the food, but puts a "brand" label of another, well known and trusted company on it. Co-packers benefit the Defendants because they can buy ingredients in larger bulk than any one Defendant could on its own, thus making the process cheaper and the profits larger. Thus, many of the ingredients that cross all types of pet foods, including "premium" foods, are the same.  The unwitting Plaintiffs/Class Representatives and the consumer class have no idea what company really manufactures the pet food that he/she buys.  The lack of oversight, quality control and traceability that the Defendants have over their co-packers is underscored by the recent melamine recall where matter was placed into the Defendants' pet food to artificially  boost "protein" content, yet it took months for the companies to recall their tainted pet food resulting in, what has been estimated by some, thousands of deaths of companion animals.

### The Defendants Profit by Recycling the Inedible Garbage of their Human Food Businesses into Commercial Pet Food

101.    Rather than the wholesome pictures shown on the pet food packaging, rendering companies dispose of millions of tons of inedible waste each day.  The Defendants purchase this

waste and turn it into pet food.  Rendering melts down "animal parts" to separate fat soluble ingredients from water soluble and solid materials at high temperatures. The high heat from processing allegedly destroys bacteria, but also destroys nearly all of whatever nutrient quality may remain in the rendering vat, although after the rendering process cross-contamination may occur. Pet food is thus comprised of slaughterhouse waste and/or tainted grains considered "unfit for human consumption," including cow tongues, esophagi, bones, pus, blood, etc. as described above.  The "whole grains" used have had the starch removed and oil extracted by chemical processing to make vegetable oil, or they are substantially comprised of the hulls and other remnants from the milling process.  Some of the whole grains used may have been deemed unfit for human consumption because of mold, contaminants or poor storage practices.

102.    The nutritional quality of by-products, meals, and digests can vary from batch to batch. The Defendants' pet food ingredients are by-products of the meat, poultry and fishing industries, with the potential for a wide variation in nutrient composition. Claims of minimum requirements of pet foods based on the current nutrient allowances do not relate to assurances of nutritional adequacy, i.e., whether the cat or dog can actually absorb the food as a nutrient, which is misleading to the consumer based upon the Defendants marketing.

103.    Dry foods contain a large amount of cereal grain or starchy vegetables to provide texture and little meat. These high-carbohydrate plant products also provide a cheap source of "energy" or, more appropriately, calories. Gluten meals are high-protein extracts from which most of the carbohydrate has been removed. They are often used to boost protein percentages without expensive animal-source ingredients. In most cases, foods containing vegetable proteins are among the poorer quality foods. Proteins are especially vulnerable to heat, and become damaged, or "denatured," when cooked. Because dry food ingredients are cooked twice, first

during rendering and again in the manufacturing process, altered proteins lead to food intolerances, food allergies, and inflammatory bowel disease.

104.    The unique, pungent odor to a new bag of dry pet food is most often "rendered" animal fat, or vegetable fats and oils deemed inedible for humans. Contrary to their advertising and marketing representations, the Defendants manufacture and sell recycled human food waste that is not fit for human consumption into the "premium," "quality," "gourmet" and "wholesome" commercial pet food that they market to consumers.

105.    Dogs and cats are carnivores and should be fed a _meat-based_ diet. The Defendants lead the Plaintiffs and the class to believe that this is what they are feeding their cats and dogs by marketing to the Plaintiffs and the class photos depicting wholesome choice cuts of chicken and beef allegedly found in the Defendants' pet food and by making representations on the packages and in other media of "real" beef or chicken in the pet food. The containers also replicate the television and web advertising by showing wholesome meat and vegetables on the packaging. This is all false and misleading to the consumer.

106.    There have been reports of euthanized cats and dogs that have been "rendered" and ultimately made into pet food that would reach millions.  Not coincidentally, drugs used in the euthanasia process have been detected in pet food because the drugs are not destroyed by heat. *See* 1998 study of samples from Laurel, Maryland attached hereto as Exhibit "57" and 2002 FDA Report on the Risk from pentobarbital in dog food attached hereto as Exhibit "58."

107.    While the FDA's 2002 report concluded that it was "highly unlikely" that dogs will experience adverse effects from consuming pentobarbital and that it could find no evidence of rendered dogs and cats out of 31 "sample" pet foods, there was no real explanation as to methods, sampling or analysis as to whether long term effects were considered over the life of a

cat or dog.   The FDA stated "it is assumed that the pentobarbital residues are entering pet foods from euthanized, rendered cattle or even horses," meaning the FDA ruled out dogs and cats in the 31 pet foods they tested.  However, a published scientific journal regarding the study stated to the contrary – both horses and cattle were ruled out because none of the 31 dog food samples examined in the study tested positive for equine-derived proteins. The study further concluded that cattle are only occasionally euthanized with pentobarbital, and thus are not considered a likely source of pentobarbital in dog food. Moreover, although the results of the study narrowed the search for the source of pentobarbital poison, it did not define the source, i.e., the species responsible for the pentobarbital contamination.  The FDA never found the source of the pentobarbital nor did the study attempt to address reports of cat and dog illness or deaths from ingestion of pentobarbital or newspaper and television accounts of animal shelters sending thousands of euthanized cats and dogs to rendering plants.[3]

108.    For example, a television report in St. Louis aired video footage of a truck with the motto "Serving the Pet Food Industry" entering a rendering plant where euthanized dogs and cats from local animal shelters were hauled. The report generated a public outcry, regarding this cannibalistic-like practice. In another story, an investigative reporter in the Baltimore area reported that euthanized cats and dogs had been rendered into Purina and other pet food despite the "guarantee" given by the rendering facility that the rendered product sold to Purina did not contain same.  Exhibit "__."

The Defendants' marketing of their purportedly wholesome pet food is wholly inconsistent with having pentobarbital in it, no matter what the source of the species.

