UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 07-21221 CIV ALTONAGA/Turnoff

RENEE BLASZKOWSKI, PATRICIA DAVIS,
SUSAN PETERS, DEBORAH HOCK, BETH WILSON,
CLAIRE KOTZAMPALTIRIS, DONNA HOPKINS-JONES,
MARIAN LUPO, JANE HERRING, JO-ANN MURPHY,
STEPHANIE STONE, PATRICIA HANRAHAN,
DEBBIE RICE, ANN QUINN, SHARON MATHIESEN,
SANDY SHORE, CAROLYN WHITE, LOU WIGGINS,
MICHELLE LUCARELLI, RAUL ISERN, DANIELLE
VALORAS, LISA MACDONALD, CINDY TREGOE,
JENNIFER DAMRON, MARLENA RUCKER, JULIE
NELSON, YVONNE THOMAS, DEBBIE MCGREGOR,
 LINDA BROWN and TONE GAGLIONE,
 individually and on behalf of others similarly situated,

        Plaintiffs/Class Representatives,
vs.

MARS INC., MARS PETCARE US, INC., PROCTER
AND GAMBLE CO., THE IAMS CO., COLGATE
PALMOLIVE COMPANY, HILL'S PET NUTRITION,
DEL MONTE FOODS, CO., NESTLÉ USA INC., NESTLÉ
PURINA PETCARE CO., NUTRO PRODUCTS INC.,
NATURA PET PRODUCTS, INC., MENU FOODS, INC.,
MENU FOODS INCOME FUND, PUBLIX SUPER MARKETS,
INC., NEW ALBERTSON'S INC., ALBERTSON'S LLC,
THE KROGER CO. OF OHIO, PETCO ANIMAL
SUPPLIES STORES, INC., PET SUPERMARKET,
INC., PET SUPPLIES PLUS/USA INC., PETSMART INC.,
TARGET CORP. AND WAL-MART STORES, INC.,

        Defendants/Class Representatives.
_____/

**THIRD AMENDED CLASS ACTION COMPLAINT**

**EXHIBIT "A"**

Dockets.Justia.com

Plaintiffs/Class Representatives, Renee Blaszkowski, *et al.,* individually and on behalf of others similarly situated, file this Third Amended Class Action Complaint against Defendants, Mars Inc., *et al.,* (hereinafter collectively referred to as the "Defendants") and allege as follows:

## INTRODUCTION

1.      This is a class action brought by the Plaintiffs on behalf of a Class of all consumers who have purchased commercial pet food and/or treats that were manufactured, marketed, distributed and/or sold by the Defendants during the Class Period. Each and every Plaintiff purchased pet food and/or treats that were manufactured, produced, distributed, marketed, advertised and/or sold by one or more of the named Defendant Manufacturers and Retailers and (a) relied upon and trusted the Defendants' representations and/or omissions in purchasing the pet food and/or treats; (b) the Plaintiffs would not have purchased the pet food and/or treats had had they known the truth about the nature, character, quality, ingredients and/or harmful effects; (c) did not receive a benefit from the purchase of pet food and/or treats that were materially different from what was advertised; and/or (d) the Plaintiffs' cat(s) and/or dog(s) have suffered illness and/or death as a result of ingesting the pet food and/or treats as described more fully below.

2.      The Plaintiffs bring this action for injunctive relief, restitution and damages for (1) false and deceptive advertising, misrepresentations and omissions made by the Defendants in the marketing, advertising and sale of the Defendants' commercial pet food and treats; and (2) for the illness and/or deaths of the Plaintiffs' cats and dogs from ingesting the Defendants' commercial pet food and treats.

## PARTIES

### Plaintiffs/Class Representatives

3.     Plaintiff/Class Representative, Renee Blaszkowski, is a resident of Michigan and Connecticut during the class period.  Plaintiff Blaszkowksi regularly purchased pet food during the class period for daily consumption by her cat(s)/dog(s) in Michigan and Connecticut, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Procter & Gamble and Iams, Colgate Palmolive and Hill's, Del Monte, Nestlé USA and Nestlé Purina Petcare, Nutro, Natura, Wal-Mart, Target, Petsmart and on information and belief Kroger and/or Menu Foods. Defendants, Kroger, Petco, Pet Supermarket, Pet Supplies Plus, Petsmart, Target and Wal-Mart marketed and sold Plaintiff Blaszkowski pet food from the above-referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

4.     Plaintiff/Class Representative, Patricia Davis, is a resident of Florida during the class period.  Plaintiff Davis regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Florida, which was manufactured and marketed by Defendants, Mars and Mars Petcare, Nestlé USA and Nestlé and Nestlé Purina Petcare, Procter & Gamble and Iams, Del Monte, Natura, and on information and belief Menu Foods. Defendants, Publix and Petsmart marketed and sold Plaintiff Davis pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

5.     Plaintiff/Class Representative, Susan Peters, is a resident of Oklahoma during the class period.  Plaintiff Peters regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Oklahoma, which was manufactured and marketed by Defendants, Mars, Mars Petcare, Nestlé USA and Nestlé Purina Petcare, Procter & Gamble and Iams, Colgate Palmolive and Hill's, Del Monte and on information and belief Wal-Mart and/or Menu Foods. Defendants, Petsmart, Wal-Mart and Petco marketed and sold Plaintiff Peters pet

food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

6.     Plaintiff/Class Representative, Linda Brown, is a resident of Minnesota during the class period.  Plaintiff Brown regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Minnesota, which was manufactured and marketed by Defendants, Nestlé USA and Nestlé Purina Petcare, Colgate Palmolive and Hill's, Del Monte, and on information and belief Menu Foods.  Defendants, Wal-Mart and Petco marketed and sold Plaintiff Brown pet food from the above-referenced manufacturers and marketers, which purchases were made based upon the above referenced Defendant's marketing.

7.     Plaintiff/Class Representative, Deborah Hock, is a resident of California during the class period.  Plaintiff Hock regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in California, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Procter & Gamble and Iams, Nestlé USA and Nestlé Purina Petcare, Colgate Palmolive and Hill's, Nutro and on information and belief Menu Foods. These products were purchased based upon the above referenced Defendants' marketing.

8.     Plaintiff/Class Representative, Beth Wilson, is a resident of Indiana during the class period.  Plaintiff Wilson regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Indiana, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Nestlé USA and Nestlé Purina Petcare, Colgate Palmolive and Hill's, Procter & Gamble and Iams, Del Monte, and on information and belief Menu Foods. Defendants, Kroger and Wal-Mart marketed and sold Plaintiff Wilson pet food from the above-referenced manufacturers and marketers, which purchases were made based upon the above referenced Defendants' marketing.

9.    Plaintiff/Class Representative, Claire Kotzampaltiris, is a resident of Massachusetts during the class period.  Plaintiff Kotzampaltiris regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Massachusetts, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Procter & Gamble and Iams, Nestlé USA and Nestlé Purina Petcare, Colgate Palmolive and Hill's, Nutro and on information and belief Menu Foods. Defendants, Wal-Mart, Target, Petco and Petsmart marketed and sold Plaintiff Kotzampaltiris pet food from the above-referenced manufacturers and marketers, which purchases were made based upon the above referenced Defendants' marketing.

10.    Plaintiff/Class Representative, Donna Hopkins-Jones, is a resident of Massachusetts during the class period.  Plaintiff Hopkins-Jones regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Massachusetts, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Nestlé USA and Nestlé Purina Petcare, Del Monte and on information and belief Wal-Mart and/or Menu Foods. Defendants, Petsmart and Wal-Mart marketed and sold Plaintiff Hopkins-Jones pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

11.    Plaintiff/Class Representative, Marian Lupo, is a resident of Ohio during the class period.  Plaintiff Lupo regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Ohio, which was manufactured and marketed by Defendants, Mars and Mars Petcare, Nutro, Nestlé USA and Nestlé Purina Petcare, Procter & Gamble and Iams, Colgate Palmolive and Hill's, Del Monte and on information and belief Petsmart, Wal-Mart and/or Menu Foods. Defendants, Petsmart, Kroger, Wal-Mart and Target

marketed and sold Plaintiff Lupo pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

12.    Plaintiff/Class Representative, Jane Herring, a resident of South Carolina during the class period.  Plaintiff Herring regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in South Carolina, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Nestlé USA and Nestlé Purina Petcare, Procter & Gamble and Iams and Del Monte and on information and belief Wal-Mart and/or Menu Foods. Defendants, Wal-Mart marketed and sold Plaintiff Herring pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

13.    Plaintiff/Class Representative, Jo-Ann Murphy, is a resident of Tennessee during the class period.  Plaintiff Murphy regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Tennessee, which was manufactured and marketed by Defendants, Nutro and on information and belief Wal-Mart and/or Menu Foods. Defendants, Petco, Petsmart and Wal-Mart marketed and sold Plaintiff Murphy pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

14.    Plaintiff/Class Representative, Stephanie Stone, is a resident of Virginia during the class period.  Plaintiff Stone regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Virginia, which was manufactured and marketed by Defendants, Nestlé USA and Nestlé Purina Petcare, Colgate Palmolive and Hill's, Del Monte and on information and belief Petsmart and/or Menu Foods. Defendants, Petsmart, Wal-Mart and Pet Supplies Plus marketed and sold Plaintiff Stone pet food from the above-referenced

manufacturers and marketers, which purchases were made based upon the above referenced Defendants' marketing.

15.     Plaintiff/Class Representative, Patricia Hanrahan, is a resident of Washington during the class period.  Plaintiff Hanrahan regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Washington, which was manufactured and marketed by Defendants, Nutro and on information and belief Menu Foods. Defendants, Petsmart marketed and sold Plaintiff Hanrahan pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

16.     Plaintiff/Class Representative, Debbie Rice, is a resident of Wisconsin during the class period.   Plaintiff Rice regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Wisconsin, which was manufactured and marketed by Defendants, Nestlé USA and Nestlé Purina Petcare and on information and belief Menu Foods. Defendants, Petsmart and Wal-Mart marketed and sold Plaintiff Rice pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

17.     Plaintiff/Class Representative, Ann Quinn, is a resident of Nevada during the class period.   Plaintiff Quinn regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Nevada, which was manufactured and marketed by Defendants, Colgate Palmolive and Hill's, Del Monte, Nutro, Procter & Gamble and Iams and Nestlé USA and Nestlé Purina Petcare and on information and belief Kroger and/or Menu Foods. Defendants, Petsmart, Albertson's, New Albertson's, Kroger and Target marketed and sold

Plaintiff Quinn pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

18.     Plaintiff/Class Representative, Sharon Mathiesen, is a resident of Kansas during the class period.  Plaintiff Mathiesen regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Kansas, which was manufactured and marketed by Defendants, Procter & Gamble & Iams, Nutro, Nestlé USA and Nestlé Purina Petcare, Del Monte and Colgate Palmolive and Hill's and on information and belief Menu Foods. Defendants, Petsmart, Wal-Mart and Petco marketed and sold Plaintiff Mathiesen pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

19.     Plaintiff/Class Representative, Sandy Shore, is a resident of Arizona during the class period.  Plaintiff Shore regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Arizona, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Nestlé USA and Nestlé Purina Petcare, Procter & Gamble and Iams and on information and belief Menu Foods. Defendants, Petsmart, Wal-Mart and Kroger marketed and sold Plaintiff Shore pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

20.     Plaintiff/Class Representative, Carolyn White, is a resident of West Virginia during the class period.  Plaintiff White regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in West Virginia, which was manufactured and marketed by Defendants, Colgate Palmolive and Hill's and on information and belief Wal-Mart and/or Menu Foods. Defendants, Wal-Mart marketed and sold Plaintiff White pet food from the above

referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

21.     Plaintiff/Class Representative, Lou Wiggins, is a resident of Nebraska during the class period.  Plaintiff Wiggins regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Nebraska, which was manufactured and marketed by Defendants, Nestlé USA and Nestlé Purina Petcare, Nutro, Colgate Palmolive and Hill's, Procter & Gamble and Iams and on information and belief Menu Foods. Defendants, Wal-Mart, Petco and Petsmart marketed and sold Plaintiff Wiggins pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

22.     Plaintiff/Class Representative, Michelle Lucarelli, is a resident of Pennsylvania during the class period.  Plaintiff Lucarelli regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Pennsylvania, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Nestlé USA and Nestlé Purina Petcare, Colgate Palmolive and Hill's, Del Monte, and on information and belief Wal-Mart and/or Menu Foods. Defendant, Wal-Mart marketed and sold Plaintiff Lucarelli pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

23.     Plaintiff/Class Representative, Raul Isern, is a resident of Florida during the class period.  Plaintiff Isern regularly purchased pet food during the class period for daily consumption for his cat(s)/dog(s) in Florida, which was manufactured and marketed by Defendants, Mars and Mars Petcare, Procter & Gamble and Iams, Nestlé USA and Nestlé Purina Petcare and Del Monte. Defendants, Publix, Petco, Pet Supermarket, Petsmart, Target and Wal-Mart marketed

and sold Plaintiff Isern pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

24.     Plaintiff/Class Representative, Danielle Valoras, is a resident of North Carolina during the class period.  Plaintiff Valoras regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in North Carolina, which was manufactured and marketed by Defendants, Colgate Palmolive and Hill's, Procter & Gamble and Iams, Nestlé USA and Nestlé Purina Petcare and on information and belief Menu Foods. Defendants, Petsmart, Target and Petco marketed and sold Plaintiff Valoras pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

25.     Plaintiff/Class Representative, Lisa MacDonald, is a resident of Georgia during the class period.  Plaintiff MacDonald regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Georgia, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Procter & Gamble and Iams, Nestlé USA and Nestlé Purina Petcare, Colgate Palmolive and Hill's, Nutro and on information and belief Petsmart and/or Menu Foods.  Defendants, Petsmart marketed and sold Plaintiff MacDonald pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

26.     Plaintiff/Class Representative, Cindy Tregoe, is a resident of Maryland during the class period.  Plaintiff Tregoe regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Maryland, which was manufactured and marketed by Defendants, Mars and Mars Pet Care, Procter & Gamble and Iams, Colgate Palmolive and Hill's, Nestlé USA and Nestlé Purina Petcare, Nutro, Del Monte and on information and belief Petsmart

and/or Menu Foods. Defendants, Target, Wal-Mart, Petco and Petsmart marketed and sold Plaintiff Tregoe pet food from the above-referenced manufacturers and marketers, which purchases were made based upon the above referenced Defendants' marketing.

27.     Plaintiff/Class Representative, Jennifer Damron, is a resident of Kentucky during the class period.  Plaintiff Damron regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Kentucky, which was manufactured and marketed by Defendants, Procter & Gamble and Iams, Colgate Palmolive and Hill's, Nestlé USA and Nestlé Purina Petcare, Nutro, and on information and belief Menu Foods. Defendants, Wal-Mart, Petsmart, Target and Pet Supplies Plus marketed and sold Plaintiff Damron pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

28.     Plaintiff/Class Representative, Marlena Rucker, is a resident of Arizona during the class period.  Plaintiff Rucker regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Arizona, which was manufactured and marketed by Defendants, Nestlé USA and Nestlé Purina Petcare, Procter & Gamble and Iams, Colgate Palmolive and Hill's and on information and belief Menu Foods. Defendants, Petsmart, Petco, Albertson's, New Albertson's and Target marketed and sold Plaintiff Rucker pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

29.     Plaintiff/Class Representative, Julie Nelson, is a resident of Kentucky during the class period.  Plaintiff Nelson regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Kentucky, which was manufactured and marketed by Defendants, Procter & Gamble and Iams, Nestlé USA and Nestlé Purina Petcare, Colgate

Palmolive and Hill's and on information and belief Menu Foods. Defendants, Petsmart and Wal-Mart marketed and sold Plaintiff Nelson pet food from the above-referenced manufacturers and marketers, which purchases were made based upon the above referenced Defendants' marketing.

30.     Plaintiff/Class Representative, Yvonne Thomas, is a resident of New York during the class period. Plaintiff Thomas regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in New York, which was manufactured and marketed by Defendants, Nestlé USA and Nestlé Purina Petcare and Natura and on information and belief Menu Foods. Defendants, Petsmart and Wal-Mart marketed and sold Plaintiff Thomas pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

31.     Plaintiff/Class Representative, Debbie McGregor, is a resident of Illinois during the class period. Plaintiff McGregor regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in Illinois, which was manufactured and marketed by Defendants, Procter & Gamble and Iams, Nestlé USA and Nestlé Purina Petcare and Colgate Palmolive and Hill's and on information and belief Menu Foods. Defendants, Petsmart, Petco and Wal-Mart marketed and sold Plaintiff McGregor pet food from the above referenced manufacturers and marketers, which purchases were made based upon the above-referenced Defendants' marketing.

32.     Plaintiff/Class Representative, Tone Gaglione, is a resident of New Jersey during the class period. Plaintiff Gaglione regularly purchased pet food during the class period for daily consumption for her cat(s)/dog(s) in New Jersey, which was manufactured and marketed by Defendants, Nestlé USA and Nestlé Purina Petcare and on information and belief Menu Foods. These products were purchased based upon the above-referenced Defendants' marketing.