### Chemical Preservatives and Contaminants

---

[3] 3-4,000,000 dogs and cats are euthanized in animal shelters each year. See http://www.hsus.org/pets/ issues_affecting_our_pets/pet_overpopulation_and_ownership_statistics/hsus_pet_overpopulation_estimates.html.

109.    Some preservatives are added to ingredients or raw materials by the suppliers, and others may be added by the manufacturer.  Ethoxyquin is a preservative that is used in pet food. Exhibit "__." Pet foods are preserved with either synthetic or "natural" preservatives. Synthetic preservatives include butylated hydroxyanisole (BHA) and butylated hydroxytoluene (BHT), propyl gallate, propylene glycol (also used as a less-toxic version of automotive antifreeze), and ethoxyquin. Exhibit "__."

110.    The Defendants continue to use these preservatives even though there is little information documenting the toxicity, safety, interactions, or chronic use of these chemicals in pet foods that may be eaten every day for the life of the animal.  Yet, through their marketing, the Defendants lead consumers to believe that they are the leaders in advanced or superior nutrition "research."   Exhibit "__" and "__." Given the Defendants marketing concerning the quality of the product and the "research" that goes into producing it, upon which the Plaintiffs and consumers rely, the Defendants marketing is deceptive if not fraudulent since a reasonable consumer would expect a company to research the long-term effects of preservatives prior to including them in pet food that is marketed as quality and safe.

111.    Ingredients used in the Defendant's pet food have been contaminated with a wide variety of toxic substances, including but not limited to, bacteria such as *Salmonella* and *E. coli*, endotoxins, drugs that were used to treat or euthanize the rendered animals such as Penicillin and pentobarbital, and antibiotics. The Defendants pet food also contains mycotoxins from mold or fungi, chemical residues and acrylamide.

**Numerous Serious Toxic Pet Food Recalls Demonstrate that the Defendants Do Not Properly Test, Monitor or otherwise Verify Pet Food Contents that are Marketed as "Healthy, Wholesome and Nutritious"**

112.    Although largely unknown to the Plaintiffs and the class, commercial pet food has been the subject of numerous lethal recalls over the years.  The recent massive Menu Foods recall is yet another example of the disastrous effect of the lack of regulation on pet food which results in the Defendants success in profiting by the lack of regulations and the consequent cost to the consumer in companion animal deaths and exorbitant veterinarian bills to try to save them. For example, Ol' Roy, Wal-Mart's store brand, has now been involved in ***3 serious recalls***. The list of other serious recalls is long and demonstrates the frequency of same:

- In 1995, Nature's Recipe recalled almost a million pounds of dry dog and cat food after consumers complained that their pets were vomiting and losing their appetite. The problem was a fungus that produced vomitoxin contaminating the wheat.

- In 1999, Doane Pet Care recalled more than a million bags of corn-based dry dog food contaminated with aflatoxin. Products included Ol' Roy (Wal-Mart's brand) and 53 other brands. The toxin killed at least 25 dogs.

- In 2000, Iams recalled 248,000 pounds of dry dog food distributed in 7 states due to excess DL-Methionine Amino Acid, a urinary acidifier.

- In 2003, a recall was made by Petcurean "Go! Natural" pet food due to circumstantial association with some dogs suffering from liver disease; no cause was ever found. Exhibit "AA."

- In late 2005, Diamond Foods recalled pet food contaminated with moldy corn which contained a particularly nasty fungal product called aflatoxin. The toxin killed at least 100 dogs. Exhibit "AA."

- In 2005, 123,000 pounds of cat and dog treats were recalled due to *Salmonella* contamination. Exhibit "AA."

- In 2006, more than 5 million cans of Ol' Roy, American Fare, and other dog foods distributed in the southeast were recalled by the manufacturer, Simmons Pet Food, because the cans' enamel lining was flaking off into the food. Exhibit "AA."

- Also in 2006, Merrick Pet Care recalled almost 200,000 cans of "Wingalings" dog food when metal tags were found in some samples. Exhibit "AA."

- In the most deadly recall of 2006, 4 *prescription* canned dog and cat foods were recalled by Royal Canin. The culprit was a serious overdose of

Vitamin D that caused calcium deficiency and kidney disease. Exhibit "AA."

- In February 2007, the FDA issued a warning to consumers not to buy "Wild Kitty," a frozen food containing raw meat. Routine testing by FDA had revealed *Salmonella* in the food. FDA specifically warned about the potential for illness in humans, not pets. There were no reports of illness or death of any pets, and the food was not recalled. Exhibit "AA."

- The most lethal pet food in history is the continuing subject of the largest and ever expanding recall ever. Menu Foods recalled more than 100 brands including Iams®, Eukanuba®, Hill's Science Diet®, Purina Mighty Dog®, and many store brands including Wal-Mart's, over 60 million individual cans and pouches. Some estimate the pet deaths at 30,000 and thousands of pets have become sick. The estimate is that 20-30% died from acute renal failure caused by the food. The death toll reported to the FDA is believed to be drastically underreported due to the volume of calls and consumers' inability to log the deaths and illnesses.

Exhibit "___."  Additionally, after a number of reports of independent testing having discovered acetaminophen in dog and cat food, Menu Foods has announced that it will test for acetaminophen, but it was only under public pressure and scrutiny that it reluctantly agreed to do so and Menu Foods has provided no information as to how it will test or the methods it will use. Moreover, while the Natura website advises that it has been tested for melamine, it is widely reported that it was the combination of melamine with cyanuric acid that caused the deaths and illness of thousands of cats and dogs in 2007.  Natura's website is silent as to whether their pet food is tested for melamine and cyanuric acid.  This is also deceptive and misleading to the consumer.