**DEFENDANTS**

**Defendant Manufacturers**

33.    Defendant, Mars, Inc. ("Mars"), is a Delaware corporation with its principal place of business in Virginia and is affiliated with Defendants, Mars Petcare U.S. Inc. and Nutro Products, Inc. Mars is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food and treats for purchase and use by the Plaintiffs and the Class in Florida and nationwide. Mars markets and advertises pet food and/or treats which have injured the Plaintiffs and the Class as described more fully below.  Mars regularly conducts business in Florida, directly and/or through agents, and places pet food products in the stream of commerce that reach Florida consumers. Mars has spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing consumer trust and confidence in its brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon this trust and confidence in the Mars' family of brands to purchase Mars' brand pet food and treats ("Whether it's the simple pleasure of savouring the world's best-loved chocolate and confectionery, the satisfaction of a drink delivered efficiently from a vending machine, *a contented pet* or the reward of a delicious hot meal, *Mars is the name behind the brands they've grown to know and trust*.").  *See* Exhibit "1."

34.    Defendant, Mars Petcare U.S., Inc. ("Mars Pet"), is a Delaware corporation with its principal place of business in Tennessee. Mars Pet is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs and the Class in Florida and nationwide. On information and belief, Mars Pet also manufactures, produces and distributes dog and cat food and treats for other companies which later attach their label to Mars' Pet products to be sold in Florida and nationwide. Mars' Pet

manufactures, markets and advertises pet food and treats which have injured the Plaintiffs and the Class as described more fully below. Mars Pet regularly conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Mars Pet has spent millions of dollars in promoting and developing trust and confidence in Mars Pet brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon and trust in the Mars family of brands to purchase Mars Pet, pet food and treats ("With the national recognition of the Waltham Center for Pet Nutrition, Mars also established a scientific authority that unifies the research and development expertise of pet care worldwide, and has a leading reputation among pet owners, breeders, veterinarians and academics."). *See* Exhibit "2."

35.     Defendant, Procter & Gamble Co. ("P&G"), is an Ohio corporation with its principal place of business in Ohio and is affiliated with Defendant, The Iams Company. P&G is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs and the Class in Florida and nationwide. P&G manufactures markets and advertises pet foods which have injured the Plaintiffs and the Class as described more fully below. P&G regularly conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. P&G has spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing trust and confidence in the P&G brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon and trust in the P&G family of brands to purchase P&G brand pet food and treats ("We will provide branded products and services of superior quality and value that improve the lives of the world's consumers. As a result, consumers will reward us with leadership sales, profit and value creation, allowing our people, our shareholders and the communities in which we live and work to prosper."). *See* Exhibit "3."

36.     Defendant, The Iams Company ("Iams"), is an Ohio corporation with its principal place of business in Dayton, Ohio.  Iams is in the business of manufacturing, producing, marketing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Iams manufactures, markets and advertises pet food which has injured the Plaintiffs and the Class as described more fully below.  Iams regularly conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Iams was established in 1946 and acquired by P&G in 1999 when it joined P&G's Health Care global business unit. Iams has spent millions of dollars in promoting and developing the trust and confidence in the Iams' brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon and trust in the Iams brands to purchase Iams brand pet food and treats ("Our Mission. . . is to enhance the well-being of dogs and cats by providing world-class quality foods and pet care products that delight the customer and strengthen the human-pet bond."). *See* Exhibit "4."

37.     Defendant, Colgate Palmolive Company ("Colgate"), is a Delaware corporation with its principal place of business in New York and is the ultimate parent of Defendant, Hill's Pet Nutrition, Inc. Colgate is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs and the Class in Florida and nationwide. Colgate manufactures, markets and advertises pet food which has injured the Plaintiffs and the Class as described more fully below.  Colgate regularly conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Colgate has spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing trust and confidence in its brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon and trust in the Colgate family of brands to purchase Colgate pet food and treats ("Welcome to the world of Colgate-Palmolive.  Every day

millions of people like you trust our products to care for themselves and the ones they love.").
*See* Exhibit "5."

38.     Defendant, Hill's Pet Nutrition, Inc. ("Hill's"), is a Delaware Corporation with its principal place of business in Kansas. Hill's is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs and the class in Florida and nationwide. Hill's manufactures, markets and advertises pet food and/or treats which have injured the Plaintiffs and the Class as described more fully below. Hill's conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Hill's veterinary diets were originally established in the 1830's and in 1968 Hill's Science Diet® was made available through veterinarians and pet professionals.  In 1976, Colgate purchased Hill's and Science Diet® which is now generally available at retailers and pet specialty stores. Hill's has spent millions of dollars in promoting and developing trust and confidence in the Hill's brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon and trust in the Hill's family of brands to purchase Hill's pet food.

39.     Defendant, Del Monte Foods Co. ("Del Monte"), is a Delaware corporation with its principal place of business in California. Del Monte is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs in Florida and nationwide. Del Monte manufactures, markets and advertises pet food which has injured the Plaintiffs and the class as described more fully below. Del Monte regularly conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Del Monte has spent millions of dollars in acquiring trusted pet food brand(s) and/or promoting and developing trust and confidence in its brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon and trust in the Del Monte

family of brands to purchase Del Monte brand pet food and treats ("We make the foods that nourish and enrich families, including the center of many families – pets.  Just a glance at our products reveals familiar brands that you know and trust.").  *See* Exhibit "6."

40.    Defendant, Nestlé USA, Inc. ("Nestlé USA"), is a Connecticut corporation with its principal place of business in California. Nestlé USA, directly and/or through an agent, is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs and the Class in Florida and nationwide. Nestlé USA manufactures, markets and advertises pet food which has injured the Plaintiffs and the class as described more fully below.  Nestlé USA regularly conducts business in Florida either directly or through an agent and places pet food products in the stream of commerce that reach Florida consumers. Nestlé USA has spent millions of dollars in promoting a sense of trust and confidence in its brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon and trust in the Nestlé brand pet food and treats ("Since its early beginnings, Nestlé has been a trusted source of quality brands and products that are essential to good living."). *See* Exhibit "7."

41.    Defendant, Nestlé Purina Petcare Co. ("Nestle Purina"), is a Missouri corporation with its principal place of business in Missouri. Nestlé Purina is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food for purchase by the Plaintiffs in Florida. Nestlé Purina markets and advertises pet food which has injured the Plaintiffs and the class as described more fully below.  Nestlé Purina conducts business in Florida, directly and/or through an agent, and places pet food products in the stream of commerce that reach Florida consumers. Ralston Purina, Nestlé Purina's predecessor, was originally founded in 1893 and began selling commercial dog food in 1957.  Nestlé Purina has

spent millions of dollars in promoting a sense of trust and confidence on behalf of the consumer in its commercial pet food products with the intent that the Plaintiff Class will rely upon this trust and confidence to purchase Nestlé pet food brands ("Fore more than 75 years, Purina® brands have been advancing the science of pet nutrition, utilizing cutting-edge technology and research so that you can give your dog or cat what they need to be healthy and happy."). *See* Exhibit "8."

43.    Defendant, Nutro Products, Inc. ("Nutro"), is a California corporation with its principal place of business in California. Nutro is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs and the Class in Florida and nationwide. Nutro manufactures, markets and advertises pet food and/or treats which have injured the Plaintiffs as described more fully below.  Nutro regularly conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Nutro has spent millions of dollars in promoting a sense of trust and confidence in its brands with the intent that the Plaintiffs and the Plaintiff Class will rely upon and trust in Nutro brand pet food and treats ("At Nutro products we have more than 80 years of experience creating great-tasting, nutritious pet foods."). *See* Exhibit "9."

43.    Defendant, Natura Pet Products, Inc. ("Natura"), is a California corporation with its principal place of business in California. Natura is in the business of manufacturing, producing, marketing, distributing, advertising and/or selling dog and cat food and treats for purchase by the Plaintiffs and the class in Florida and nationwide. Natura manufactures, markets and advertises pet food and/or treats which have injured the Plaintiffs and the Class as described more fully below.  Natura regularly conducts business in Florida and places pet food products in the stream of commerce that reach Florida consumers. Natura has made a considerable effort to promote a sense of trust and confidence in its brands with the intent that the Plaintiffs and the

Plaintiff Class will rely upon and trust in the Natura brand pet food and treats ("No pet food company in the world makes natural pet foods like Natura. We use only ingredients you'd eat yourself… ."). *See* Exhibit "10."

**Defendant Co-Packers**

44.    Defendant, Menu Foods, Inc., is a New Jersey corporation with its principal place of business in the state of New Jersey.

45.    Defendant Menu Foods, Inc. is ultimately owned or controlled by Defendant Menu Foods Income Fund, an unincorporated open-ended trust with its principal place of business in the Province of Ontario, Canada. Some of the Defendant Menu Foods, Inc.'s high managerial officers or agents are also high managerial officers and agents of Defendant Menu Foods Income Fund. Defendant Menu Foods, Inc., and Defendant Menu Foods Income Fund are collectively referred to as "Menu Foods."

46.    The Menu Foods Defendants are in the business of manufacturing, producing, and/or selling dog and cat food and/or treats under various brands and/or for third party firms, including the Defendants pet food products which have injured the Plaintiffs and the class as described more fully below.

47.    The Menu Foods Defendants also manufacture pet food for many North American retailers, including but not limited to, Defendant, Wal-Mart's Stores, for purchase and use by the Plaintiffs and the Class.

48.    Menu Foods is also a contract manufacturer of the Iams® and Eukanuba® brand pet food products for Defendant Procter & Gamble for purchase and use by the Plaintiffs and the Class.

49.     On information and belief, Mars and/or Mars Pet are in the business of manufacturing, producing, and/or selling dog and cat food under various brands and/or for third party firms, including, the other Defendants' pet food products, for purchase and use by the Plaintiffs and the Class.

### Defendant Retailers

50.     Defendant, Target Corp. ("Target"), is a Minnesota corporation with its principal place of business in Minnesota. Target is in the business of manufacturing, marketing, producing, distributing, advertising and/or selling its private label brands and the Defendant Manufacturers' pet food and treat brands which have injured the Plaintiffs and the Class as described more fully below. Target regularly conducts business in Florida and places products in the stream of commerce that reach Florida consumers.  Target makes its own representations for its own profit and gain and adopts the marketing representations of the Defendant Manufacturers' by placing point of purchase advertising at or near the Defendant Manufacturers' pet food and treats in its retail stores with the intent to induce the Plaintiff Class to purchase them. Target also markets and sells its own pet food brands.

51.     Defendant, Wal-Mart Stores Inc. ("Wal-Mart"), is a Delaware corporation with its principal place of business in Arkansas. Wal-Mart is in the business of manufacturing, producing, distributing, advertising and/or selling its own brands and the Defendant Manufacturers' brands of commercial pet food and treats which have injured the Plaintiffs and the Class as described more fully below.  Wal-Mart regularly conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Wal-Mart adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers' pet food and treats in its retail stores with

the intent to induce the Plaintiff Class to purchase them. Wal-Mart also markets and sells its own pet food brands.

52.    Defendant, Publix Supermarkets, Inc. ("Publix"), is a Florida corporation with its principal place of business in Florida. Publix is in the business of manufacturing, producing, distributing, advertising and/or selling its private label brands of pet food and treats as well as distributing, advertising and/or selling the Defendant Manufacturers' pet food and treat products. Publix markets and sells its private label brands and the Defendant Manufacturers' brands of commercial pet food in its grocery stores in Florida and other states which has injured the Plaintiffs and the Class as described more fully below. Publix adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers' pet food in its retail stores with the intent to induce the Plaintiffs and the Plaintiff Class to purchase its products.

53.    Defendant, Albertson's LLC ("Albertson's"), is a Delaware corporation with its principal place of business in Boise, Idaho. Albertson's is registered to do business in Florida and has a registered agent upon which service has been executed. Albertson's conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Albertson's is in the business of manufacturing, producing, distributing, advertising and/or selling its own private label brands and the Defendant manufacturers' pet food and treat brands which have injured the Plaintiffs and the Class as described more fully below. Albertson's markets and sells its own brands and the Defendants' brands of commercial pet food at issue in Florida.  Albertson's adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers' pet food in its

retail stores with the intent to induce the Plaintiffs and the Plaintiff Class to purchase its products.

54.    Defendant, New Albertsons, Inc. ("New Albertsons"), is a Delaware Corporation with its principal place of business in Boise, Idaho. New Albertsons is registered to do business in Florida, has a registered agent in Florida upon which service has been executed and is qualified to do business in Florida. New Albertsons, either directly and/or through its parent, subsidiaries, affiliates, agents, or sister corporations, operates, conducts, engages in or carries on a business venture in Florida pursuant to Florida Statute §48.193. For example, New Albertsons is affiliated with Supervalu, Inc. ("Supervalu") and CVS and AB Acquisition LLC, which appear to do substantial and not isolated business activity in Florida and which appear to act as New Albertsons agents.  On information and belief, New Albertsons is operating a business venture in Florida by and through the operations of Supervalu.  Supervalu is thus an agent through which New Albertsons conducts business in Florida. Upon information and belief, there is a lack of corporate distinction between the two entities and the corporate distinction is merely a matter of formality because, for example, Supervalu and New Albertson's officers and/or directors are substantially identical such that there is no corporate distinction between the two entities. Supervalu is listed as having distribution centers that are also designated as belonging to "New Albertsons" and/or "Albertsons." Supervalu is one of the largest grocery retail suppliers in the country and operates distribution centers and supply chain services in Florida, among other things, which on information and belief is also a business operation that is conducted on New Albertsons behalf. On information and belief, Supervalu is the agent by which New Albertson's does business in Florida either financially and/or operationally. New Albertsons holds an active fuel wholesale business license in Florida. On information and belief, New Albertsons also has

more than two hundred (200) suppliers in the State of Florida with which it regularly enters into contracts and/or regularly conducts business in this State. New Albertsons is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendant Manufacturers' pet food products, which has injured the Plaintiffs as described more fully below. New Albertson's markets and sells its own brands and the Defendants' brands of commercial pet food. On information and belief, New Albertsons adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers' pet food in its retail stores with the intent to induce the Plaintiffs and the Plaintiff Class to purchase its products.

55.     Defendant, The Kroger Co. of Ohio ("Kroger"), is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Kroger is registered to do business in Florida, has a registered agent in Florida upon which service has been executed and is qualified to do business in Florida. Kroger, either directly and/or through its parent, subsidiaries, affiliates, agents, or sister corporations, operates, conducts, engages in or carries on a business venture in Florida pursuant to Florida Statute §48.193 (1) and/or (2). For example, pet food is sold at Tom Thumb convenience stores that may be owned and operated by Kroger. Kroger also appears to own and operate jewelry stores in Florida through which it conducts substantial and not isolated business activity in Florida. Kroger has officers in the State of Florida, has employees working in the State of Florida, appears to hold an active business license in Florida through an agency and/or affiliated partnership and has entered into contracts for active leaseholds in Florida. Flowers and gourmet fruit baskets can be purchased through the Kroger website for delivery to consumers in Florida. Kroger also advertises job openings in Florida. Upon information and

belief, Kroger also enters into contracts with suppliers and/or has suppliers in Florida with which it regularly and systematically conducts business. On information and belief, Kroger has also done business in Florida through "custom sales activity" in Florida and distributes, advertises and/or sells the Defendants' pet food products through its agents, affiliates and/or subsidiaries in convenience retail stores in Florida. Kroger is in the business of manufacturing, producing, distributing, advertising and/or selling its own brand of pet food as well as distributing, advertising and/or selling the Defendants' pet food and treat products which have injured the Plaintiffs as described more fully below. On information and belief, Kroger adopts the marketing representations of the Defendant Manufacturers by placing point of purchase advertising at or near the Defendant Manufacturers' pet food in its retail stores with the intent to induce the Plaintiffs and the Plaintiff Class to purchase its products.

## Defendant Pet Specialty Retailers

56.    Defendant, Petsmart, Inc. ("Petsmart"), is a Delaware corporation with its principal place of business in Arizona. Petsmart regularly conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Petsmart is in the business of marketing, advertising, distributing, selling and making recommendations to the Plaintiffs and the Plaintiff Class regarding the Defendant Manufacturers' dog and/or cat food and treats in Florida which has caused injury to the Plaintiffs and the Class as described more specifically below. Petsmart conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Petsmart makes its own marketing representations and adopts the marketing representations of the Defendant Manufacturers' both on the internet and by placing point of purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores in Florida. Petsmart makes recommendations to the Plaintiffs and Plaintiff

Consumers regarding the Defendant Manufacturers' and its own private label commercial pet food on the internet through its Smart Nutrition Selector™ and elsewhere on its website. Petsmart markets, advertises and sells the Defendants' and its own commercial pet food and treat products with the intent to induce consumers to purchase these.

57.    Defendant, Pet Supermarket, Inc. ("Pet Supermarket"), is a Delaware corporation with its principal place of business in Florida. Pet Supermarket regularly conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Pet Supermarket is in the business of advertising, distributing, marketing, selling and making recommendations to consumers regarding dog and/or cat food and treats, which have caused injury to the Plaintiffs and the Class as described more specifically below. Pet Supermarket conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Pet Supermarket adopts the marketing representations of the Defendant Manufacturers by placing point of purchase marketing materials near the Defendant Manufacturers' pet food in its retail stores. Pet Supermarket markets, sells and makes recommendations to consumers regarding the Defendants' commercial pet food and treats in its retail stores in Florida with the intent to induce the Plaintiffs and the Plaintiff Class to purchase these products.