## Nutrition-Related Diseases

113.    Unbeknownst to the Plaintiffs and the class, the Defendants' "wholesome" pet foods cause numerous health problems because they are filled with cheap, inedible grains as fillers and poor protein sources when the Defendants know that cats and dogs are carnivores. The unpleasant results of poor protein, grain-based, processed, year-in and year-out diets are

common. Health problems associated with commercial pet food include urinary tract disease, kidney disease, dental disease, obesity, diabetes, chronic digestive problems, bloat, heart disease, hypertension, hyperthyroidism and bovine spongiform encephelopethy (BSE) or "mad cow" disease.

114.    Diets composed primarily of low quality grains and rendered meals are not as wholesome as the Defendants have led the Plaintiffs and consumers to believe. The Plaintiffs paid for the Defendants' pet foods because they thought that the particular Defendants' pet food was wholesome, human-like, real meat based upon the Defendants' marketing and were not aware of the true contents and quality of the Defendants' pet food products, including the additives, contaminants, toxins and other ingredients.

115.    The rampant problems with the Defendant Manufacturers and Co-Packers lack of quality control and traceability of ingredients, among other things, has lead to the illness and deaths of thousands cats and dogs.

116.    Had the Plaintiffs known the true contents and quality of the Defendants' pet food, they would not have purchased the Defendants' pet food products.

117.    The Plaintiffs have also had to pay thousands of dollars in veterinarian bills as a result of their dogs and cats ingesting this food.

118.    The Defendants are aware that the true contents of their dog and cat food products are not what they market them to be.  The Defendants have deceptively, unfairly, willfully, intentionally and/or negligently misrepresented, deceived and/or omitted to disclose the quality and contents of their pet food products to the Plaintiffs and the consumer class to increase their profit margins.

**Joinder of the Defendants**

119.    The Defendants have been included in this action because there is a separate right to relief against each Defendant arising out of the same or similar conduct on or about the same time and questions of law and fact are common to each Defendant Manufacturer, Co-Packer, Retailer and Pet Specialty Retailer.  The Defendants are part of a largely homogenous industry that is owned and operated in the same or similar manner as to the relevant issues in this lawsuit. The Defendants joined herein have the vast majority of the global market share of pet food sales and thus few companies are involved but many various brands are manufactured, advertised, marketed, tested, regulated, produced, distributed and sold in the same or similar manner.

## CLASS ACTION ALLEGATIONS

120.    Plaintiffs/Class Representatives bring this action on their own behalf and as a Class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and (3) on behalf of the following proposed Class:

> All consumers in the United States who have purchased pet food produced, manufactured, advertised, marketed, distributed and/or sold by any of the Defendants that (a) was marketed as having certain ingredients or benefits to cats and dogs when the pet food either contained ingredients and/or additives and/or contaminants and/or other matter that were not represented in the Defendants' marketing and/or (b) fails to contain the promised benefits based upon scientifically valid research studies.  The relevant time period for the Class is May 9, 2003 through the present.

The Plaintiffs/Class Representatives reserve the right to amend the class definition after more information has been obtained through discovery. Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, directors and officers, and members of their immediate families. Also excluded from the Class are the Court, the Court's spouse, all persons within the third degree of relationship to the Court and its spouse, and the spouse of all such persons.

### Injunctive Relief

121.    The Plaintiffs bring this action under Rule 23(b)(2) as to Counts ___ through ___ because the Defendants have acted or refused to act on grounds generally applicable to the class, such that a final injunctive relief is appropriate with respect to the class as a whole. In particular, the Plaintiffs seek injunctive or other equitable relief regarding the false and deceptive marketing, advertising and sale of the Defendants' pet food.

**Numerosity**

122.    According to the American Pet Products Manufacturers Association 2007-2008 survey, there are 88.3 million companion dogs and 74.8 million companion cats in the United States. 44.8 million United States households enjoy companion dogs and 38.4 million share their home with companion cats. The overwhelming majority of consumers who have companion cats and dogs purchase commercial pet food that the Defendants place in the stream of commerce. The members of the Class are, thus, so numerous and geographically diverse that joinder of all of them is impracticable. While the exact number and identities of the members of the Class are unknown to the Plaintiffs/Class Representatives at this time, and can only be ascertained through appropriate discovery from the Defendants records and notices, the Plaintiffs/Class Representatives believe and therefore aver that there are thousands of Class members throughout the United States and know for certain that there are over 1,000. As a general rule classes of 40 or more are numerous enough to certify. *See* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* para. 23-05 [1] (2d ed. 1987).

**Commonality**

123.    There are questions of fact and law common to members of the Class that predominate over any questions affecting any individual members including, *inter alia*, the following:

50

(a)     Whether the Defendants advertised, marketed and sold pet food that the consumer would not have purchased had the consumer been aware of the true contents, additives, chemicals and other contents;

(b)     Whether the Defendants manufactured, marketed, advertised, distributed and/or sold pet food that promised benefits but which claims are unsupported by valid scientific research studies;

(c)     Whether the Defendants conducted marketing and other surveys to determine how best to "humanize" pet food to induce consumers to buy it;

(d)     Whether the "Veterinarian recommended" endorsement is false and misleading;

(e)     Whether the Defendants deceptively, unfairly, knowingly, intentionally and/or negligently manufacture, produce, advertise, market, distribute and/or sell pet food that contains toxic, dangerous, and/or other ingredients, additives or chemicals;

(f)     Whether the Defendants knew or should have known that valid research studies should be performed prior to marketing the quality of the pet food and the claimed benefits to induce consumers to purchase the Defendants' pet food;

(g)     Whether the Defendants advertised, represented or held themselves out as experts in dog and/or cat nutrition and the otherwise beneficial effects of pet food;

(h)     Whether the Defendants use ingredients and/or additives and/or other substances that they either knew or should have known would not have the beneficial qualities claimed in their marketing materials;

(i)     Whether the Defendants intended for consumers to rely on their marketing representations;

(j)    Whether the Defendants were unjustly enriched by selling consumers pet food that was adulterated, did not comport with their own marketing, contained toxic substances, and/or was otherwise not as advertised;

(k)    Whether the Defendants' marketing and advertising was false and deceptive under Florida and applicable state laws; and

(l)    Whether the Defendants violated applicable consumer statutes requiring the Defendants not to commit deceptive or unfair trade practices to the detriment of the consumer.