58.    Defendant, Petco Animal Supplies Stores, Inc. ("Petco"), is a Delaware corporation with its principal place of business in Arkansas. Petco regularly conducts business in Florida and places products in the stream of commerce that reach Florida consumers. Petco is in the business of advertising, distributing, selling and making recommendations to consumers regarding the Defendant Manufacturers' dog and/or cat food and treats in Florida. Petco conducts business in Florida and places products in the stream of commerce that reach Florida consumers.

Petco markets, sells and makes recommendations to consumers regarding the commercial pet food, which has caused injury to the Plaintiffs and the Class as described more fully below. Petco makes its own marketing representations and adopts the marketing representations of the Defendant Manufacturers' by placing the Defendant Manufacturers' and its own point of purchase marketing materials near the Defendant Manufacturers' pet food and treats in its retail stores with the intent to induce the Plaintiffs and the Plaintiff Class to purchase these products.

59.      Defendant, Pet Supplies "Plus"/USA, Inc. ("Pet Supplies"), is a Michigan corporation with its principal place of business in Michigan.  Pet Supplies operates, conducts, engages in or carries on a business venture in Florida and places products in the stream of commerce that reach Florida consumers pursuant to Florida Statute §48.193. Through its franchises, Pet Supplies is in the business of advertising, distributing and selling dog and/or cat food and treats in Florida through at least two franchises located in Florida, by, among other things, providing inventory, through a "buying" program, assisting with obtaining pet food products, providing ongoing public relations and marketing to franchisees. Pet Supplies also advertises franchise opportunities to Florida consumers. Pet Supplies, through is agents, affiliates, and franchisees has gained profits from the sale of pet food and has actively participated in the marketing, sale and distribution of pet food in Florida. A Pet Supplies company was registered to do business in Florida and was active within the Class Period.   As part of its franchise business, Pet Supplies conducts business in Florida and/or places products in the stream of commerce that reach Florida consumers. Pet Supplies markets, distributes, sells and advertises the Defendants' commercial pet food at issue through its franchises in Florida with the intent to induce consumers to purchase these products and which has harmed the Plaintiffs and the Plaintiff Class as described more specifically below.

## JURISDICTION AND VENUE

60.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1332(d)(2), as amended by the Class Action Fairness Act, in that at least one member of the

Class is a citizen of a State different from any defendant named herein, there are over 100 class

members and the matter in controversy exceeds the sum or value of $5,000,000.  This court has

also has jurisdiction over supplemental law claims pursuant to 28 U.S.C. §1367.

61.     This Court has personal jurisdiction over Publix and Pet Supermarket because

they are Florida corporations.

62.     Pursuant to Florida Statute §48.193, each of the remaining named Defendants

have subjected themselves to the jurisdiction of Florida courts by virtue of:

(a)     Operating, conducting, engaging in, or carrying on a business or business venture
        in this state or having an office or agency in this state; and/or

(b)     Committing a tortious act within this state; and/or

(c)     Causing injury to persons or property within this state arising out of an act or
        omission by the defendant outside this state, if, at or about the time of the injury,
        either; and/or

(d)     Engaged in solicitation or service activities within this state; and/or

(e)     Products, materials, or things processed, serviced, or manufactured by the
        defendant anywhere were used or consumed within this state in the ordinary
        course of commerce, trade, or use; and/or

(f)     The remaining defendants are engaged in substantial and not isolated activity
        within Florida, whether such activity is wholly interstate, intrastate, or otherwise,
        and are  subject to the jurisdiction of the courts of this state pursuant to Florida
        Statute §48.193(2), whether or not the claim arises from that activity; and/or

(g)     Any other applicable subsection of Florida Statute §48.193.

63.     Venue is proper in this Court and judicial district pursuant to 28 U.S.C. §1391

and/or the Class Action Fairness Act because the Defendants have systematically manufactured

for sale, marketed, advertised and sold commercial pet food in this district. A substantial part of the events, misrepresentations, deceptive practices, omissions and/or injuries giving rise to the claim occurred in this district. Moreover, conduct that is the subject of the lawsuit occurred in this district.

## FACTS GIVING RISE TO THE CLAIMS

64.    Manufacturing, producing, marketing, selling, and distributing pet food and treats is a $16,000,000,000 a year industry in the United States alone. The majority of the 163,000,000 companion cats and dogs in the United States are fed commercial pet food and derive all of whatever nutritional content they can obtain from the Defendants' commercial pet food.

65.    The Defendant Manufacturers have spent millions of dollars over the years to build consumer confidence with the Plaintiffs and consumers concerning their respective brands and consequently intend that the Plaintiffs and consumers rely on these representations, believing them to be fair, truthful, scientifically supported and/or otherwise true and accurate. The Defendant manufacturers know that the Plaintiffs and consumers are particularly vulnerable to these representations because the Plaintiffs and the average consumer have no knowledge of cat and/or dog nutrition or other requirements.

66.    This relationship of trust and confidence is fostered by the Defendant Retailers and Defendant Pet Specialty Retailers, on which the Defendant Manufacturers have spent considerable time and effort in cultivating mutually profitable relationships to market, advertise and sell their cat and dog food to vulnerable and trusting Plaintiffs and consumers. The Defendant Retailers and Pet Specialty Retailers not only adopt the point of purchase marketing of the Defendant Manufacturers, but also market and advertise the Defendant Manufacturers' cat and dog food through their own marketing programs and incentives and make recommendations

to the Plaintiffs and consumers both in stores and on the internet regarding the ingredients, quality and nutritional content, health and other benefits of the Defendant Manufacturers' and Petsmart's private label pet food.

67.    Based upon the Defendant Manufacturers', Retailers' and Pet Specialty Retailers' extensive and expensive marketing, the Plaintiffs, like the Class, believe that when they purchase the Defendant Manufacturers' or any of the Retailers'/Petsmart's private label brands from the Defendant Retailers and Pet Specialty Stores, they are buying wholesome and/or "premium" pet food with all of the quality and other claimed "benefits" represented in the Defendants' marketing.  Moreover, based upon regular, systematic and extensive claims in multiple media that the Defendant Manufacturers are "world-class" experts in pet food who advise veterinarians concerning pet nutrition, they fail to disclose that the programs to inform veterinarians about pet nutrition are part of an ongoing marketing scheme to increase sales and a clear conflict of interest between the verterinarians who are profiting from these sales to the consumer. The Defendant Manufacturers have claimed throughout the class period that they promote scientific research as to their pet food products thus leading the Plaintiffs and consumers to believe that their pet food and/or treat ingredients and claimed benefits are adequately supported by competent and reliable scientific data and that prior to using ingredients in the pet food, each ingredient is examined to determine the health effect and/or benefit on a cat or dog. However, the Defendant Manufacturers' and Retailers'/Petsmart's pet food is far from the type of wholesome, "quality," research-supported and/or beneficial product that the Defendants have lead the Plaintiffs and consumers to believe.

68.    The approximate $58,000,000,000 spent by consumers on pet food over the last four years has been without the knowledge that the "wholesome," "quality," "premium" or

"gourmet" food that they are feeding their companion animals was made wholly or partially of inedible garbage unfit for human consumption, including, but not limited to, restaurant grease, roadkill, hair, blood, pus, esophagi, chicken heads, feet and intestines, cow brains, excrement, fetal tissue, moldy grains, hulls, styrofoam packaging from discarded supermarket meat, euthanized animals, including cats and dogs, and/or diseased, dying, disabled and dead animals.

69.     The Defendant Manufacturers, Retailers and Pet Specialty Retailers' marketing has mislead, deceived and/or failed to disclose to the Plaintiffs on an ongoing and continuous basis throughout the Class Period (and  prior to the class period) material information regarding the pet food products that they have purchased. Some specific examples include, but are not limited to:

- The Defendants' pet food containers deceptively include pictures and/or drawings of human-grade ingredients, but the pet food does not have human-quality food ingredients as depicted on the containers;

- The Defendants' marketing deceptively makes the Plaintiffs believe that they are purchasing wholesome pet food when the Defendants use a food pyramid similar to that used by nutritionists for human-grade food and human nutrition, particularly where the above-described pictures and/or drawings of human-grade ingredients are used;

- The Defendants' cat and dog food is deceptively marketed as having health, medical, hygienic and other benefits which are not adequately supported by competent and reliable scientific data;

- The Defendants include ingredients in pet food without first determining whether those ingredients will have a deleterious effect on a cat or dog despite the numerous claims of extensive research that leads the Plaintiffs to believe that pet food contents are safe for their cats or dogs and/or adequately supported by competent and reliable scientific data prior to sale;

- The Defendants' marketing makes numerous deceptive and/or false claims relating to quality, content, health, medical, hygienic, hairball, dietetic, breed and/or age specific benefits which are inaccurate and/or are not based upon competent and reliable scientific data supporting proving same;

- The Defendants deceptively and/or falsely market their pet food as safe and wholesome yet the number and/or extent of recalled pet food products demonstrates the lack of sufficient quality control and traceability analyses which makes the pet food unsafe;

- The Defendant deceptively and/or falsely market themselves as food experts and claim to produce the safest and highest quality of pet food yet their pet food contains substances either known and/or unknown to the Defendants and/or substances that are toxic and/or unhealthy for cats and/or dogs;

- The Defendant Manufacturers market their brands of pet food as "premium" and/or "super-premium," but they contain ingredients that are unhealthy for consumption by cats and dogs and either fail to provide the promised benefit or cause other health problems. For example, dry food diets packed with cereal carbohydrates purport to treat urinary and kidney problems may assist with deterring the formation of some crystals, but actually promote the formation of other crystals or stones in cats;

- The Defendants deceptively market "light" or diet cat and dog food as providing a health benefit, when in fact it still largely consists of carbohydrates and other fillers that cause obesity, allergies and other known health problems and may be higher in carbohydrates than is advertised;

- The Defendants deceptive marketing leads the Plaintiffs and consumers to believe that the ingredients used in their brands of pet food are "human quality," but they, or their co-packers, use material other than human-grade "real meat, chicken, lamb," etc., as a nitrogen source to boost "protein" content unbeknownst to the consumer;

- The Defendants omit to advise the Plaintiffs about the true quality and content of the pet food, including rendered product that may contain, including but not limited to, mad cow disease;

- The Defendants make a number of claims concerning the benefits, content and quality of their pet food without competent and reliable scientific documentation, including but not limited to, the bioavailability of their pet food products;

- The Defendants omit to advise the Plaintiffs about the toxins and other substances in the pet food for which there are no known studies to substantiate their use in pet food and/or the long term effect on cats and dogs;

- The Defendants deceptively market product comparisons where one Defendant compares its product to another without disclosing the shortcomings of its own product;

- The Defendant Manufacturers, Retailers and Pet Specialty Retailers' marketing  actively encourages the Plaintiffs and consumers to purchase only commercial pet food despite the known benefit of diets with higher levels of real protein and without cheap carbohydrate cereal fillers;

- The Defendants market their pet food as an entrée or dinner, leading the Plaintiffs to believe that it is suitable to sustain a cat or dog when, in fact, the diet is insufficient and the Plaintiffs and consumers are only told that the pet food is a "snack" when the Plaintiffs specifically request that information from the Defendant and/or when the Plaintiffs read fine print on website;

- The Defendant Manufacturers', Retailers' and Pet Specialty Retailers' marketing deceptively encourages the Plaintiffs and consumers to buy "premium" pet food by representing that the expenditure of additional monies for "premium" pet foods provides nutritional, health, medicinal, hygienic and other benefits that non-premium pet foods allegedly do not have when they are comprised of essentially the same material;

- The Defendants deceptively market dry food as "good" for cats despite the fact that studies demonstrate that dry food is associated with a higher incidence of feline lower urinary tract disease;

- The Defendants deceptively market dry food as "good" for dogs but dry food that is comprised of cheap cereal fillers, additives and dyes contain ingredients that cause allergies, bloating and gastric upset, among other things;

- The Defendants tout their pet food as "wholesome," but it is basically corn and other cheap carbohydrate fillers; and

- The Defendants marketing omits to advise the Plaintiffs of the predominance of processed carbohydrates, allergenic substances, low grade proteins and known and/or unknown ingredients and/or additives that have detrimental effects on the health of dogs and cats contrary to what the Plaintiffs and consumers are lead to believe.

The Defendants' misleading, unfair and deceptive marketing and/or failure to disclose on an ongoing and continuous basis throughout the Class Period has resulted in damage to the Plaintiffs because they would not have otherwise purchased these products had they known the truth about them and/or their cats and/or dogs became ill and/or died from ingesting the pet food.

### The Defendants' deliberately "Humanize" Pet Food to
### Obtain Greater Market Share and even more Staggering Profits

70.     As described above, the Defendants marketing is intended to entice the Plaintiffs and consumers to purchase pet food that they believe is human-grade quality because the Defendants intentionally depict it as such in their marketing to boost sales because marketing studies have shown that the Plaintiffs and consumers want the best for their pets, including

human-grade, healthy pet food products. However, the attempt to liken these pet foods to human-like quality does not end at appearance. The Defendant Manufacturers' also market their pet food with alleged health, medical and other benefits in much the same way that medical or other benefits are marketed to the Plaintiffs and consumers directly for human consumption.  For example, glucosamine and chondroitin are marketed as providing a benefit to human joints and they are also marketed in pet food without competent and reliable scientific evidence to demonstrate a benefit to a cat and/or dog.  Likewise, the Defendant Manufacturers' are marketing Omega-3 fatty acids without competent and reliable scientific evidence to support claims that cats and/or dogs derive a benefit from consuming same. While the Defendants manufacture, distribute, market, advertise and sell these commercial pet foods as "human-like," the matter contained in bags, pouches and cans is instead wholly or partially the product of recycling the putrid, inedible garbage of the human food industry, including additives, chemicals, toxins, contaminants and other substances both known and unknown.

### The Defendants' Marketing of Commercial
### Pet Food Misleads the Plaintiffs and Consumers

71.    The Defendant Manufacturers' and Retailers' private label and Petsmart's Authority pet food marketing induces the Plaintiffs and consumers to buy the Defendants' pet food. Examples of such marketing include "Veterinarian Recommended," "real meat, beef, chicken or lamb," "rich in quality protein," "crunchy corn" and "enhanced protein system," among other things. The intent is to make the consumer feel good about purchasing "veterinarian recommended," "premium" and/or "quality" food for their companion cat or dog with age, breed, health, medical, dietetic and/or other claimed benefits that are described in various media and on the packaging. The Plaintiffs, like the average consumer, are highly vulnerable to these and other inducements referenced herein because they have no knowledge of the nutritional and/or other

requirements of their cats' and/or dogs' food and, therefore, the Plaintiffs and consumers rely upon the trust and confidence that the Defendants' have developed in their brands (and in acquiring established and trusted pet food companies) and the representations and self-proclaimed expertise of the Defendants. The Plaintiffs, like the average consumer, are unaware of pet food and treat contents, including what additives, contaminants and other chemicals could be harmful to their cats and dogs and believe the Defendant Manufacturers, Retailers and Pet Specialty Retailers representations, unaware that they are factually inaccurate, unsupported, deceptive, misleading, negligent and/or false representations and omissions about the quality, content, medical, health and/or other benefits of their pet food products.

72.   Commercials showing healthy, vibrant cats and dogs enjoying "the good life," choice chunks of fresh meats and wholesome stalks of grains and fresh vegetables on bags, cans and pouches induce the Plaintiffs and the Plaintiff Class to buy the Defendant Manufacturers', Retailers and Petsmart's private label pet food and to believe that these products contain human quality food products and have health-related and other benefits. These same photos are on websites where, for example, Nestlé makes representations such as "Healthy Harvest® maximizes your dog's health and happiness with our premium dry dog food, featuring soy and other, wholesome ingredients." *See* Beneful® website page attached hereto as Exhibit "11." However, competent research studies have demonstrated problems associated with soy in pet food diets and, as discussed above, the Plaintiffs do not consider inedible garbage "wholesome" and would not have purchased the Defendants pet food had they known the true contents and quality.

73. The Defendants' pet foods, such as "Beneful®," "Natural Choice®," "Science Diet®," and "The Good Life," among many others, are intentionally named to lead consumers to believe that they are wholesome and/or provide benefits to cats and dogs.

74. The bags, pouches and cans of the Defendants' commercial pet food make many strong representations to the Plaintiffs and the class. For example, bags of pet food state "**Superior Nutrition** FOR LIFELONG HEALTH," followed by claims that the pet food promotes, "Strong Immune System," "Healthy Bones and Muscles," "Strong Clean Teeth & Fresh Breath," "Healthy Skin & Radiant Coat," "Overall Health and Vitality" and "Easy to Digest." The containers contain misleading pictures and also state "Total Nutrition Helps Your Pet Stay Healthy and Live Long." In fact, there are so many representations on a container of pet food, they cannot all be set forth here. The Plaintiffs, like the average consumer, have thus been regularly and systematically bombarded with representations on the Defendants' cat and/or dog food containers and in print and other media that are intended to have the Plaintiffs and the Plaintiff Class rely upon the Defendants' representations to induce them into buying their pet food to their detriment. Moreover, these containers omit to advise the Plaintiffs and the Plaintiff Class of the true contents and quality of the food.