## Typicality

124.    The Plaintiffs/Class Representatives claims are typical of the claims of the other members of the Class in that all such claims arise out of the Defendants' conduct in manufacturing, producing, marketing, advertising, processing, distributing, selling and entering into the stream of commerce pet food as described herein. The Plaintiffs/Class Representatives and other members of the Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiffs/Class Representatives' claims and those of the Class.

## Adequacy

125.    The Plaintiffs/Class Representatives will fairly and adequately protect the interests of the Class. The Plaintiffs/Class Representatives claims are coextensive with, and not antagonistic to, the claims of others members of the Class and they are willing and able to vigorously prosecute this action on behalf of the Class. The Plaintiffs/Class Representatives have retained competent counsel who are very experienced in class action litigation.

## Predominance and Superiority

126.    Plaintiffs/Class Representatives bring this action under Rule 23(b)(3) as to Counts ___ through ___, because common questions of law and fact predominate over questions of law and fact affecting individual members of the Class. In addition, the expense of litigating each member of the Class's claim individually would be so cost prohibitive as to deny Class members a viable remedy. Certification under Rule 23(b)(3) is appropriate because a class action is superior to other available methods for the fair and efficient adjudication of this action, and Plaintiffs/Class Representatives envision no unusual difficulty in the management of this action as a class action.

127.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, respectfully request this Court to:

(a)    Enter an order certifying the Class under Rules 23(a), 23(b)(2) and/or (b)(3) and appointing the Plaintiffs/Class Representatives and their legal counsel to represent the Class;

(b)    Enter an injunction requiring the Defendants to cease their false and deceptive advertising;

(c)    Award restitution and disgorgement in an amount to be determined at trial;

(d)    Enter an Order granting reasonable attorneys' fees and costs to Class Counsel;

(e)    Award damages, including punitive damages, as allowed by law;

(f)    Establish a consumer fund to monitor consumer pet food issues;

(g)    Award costs of suit, including pre and post-judgment interest;

(h)    Grant such other and further relief in law or equity as the Court deems just and proper.

## COUNT I

## Fraudulent Misrepresentation and Concealment[4]

---

[4] And other state fraudulent misrepresentation and concealment laws of the various states where Class members

**As to All Defendants**

128.    Plaintiffs/Class Representatives hereby adopt and incorporate by reference paragraphs 1-___ as if set forth more fully herein.

129.    During the class period, the Defendant Manufacturers, Retailers, Pet Specialty Retailers and Co-Packers (through association with and/or by agreement with the Manufacturers, Retailers and Petsmart) were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

130.    During the class period, Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.  Retailers and Pet Specialty Retailers adopted the marketing representations of the Defendant Manufacturers and/or made their own marketing representations regarding pet food ultimately sold to the consumer.

131.    The Defendants intentionally omitted and/or concealed material facts from, the Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, labeling, and sale of the Defendants' pet foods facts including, but not limited to:

    a.    Failing to disclose, and/or intentionally concealing, ingredients which are not safe or healthy for companion pets;

    b.    Failing to disclose, and/or intentionally concealing, the results of tests showing the potential health risks to companion pets associated with the use of Defendants' commercial pet foods;

    d.    Failing to include adequate warnings about the potential actual risks and nature, scope, severity, and duration of adverse effects of the ingredients and contents in the Defendants' pet foods;

    e.    Concealing information regarding the known health risks to companion pets associated with the Defendants' pet foods; and

---

reside.

  f. Concealing research showing the deleterious effect of the Defendants pet food and/or failing to conduct valid scientific studies to support the claims while leading consumers to believe that they were accurate;

133. The Defendants deliberately and/or intentionally misrepresented by omission or concealment material facts from consumers, including the Plaintiffs/Class Representatives and other Class members.  Co-Packers, as the manufacturer and producer of the Defendants' pet food by omission failed to disclose material facts to consumers.

134. The Defendants intentionally concealed facts known, or facts which they should have known, as alleged herein, in order to ensure increased sales and profits of the Defendants' pet foods.

135. The Plaintiffs/Class Representatives and the Class were unaware of the falsity of the omissions and concealment. Had the Plaintiffs/Class Representatives and the Class known the true facts, they would not have purchased the pet foods and/or fed the pet foods to their companion pets.

136. As a direct and proximate result of the Defendants' misrepresentations by omission and concealment of material facts, the Plaintiffs/Class Representatives and the Class have suffered damages.

137. The Defendants' conduct in concealing material facts and making the foregoing misrepresentations, as alleged herein, was committed with such reckless disregard that the conduct amounts to a conscious disregard or indifference to the rights of consumers such as the Plaintiffs/Class Representatives and other Class members, thereby entitling the Plaintiffs/Class Representatives and other Class members to punitive damages.

138. Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)      Awarding actual and consequential damages;

(b)      For pre- and post-judgment interest to the Class, as allowed by law;

(c)      Awarding punitive damages; and

(d)      Granting such other and further relief as allowed by law.

## COUNT II

### Negligent Misrepresentation[5]
### As to All Defendants

139.     Plaintiffs/Class Representatives and the Class members re-allege paragraphs 1-____ as if set forth more fully herein.

140.     At all material times, Defendant Manufacturers, Retailers, Pet Specialty Retailers and Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

141.     At all material times, Defendant Retailers and Pet Specialty retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

142.     The Defendants omitted and concealed material facts to Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendant Manufacturers' Retailers and Petsmart's pet foods on a continuing and ongoing basis as alleged herein.