**Mars' "Good Life Recipe"™**

75. An example of the manner in which Mars misleads consumers as to only one of its products is the "Good Life Recipe"™ brand. The "Good Life Recipe"™ is a recently launched commercial pet food. The "humanization" of this brand is patent in every aspect of this commercial pet food's marketing and is intended to capitalize on the emotional bond between the consumer and their cats and dogs by deceptively and/or falsely and/or negligently representing what the consumer is purchasing for the companion animal:

Good food inspired by pet-loving people like you.

35

> We don't believe people are pet owners. People own TVs, cars and vacation homes. But they don't own pets. They have a relationship with their pets. <u>They enjoy bonds that are sometimes stronger than family. So it's not surprising that people want to provide their pets with the healthiest and best tasting food.</u> That's where The Goodlife Recipe™ pet food comes in. We use the <u>best ingredients</u> in the <u>right balance</u> to create great food and snacks for cats and dogs. <u>Because we believe, pets that eat well are pets that live well. And when your pet is living well, you're living well.</u>

*See* the Goodlife Recipe™ "Our Mission" web page attached hereto as Exhibit "12." The "Good Life Recipe"™ website further states:

> A healthy, balanced diet your four-legged friends will love!
>
> Every bag of The Goodlife Recipe™ food for cats or dogs is a <u>perfect blend of six tasty ingredient groups like real chicken, beef or salmon, healthy vegetables and hearty whole grains - created with our nutritionally balanced "pet food pyramid" as a guide</u>. It's our way of giving your pets all the enjoyable taste and <u>essential nutrients</u> they need without any of the artificial additives they don't. And who wouldn't love that?

*See* the "Goodlife Recipe™" "What's Inside" website page attached hereto as Exhibit "13." This commercial pet food is designed to appeal to the consumers' understanding of the human food pyramid and to lead people to believe that they are purchasing quality food for their special companion cats and dogs that is primarily made of human quality food items such as "real" meat, fish, wholesome grains and vegetables.

76.     The wildly popular "Good Life"™ commercials show beautiful dogs with Frank Sinatra or Jewel singing in the background.[1] While the commercial is showing large chunks of meat with carrots and green vegetables, an announcer states, "Six key ingredients for the tastes that dogs crave without the artificial additives they don't."[2] The Good Life™ containers even state "No fillers," yet this pet food's first ingredient is corn followed by a number of cheap fillers such as corn gluten meal and rice. Moreover, the "real" meat is far from human-grade since it is chicken by-products, which consists of heads, feet, viscera free from fecal content and foreign matter only to the extent that the inclusion of such fecal matter and foreign matter might

---

[1] *See* http://www.youtube.com/watch?v=QMnUU2Zh9hE. There is another substantially similar commercial for cats.
[2] *Id.*

**MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**

"unavoidably" occur in good factory practice. The commercials thus fail to advise consumers about the real contents of the Good Life™ pet food. Moreover, on the website, the six key ingredients are listed as tomatoes, garden peas and spinach, "real" natural chicken, beef or salmon," "healthy carrots" and "natural whole grain brown rice packed with vitamins" and pictures of same. Exhibit "13" (can be seen by pressing "Rollover to see what's inside"). This is misleading because far from the "healthy carrots depicted," the pet food actually contains carrot, spinach and tomato dust in minor amounts and hardly contains the sort of "real" meat pictured on the container.

### Mars' Pedigree®

77.      The name "Pedigree"®, another of Defendant Mars' brands, implies a food fit for an expensive pure bred companion dog. This is reinforced by the claims on the website:

> Help your dog be the <u>best he can be</u> with PEDIGREE® Dry Food.
>
> Not only does PEDIGREE® Brand Dry Food For Dogs provide your dog with a <u>balanced diet of vitamins, minerals, essential fatty acids, fiber and protein</u>, it's a delicious <u>foundation to your dog's overall diet</u>. It's also helpful in <u>preventing the accumulation of dental tartar and plaque</u>. And dry food has the added benefit of being very convenient for you.

*See* Pedigree™ website "Dry Products" attached hereto as Exhibit "14." The website leads consumers to believe that their companion dogs are eating healthy nuggets of chicken, rice and vegetables:

> New, improved PEDIGREE WITH CHICKEN, RICE & VEGETABLES™ Food For Dogs (formerly PEDIGREE COMPLETE NUTRITION® Meaty Chunks With Rice & Vegetables) offers a way for dogs to get the **healthy benefits of real vegetables and real chicken** in **a tasty balanced meal owners can feel good about feeding every day**. It's made up of five different components to offer a variety of flavors and textures that dogs love.

- PEDIGREE WITH CHICKEN, RICE & VEGETABLES™ Food For Dogs now contains a new and improved patented PEDIGREE HEALTHY NUGGETS™ with **Meaty Centers kibble**. Improvements include a golden yellow shell, 25% <u>more cream fill and meaty center</u>.
- **Made with real chicken, a high quality protein source**
- **Made with healthy real vegetables that dogs love**

- <u>Higher guaranteed levels of protein than BENEFUL® Original</u> (Based on guaranteed analysis: PEDIGREE WITH CHICKEN RICE & VEGETABLES™: 26% protein, BENEFUL® Original: 25% protein)
- Nutritionally complete and balanced for both puppies and adult dogs
- Contains patented HEALTHY NUGGETS™ pocket kibbles that have a dual texture- crispy outside with a soft, creamy inner
- Contains the Advanced Antioxidant Recipe with guaranteed levels of vitamins E & C
- <u>Highly digestible ingredients so nutrients are easily absorbed</u>
- Improved taste that dogs love
- Select sizes available with the SLIDE RITE® Zipper for easy opening and resealing between feedings
- <u>No artificial flavors or fillers</u>

*See* Pedigree™ website "Dry Nutrition for Adult Dogs" attached hereto as Exhibit "15." However, the "high quality," "real chicken" is the same and/or similar non-human-grade product used in the Good Life™ brand, which consists of necks, heads, feet, undeveloped eggs, intestines, viscera free from fecal content and foreign matter and feathers only to the extent that the inclusion of such fecal matter, foreign matter and feathers might unavoidably occur in good factory practice. The "real" meat is mammal tissues from non-human grade meat, including bone, and not added blood, hair, hoof, horn, hide trimmings, manure, stomach and rumen contents, only the extent that the inclusion of such is "unavoidable" in good processing practices. This is not the diet the Plaintiffs "feel good" about feeding to their dogs. Moreover, contrary to the marketing, the primary ingredients are cheap carbohydrate fillers, which is inconsistent with the marketing of this dog food. Finally, the negative comparison to Beneful® is misleading as there is little to no difference between these two pet food brands.

**P&G's Iams™**

78.    An example of the manner in which P&G and Iams (collectively "P&G") misleads the consumers is through its Iams™ brand. P&G holds itself out as a cat and dog food expert whose pet food products are "veterinarian recommended" – "More vets recommend Iams than the leading grocery brand." Pet food consumers rely upon this endorsement and it is one

upon which P&G intends that consumers rely. P&G thus promotes a relationship of trust and confidence that exists between the consumers and the company. In these marketing materials, there is no indication, however, as to exactly how Iams® became "Veterinarian Recommended" or why, other than a notation in fine print that states a "survey" was conducted.

79.     Another example of the deceptive manner in which Iams has mislead the Plaintiffs is advertising that Iams original cat food: "Helps Maintain Urinary Tract Health Iams research confirms the effectiveness of Iams Original Cat Food in reducing urinary pH while providing low dietary magnesium for urinary tract health." See Exhibit "16."  Iams, however, offers no explanation as to how the research has confirmed same. This Iam's® advertising also fails to advise the Plaintiffs of the correlation between a cat's consumption of dry food and urinary tract illness in the first place that is known to be a major contributing factor to the illness.  Iams also markets its "wholesome" pet food: "The wholesome protein sources in Iams naturally provide essential nutrients and amino acids for clear eyes and a strong heart."  Exhibit "16." The reference to "wholesome protein sources" buttresses the vivid images of wholesome "real" meat and chicken and leads consumers to believe that they are feeding their dog or cat the same food that they purchase for their family, but they are not.

**Colgate's and Hills' Science Diet®**

80.     Colgate and Hill's (collectively "Colgate") makes similar representations in marketing its Science Diet® brands.  On its website, Colgate displays its Science Diet® logo, stating "Veterinarian Recommended." Colgate is thus holding itself out as a cat and dog food expert, which advises consumers, veterinarians and "other key pet professionals worldwide."  *See* Exhibit "17."   The Plaintiffs as pet food consumers rely upon this claim of specialized

knowledge and upon which Colgate intends that consumers rely. Colgate thus promotes a relationship of trust and confidence that exists between the consumer and the company. In these marketing materials, there is no indication, however, as to exactly how Science Diet® became "Veterinarian Recommended" or why.

81.    Nowhere on its website does Colgate disclose that it has spent millions marketing its Science Diet® pet foods and/or treats to veterinary students and veterinarians in order to get an edge over its competitors by having veterinarians endorse and recommend these brands to consumers who Colgate knows will rely upon them and that they will trust Colgate with their cats' and dogs' health and well being.  Colgate funds veterinary schools, provides stipends for and discounts its pet food to veterinary students, and arranges for veterinarians to have financial incentives to sell its pet food. The average consumer has no idea that the veterinarian is profiting from the recommendation and is boosting Colgate's profits in the process.  The conflict of interest, created and encouraged by Colgate, is patent.

82.    One of the products in Colgate's Science Diet® line is the Light Adult brand, which is marketed as follows :

| Superior Antioxidant Formula | A higher level of vitamins E +C versus major competitive brands. A powerful combination of antioxidants helps keep the immune system healthy. Antioxidants are known to help slow cell oxidation. |
| High-Quality Protein | Helps maintain strong bones and muscles. Contains all essential amino acids including taurine to help ensure optimal heart and eye health. |
| High Carnitine | Works to turn fat into energy and promotes fat metabolism. Helps utilize fat while helping to maintain lean body mass. Supports healthy liver function, a strong heart and eye muscles. |
| Increased Fiber | For gastrointestinal function and weight management. |
| Essential Fatty Acids | Help maintain proper function of nervous and immune systems as well as promote healthy skin and a shiny coat. |
| Vitamins and Minerals | Provide an ideal balance of vitamins and minerals for adult cats. |
| Naturally Preserved | Mixed tocopherols (a form of vitamin E) preserve freshness and great taste. |
| Daily Dental Protection | Helps reduce tartar build-up and promotes clean teeth. Helps scrub away plaque and promotes fresh breath. An ideal balance of calcium and other minerals to help maintain healthy teeth. |

*See* Exhibit "18."  The Light Adult brand, however, contains ingredients that the average consumer would *not* consider healthy for their cat. In addition to the ingredients described above

in other pet food, Science Diet® Light Adult dry cat food, for example, also contains "powdered cellulose." Powdered cellulose is essentially sawdust, which is not what most consumers would want to feed to their cats as "fiber." The higher levels of Vitamins C and E "versus competitive brands" is deceptive and misleading. While competent scientific research indicates that Vitamin E is essential to a dog and/or cats diet, Vitamin C is not. Higher levels are also of "questionable benefit" and there is no definitive scientific data to support any benefit. Moreover, the primary ingredient is "chicken byproduct meal," which is made from grinding rendered <u>poultry</u> <u>carcasses</u> containing <u>offal</u> and undeveloped <u>eggs</u>, but not <u>feathers</u> except to the extent that they are unavoidable in processing. Consumers are not aware that this allegedly "premium" food is carbohydrate filled and includes downed and rotting animals with mad cow disease, among all of the other awful things in this food.

### Del Monte's 9Lives®

83.    Del Monte deceptively advises consumers that dry food is *<u>good</u>* for their cats when competent scientific data has shown that a dry cat food diet is detrimental to cats' health.

> With dry food that not only tastes good, *<u>but is good for your cat</u>*, the 9Lives® *<u>brand really cares about your cats health</u>*. <u>Our dry varieties are formulated to meet your cat's special nutritional needs</u> while providing great taste.

> With 9Lives® daily essentials™ healthy cat food, <u>you can be confident you are giving your cat essential whole body health from the real meat she craves</u>. 9Lives® daily essentials™ cat food is a savory blend of delicious pieces made with <u>real meat and fish</u> for a <u>wholesome</u> flavor your cat will look forward to.

Exhibit "20." The actual ingredients, however, reveal that the "healthy" dry food is comprised of carbohydrate fillers such as ground corn, ground wheat and corn gluten meal, a poor source of protein that is used instead of "real" meat. Exhibit "21." The "real" chicken is comprised of necks, feet, undeveloped eggs, and intestines and exclusive of feathers only to the extent that it may be unavoidable in good processing practices. This pet food also has animal digest, which is

a material that results from chemical or enzymatic hydrolysis of un-decomposed animal tissue and is exclusive of hair, horns, teeth, hooves and feathers only to the extent that such trace amounts may be unavoidable. It is also preserved with BHA, among other things.  Exhibit "22." Moreover, ironically, Del Monte offers a "urinary tract health" diet in dry cat food form when dry food is associated with urinary illness, which is deceptive and misleading to the Plaintiffs and consumers.  Exhibit "22."

**Nestlé's  Beneful®[3]**

84.     An example of Nestlé's misleading advertising is its Beneful® brand pet food. The marketing materials show wholesome looking meat and vegetables and like the advertising and the containers of so many other Defendants, the container in which the food is packaged displays the same healthy looking, people quality food that is in Nestlé's other marketing media. *See* Exhibit "23."  The food itself is marketed in cute shapes with colors designed to make the consumer want to buy it for their dog and to reinforce to the consumer that the food is similar to human food in quality, composition and/or is wholesome.

Beneful® Original

**A perfect balance of healthful ingredients, quality nutrition and superb taste for pure contentment for dogs**



Moist, chewy chunks made with real beef are rich in quality protein to help build strong muscles.

Omega fatty acids, along with antioxidants like Vitamin E and selenium, help support a healthy immune system.



Enriched with calcium for healthy teeth and strong bones.

Crunchy corn packed with carbohydrates for energy and linoleic acid for a shiny coat.



Contains vegetables with Vitamin A and other quality vitamins, minerals, and nutrients.

Contains iron for healthy blood.

---

[3] Nestlé USA and Nestlé Purina shall be referred to collectively as "Nestlé" since upon, information and belief, there is a lack of corporate distinction between these two entities and both companies are involved in the manufacture, marketing, distribution and sale of pet food and treats.

Exhibit "23." The "real beef" is the <u>seventh ingredient</u>, however, which means that there is not much "beef" in the dog food at all. Moreover, it is limited to the inedible portions of slaughtered mammals, including the striate muscle, which is skeletal or the "meat" found in the tongue, diaphragm, the heart and the esophagus, with or without the accompanying overlying fat in the skin, sinew, nerve and blood vessels which normally accompany the flesh. The primary ingredients are cheap carbohydrate fillers and "chicken," including the necks, heads, feet, undeveloped eggs, intestines, viscera free from fecal content and foreign matter and feathers only to the extent that the inclusion of such fecal matter is unavoidable. These contents are not what the Plaintiffs and consumers are lead to believe that they are purchasing.

### Nutro Natural Choice® Complete Care® Indoor Adult Cat

85. Nutro's marketing makes the same and/or similar misleading statements and guarantees as the other Defendants. For example, when marketing its commercial cat food, Nutro® represents as follows:

> **Benefits of Natural Choice Complete Care Indoor Adult Cat:**
>
> - Scientifically formulated for the unique <u>needs of indoor cats</u>
> - <u>Guaranteed to improve skin & coat for less shedding, fewer hairballs</u>
> - <u>Reduces litter box and in-home odors</u>
> - <u>Natural ingredients</u> with vitamins & minerals
>
> Indoor temperature, lighting and reduced opportunity for exercise can affect the health of your cat's skin and coat, muscle and bone condition and may cause weight gain. If your cat lives indoors most of the time, then <u>feeding Natural Choice Complete Care Indoor Formula can improve your cat's overall health and well-being</u>. It's not just another cat food. Based on the latest scientific and nutritional research, Complete Care Indoor formula is **<u>guaranteed</u>** to <u>improve the health of your indoor cat's skin and coat</u>, <u>reduce shedding</u>, <u>minimize hairballs</u>, build strong muscles and bones and <u>help limit excess weight gain</u>. It's formulated with **<u>unique</u>** <u>ingredients like chicken meal, rice, soy protein, sunflower oil and oat fiber, which are especially important for indoor cats</u>. And it's formulated with a blend of <u>natural ingredients</u> to help reduce litter box odor for a fresher indoor environment. Natural Choice Complete Care Indoor Formula will <u>improve the quality of life for your cat and you</u>.