143.     By Defendants negligently made misrepresentations regarding their pet foods as alleged herein.

---

[5] And other state negligent misrepresentation laws of the various states where Class members reside.

144.    The Defendants either knew of these misrepresentations, or made these misrepresentations by omission and concealment and either knew or should have known of the false representations and/or omissions.

145.    The Defendants intentionally made such misrepresentations about their products in order to induce the Plaintiffs/Class Representatives and the Class to act on the misrepresentations so that the Plaintiffs/Class Representatives and the Class would buy the Defendants' pet food products, thus increasing the sales and profits of Defendants' pet foods.

146.    The Plaintiffs/Class Representatives were unaware of the misrepresentations and/or omissions and/or had the Plaintiffs/Class Representatives and the Class known the true facts concerning the Defendants' commercial pet foods, they would not have purchased the pet foods and/or fed the pet foods to their companion pets.

147.    As a proximate cause of the Defendants' negligent misrepresentations and/or omissions, the Plaintiffs/Class Representatives and the Class bought the Defendants products and suffered injuries and damages as a result thereof.

148.    Wherefore, Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

### COUNT III

**Violation of the Florida[6] Deceptive and Unfair Trade
Practices Act (FDUTPA), Fla. Stat. § 501.201
As to All Defendants**

---

[6] And other state deceptive trade practice laws of the various states where Class members reside.

149.    The Plaintiffs/Class Representatives and the Class re-allege paragraphs 1-___ as if set forth more fully herein.

150.    At all material times, Defendant Manufacturers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), Retailers, and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

151.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

152.    This is a cause of action for damages due to the Defendants' violation of Florida's Deceptive and Unfair Trade Practices Act, Florida Statute §501.201, *et seq*.

153.    The Defendants' conduct in making deceptive representations to, and omissions and/or concealing material facts from, the Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendants' pet foods on a continuing and ongoing basis as alleged herein is an unfair and/or a deceptive act in violation of § 501.201.

154.    At all material times hereto, the Plaintiffs/Class Representatives and the Class were "interested parties or persons" as said term is defined under Fla. Stat. §501.203(6). Furthermore, the Plaintiffs/Class Representatives and the class were "consumers" as said term is defined under Fla. Stat. §501.203(7).

155.    By virtue of the acts described above, the Defendants were engaged in "trade or commerce" as said term is defined under Fla. Stat. §501.203(8).

155.    The Defendants' representations and/or omissions regarding their pet food products constitute unlawful, unfair, or deceptive acts under Fla. Stat. §501.204,

156.    The Defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and therefore a violation of § 501.201.[7]

157.    The Plaintiffs/Class Representatives and the Class acted reasonably under the circumstances by purchasing these products based on the marketing, advertising, and other information provided by the Defendants. The Plaintiffs/Class Representatives and the Class are average consumers who had no specialized knowledge of pet food and pet food ingredients at the time of purchase.

158.    As a proximate result of the Defendants' deceptive trade practices, the Plaintiffs/Class Representatives and the Class have been aggrieved and suffered damages.

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against Defendants as follows:

(a)    Awarding actual damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law;

(c)    For reasonable attorneys' fees and costs pursuant to Fla. Stat. §501.2105;

(d)    Awarding injunctive relief;

(d)    Granting such other and further relief as it deems just and proper.

## COUNT IV

## Negligence[8]
## As to Defendant Manufacturers and Co-Packers and PetSmart

---

[7] While the Florida legislature does not define what an unfair or deceptive act is, it has mandated that Fla. Stat. chs. 501.204, 501.211(1)-(2) (1997) of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) are to be liberally construed. The legislature has also specifically stated that great weight should be given to federal cases interpreting the federal counterpart of this act. An unfair practice under 15 U.S.C.S. § 45(a)(1) of the Federal Trade Commission Act has been defined as one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. See Samuels v. King Motor Co., 782 So. 2d 489 (Fla. 4th DCA 2001).
[8] And other state negligence laws of the various states where Class members reside.

159.    The Plaintiffs/Class Representatives re-allege paragraphs 1-☐☐ as if more fully set forth herein.

160.    At all material times, Defendant Manufacturers, Co-Packers, Retailers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart) and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

161.    The Defendant Manufacturers, Co-Packers (through association with and/or by agreement with Defendant Manufacturers Retailers and Petsmart), Retailers and Petsmart owed the Plaintiffs/Class Representatives and the Class a duty to offer pet food free from deleterious and harmful effects.

162.    The Defendants breached their duty of care to the Plaintiffs/Class Representatives and the Class by failing to use sufficient quality control, perform adequate testing, proper manufacturing practices, production, processing, adequate oversight and failing to take sufficient measures to prevent the pet foods from being offered for sale in a manner in which would cause injury to the Plaintiffs' companion pets as alleged herein.

163.    The Defendants knew or, in the exercise of reasonable care, should have known, that the pet foods presented an unacceptable and unreasonable risk of harm to the Plaintiffs/Class Representatives' and the Class' companion pets, and would result in foreseeable, and reasonably avoidable, damages.

164.    The Defendants' conduct, as alleged herein, was therefore negligent, careless, and reckless.

165.    As a direct and proximate result of the Defendants' above referenced negligence, the Plaintiffs/Class Representatives and other Class members have suffered loss and damages.

Wherefore, the Plaintiffs/Class Representatives and other Class members, on behalf of themselves and all others similarly situated, prays relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT V

## Strict Liability[9]

166.    The Plaintiffs/Class Representatives and the Class re-allege paragraphs 1-___ as set forth more fully herein.

167.    The Plaintiffs/Class Representatives purchased pet food products which they fed to the companion pets from the Defendants as manufacturer, retailer, wholesaler and/or distributors.