*See* Nutro Natural Choice® Complete Care® Indoor Adult Cat website page attached hereto as Exhibit "24." Nutro has omitted to advise the Plaintiffs and consumers just how it is scientifically formulated for an indoor cat much less why an indoor cat's needs are any different from one who goes outdoors. Nutro also omits to advise consumers that weight gain in cats has largely been attributed to the predominance of cheap carbohydrate fillers in dry pet food nor does the company advise consumers that soy is not readily digestible by cats and/or why soy is allegedly "important" for an indoor cat, because it is not. Nor does Nutro explain how these pet food ingredients are "unique," given that they are substantially similar to all of the other purported "premium" pet food ingredients sold by the Defendants, including "chicken" consisting of the necks, heads, feet, undeveloped eggs, intestines, viscera free from fecal content and foreign matter and feathers of only to the extent that the inclusion of such fecal matter is unavoidable.

### Natura Brand Pet Food

86.     Natura's marketing also makes the same misleading statements and guarantees as the other Defendants. For example, when marketing its commercial cat food, Natura represents that it is the "Healthiest Pet Food in the World." Natura further states:

> No pet food company in the world makes natural pet foods like Natura. We use only ingredients you'd eat yourself: quality meats, whole grains, fresh fruits and vegetables, and complete vitamin and mineral supplements. For us humans, a diet of natural, wholesome food is essential to living a long healthy life. We believe this fundamental principle is true for your pet, too.

Exhibit "11." However, the pet food still contains carbohydrate fillers notwithstanding the marketing representations, including barley, rice and potatoes, and the same and/or similar chicken heads and feet described above that the other Defendant Manufacturers use and which the Plaintiffs would hardly consider eating themselves given that they are deemed "inedible" for human consumption. Natura's website indicates that the chicken meal it uses is exclusive of

feathers, heads, feet or entrails, but testing has revealed the presence of feathers in Natura's pet food contrary to Natura's representations. Moreover, testing of Natura products has also shown that Natura pet food contains glycoalkaloid toxins from the processing of green potatoes that is at such a high level that it would be toxic to humans, much less small animals. *See* example at Exhibit "25." The ingredients and known and unknown contaminants and additives hardly comport with Natura's claims of the "healthiest Pet Food in the World" and/or food that the Plaintiffs would eat.

### Petco's Marketing of the Defendants' Premium Pet Foods

87. Petco is a retail seller of pet products, including cat and dog food. Petco has a number of marketing displays at or around ceiling height intended to obtain the attention of potential buyers of cat and dog food. These signs have the Petco logo and state **"Supreme Nutrition"** and list one of the Defendants' brand name pet food products. *See* example as Exhibit "26."

88. In each store, Petco displays marketing material about the Defendants' cat and/or dog food. For example, under each specific brand and type of food, a card is inserted on the shelf with marketing information. Please see example as Exhibit "27." At points of purchase, Petco not only adopts the representations of the Defendant Manufacturers regarding their cat and dog foods, but Petco additionally makes its own representations to consumers regarding the Defendants "premium" pet food products. For example, when shopping for cat and dog food, Petco retail stores have a number of signs in and around the stacks of cat and dog food, such as the following:

**SUPREME**
**NUTRITION**
**WHY FEED PREMIUM PET FOOD?**

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

**MORE NUTRITION / FEED LESS**

*Only the highest quality ingredients are used in Premium Pet Foods*, so they are *more nutritious* and *digestible* than Supermarket Brands. *It takes less food to meet the nutritional needs of your pet*.

**BETTER VALUE / SPEND LESS**

**Rich in nutrients, Premium Pet Food packs more protein and energy per mouthful than Supermarket Brands**. It takes less food to feed your pet, so you get more for your money.

**EASIER CLEAN UP / LESS WASTE**

**Feeding smaller amounts of highly digestible Premium Pet Food means lower stool volume and easier backyard clean up.**

*See* example of Petco signage displayed in retail store attached hereto as Exhibit "28." This quality comparison between supermarket brands and "Premium Pet Foods" omits to advise the Plaintiffs that the "highest quality ingredients" are the same or similar to supermarket brands and the allegedly protein packed premium brands are carbohydrate filled just as the supermarket brands contain primarily carbohydrate filled ingredients. Such marketing is deceptive to the Plaintiffs and consumers and is not substantiated by competent and reliable scientific data.

### Petsmart's Marketing of the Defendants' Premium Pet Foods

89.     Petsmart is a retail seller of pet products, including cat and dog food. Petsmart has a number of marketing displays at or around ceiling height intended to obtain the attention of potential buyers of cat and/or dog food. These signs state "Advanced Nutrition" followed by one of the Defendants' brand name pet food products. *See* example at Exhibit "29." Petsmart also displays marketing material about each specific type of the Defendants' cat and/or dog food. For example, under each specific brand and type of food, a card is inserted on the shelf with marketing information. Please see examples Exhibit at "30." Petsmart also markets, sells and makes representations regarding its own brand of pet food, Authority.

46

**Pet Supermarket's and Pet Supplies' Marketing of the Defendants' Pet Foods**

90.    Pet Supermarket is a retail seller of pet products, including cat and dog food. Pet Supermarket has a number of marketing displays at point of purchase intended to obtain the attention of potential buyers of cat and/or dog food.  In each store, Pet Supermarket displays information concerning each of the Defendant Manufacturers' cat and/or dog food and/or treats that it carries. Pet Supplies sells and advertises commercial pet food and distributes point of purchase advertising to Pet Supplies' franchising in Florida and in other states with the intent that the Plaintiffs and other consumers purchase these products and, as a franchise, Pet Supplies' corporate income is derived from the sale of the Defendant's pet food in Florida and elsewhere in the nation.

**Retailers Marketing of the Defendants' Pet Food**

91.    Retailers such as Target, Wal-Mart, Publix, Albertson's, New Albertsons and Kroger, are retail sellers of pet products, including cat and dog food. These retailers have a number of marketing displays at point of purchase intended to obtain the attention of potential buyers of cat and/or dog food.  In each store, these retailers display information concerning the Defendant Manufacturers' cat and/or dog food and treats that they carry and thereby adopt the representations of the Defendant Manufacturers.

**"Premium" Pet Food is made by the same co-packer of non-premium pet food**

92.    Some or all of the Defendants distribute, market, advertise and/or sell commercial pet food that is manufactured and produced by Menu Foods, and/or other similar companies. Thus, consumers believe that they are purchasing a trusted brand made by a recognized and trusted pet food "manufacturer," when they are in fact buying a "premium" pet food for a _higher_ price that is made by the same manufacturer of at least 100 other foods, including Wal-Mart's

*much less expensive* Gourmet Kitty and Ol' Roy. "Premium" pet food thus has no meaning except a higher price because the contents come from an industry that manufactures the pet food in the same manner and the same or similar suppliers, among other things.

93.    "Co-packing" means that one company makes the food, but puts a "brand" label of another, well known and trusted company on it. Co-packers benefit the Defendants because they can buy ingredients in larger bulk than any one Defendant could on its own, thus making the process cheaper and the profits larger. Thus, many of the ingredients that cross all types of pet foods, including "premium" pet foods, are the same.  The unwitting Plaintiffs and the consumer class have no idea what company really manufactures the pet food that he/she buys.  The lack of oversight, quality control and traceability that the Defendants have over their co-packers is underscored by the recent melamine recall where matter was placed into the Defendants' pet food to artificially boost "protein" content, yet it took months for the companies to recall their tainted pet food resulting in, what has been estimated by some, thousands of deaths of companion animals.

### The Defendants Profit by Recycling the Inedible Garbage of their Human Food Businesses into Commercial Pet Food

94.    Rather than the wholesome pictures shown on the pet food packaging, rendering companies dispose of millions of tons of inedible waste each day.  The Defendants purchase this waste and turn it into pet food.  Rendering melts down "animal parts" to separate fat soluble ingredients from water soluble and solid materials at high temperatures. The high heat from processing allegedly destroys bacteria, but also destroys nearly all of whatever nutrients may remain in the rendering vat, although after the rendering process, cross-contamination may occur. Pet food is thus comprised of slaughterhouse waste and/or tainted grains considered "unfit for human consumption," including cow tongues, esophagi, bones, pus, blood, etc., as described

above.  The "whole grains" used have had the starch removed and oil extracted by chemical processing to make vegetable oil, or they are substantially comprised of the hulls and other remnants from the milling process.  Some of the whole grains used may have been deemed unfit for human consumption because of mold, contaminants or poor storage practices.

95.    The nutritional quality of by-products, meals, and digests can vary from batch to batch. The Defendants' pet food ingredients are by-products of the meat, poultry and fishing industries, with the potential for a wide variation in nutrient composition. Claims of minimum requirements of pet foods based on the current nutrient allowances do not relate to assurances of nutritional adequacy, i.e., whether the cat or dog can actually absorb the food as a nutrient, which is misleading to the consumer based upon the Defendants' marketing.

96.    Dry foods contain a large amount of cereal grain or starchy vegetables to provide texture and little meat. These high-carbohydrate plant products also provide a cheap source of "energy" or, more appropriately, calories. Gluten meals are high-protein extracts from which most of the carbohydrate has been removed. They are often used to boost protein percentages without expensive animal-source ingredients. In most cases, foods containing vegetable proteins are among the poorer quality foods. Proteins are especially vulnerable to heat, and become damaged, or "denatured," when cooked. Because dry food ingredients are cooked twice, first during rendering and again in the manufacturing process, altered proteins lead to food intolerances, food allergies and inflammatory bowel disease.

97.    The unique, pungent odor to a new bag of dry pet food is most often "rendered" animal fat, or vegetable fats and oils deemed inedible for humans. Contrary to their advertising and marketing representations, the Defendants manufacture and sell recycled human food waste

that is not fit for human consumption into the "premium," "quality," "gourmet" and "wholesome" commercial pet food that they market to consumers.

98.      Dogs and cats are carnivores and should be fed a _meat-based_ diet. The Defendants lead the Plaintiffs and the class to believe that this is what they are feeding their cats and dogs by marketing to the Plaintiffs and the class photos depicting wholesome  choice cuts of chicken and beef allegedly found in the Defendants' pet food and by making representations on the packages and in other media of "real" beef or chicken in the pet food. The containers also replicate the television and web advertising by showing wholesome meat and vegetables on the packaging. This is all false and misleading to the consumer.

99.      There have been reports of euthanized cats and dogs that have been "rendered" and ultimately made into pet food that would reach millions.  Not coincidentally, drugs used in the euthanasia process have been detected in pet food because the drugs are not destroyed by heat. *See* 1998 study of samples from Laurel, Maryland attached hereto as Exhibit "31" and 2002 FDA Report on the Risk from pentobarbital in dog food attached hereto as Exhibit "32."

100.      While the FDA's 2002 report concluded that it was "highly unlikely" that dogs will experience adverse effects from consuming pentobarbital and that it could find no evidence of rendered dogs and cats out of only 31 "sample" pet foods, there was no real explanation as to the methods, sampling or analysis as to whether long term effects were considered over the life of a cat or dog. Exhibit "32." The FDA stated "it is assumed that the pentobarbital residues are entering pet foods from euthanized, rendered cattle or even horses," meaning the FDA ruled out dogs and cats in only 31 pet foods they tested.  However, a published scientific journal regarding the study stated to the contrary – both horses and cattle were ruled out because none of the 31 dog food samples examined in the study tested positive for equine-derived proteins. Exhibit

"33." The study further concluded that cattle are only occasionally euthanized with pentobarbital, and thus are not considered a likely source of pentobarbital in dog food. Moreover, although the results of the study narrowed the search for the source of pentobarbital poison, it did not define the source, i.e., the species responsible for the pentobarbital contamination. Exhibit "33." The FDA never found the source of the pentobarbital, nor did the study attempt to address reports of cat and dog illness or deaths from ingestion of pentobarbital nor newspaper and television accounts of animal shelters sending thousands of euthanized cats and dogs to rendering plants used by pet food companies such as Purina.[4]

101.    For example, a television report in St. Louis aired video footage of a truck with the motto "Serving the Pet Food Industry" entering a rendering plant where euthanized dogs and cats from local animal shelters were hauled. The report generated a public outcry, regarding this cannibalistic-like practice. In another story, an investigative reporter in the Baltimore area reported that euthanized cats and dogs had been rendered into Purina and other pet food despite the "guarantee" given by the rendering facility that the rendered product sold to Purina did not contain same. Exhibit "34." The Plaintiffs love their cats and dogs and consider them members of their families. These "guarantees" from rendering plants are thus meaningless because they are not followed during processing and the Defendant's either know, or should know, that their suppliers are not abiding by them. The Plaintiffs would not have purchased the Defendant's pet food had they known of this practice.

102.    The Defendants' marketing of their purportedly wholesome pet food is wholly inconsistent with the pet food having pentobarbital in it, no matter what the source of the species.

---

[4] 3-4,000,000 dogs and cats are euthanized in animal shelters each year. See http://www.hsus.org/pets/ issues_affecting_our_pets/pet_overpopulation_and_ownership_statistics/hsus_pet_overpopulation_estimates.html.

Case 1:07-cv-21221-CMA    Document 310-2    Entered on FLSD Docket 01/16/2008    Page 52 of 90

### Chemical Preservatives and Contaminants

103.    Some preservatives are added to ingredients or raw materials by the suppliers, and others may be added by the manufacturer.  Pet foods are preserved with either synthetic or "natural" preservatives. Synthetic preservatives include butylated hydroxyanisole (BHA) and butylated hydroxytoluene (BHT), propyl gallate, propylene glycol (also used as a less-toxic version of automotive antifreeze), and ethoxyquin. Exhibit "35."   Ethoxyquin is a preservative that is used in pet food.  Exhibit "19." Ethoxyquin has also been used as a rubber preservative and/or pesticide and is listed and identified as a hazardous chemical under the criteria of the OSHA Hazard Communication Standard (29 CFR §§1910, 1220).  The Chemical Toxicology of Commercial Products states that ethoxyquin has a toxic rating of 3 (on a scale of 1 to 6, with 6 being super toxic requiring less than 7 drops to produce death). While the FDA maintains it is "safe," it nevertheless asked the Defendant pet food Manufacturers to "voluntarily" lower the levels previously allowed at 150 ppm to 75 ppm.  Exhibit "19."  While BHA and BHT retard rancidity in fats and oils, some studies have indicated that these preservatives have caused cancer in rats.

104.    The Defendants continue to use these preservatives even though there is little information documenting the toxicity, safety, interactions or chronic use of these chemicals in pet foods that may be eaten every day for the life of the animal.  Yet, through their marketing, the Defendants lead the Plaintiffs and consumers to believe that they are the leaders in advanced or superior nutrition "research." Given the Defendants' marketing concerning the quality of the product and the "research" that goes into producing it, upon which the Plaintiffs and consumers rely, the Defendants' marketing is deceptive and/or fraudulent, since a reasonable consumer

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
**MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**

would expect a company to research the long-term effects of preservatives prior to including them in pet food that is marketed as a well-researched quality product and as safe.

105.    Ingredients used in the Defendant's pet food have been contaminated with a wide variety of toxic substances, including but not limited to, bacteria such as *Salmonella* and *E. coli*, endotoxins, drugs that were used to treat or euthanize the rendered animals such as Penicillin and pentobarbital, and antibiotics. Exhibit "35." The Defendants pet food also contains mycotoxins from mold or fungi, chemical residues and acrylamide.  Exhibit "35."

**Numerous Serious Toxic Pet Food Recalls Demonstrate that the Defendants Do Not Properly Test, Monitor or otherwise Verify Pet Food Contents that are Marketed as "Healthy, Wholesome and Nutritious"**

106.    Although largely unknown to the Plaintiffs and the class, commercial pet food has been the subject of numerous lethal recalls over the years.  The recent massive Menu Foods recall is yet another example of the disastrous effect of the lack of regulation on pet food which results in the Defendants success in profiting by the lack of regulations and the consequent cost to the Plaintiffs and the Class in companion animal illness and deaths and exorbitant veterinarian bills to try to save them.  For example, Ol' Roy, Wal-Mart's store brand, has now been involved in ***3 serious recalls***. The list of other serious recalls is long and demonstrates the frequency of same:

- In 1995, Nature's Recipe recalled almost a million pounds of dry dog and cat food after consumers complained that their pets were vomiting and losing their appetite. The problem was a fungus that produced vomitoxin contaminating the wheat.

- In 1999, Doane Pet Care recalled more than a million bags of corn-based dry dog food contaminated with aflatoxin. Products included Ol' Roy (Wal-Mart's brand) and 53 other brands. The toxin killed at least 25 dogs.

- In 2000, Iams recalled 248,000 pounds of dry dog food distributed in 7 states due to excess DL-Methionine Amino Acid, a urinary acidifier.

- In 2003, a recall was made by Petcurean "Go! Natural" pet food due to circumstantial association with some dogs suffering from liver disease; no cause was ever found.

- In late 2005, Diamond Foods recalled pet food contaminated with moldy corn which contained a particularly nasty fungal product called aflatoxin. The toxin killed at least 100 dogs.

- In 2005, 123,000 pounds of cat and dog treats were recalled due to *Salmonella* contamination.

- In 2006, more than 5 million cans of Ol' Roy, American Fare, and other dog foods distributed in the southeast were recalled by the manufacturer, Simmons Pet Food, because the cans' enamel lining was flaking off into the food.