168.    The pet food product was defective and unreasonably dangerous because it caused injury, illness and death to the Plaintiffs companion pets due to harmful substances, including, but not limited to, additives, chemicals, toxins and contaminants.

169.    As a direct and proximate cause of the unreasonably dangerous condition of the pet food that the Plaintiffs/Class Representatives and the Class purchased and fed to their companion pets, the Plaintiffs/Class Representatives and the Class suffered property damage and economic losses.

---

[9] And other state strict liability laws of the various states where Class members reside.

WHEREFORE the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT VI

## Injunctive Relief[10]

170.    The Plaintiffs/Class Representatives and the Class re-allege paragraphs 1-___ as set forth more fully herein.

171.    The Plaintiffs/Class Representatives seek an injunction enjoining Defendants to cease its unlawful, false and misleading marketing, advertising and sale of pet food products because there is a genuine threat of imminent injury to the Plaintiffs and there is no adequate remedy at law available to the Plaintiffs.

171.    An injunction is particularly warranted here because even after the largest recall in American history, a number of recalls have followed.  The Plaintiffs seek to prevent further needless deaths of the Plaintiffs and consumers' cats and dogs is to enjoin the Defendants from their continuing and ongoing pattern and practices of deceiving and misleading consumers.

172.    The Plaintiffs have a clear legal interest in the subject matter of this lawsuit because they have cats and/or dogs and regularly purchase pet food products for consumption by their companion pets.

173.    There is a substantial likelihood of success on the merits of one or more of the Plaintiffs claims against the Defendants.

---

[10] And other state injunctive relief laws of the various states where Class members reside

174.    Unless an injunction is entered, the Plaintiffs and the Class will continue to suffer irreparable harm and the threatened injury to the Plaintiffs outweighs any threatened harm the injunction may cause the Defendants.

175.    An injunction will serve the public interest by preventing harmful pet food from causing further injury to the Plaintiffs and the Class from entering the market.

WHEREFORE, the Plaintiffs/Class Representatives and the Class respectfully requests that this Honorable Court enter a permanent injunction enjoining the Defendants from continuing its current unlawful, false and misleading advertising and marketing and sale of their pet food products.

## COUNT VII

### Breach of Implied Warranty[11]
### as to Retailers and Pet Specialty Retailers

176.    The Plaintiffs/Class Representatives and the Class re-allege paragraphs 1-___ as set forth more fully herein.

177.    At all material times, the Defendant Manufacturers, Co-Packers, Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

178.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

179.    At the time the Defendants advertised, marketed, sold, and distributed the commercial pet food, the Defendants knew of the purpose for which the pet foods were intended

---

[11] And other state breach of warranty laws of the various states where Class members reside.

and impliedly warranted that the pet foods were of merchantable quality and safe and fit for such use.

180.    The Plaintiffs/Class Representatives and the Class reasonably relied upon the skill, superior knowledge and judgment of the Defendants as to whether the pet foods were of merchantable quality and safe and fit for their intended use.

180.    Based on the implied warranty of merchantability and quality for its purpose, Plaintiffs/Class Representatives purchased pet food products offered for sale by the Defendants.

181.    Contrary to such implied warranties, the pet foods were not of merchantable quality and were not safe for their intended use.

182.    The Defendants breached the implied warranties because their products, purchased by the Plaintiffs/Class Representatives and the Class, were not of merchantable quality, nor safe, nor fit for their intended use because the products were adulterated, and, therefore, were unreasonably dangerous and unfit for their ordinary and/or intended use. As a result thereof, the Plaintiffs/Class Representatives and the Class suffered injuries and damages.

183.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

### COUNT VIII

### Breach of Express Warranty[12]
### As to All Defendants

---

[12] And other state breach of express warranty laws of the various states where Class members reside.

184.    The Plaintiffs/Class Representatives re-allege paragraphs 1-▮▮ as if more fully set forth herein.

185.    At all material times, the Defendant Manufacturers, Co-Packers, Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

186.    At all material times, Defendants Pet Supermarket, Petco, PetSmart, Target, and Wal-Mart were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

187.    The Defendants expressly warranted that the pet foods were safe, healthy, perfect, balanced, and nutritious for consumption by companion cats and dogs through their products' labels, packaging, and advertisements.

188.    The Plaintiffs/Class Representatives purchased the pet food products based on the express warranties trusting the Defendants superior knowledge and promises contained in the warranties.

189.    The Defendants breached the express warranties because the pet foods did not conform to these express representations. The pet foods are not safe and/or healthy for consumption by the Plaintiffs/Class Representatives companion pets and Class' cats and dogs.

190.    In fact, the Defendants' pet foods are harmful, unhealthy, and not safe for consumption by the Plaintiffs/Class Representatives and the Class' companion pets and as a result thereof the Plaintiffs/Class Representatives and the Class have suffered damages as a result of the Defendants' breach of express warranty.

191.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against the Defendants as follows:

    (a)      Awarding actual and consequential damages;

    (b)      For pre- and post-judgment interest to the Class, as allowed by law; and

    (c)      Granting such other and further relief as allowed by law.

## COUNT IX

### Unjust Enrichment[13]
### As to All Defendants

192.    Plaintiffs/Class Representatives and other Class members reallege paragraphs 1-____ as if more fully set forth herein.

193.    Plaintiffs/Class Representatives do not have an adequate remedy in law.

194.    At all material times, the Defendant Manufacturers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

195.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

196.    The Plaintiffs/Class Representatives and the Class purchased the Defendants' pet foods because they believed that the pet foods were safe for their pets to consume. The Plaintiffs/Class Representatives payment of purchase price for the substandard products conferred a benefit to the Defendants.

197.    The Defendants had knowledge of the benefit conferred upon them by the Plaintiffs/Class Representatives. In fact, the Defendants made calculated profit off of the sales of

---

[13] And other state unjust enrichment laws of the various states where Class members reside.

the pet food products when the Plaintiffs/Class Representatives on the other hand suffered damages as a result of the transaction.