- Also in 2006, Merrick Pet Care recalled almost 200,000 cans of "Wingalings" dog food when metal tags were found in some samples.

- In the most deadly recall of 2006, 4 <u>prescription</u> canned dog and cat foods were recalled by Royal Canin. The culprit was a serious overdose of Vitamin D that caused calcium deficiency and kidney disease.

- In February 2007, the FDA issued a warning to consumers not to buy "Wild Kitty," a frozen food containing raw meat. Routine testing by FDA had revealed *Salmonella* in the food. The FDA specifically warned about the potential for illness in humans, not pets. There were no reports of illness or death of any pets, and the food was not recalled.

- The most lethal pet food in history is the continuing subject of the largest recall ever. Menu Foods recalled more than 100 brands including Iams®, Eukanuba®, Hill's Science Diet®, Purina Mighty Dog®, and many store brands, including Wal-Mart's, over 60 million individual cans and pouches. Some estimate pet deaths in the thousands and thousands of pets have become sick. The estimate is that 20-30% died from acute renal failure caused by the food. The death toll reported to the FDA is believed to be drastically underreported due to the volume of calls and consumers' inability to log the deaths and illnesses.

Exhibit "34."   Additionally, after a number of reports of independent testing discovered acetaminophen in dog and cat food, Menu Foods has announced that it will test for acetaminophen, but it was only under public pressure and scrutiny that Menu Foods reluctantly agreed. Menu Foods, however, has provided no information as to how it will test or the methods

it will use.  Moreover, while the Natura website advises that its products have been "tested" for melamine, it is widely reported that it was the combination of melamine with cyanuric acid that caused the deaths and illness of thousands of cats and dogs in 2007.  Natura's website is silent as to whether their pet food is tested for melamine and cyanuric acid.  This is also deceptive and misleading to the consumer.

### Nutrition-Related Diseases

107.    Unbeknownst to the Plaintiffs and the class, the Defendants' "wholesome" pet foods cause numerous health problems because they are filled with cheap, inedible grains as fillers and poor protein sources when the Defendants know that cats and dogs are carnivores. The unpleasant results of poor protein, grain-based, processed, year-in and year-out diets are common. Health problems associated with commercial pet food include urinary tract disease, kidney disease, dental disease, obesity, diabetes, chronic digestive problems, bloat, heart disease, hypertension, hyperthyroidism and bovine spongiform encephelopethy ("BSE") or "mad cow" disease.

108.    Diets composed primarily of low quality grains and rendered meals are not as wholesome as the Defendants have led the Plaintiffs and consumers to believe. The Plaintiffs paid for the Defendants' pet foods because they thought that the particular Defendants' pet food was wholesome, human-like, "real" meat based upon the Defendants' marketing and were not aware of the true contents and quality (or lack thereof) of the Defendants' pet food products, including the  additives, contaminants, toxins and other ingredients.

109.    The rampant problems with the Defendant Manufacturers and Co-Packers lack of quality control and traceability of ingredients, among other things, has lead to the illness and deaths of thousands of cats and dogs.

110. Had the Plaintiffs known the true nature, character, contents and quality of the Defendants' pet food, they would not have purchased the Defendants' pet food products.

111. The Plaintiffs have also had to pay thousands of dollars in veterinarian bills and/or other expenses as a result of their dogs and cats illnesses and/or deaths from ingesting this food.

112. The Defendants are aware that the true contents of their dog and cat food products are not what they market them to be. The Defendants have deceptively, unfairly, willfully, intentionally and/or negligently misrepresented, deceived and/or omitted to disclose the quality and contents of their pet food products to the Plaintiffs and the consumer class to increase their profit margins at the expense of the Plaintiff's beloved cats and dogs about whom the Defendant's profess to care. Moreover, the marketing representations made in various media and on pet food packaging is deceptive, false, unfair and misleading.

**Joinder of the Defendants**

113. The Defendants have been included in this action because the relief sought against the Defendants arises out of the same or similar conduct on or about the same time and questions of law and/or fact are common to each Defendant Pet Food Manufacturers, Pet Food Retailers and Pet Specialty Retailers, including their defenses. The Defendants are part of a homogenous industry that operates in the same or similar manner regarding the issues raised in this lawsuit. The Defendant Pet Food Manufacturers produce distribute and sell many various brands of pet food and treats yet they are often manufactured by the same manufacturer(s) and use the same or substantially similar ingredients from the same suppliers. The Defendants also advertise, market and sell pet food and/or treats in the same or similar manner. The Defendant Class Representatives and the Class are represented by trade associations, such as the Pet Food

MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

Institute, the Pet Industry Joint Advisory Council, the American Pet Products Manufacturers Association and the National Retail Federation, which have undertaken to represent them before federal and state governments and regulators to protect and preserve the Defendants interests to the detriment of the Plaintiffs and consumers. For example, the Pet Food Institute has appeared on behalf of the Defendants at Congressional inquiries; as an Advisor to the American Association of Feed Control Officials; and in formulating proposed regulations concerning pet food. The Pet Food Institute has also interfaced with the Food and Drug Administration regarding pet food and/or treat issues, participated in investigations with state and federal officials, assisted with regulatory filings and represented the Defendants in the media by making public statements regarding everything from pet food regulation to numerous pet food recalls. The Pet Food Institute and other trade associations to which the Defendants all belong act in concert and exist for the express purpose of representing their members and protecting and asserting their common interests. The Defendant Pet Food Manufacturers, Pet Food Retailers and trade associations, such as the Pet Food Institute, have acted in concert and are bound by a common course of conduct to injure the Plaintiffs by, among many other things, providing information that is deceptive to the Plaintiffs and consumers in violation of state consumer law statutes and false advertising statutes and lobbying state and federal governments, all of which has resulted in injury to the Plaintiffs and the consumer class.  The Defendants are also juridically related by and through the aforementioned trade associations such that a single resolution of the claims in this lawsuit would be expeditious and preserve judicial economy by avoiding a multiplicity of lawsuit filings and trials as described hereinabove and below.

## CLASS ACTION ALLEGATIONS

### Plaintiffs' Class Action

114.    Plaintiffs/Class Representatives bring this action on their own behalf and as a

Plaintiff class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and (3) on

behalf of the following proposed Plaintiff Class:

> All consumers in the United States who have purchased pet food
> produced, manufactured, advertised, marketed, distributed and/or
> sold by any of the Defendants that (a) was marketed as having
> certain ingredients or benefits to cats and dogs when the pet food
> either contained ingredients and/or additives and/or contaminants
> and/or other matter that were not represented in the Defendants'
> marketing and/or (b) fails to contain the promised benefits based
> upon scientifically valid research studies.  The relevant time period
> for the Class is May 9, 2003 through the present.

The Plaintiffs/Class Representatives reserve the right to amend the Plaintiff Class definition after

more information has been obtained through discovery. At the time of class certification, one or

more subclasses may be proposed. Excluded from the Plaintiff Class are Defendants, their

parents, subsidiaries and affiliates, directors and officers, and members of their immediate

families. Also excluded from the Class are the Court, the Court's spouse, all persons within the

third degree of relationship to the Court and its spouse, and the spouse of all such persons.

### Injunctive Relief

115.    The Plaintiffs bring this Plaintiff Class Action action under Rule 23(b)(2) because

the Defendants have acted or refused to act on grounds generally applicable to the Plaintiff Class,

such that a final injunctive relief is appropriate with respect to the class as a whole. In particular,

the Plaintiffs seek injunctive or other equitable relief regarding the false and deceptive

marketing, advertising and sale of the Defendants' pet food.

## Numerosity

116.    According to the American Pet Products Manufacturers Association 2007-2008 survey, there are 88.3 million companion cats and 74.8 million companion dogs in the United States. 44.8 million United States households enjoy companion dogs and 38.4 million share their home with companion cats. The overwhelming majority of consumers who have companion cats and dogs purchase commercial pet food that the Defendants place in the stream of commerce. The members of the Plaintiff Class are thus so numerous and geographically diverse that joinder of all of them is impracticable. While the exact number and identities of the members of the Plaintiff Class are unknown at this time, and can only be ascertained through appropriate discovery from the Defendants' records and notices, the Plaintiffs/Class Representatives believe and therefore aver that there are thousands of Plaintiff Class members throughout the United States and know for certain that there are over 100. As a general rule, classes of 40 or more are numerous enough to certify. *See* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* para. 23-05 [1] (2d ed. 1987).  Given the expense of litigating against these Defendants and that each Plaintiff Class Member's damages are relatively small, it would be virtually impossible for individual Class Members to bring suit against the Defendants.  The Class thus has no other viable remedy other than class certification.

## Commonality

117.    There are questions of fact and law common to members of the Plaintiff Class that predominate over any questions affecting any individual members including but not limited to, *inter alia*, the following:

(a)    Whether the Defendants should be enjoined;

(b)      Whether the Defendants advertised, marketed and sold pet food that the consumer would not have purchased had the consumer been aware of the true contents, additives, chemicals and other contents of the pet food;

(c)      Whether the Defendants manufactured, marketed, advertised, distributed and/or sold pet food that marketed promised benefits, but which marketing claims are unsupported by competent and reliable scientific research studies;

(d)      Whether the Defendants conducted marketing surveys or other studies to determine how best to "humanize" pet food to induce consumers to buy it;

(e)      Whether the "Veterinarian recommended" endorsement is deceptive and unfair;

(e)      Whether the Defendants deceptively, unfairly, knowingly, intentionally and/or negligently manufacture, produce, advertise, market, distribute and/or sell pet food that contains toxic, dangerous, and/or other ingredients, additives or chemicals;

(f)      Whether the Defendants knew or should have known that valid research studies should be performed prior to marketing the pet food and/or treats and the claimed benefits to induce the Plaintiffs and the Plaintiff Class to purchase the Defendants' pet food and/or treats;

(g)      Whether the Defendants advertised, represented or held themselves out as experts in dog and/or cat nutrition and the otherwise beneficial effects of pet food and/or treats;

(h)      Whether the Defendants knew or should have known that the ingredients and/or additives and/or other substances in pet food and/or treats do not have the nutritional and/or other beneficial qualities claimed in their marketing;

(i)      Whether the Defendants intended for consumers to rely on their marketing representations;

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
**MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**

(j)     Whether the Defendants were unjustly enriched by selling consumers pet food that was adulterated, did not comport with their own marketing, contained toxic substances, and/or was otherwise not as advertised;

(k)     Whether the Defendants' marketing and advertising was false and deceptive under Florida and applicable state laws; and

(l)     Whether the Defendants violated applicable consumer statutes requiring the Defendants not to commit deceptive or unfair trade practices to the detriment of the consumer;

(m)     Whether the Defendants negligently manufactured, distributed marketed and sold pet food and/or treats to the Plaintiffs and the Plaintiff Class; and

(n)     Whether the Defendants negligently made false representations and/or omissions regarding pet food and/or treats to the Plaintiffs and/or the Plaintiff Class that were not supported by competent and reliable scientific data and research;

**Typicality**

118.     The Plaintiffs/Class Representatives claims are typical of the claims of the other members of the Plaintiff Class in that all such claims arise out of the Defendants' conduct in manufacturing, producing, marketing, advertising, processing, distributing, selling and entering into the stream of commerce pet food as described herein. The Plaintiffs/Class Representatives and other members of the Plaintiff Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiffs/Class Representatives' claims and those of the Plaintiff Class.

**Adequacy**

119.     The Plaintiffs/Class Representatives will fairly and adequately protect the interests of the Class. The Plaintiffs/Class Representatives claims are coextensive with, and not

antagonistic to, the claims of others members of the Plaintiff Class and they are willing and able to vigorously prosecute this action on behalf of the Plaintiff Class. The Plaintiffs/Class Representatives have retained competent counsel who are very experienced in class action litigation.

### Predominance and Superiority

120.    Plaintiffs/Class Representatives bring this action under Rule 23(b)(3), because common questions of law and fact predominate over questions of law and fact affecting individual members of the Plaintiff Class. In addition, the expense of litigating each member of the Class's claim individually would be so cost prohibitive as to deny Class members a viable remedy given the Defendants propensity to aggressively litigate this action. Certification under Rule 23(b)(3) is appropriate because a class action is superior to other available methods for the fair and efficient adjudication of this action, and Plaintiffs/Class Representatives envision no unusual difficulty in the management of this action as a class action.

121.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, respectfully request this Court to:

(a)    Enter an order certifying the Class under Rules 23(a), 23(b)(2) and/or (b)(3) and appointing the Plaintiffs/Class Representatives and their legal counsel to represent the Class;

(b)    Enter an injunction requiring the Defendants to cease their false and deceptive advertising;

(c)    Award restitution and disgorgement in an amount to be determined at trial;

(d)    Enter an Order granting reasonable attorneys' fees and costs to Class Counsel;

(e)    Award damages, including punitive damages, as allowed by law;

(f)    Establish a consumer fund to monitor consumer pet food issues and to educate consumers regarding pet food and treat issues;

(g)    Award costs of suit, including pre and post-judgment interest;

(h)    Grant such other and further relief in law or equity as the Court deems just and proper.

### Defendant Class

122.    Plaintiffs/Class Representatives seek to certify a Defendant Class in this action consisting pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) and propose the following Defendant Class to be comprised of two (2) subclasses of Pet Food and Treat Manufacturers and Pet Food and Treat Retailers:

**(A)    Defendant Pet Food and Treat Manufacturer Subclass**

All manufacturers, producers, distributors and marketers of pet food and/or treats in the United States who have produced, manufactured, advertised, marketed and distributed pet food and/or treats during the class period. The relevant time period for this subclass is May 9, 2003 through the present.

**(B)    Defendant Pet Food and Treat Retailer Subclass**

All Pet Food and treat Retailers who have

(1)    manufactured, or caused to manufacture, their own private label brands of pet food and/or treats during the class period and/or

(2)    all Pet Food Retailers who have distributed, marketed and sold pet food and/or treats in the United States produced by Pet Food and Treat Manufacturers during the class period.

The relevant time period for this class is May 9, 2003 through the present.

The Plaintiffs/Class Representatives reserve the right to revise or amend the Defendant Class definition after more information has been obtained through discovery. Excluded from the Class

are: (1) the Court, the Court's spouse, all persons within the third degree of relationship to the Court and its spouse, and the spouse of all such persons: (2) the following pet food and/or treats: (a) Old Mother Hubbard and/or Wellness; (b) Chicken Soup for the Pet Lover's Soul; (c) Newman's Own Organics Premium Pet Food and treats; (d) prescription dog and/or cat diets; (e) Evanger's; (f) Solid Gold; (g) Lick Your Chops; (h) Nature's Variety; (i) Merrick Turducken; (j) Holistic Select; (k) Orijin; (l) Sprout Ultra; and (m) Senior Gold.

**Numerosity**

123.    The members of the Defendant Pet Food and Treat Manufacturer subclass and the Defendant Pet Food and Treat Retailer subclass are numerous and geographically diverse such that joinder of all of them is impracticable.  On information and belief, the exact number of the members of the Defendant Class can be ascertained through appropriate discovery from the Defendants and the records of the Pet Food Institute, the Pet Industry Joint Advisory Council, the Association of Pet Product Manufacturers Association and the National Retail Federation and notices.  According to the Pet Food Institute website there are over twenty (20) pet food and treat manufacturers.  On information and belief, there are more than twenty (20) Pet Food and Treat Retailers. The Plaintiffs/Class Representatives believe and therefore aver that there are sufficient Pet Food and Treat Manufacturers and Pet Food and Treat Retailers throughout the United States for certification.

**Commonality**

124.    There are questions of fact and law common to members of the Defendant Class that predominate over any questions affecting any individual members including but not limited to, *inter alia*, the following:

(a)    Whether the Defendant Class should be enjoined;

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
**MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**

(b)    Whether the Defendant Class manufactured, marketed, advertised, distributed and/or sold pet food that promised benefits, but which claims are supported by competent and reliable scientific evidence;

(c)    Whether the Plaintiffs/Class Representatives' consumer protection act claims are barred by state regulation;

(d)    Whether the economic loss rule bars the Plaintiffs/Class Representatives' negligence claim;

(e)    Whether the Plaintiffs/Class Representatives claims fail to show causation and damages;

(f)    Whether the Defendants and the Defendant Class conducted marketing, surveys or other studies to determine how best to "humanize" pet food to induce consumers to buy it;

(g)    Whether the "Veterinarian recommended" endorsement is deceptive and unfair;

(h)    Whether the Defendants and the Defendant Class deceptively, unfairly, knowingly, intentionally and/or negligently manufacture, produce, advertise, market, distribute and/or sell pet food that contains toxic, dangerous, and/or other ingredients, additives or chemicals;

(i)    Whether the Defendants and the Defendant Class knew or should have known that valid research studies should be performed prior to marketing pet food and/or treats and the claimed benefits to induce the Plaintiffs and the Class to purchase the Defendants' pet food;

(j)    Whether the Defendants and Defendant Class advertised, represented or held themselves out as experts in dog and/or cat nutrition and the otherwise beneficial effects of pet food;

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

(k)     Whether the Defendants and Defendant Class knew or should have known that the ingredients and/or additives and/or other substances in pet food and/or treats do not have the beneficial qualities claimed in their marketing materials;

(l)     Whether the Defendants and Defendant Class intended for the Plaintiffs and the Class to rely on their marketing representations;

(m)     Whether the Defendants and Defendant Class were unjustly enriched by marketing and selling the Plaintiffs and the Class pet food that was adulterated, did not comport with their own marketing, contained toxic substances and/or was otherwise not as advertised;

(n)     Whether the Defendants and the Defendant Class' marketing and advertising was false, unfair and/or deceptive under Florida and applicable state laws;

(o)     Whether the Defendants and the Defendant Class violated applicable consumer statutes requiring the Defendants not to commit deceptive or unfair trade practices to the detriment of the Plaintiffs and the Class; and

(p)     Whether the conduct of the Defendants and the members of the Defendant Class in manufacturing, distributing, marketing and selling pet food and/or treats to the Plaintiffs and the Class were negligent; and

(q)     Whether the Defendants and the Defendant Class negligently made false representations and/or omissions regarding pet food and/or treats to the Plaintiffs and/or the Class that were not supported by adequate scientific data and research.