198.    The Defendants have voluntarily accepted and retained these profits and benefits, derived from consumers, including the Plaintiffs/Class Representatives and the Class, despite the fact the Plaintiffs/Class Representatives and the Class, were not receiving pet foods of quality, nature, fitness, or value that had been represented by the Defendants or that unknowing consumers expected.

199.    Under the circumstances where the Plaintiffs/Class Representatives were left with a product they would not have purchased had they known of the quality and content and where the Plaintiffs were damaged as a result of the purchase, the Defendants have been unjustly enriched. Under the circumstances it would be inequitable for the Defendants to retain the benefits conferred upon them by the Plaintiffs /Class Representatives.

200.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows: the disgorgement and restitution of the Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

### JURY DEMAND

Plaintiffs/Class Representatives and the Class demand a jury trial on all issues triable by a jury.

DATED: November __, 2007

s/    Catherine J. MacIvor
CATHERINE J. MACIVOR (FBN 932711)
cmacivor@mflegal.com
MALTZMAN FOREMAN, PA

One Biscayne Tower
2 South Biscayne Boulevard – Suite 2300
Miami, Florida 33131
Tel: 305-358-6555 / Fax: 305-374-9077
*Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the

Court via CM/ECF on this ___ day of November, 2007. We also certify that the foregoing was

served on all counsel or parties of record on the attached Service List either via transmission of

Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those

counsel or parties who are not authorized to receive electronic Notices of Filing.

s/    Catherine J. MacIvor_____

CATHERINE J. MACIVOR

**SERVICE LIST**

**CASE NO. 07-21221 ALTONAGA/Turnoff**

**CATHERINE J. MACIVOR**
cmacivor@mflegal.com
**JEFFREY B. MALTZMAN**
jmaltzman@mflegal.com
**JEFFREY E. FOREMAN**
jforeman@mflegal.com
**DARREN W. FRIEDMAN**
dfriedman@mflegal.com
**MALTZMAN FOREMAN, PA**
One Biscayne Tower
2 South Biscayne Boulevard -Suite 2300
Miami, Florida 33131
Tel: 305-358-6555 / Fax: 305-374-9077
*Attorneys for Plaintiffs*

**JOHN B.T. MURRAY, JR.**
**E-Mail: Jbmurray@ssd.com**
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, Florida 33401-6198
Telephone: (561) 650-7200
Facsimile:   (561) 655-1509

*Attorneys for Defendants PETCO Animal Supplies Stores, Inc., PetSmart, Inc., Wal-Mart Stores, Inc., Target Corporation and Meiner, Inc.*

**ROLANDO ANDRES DIAZ**
E-Mail: **rd@kubickdraper.com**
**CASSIDY YEN DANG**
E-Mail: **cyd@kubickidraper.com**
**MARIA KAYANAN**
E-Mail: **mek@kubickidraper.com**
**KUBICKI DRAPER**
25 W. Flagler Street
Penthouse
Miami, Florida 33130-1712
Telephone: (305) 982-6708
Facsimile:  (305) 374-7846

*Attorneys for Defendant Pet Supermarket, Inc.*

**ALEXANDER SHAKNES**
E-Mail: Alex..Shaknes @dlapiper.com
**AMY W. SCHULMAN**
E-Mail: Amy.schulman@dlapiper.com
**LONNIE L. SIMPSON**
E-Mail: Lonnie.Simpson@dlapiper.com
S. DOUGLAS KNOX
E-Mail: Douglas.knox@dlapiper.com
**DLA PIPER LLP**
1251 Avenue of the Americas
New York, New York 10020

*Attorneys for Defendants Menu Foods, Inc. and Menu Foods Income Fund*

**WILLIAM C. MARTIN**
**DLA PIPER LLP**
203 North LaSalle Street
Suite 1900
Chicago, Illinois 60601-1293
E-Mail: William.Martin@dlapiper.com

*Attorneys for Defendants Menu Foods, Inc. And Menu Foods Income Fund*

**HUGH J. TURNER, JR.**
**AKERMAN SENTERFITT**
350 E. Las Olas  Boulevard
Suite 1600
Fort Lauderdale, Florida 33301-2229
Telephone: (954)463-2700
Facsimile:   (954)463-2224
E-Mail: hugh.turner@ackerman.com
*Attorneys for Defendants Publix Super Markets, Inc. and H.E. Butt Grocery Co.*

**GARY L. JUSTICE**
E-Mail: gjustice@gibsondunn.com
**CHARLES H. ABBOTT**
E-Mail: cabbott@gibsondunn.com
GAIL E. LEES
E-Mail: glees@gibsondunn.com
**WILLIAM EDWARD WEGNER**
E-Mail: wwegner@gibsondunn.com
**GIBSON DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000

*Attorneys for Defendant Nutro Products, Inc.*

**OMAR ORTEGA**
**DORTA AND ORTEGA, P.A.**
Douglas Entrance
800 S. Douglas Road, Suite 149
Coral Gables, Florida 33134
Telephone: (305) 461-5454
Facsimile:  (305) 461-5226
E-Mail: oortega@dortandortega.com

*Attorneys for Defendant Mars, Incorporated
And Mars Petcare U.S.*

**BENJAMIN REID**

**JOHN F. MULLEN**
jmullen@cozen.com
Cozen O'Connor
The Atrium – 3rd Floor
1900 Market Street
Philadelphia, PA  19103
Tel: 215.665.2179 / Fax: 215.665.2013
*Attorneys for Defendant Del Monte Foods Co.*

**MARTY STEINBERG**
E-Mail: msteinberg@hunton.com
ADRIANA RIVIERE-BADELL
E-Mail: ariviere-badell@hunton.com
**HUNTON & WILLIAMS, LLP**
Mellon Financial Center
1111 Brickel Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile:  (305) 810-2460