### Typicality

125.    The Defendant Class' defenses to the Plaintiffs/Class Representatives claims are typical of the claims of the other members of the Defendant Class in that the Defendant Class Representatives and other members of the Class have nearly identical defenses to the remedies

by the Plaintiffs/ Class Representatives, and there is no antagonism or material factual variation between Defendant Class Representatives defenses and those of the Defendant Class.

## Adequacy

126.    The Defendant Class Representatives will fairly and adequately protect the interests of the Defendant Class. The Defendant Class Representatives' defenses are coextensive with, and not antagonistic to, the claims of others members of the Defendant Class.    The Defendant Representatives are represented by competent and diligent counsel who have both aggressively defended the action to date. There are no antagonistic or conflicting issues between the Defendant Class Representatives and the members of the proposed Defendant Class as best demonstrated by the Defendants Motions to Dismiss and Defendant Natura's adoption of the Motion to Dismiss the Second Amended Complaint after service.  Because the Defendant Class Representatives have the majority of the market share of the pet food and treat manufacturing and sales industry, they have a substantial stake in defending the present action and will therefore be more than adequate Defendant Class Representatives.

## Predominance and Superiority

127.    Plaintiffs/Class Representatives seek to certify the Defendant Class under Rule 23(b)(3), because common questions of law and fact predominate over questions of law and fact affecting individual members of the Defendant Class. The Defendant Pet Food and Treat Manufacturers and Pet Food and Treat Retailers are part of a pet food industry that has acted in concert and which has been homogenized by, among other things, representation as a group by and through trade associations before federal and state governments and regulatory and non-regulatory processes, identical manufacturing processes, co-packers, agreements between Pet Food manufacturers and Pet Food Retailers concerning the distribution, marketing and sale of pet

food. Certification under Rule 23(b)(3) is appropriate because a class action is superior to other available methods for the fair and efficient adjudication of this action and there will be no unusual difficulty in the management of this action as a Defendant Class action.  Because the focus of the lawsuit is on the Defendant Pet Food and Treat Manufacturers and Pet Food and Treat Retailers, there is a predominance of common versus individual issues.  The Defendant class is also superior and manageable because it is preferable to filing a multiplicity of individual lawsuits that would result in either a lengthy multi-district litigation process and proceeding under 28 U.S.C. §1407 and/or consolidation under Federal Rule of Civil Procedure 42.

128.    Wherefore, the Plaintiffs/Class Representatives respectfully request this Court to:

(a)     Enter an order certifying the Defendant Class under Rules 23(a) and (b)(3) and appointing the Defendants as Class Representatives and their legal counsel to represent the Defendant Class;

(b)     Enter an injunction requiring the Defendants to cease their false and deceptive advertising;

(c)     Award restitution and disgorgement in an amount to be determined at trial;

(d)     Enter an Order granting reasonable attorneys' fees and costs to Class Counsel;

(e)     Award damages, including punitive damages, as allowed by law;

(f)     Establish a consumer fund to monitor consumer pet food issues and to educate consumers regarding pet food and treat issues;

(g)     Award costs of suit, including pre and post-judgment interest;

(h)     Grant such other and further relief in law or equity as the Court deems just and proper.

**COUNT I**

**Fraudulent Misrepresentation and Concealment[5]**
**As to All Defendants**

129.    Plaintiffs/Class Representatives hereby adopt and incorporate by reference paragraphs 1-128 as if set forth more fully herein.

130.    During the class period, the Defendant Manufacturers, Retailers, Pet Specialty Retailers and Co-Packers (through association with and/or by agreement with the Manufacturers, Retailers and Petsmart) were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

131.    During the class period, Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling the Defendant Manufacturers' and/or their own private label brands of pet foods and treats throughout the United States.  Retailers and Pet Specialty Retailers adopted the marketing representations of the Defendant Manufacturers and/or made their own marketing representations regarding pet food ultimately sold to the Plaintiffs and the Plaintiff Class.

132.    The Defendants made false representations, intentionally omitted and/or concealed material facts from, the Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendants' pet foods on a regular and systematic basis throughout the Plaintiff Class period by including, but not limited to:

   (a).    Failing to disclose, and/or intentionally concealing ingredients which are not safe or healthy for companion pets;

_____

[5] And other state fraudulent misrepresentation and concealment laws of the various states where Plaintiff Class members reside.

    (b).    Failing to disclose, and/or intentionally concealing, the results of tests showing the potential health risks to companion pets associated with the use of Defendants' commercial pet foods;

    (c).    Making false representations of fact that certain ingredients are beneficial to cats and/or dogs when there are no competent and reliable scientific evidence to support such representations;

    (d).    Failing to include adequate warnings about the potential actual risks and nature, scope, severity, and duration of adverse effects of the ingredients and contents in the Defendants' pet foods;

    (e).    Concealing information regarding the known health risks to companion pets associated with the Defendants' pet foods; and

    (f)    Concealing research showing the deleterious effect of the Defendants' pet food and/or failing to conduct competent and reliable scientific studies to support the claims while leading consumers to believe that they were accurate;

133.　　The Defendants deliberately and/or intentionally misrepresented by omission or concealment material facts from consumers, including the Plaintiffs/Class Representatives and other Plaintiff Class members.  Co-Packers, as the manufacturer and producer of the Defendants' pet food by omission failed to disclose material facts to consumers.

134.　　The Defendants intentionally concealed facts known, or facts which they should have known, as alleged herein, in order to ensure increased sales and profits of the Defendants' pet foods.

135.　　The Plaintiffs/Class Representatives and the Plaintiff Class were unaware of the falsity of the omissions and concealment and justifiably relied on the representations and omissions.  Had the Plaintiffs/Class Representatives and the Plaintiff Class known the true facts, they would not have purchased the pet foods and/or fed the pet foods to their companion pets.

136.    As a direct and proximate result of the Defendants' misrepresentations and/or omissions and concealment of material facts, the Plaintiffs/Class Representatives and the Plaintiff Class have suffered damages.

137.    The Defendants' conduct in concealing material facts and making the foregoing misrepresentations, as alleged herein, was committed with such reckless disregard that the conduct amounts to a conscious disregard or indifference to the rights of consumers such as the Plaintiffs/Class Representatives and other Plaintiff Class members, thereby entitling the Plaintiffs/Class Representatives and other Class members to punitive damages.

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law;

(c)    Awarding punitive damages; and

(d)    Granting such other and further relief as allowed by law.

## COUNT II

### Negligent Misrepresentation[6]
### As to All Defendants

138.    Plaintiffs/Class Representatives and the Class members re-allege paragraphs 1-128 as if set forth more fully herein.

139.    At all material times, Defendant Manufacturers, Retailers, Pet Specialty Retailers and Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), and Petsmart were engaged in the business of

---

[6] And other state negligent misrepresentation laws of the various states where Plaintiff Class members reside.

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
**MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**

manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

140. At all material times, Defendant Retailers and Pet Specialty retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

141. The Defendants omitted and concealed material facts to Plaintiffs/Class Representatives and the Plaintiff Class in the advertising, marketing, distribution, and sale of the Defendant Manufacturers' Retailers and Petsmart's pet foods on a continuing and ongoing basis as alleged herein.

142. By Defendants negligently made misrepresentations regarding their pet foods as alleged herein.

143. The Defendants either knew of these misrepresentations, or made these misrepresentations by omission and concealment and either knew or should have known of the false representations and/or omissions.

144. The Defendants intentionally made such misrepresentations about their products in order to induce the Plaintiffs/Class Representatives and the Plaintiff Class to act on the misrepresentations so that the Plaintiffs/Class Representatives and the Class would buy the Defendants' pet food products, thus increasing the sales and profits of Defendants' pet foods.

145. The Plaintiffs/Class Representatives relied on the misrepresentations and/or omissions and/or had the Plaintiffs/Class Representatives and the Plaintiff Class known the true facts concerning the Defendants' commercial pet foods, they would not have purchased the pet foods and/or fed the pet foods to their companion pets; the Plaintiffs were injured as a result of their reliance on the Defendants' misrepresentations and omissions.

146.    As a proximate cause of the Defendants' negligent misrepresentations and/or omissions, the Plaintiffs/Class Representatives and the Plaintiff Class bought the Defendants' products and suffered injury and damages as a result thereof.

Wherefore, Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT III

### Violation of the Florida[7] Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 As to All Defendants

147.    The Plaintiffs/Class Representatives and the Class re-allege paragraphs 1-128 as if set forth more fully herein.

148.    At all material times, Defendant Manufacturers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), Retailers, and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

149.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

150.    This is a cause of action for damages due to the Defendants' violation of Florida's Deceptive and Unfair Trade Practices Act, Florida Statute §501.201, *et seq*.

---

[7] And other state deceptive trade practice laws of the various states where Plaintiff Class members reside.

151.    The Defendants' conduct in making deceptive statements to, and omissions and/or concealing material facts from, the Plaintiffs/Class Representatives and the Class in the advertising, marketing, distribution, and sale of the Defendants' pet foods on a continuing and ongoing basis as alleged herein is an unfair and/or a deceptive act in violation of § 501.201.

152.    At all material times hereto, the Plaintiffs/Class Representatives and the Class were "interested parties or persons" as said term is defined under Fla. Stat. §501.203(6). Furthermore, the Plaintiffs/Class Representatives and the class were "consumers" as said term is defined under Fla. Stat. §501.203(7).

153.    By virtue of the acts described above, the Defendants were engaged in "trade or commerce" as said term is defined under Fla. Stat. §501.203(8).

154.    The Defendants' representations and/or omissions regarding their pet food products constitute unlawful, unfair, or deceptive acts under Fla. Stat. §501.204.

155.    The Defendants' conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and therefore a violation of § 501.201.[8]

156.    The Plaintiffs/Class Representatives and the Class acted reasonably under the circumstances by purchasing these products based on the marketing, advertising, and other information provided by the Defendants. The Plaintiffs/Class Representatives and the Plaintiff Class are average consumers who had no specialized knowledge of pet food and pet food ingredients at the time of purchase.

---

[8] While the Florida legislature does not define what an unfair or deceptive act is, it has mandated that Fla. Stat. chs. 501.204, 501.211(1)-(2) (1997) of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) are to be liberally construed. The legislature has also specifically stated that great weight should be given to federal cases interpreting the federal counterpart of this act. An unfair practice under 15 U.S.C.S. § 45(a)(1) of the Federal Trade Commission Act has been defined as one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. See *Samuels v. King Motor Co.*, 782 So. 2d 489 (Fla. 4th DCA 2001).

157.    As a proximate result of the Defendants' deceptive trade practices, the Plaintiffs/Class Representatives and the Plaintiff Class have been aggrieved and suffered damages.

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows:

(a)    Awarding actual damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law;

(c)    For reasonable attorneys' fees and costs pursuant to Fla. Stat. §501.2105;

(d)    Awarding injunctive relief;

(d)    Granting such other and further relief as it deems just and proper.

## COUNT IV

### Negligence[9]
### As to Defendant Manufacturers and Co-Packers and PetSmart

158.    The Plaintiffs/Class Representatives re-allege paragraphs 1-128 as if more fully set forth herein.

159.    At all material times, Defendant Manufacturers, Co-Packers, Retailers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart) and Petsmart were engaged in the business of manufacturing, distributing, marketing, promoting, advertising, and selling Defendants' pet foods throughout the United States.

160.    The Defendant Manufacturers, Co-Packers (through association with and/or by agreement with Defendant Manufacturers Retailers and Petsmart), Retailers and Petsmart owed

---

[9] And other state negligence laws of the various states where Plaintiff Class members reside.

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

the Plaintiffs/Class Representatives and the Plaintiff Class a duty to offer pet food free from deleterious and harmful effects.

161.    The Defendants breached their duty of care to the Plaintiffs/Class Representatives and the Plaintiff Class by failing to use sufficient quality control, perform adequate testing, proper manufacturing practices, production, processing, adequate oversight and failing to take sufficient measures to prevent the pet foods from being offered for sale in a manner in which would cause injury to the Plaintiffs' companion pets as alleged herein.

162.    The Defendants knew or, in the exercise of reasonable care, should have known, that the pet foods presented an unacceptable and unreasonable risk of harm to the Plaintiffs/Class Representatives' and the Plaintiff Class' companion pets, and would result in foreseeable, and reasonably avoidable, damages.

163.    The Defendants' conduct, as alleged herein, was therefore negligent, careless, and reckless.

164.    As a direct and proximate result of the Defendants' above referenced negligence, the Plaintiffs/Class Representatives and other Class members have suffered loss and damages.

Wherefore, the Plaintiffs/Class Representatives and other Class members, on behalf of themselves and all others similarly situated, prays relief and judgment against the Defendants as follows:

(a)     Awarding actual and consequential damages;

(b)     For pre- and post-judgment interest to the Class, as allowed by law; and

(c)     Granting such other and further relief as allowed by law.

## COUNT V

### Strict Liability[10]
### As To All Defendants

165.    The Plaintiffs/Class Representatives and the Class re-allege paragraphs 1-128 as set forth more fully herein.

166.    The Plaintiffs/Class Representatives purchased pet food products which they fed to the companion pets from the Defendants as manufacturer, retailer, wholesaler and/or distributors.

167.    The pet food product was defective and unreasonably dangerous because it caused injury, illness and/or death to the Plaintiffs companion pets by including, but not limited to, adulterated ingredients, additives, chemicals, toxins and/or contaminants.

168.    As a direct and proximate cause of the unreasonably dangerous condition of the pet food that the Plaintiffs/Class Representatives and the Plaintiff Class purchased and fed to their companion pets, the Plaintiffs/Class Representatives and the Plaintiff Class suffered property damage and economic losses.

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

---

[10] And other state strict liability laws of the various states where Class members reside.

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

## COUNT VI

### Injunctive Relief[11]
### As To All Defendants

169.     The Plaintiffs/Class Representatives and the Class re-allege paragraphs 1-128 as set forth more fully herein.

170.     An injunction is particularly warranted here because even after the largest recall in American history, a number of deadly recalls have followed.  The Plaintiffs seek to prevent further needless illness and deaths of the Plaintiffs' and the Plaintiff Class' cats and dogs by enjoining the Defendants from their continuing and ongoing pattern and practices of deceiving and misleading consumers.  An injunction is also necessary to protect the Plaintiffs and the Plaintiff Class from the ongoing pattern and practice of deceptive advertising which will result in consumers purchasing pet food and treats that they would not otherwise purchase but for the deceptive and unfair marketing.

171.     The Plaintiffs/Class Representatives seek an injunction enjoining Defendants to cease their unlawful, false and misleading marketing, advertising and sale of pet food products because there is a genuine threat of imminent injury to the Plaintiffs and there is no adequate remedy at law available to the Plaintiffs.  The Defendants marketing continues to mislead because the Plaintiffs and the Class can never be compensated in money damages for the illness and/or loss of their companion cats and dogs.

172.     The Plaintiffs and the Plaintiff Class have a clear legal interest in the subject matter of this lawsuit because they have cats and/or dogs and regularly purchase pet food products for consumption by their companion pets.

---

[11] And other state injunctive relief laws of the various states where Class members reside

173.    There is a substantial likelihood of success on the merits of one or more of the Plaintiffs' claims against the Defendants.

174.    Unless an injunction is entered, the Plaintiffs and the Plaintiff Class will continue to suffer irreparable harm and the threatened injury in the form of illness and death of their companion cats and dogs outweighs any threatened harm the injunction may cause the Defendants.

175.    An injunction will serve the public interest by preventing harmful pet food from causing further injury to the Plaintiffs and the Plaintiff Class from entering the market.

Wherefore, the Plaintiffs/Class Representatives and the Plaintiff Class respectfully request that this Honorable Court enter a temporary and permanent injunction enjoining the Defendants from continuing their current unlawful, false and misleading advertising and marketing and sale of their pet food products and ordering them to terminate the continuing ill effects of past false advertising.

## COUNT VII

### Breach of Implied Warranty[12]
### as to Retailers and Pet Specialty Retailers

176.    The Plaintiffs/Class Representatives and the Class re-allege paragraphs 1-128 as set forth more fully herein.

177.    At all material times, the Defendant Manufacturers, Co-Packers, Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

---

[12] And other state breach of warranty laws of the various states where Class members reside.