*Attorneys for Defendant Nutro Products, Inc.*

**DANE H. BUTSWINKAS**
E-Mail: dbutswinkas@wc.com
**PHILIP A. SECHLER**
E-Mail: psechler@wc.com
**THOMAS G. HENTOFF**
E-Mail: thentoff@wc.com
**CHRISTOPHER  M. D'ANGELO**
E-Mail: cdangelo@wc.com
**PATRICK J. HOULIHAN**
E-Mail: phoulihan@wc.com
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC  20005

*Attorneys for Defendants Mars, Incorporated
And Mars Petcare U.S.*

**ROBERT C. TROYER**
rctroyer@hhlaw.com
Hogan & Hartson LLP
One Tabor Center -Suite 1500
1200 Seventeenth Street
Denver, CO 80202
Tel: 303-899-7300 / Fax: 303-899-7333
*Attorneys for Nestle U.S.A., Inc.*

**MIRANDA L. BERGE**
mlberge@hhlaw.com
**CRAIG A. HOOVER**
cahoover@hhlaw.com

Hogan & Hartson, LLP
555 13th Street, NW
Washington, DC 20004
Tel: 202.637.5600 / Fax: 202.637.5910
*Attorneys for Nestle U.S.A., Inc.*

**CHARLES ABBOTT**
cabbott@gibsondunn.com
**BEN BRODERICK**
bbroderick@gibsondunn.com
**GARY L. JUSTICE**
gjustice@gibsondunn.com
**WILLIAM EDWARD WEGNER**
wwegner@gibsondunn.com
**GAIL E. LEES**
glees@gibsondunn.com
Gibson Dunn & Crutcher L.L.P
333 S. Grand Avenue -Suite 4600
Los Angeles, CA 90071
Tel: 213.229.7887 / Fax: 213.229.6887
*Attorneys for Defendant Nutro Products Inc.*

**CAROL A. LICKO**
calicko@hhlaw.com
Hogan & Hartson L.L.P
Mellon Financial Center
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel: 305.459.6500 / Fax: 305.459.6550
*Attorneys for Nestle U.S.A., Inc.*

**MARTY STEINBERG**
msteinberg@hunton.com
**ADRIANA RIVIERE-BADELL**
ariviere-badell@hunton.com
Hunton & Williams, LLP
1111 Brickell Avenue - #2500
Miami, Florida 33131
Tel: 305.810.2500 / Fax: 305.810.2460
*Attorneys for Defendant Nutro Products Inc.*

**HUGH J. TURNER JR.**
Hugh.turner@akerman.com
Akerman Senterfitt & Eidson
Las Olas Centre II, Suite 1600
350 East Las Olas Blvd.
Ft. Lauderdale, Florida 33301-2229
Tel: 954.463.2700 / Fax: 954.463.2224
*Attorneys for Defendant Publix Supermarkets, Inc.*

**JOHN B. T. MURRAY, JR.**
jbmurray@ssd.com
Squire, Sanders & Dempsey LLP
1900 Phillips Point West
777 South Flagler Drive - #1900
West Palm Beach, Florida 33401
Tel: 561.650.7200 / Fax: 561.655.1509
*Attorneys for Defendants Petco Animal Supplies, Inc. and Wal-Mart Stores, Inc.*

**ROLANDO ANDRES DIAZ**
rd@kubickidraper.com
**MARIA KAYANAN**
mek@kubickidraper.com
**CASSIDY YEN DANG**
cyd@kubickidraper.com
Kubicki Draper, P.A.
25 West Flagler Street - Penthouse
Miami, Florida 33130
Tel: 305.982.6722 / Fax: 305.374.7846
*Attorneys for Defendant Pet Supermarket, Inc.*

**ROBIN LEA HANGER**
rlhanger@ssd.com
Squire, Sanders & Dempsey, LLP
200 S. Biscayne Boulevard – 40th Floor
Miami, Florida  33131-2398
Tel: 305.577.7040 / Fax: 305.577.7001
*Attorneys for Defendants Petco Animal Supplies,*
*Inc. and Wal-Mart Stores, Inc.*

**ALEXANDER SHAKNES**
Alex.shaknes@dlapiper.com
**AMY W. SCHULMAN**
Amy.schulman@dlapiper.com
DLA PIPER US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: 212.335.4829 / Fax: 212.884.8629
*Attorneys for Menu Foods Income Fund and*
*Menu Foods, Inc.*

**WILLIAM C. MARTIN**
William.martin@dlapiper.com
DLA PIPER US LLP
203 North LaSalle Street - #1900
Chicago, Illinois 60601-1293
Tel: 312.368.3449 / Fax: 312.630.7318
*Attorneys for Menu Foods Income Fund and*
*Menu Foods, Inc.*

**LONNIE L. SIMPSON**
lonnie.simpson@dlapiper.com
**S. DOUGLAS KNOX**
sdouglas.knox@dlapiper.com
DLA PIPER US LLP
101 E. Kennedy Boulevard - #2000
Tampa, Florida  33602
Tel:   / Fax:
*Attorneys for Menu Foods Income Fund and*
*Menu Foods, Inc.*

**SUSAN ELIZABETH MORTENSEN**
smortensen@coffeyburlington.com
Coffey Burlington
2699 S. Bayshore Drive - Penthouse
Miami, Florida 33133
Tel: 305.858.2900 / Fax: 305.858.5261
*Attorneys for Defendant Petsmart, Inc.*

**MICHAEL K. KENNEDY**
mkk@gknet.com
**MICHAEL R. ROSS**
mrr@gknet.com
Gallagher and Kennedy, PA
2575 E. Camelback Road - #1100
Phoenix, Arizona 85016
Tel: 602.530.8504 / Fax: 602.530.8500
*Attorneys for Defendant Petsmart, Inc.*