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
**MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**

178.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

179.    At the time the Defendants advertised, marketed, sold, and distributed the commercial pet food, the Defendants knew of the purpose for which the pet foods were intended and impliedly warranted that the pet foods were of merchantable quality and safe and fit for such use.

180.    The Plaintiffs/Class Representatives and the Plaintiff Class reasonably relied upon the skill, superior knowledge and judgment of the Defendants as to whether the pet foods were of merchantable quality and safe and fit for their intended use.

181.    Based on the implied warranty of merchantability and quality for its purpose, Plaintiffs/Class Representatives purchased pet food products offered for sale by the Defendants.

182.    Contrary to such implied warranties, the pet foods were not of merchantable quality and were not safe for their intended use.

183.    While being used for its intended purpose, the Defendants' pet food and treats caused injury to the Plaintiffs' cats and dogs.

184.    The Defendants breached the implied warranties because their products, purchased by the Plaintiffs/Class Representatives and the Plaintiff Class, were not of merchantable quality, nor safe, nor fit for their intended use because the products were adulterated, and, therefore, were unreasonably dangerous and unfit for their ordinary and/or intended use. As a result thereof, the Plaintiffs/Class Representatives and the Plaintiff Class suffered injuries and damages.

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays for relief and judgment against the Defendants as follows:

(a)     Awarding actual and consequential damages;

(b)     For pre- and post-judgment interest to the Class, as allowed by law; and

(c)     Granting such other and further relief as allowed by law.

## COUNT VIII

### Breach of Express Warranty[13]
### As to All Defendants

185.     The Plaintiffs/Class Representatives re-allege paragraphs 1-128 as if more fully set forth herein.

186.     At all material times, the Defendant Manufacturers, Co-Packers, Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

187.     At all material times, Defendants Pet Supermarket, Petco, Petsmart, Target, and Wal-Mart were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

188.     The Defendants expressly warranted that the pet foods were safe, healthy, perfect, balanced, and nutritious for consumption by companion cats and dogs through their products' labels, packaging, and advertisements.

189.     The Plaintiffs/Class Representatives purchased the pet food products based on the express warranties trusting the Defendants superior knowledge and promises contained in the warranties.

---

[13] And other state breach of express warranty laws of the various states where Plaintiff Class members reside.

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
**MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**

190.    The Defendants breached the express warranties because the pet foods did not conform to these express representations. The pet foods are not safe and/or healthy for consumption by the Plaintiffs/Class Representatives companion pets and Plaintiff Class' cats and dogs.

191.    In fact, the Defendants' pet foods are harmful, unhealthy, and not safe for consumption by the Plaintiffs/Class Representatives and the Plaintiff Class' companion pets and as a result thereof the Plaintiffs/Class Representatives and the Plaintiff Class have suffered damages as a result of the Defendants' breach of express warranty.

Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, prays relief and judgment against the Defendants as follows:

(a)    Awarding actual and consequential damages;

(b)    For pre- and post-judgment interest to the Class, as allowed by law; and

(c)    Granting such other and further relief as allowed by law.

## COUNT IX

**Unjust Enrichment[14]**
**As to All Defendants**

192.    Plaintiffs/Class Representatives and other Class members reallege paragraphs 1-128 as if more fully set forth herein.

193.    Plaintiffs/Class Representatives do not have an adequate remedy in law.

194.    At all material times, the Defendant Manufacturers, Co-Packers (through association with and/or by agreement with the Defendant Manufacturers, Retailers and Petsmart), Retailers and Petsmart manufactured, packaged, marketed, advertised, distributed, and sold the Defendants' pet foods throughout the United States.

---

[14] And other state unjust enrichment laws of the various states where Class members reside.

195.    At all material times, Defendant Retailers and Pet Specialty Retailers were engaged in the business of promoting, advertising, marketing, and selling Defendants' pet foods throughout the United States.

196.    The Plaintiffs/Class Representatives and the Plaintiff Class purchased the Defendants' pet foods for the reasons alleged herein. The Plaintiffs/Class Representatives payment of purchase price for the substandard products conferred a benefit to the Defendants.

197.    The Defendants had knowledge of the benefit conferred upon them by the Plaintiffs/Class Representatives. In fact, the Defendants made a calculated profit from the sales of the pet food products when the Plaintiffs/Class Representatives on the other hand suffered damages as a result of the transaction.

198.    The Defendants have voluntarily accepted and retained these profits and benefits, derived from consumers, including the Plaintiffs/Class Representatives and the Plaintiff Class, despite the fact the Plaintiffs/Class Representatives and the Plaintiff Class, were not receiving pet foods of quality, nature, fitness, or value that had been represented by the Defendants or that unknowing consumers expected.

199.    Under the circumstances where the Plaintiffs/Class Representatives were left with a product they would not have purchased had they known of the quality and content and where the Plaintiffs were damaged as a result of the purchase, the Defendants have been unjustly enriched. Under the circumstances it would be inequitable for the Defendants to retain the benefits conferred upon them by the Plaintiffs /Class Representatives.

200.    Wherefore, the Plaintiffs/Class Representatives, on behalf of themselves and all others similarly situated, pray for relief and judgment against Defendants as follows: the disgorgement and restitution of the Defendants' wrongful profits, revenue, and benefits, to the

extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

## JURY DEMAND

Plaintiffs/Class Representatives and the Class demand a jury trial on all issues triable by a jury.

DATED: January 16, 2008

s/  Catherine J. MacIvor
CATHERINE J. MACIVOR (FBN 932711)
cmacivor@mflegal.com
MALTZMAN FOREMAN, PA
One Biscayne Tower
2 South Biscayne Boulevard – Suite 2300
Miami, Florida 33131
Tel: 305-358-6555 / Fax: 305-374-9077
*Attorneys for Plaintiffs*

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the

Court via CM/ECF on this 16th day of January, 2008. We also certify that the foregoing was

served on all counsel or parties of record on the attached Service List either via transmission of

Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those

counsel or parties who are not authorized to receive electronic Notices of Filing.

s/   Catherine J. MacIvor
CATHERINE J. MACIVOR

## SERVICE LIST

### CASE NO. 07-21221 ALTONAGA/Turnoff

**CATHERINE J. MACIVOR**
cmacivor@mflegal.com
**JEFFREY B. MALTZMAN**
jmaltzman@mflegal.com
**JEFFREY E. FOREMAN**
jforeman@mflegal.com
**DARREN W. FRIEDMAN**
dfriedman@mflegal.com
**MALTZMAN FOREMAN, PA**
One Biscayne Tower
2 South Biscayne Boulevard -Suite 2300
Miami, Florida 33131
Tel: 305-358-6555 / Fax: 305-374-9077

*Attorneys for Plaintiffs*

**JOHN B.T. MURRAY, JR.**
E-Mail**: jbmurray@ssd.com**
**ROBIN L. HANGER**
E-Mail: rlhanger@ssd.com
**SQUIRE, SANDERS & DEMPSEY LLP**
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, Florida 33401-6198
Telephone: (561) 650-7200
Facsimile:   (561) 655-1509

*Attorneys for Defendants PETCO Animal Supplies Stores Inc., PetSmart, Inc., Wal-Mart Stores, Inc. and Target Corporation*

**ROLANDO ANDRES DIAZ**
E-Mail: rd@kubickdraper.com
**CASSIDY YEN DANG**
E-mail: cyd@kubickidraper.com
**MARIA KAYANAN**
E-Mail**: mek@kubickidraper.com**
**KUBICKI DRAPER**
25 W. Flagler Street
Penthouse
Miami, Florida 33130-1712
Telephone: (305) 982-6708
Facsimile:  (305) 374-7846

*Attorneys for Defendant Pet Supermarket, Inc.*

**ALEXANDER SHAKNES**
E-Mail: Alex.Shaknes@dlapiper.com
**AMY W. SCHULMAN**
E-Mail: Amy.schulman@dlapiper.com
**LONNIE L. SIMPSON**
E-Mail: Lonnie.Simpson@dlapiper.com
**S. DOUGLAS KNOX**
E-Mail: Douglas.knox@dlapiper.com
**DLA PIPER RUDNICK GRAY CARY US LLP**
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4829

*Attorneys for Defendants Menu Foods, Inc. and Menu Foods Income Fund*

**WILLIAM C. MARTIN**
E-Mail: william.martin@dlapiper.com
**DLA PIPER RUDNICK GRAY CARY US LLP**
203 North LaSalle Street
Suite 1900
Chicago, Illinois 60601-1293

*Attorneys for Defendants Menu Foods, Inc.
and Menu Foods Income Fund*

**HUGH J. TURNER, JR.**
E-Mail: hugh.turner@akerman.com
**AKERMAN SENTERFITT & EDISON**
350 E. Las Olas Boulevard
Suite 1600
Fort Lauderdale, Florida 33301-2229
Telephone: (954)463-2700
Facsimile:   (954)463-2224

*Attorneys for Defendant Publix Super Markets,
Inc.*

**GARY L. JUSTICE**
E-Mail: gjustice@gibsondunn.com
**CHARLES H. ABBOTT**
E-Mail: cabbott@gibsondunn.com
**GAIL E. LEES**
E-Mail: glees@gibsondunn.com
**WILLIAM EDWARD WEGNER**
E-Mail: wwegner@gibsondunn.com
**GIBSON DUNN & CRUTCHER LLP**
333 South Grand Avenue, Suite 4600
Los Angeles, California 90071-3197
Telephone: (213) 229-7000

*Attorneys for Defendant Nutro Products, Inc.*

**MARTY STEINBERG**
E-Mail: msteinberg@hunton.com
**ADRIANA RIVIERE-BADELL**
E-Mail: ariviere-badell@hunton.com
**HUNTON & WILLIAMS**
Mellon Financial Center
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile:  (305) 810-2460

*Attorneys for Defendant Nutro Products, Inc.*

**OMAR ORTEGA**
Email: ortegalaw@bellsouth.net
**DORTA & ORTEGA, P.A.**
Douglas Entrance
800 S. Douglas Road, Suite 149
Coral Gables, Florida 33134
Telephone: (305) 461-5454
Facsimile:   (305) 461-5226

*Attorneys for Defendant Mars, Inc.
and Mars Petcare U.S.*

**DANE H. BUTSWINKAS**
E-Mail: dbutswinkas@wc.com
**PHILIP A. SECHLER**
E-Mail: psechler@wc.com
**THOMAS G. HENTOFF**
E-Mail: thentoff@wc.com
**CHRISTOPHER  M. D'ANGELO**
E-Mail: cdangelo@wc.com
**PATRICK J. HOULIHAN**
E-Mail: phoulihan@wc.com
**WILLIAMS & CONNOLLY LLP**
725 12th Street, N.W.
Washington, DC  20005
Telephone: (202)434-5000

*Attorneys for Defendants Mars, Incorporated
and Mars Petcare U.S.*

CASE NO. 07-21221 CIV ALTONAGA/Turnoff
MALTZMAN FOREMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077

**BENJAMIN REID**
E-Mail: bried@carltonfields.com
**OLGA M. VIEIRA**
E-Mail: ovieira@carltonfields.com
**CARLTON FIELDS, P.A.**
100 S.E. Second Street, Suite 4000
Miami, Florida 33131-0050
Telephone: (305)530-0050
Facsimile: (305) 530-0050

*Attorneys for Defendants Colgate-Palmolive
Company and Hill's Pet Nutrition, Inc.*

**KARA L. McCALL**
kmccall@sidley.com
Sidley Austin LLP
One S. Dearborn Street
Chicago, ILL 60633
Telephone: (312) 853-2666

*Attorneys  for Defendants Colgate-Palmolive
Company and Hill's Pet Nutrition, Inc.*

**SHERRIL M. COLOMBO**
E-Mail: scolombo@cozen.com
**COZEN O'CONNOR**
200 South Biscayne Boulevard
Suite 4410
Miami, Florida 33131
Telephone: (305) 704-5945
Facsimile:  (305) 704-5955

*Attorneys for Defendant Del Monte Foods Co.*

**JOHN J. KUSTER**
jkuster@sidley.com
**JAMES D. ARDEN**
jarden@sidley.com
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019-6018
Telephone: (212) 839-5300

*Attorneys for Defendants Colgate-Palmolive
Company and Hill's Pet Nutrition, Inc.*

**RICHARD FAMA**
E-Mail: rfama@cozen.com
**JOHN J. McDONOUGH**
E-Mail: jmcdonough@cozen.com
**COZEN O'CONNOR**
45 Broadway
New York, New York 10006
Telephone: (212) 509-9400
Facsimile:   (212) 509-9492

*Attorneys for Defendant Del Monte Foods*

**C. RICHARD FULMER, JR.**
E-Mail: rfulmer@Fulmer.LeRoy.com
**FULMER, LEROY, ALBEE, BAUMANN,
&
GLASS**
2866 East Oakland Park Boulevard
Fort Lauderdale, Florida 33306
Telephone: (954) 707-4430
Facsimile:  (954) 707-4431

*Attorneys for Defendant The Kroger Co. of
Ohio*

**JOHN F. MULLEN**
**COZEN O'CONNOR**
E-Mail: jmullen@cozen.com
1900 Market Street
Philadelphia, PA 19103
Telephone: (215) 665-2179
Facsimile: (215) 665-2013

*Attorneys for Defendant Del Monte Foods, Co.*

**ROBERT C. TROYER**
E-Mail: rctroyer@hhlaw.com
**HOGAN & HARTSON**
1200 17th Street
 One Tabor Center, Suite 1500
Denver, Colorado 80202
Telephone: (303) 899-7300
Facsimile: (303) 899-7333

*Attorneys for Defendants Nestle U.S.A., Inc. and Nestle Purina Petcare Co.*

**JAMES K. REUSS**
E-Mail: jreuss@lanealton.com
**LANE ALTON & HORST**
Two Miranova Place
Suite 500
Columbus, Ohio 43215
Telephone: (614) 233-4719

*Attorneys for Defendant The Kroger Co. of Ohio*

**CAROL A. LICKO**
E-Mail: calicko@hhlaw.com
**HOGAN & HARTSON**
Mellon Financial Center
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone (305) 459-6500
Facsimile (305) 459-6550

*Attorneys for Defendants Nestle U.S.A., Inc. and Nestle Purina Petcare Co.*

**CRAIG A. HOOVER**
E-Mail: cahoover@hhlaw.com
**MIRANA L. BERGE**
E-Mail: mlberge@hhlaw.com
**HOGAN & HARTSON L.L.P.**
555 13th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Attorneys for Defendants Nestle U.S.A., Inc. and Nestle Purina Petcare Co.*

**ALAN G. GREER**
agreer@richmangreer.com
**RICHMAN GREER WEIL BRUMBAUGH MIRABITO & CHRISTENSEN**
201 South Biscayne Boulevard
Suite 1000
Miami, Florida 33131
Telephone: (305) 373-4000
Facsimile: (305) 373-4099

*Attorneys for Defendants Proctor & Gamble Co. and The Iams Co.*

**D. JEFFREY IRELAND**
E-Mail: djireland@ficlaw.com
**BRIAN D. WRIGHT**
E-Mail: bwright@ficlaw.com
**LAURA A. SANOM**
E-Mail: lsanom@ficlaw.com
**FARUKI IRELAND & COX**
500 Courthouse Plaza, S.W.
10 North Ludlow Street
Dayton, Ohio 45402

*Attorneys for Defendant Proctor & Gamble*
*Co. and The Iams Co.*

**RALPH G. PATINO**
E-Mail: rpatino@patinolaw.com
**DOMINICK V. TAMARAZZO**
E-Mail: dtamarazzo@patinolaw.com
**CARLOS B. SALUP**
E-Mail: csalup@patinolaw.com
**PATINO & ASSOCIATES, P.A.**
225 Alcazar Avenue
Coral Gables, Florida 33134
Telephone: (305) 443-6163
Facsimile: (305) 443-5635

*Attorneys for Defendants Pet Supplies "Plus"*
*and Pet Supplies Plus/USA, Inc.*

**CRAIG P. KALIL**
E-Mail: ckalil@aballi.com
**JOSHUA D. POYER**
E-Mail: jpoyer@abailli.com
**ABALLI MILNE KALIL & ESCAGEDO**
2250 Sun Trust International Center
One S.E. Third Avenue
Miami, Florida 33131
Telephone: (303) 373-6600
Facsimile: (305) 373-7929

*Attorneys for New Albertson's Inc. and*
*Albertson's LLC*

**JEFFREY S. YORK**
E-Mail: jyork@mcguirewoods.com
Sara F. Holladay-Tobias
E-Mail: sfhollad@mcguirewoods.com
**McGUIRE WOODS LLP**
50 N. Laura Street, Suite 3300
Jacksonville, FL 32202
Telephone: (904) 798-2680
Facsimile: (904) 360-6330

*Attorneys for Defendant Natura Pet Products,*
*Inc.*

**W. RANDOLPH TESLIK**
E-Mail: rteslik@akingump.com
**ANDREW J. DOBER**
E-Mail: adober@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD**
**LLP**
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile:   (202) 887-4288

*Attorneys for Defendants New Albertson's Inc.*
*and Albertson's LLC*