UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 07-21221-CIV-ALTONAGA/BROWN

RENEE BLASZKOWSKI, et al., individually
and on behalf of others similarly situated,

Plaintiffs,

vs.

MARS INC., et al.,

Defendants.

_____/

**DECLARATION OF DAN RAJCZAK IN SUPPORT OF DEFENDANT THE IAMS
COMPANY'S MOTION FOR PROTECTIVE ORDER TO LIMIT DISCOVERY**

STATE OF OHIO           )
                             ) SS:
COUNTY OF MONTGOMERY   )

      I am making this declaration based on personal knowledge available to me in my

position with The Iams Company d/b/a P&G Pet Care ("Iams"), and I am competent to testify to

the statements of fact set forth below.

I.        BACKGROUND

      1.      I am employed by Iams as its General Manager. Iams' mission is to

enhance the well-being of dogs and cats by providing world-class quality foods. I am

responsible for developing and directing the sales and marketing functions within Iams to

support that mission by coordinating and directing strategic plans for nutritionally-superior

products, and working with the Research and Development organization to ensure that Iams'

**Exhibit F**

Dockets.Justia.com

products comply with regulatory directives. Iams has been making and selling dog food for over 50 years, and it has over 900 employees throughout the United States. It is not an exaggeration to say that most, if not all, of these employees maintain or monitor electronic and paper files that must be reviewed in order to respond to all 376 of the document requests in the First, Second, and Third Request for Documents. I am responsible for the sales and marketing of Iams' products, which include the Eukanuba, Iams, and the Iams Veterinary Formulas brands.

      2.    I have reviewed the Fourth Amended Complaint ("Complaint") and I am familiar with the allegations that have been pled and alleged against Iams and most of the rest of the pet food industry (including most of Iams' competitors) in that Complaint. In addition, I have reviewed all 116 of the Documents and Things to be Produced in Plaintiffs' First Request for Production of Documents and Things to Defendant The Iams Company ("First Request for Documents"), all 102 of the Documents and Things to be Produced in Plaintiffs' Second Request for Production of Documents and Things to Defendant The Iams Company ("Second Request for Documents"), and all 158 of the Documents and Things to be Produced in Plaintiffs' Third Request for Production of Documents and Things to Defendant The Iams Company ("Third Request for Documents").

      3.    At my direction, employees of Iams investigated the documents and data available to and retained by the Iams to provide an estimate of the number of documents and amount of data and employee time that would be required to produce the requested documents and data to Plaintiffs in response to the First, Second, and Third Requests for Documents. This declaration describes the harm that could result to Iams' business, including the marketing and

2

business function of Iams, if Iams is required to respond to all 376 of the overbroad and unduly burdensome requests in Plaintiffs' First, Second, and Third Requests for Documents.

      4.    To produce all responsive documents and data to comply with the all 376 separate requests in the First, Second, and Third Requests for Documents, Iams' employees would be required to cease all other work for weeks and do nothing but search electronic and paper files in order to respond to these requests. Given the vast number of documents and amount of data that would need to be reviewed to respond to each of Plaintiffs' requests in the First, Second, and Third Requests for Documents, it is difficult to precisely estimate the costs as measured in employee hours and lost time devoted to Iams' business. However, while not considering the business cost and losses to Iams associated with ceasing any business function, I estimate that it would cost Iams several hundreds of thousands of dollars, or more, in out-of-pocket expenses and lost productivity in order to respond to each of the broad requests for documents and data in Plaintiffs' First, Second, and Third Requests for Documents. Responding to each and every one of Plaintiffs' 376 separate requests for documents and data would require most of the employees and personnel of the Iams to review most of the documents and data — if not every single document and every piece of data — that are currently in the possession of Iams. Iams would be left in the untenable position of having no business functions other than reviewing documents and data to respond to the 376 separate requests from Plaintiffs.

      5.    Moreover, much of the information requested by Plaintiffs, i.e., the quality assurance, quality control, and testing requests related to production and co-packers (First Set, Request Nos. 21-40 and 43-51), are located in at least five separate facilities. Iams has five

separate production facilities in the United States, including facilities in Dayton, Lewisburg, and

Leipsic, Ohio; Aurora, Nebraska; and Henderson, North Carolina. Each of these facilities

maintain documents associated with manufacturing standards of Iams, as well as any other

entities that provide raw materials or ingredients to Iams. Much of this information is

proprietary and confidential. It would include the formulations or "recipes" for Iams pet food

products that are known to only a few employees. This matter involves virtually every

competitor in the pet food industry as Defendants. If Iams is required to respond to the 376

requests in the First, Second, and Third Requests for Documents and disclosed all of the

materials requests without protection, then it would irreparably injure Iams' business through

these disclosures. This information should not be produced without an appropriate order limiting

strictly the terms of its disclosure.

II.        OVERBROAD AND UNDULY BURDENSOME REQUESTS

      A.        First Request for Documents

      6.        Request No. 3 and 4 in the First Request for Documents seeks every

document and every piece of data that Iams has in its possession regarding the "factual

information relating to any named Defendant [or former named Defendant] in this case regarding

any issue in this case." Plaintiffs have brought a lawsuit against almost every major competitor,

as well as Iams' largest customers in the dog and cat food industry. Plaintiffs' Complaint makes

wide-ranging allegations about the manufacturing, marketing, advertising, and sales conduct of

the industry over the past five years. Given the wide-ranging allegations in the Complaint,

Plaintiffs seek virtually every document about competitors, sales financials, sales forecasts, and

4

sales and marketing strategy in the possession of Iams.  It is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests.  It is clear, however, each and every document and piece of data that is in Iams' possession may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

      7.     Request No. 10 in the First Request for Documents seeks every document and piece of data that exists at Iams that relates "to internal investigations, reviews, evaluations or analysis reflecting the accuracy of [Iams] marketing, prices and promotional strategy." Iams markets, advertises, and sells 2 different brands of pet food products in several different countries throughout the world.  I understand from reviewing the Complaint that Plaintiffs' Allegations relate to only the "Iams[TM] brand" products (Complaint, ¶ 75) and the very nature of this lawsuit limits the allegations in the Complaint to advertising and products sold in the United States.  In that light, Iams conducts a review, evaluation, and analysis of each piece of marketing and advertising that is used to market and advertise Iams' products.  There have been thousands of different pieces of marketing and advertising for Iams pet food products in the last five years.  Plaintiffs basically seek every document that relates in any way to any marketing or advertising, including all substantiation for every advertising claim that Iams has made in the last five years, that is currently in the possession of Iams.  Iams has hundreds of thousands of documents that relate to its advertising claims.  Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these

5

requests. It is clear, however, each and every document and piece of data that is in Iams' possession that relates to each and advertising claim used by Iams in the last five years may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

8.     Request Nos. 21 through 31 in the First Request for Documents seeks each and every document and piece of data that relates in any way to Iams and any relationship with a co-packer. More specifically, Request No. 21 seeks "any and all agreements," Request No. 22 seeks "copies of all correspondence to and from [Iams] and any and all 'co-packer[s],'" Request No. 23 seeks "copies of all documents reflecting instructions . . . regarding the manufacturing of pet food," Request No. 24 seeks "all documents indicating . . . quality control instructions," Request No. 25 seeks " all documents indicating instructions regarding specific ingredient content and manufacturing," Request No. 26 seeks "any and all indemnity agreements," Request Nos. 27 through 29 seeks "all marketing and/or sales information provide by [Iams] to a co-packer," Request No. 30 and 31 seeks "policy and procedure manuals regarding all manufacturing standards and practices." Iams manufactures all of its dry food and only utilizes a co-packing manufacturer for a relatively small amount of product (basically wet canned and pouch dog and cat food). Nevertheless, Plaintiffs seek an enormous number of documents and amount of data. Iams has hundreds of thousands of documents that relate to co-packers. These documents include contracts, purchase orders, bills of lading and shipping documents, formulations, specifications for manufacturing, pricing information, quality assurance and

quality controls, correspondence, and many others. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession that was ever provided by Iams to — or received from — any co-packer or any document regarding the manufacturing standards and practices of Iams pet food may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

9.      Request Nos. 32 through 34 in the First Request for Documents seek every document and piece of data that relates in any way to Iams' standards and practices related to purchasing rendered materials that are currently in the possession of Iams. More specifically, Requests Nos. 32 through 34 seek "policies and procedure manuals regarding manufacturing standards and practices for [Iams'] pet food with companies from which [Iams or any third party] purchases rendered material to be used in pet food" and "documents indicating that [Iams] have inspected the rendering facilities from which [Iams] purchased rendered materials to be used in [Iams'] pet food, including when, where, what was specifically inspected and notes, memoranda or any other document related to such inspection" since January 1, 2003. These requests relate to many of Iams' raw materials. In essence, these requests seek every document that involves a supplier that provides, or may provide, any raw material that has been rendered. Iams has hundreds of thousands of documents that relate to the supply of these materials. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data

7

would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession regarding rendering need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

          10.     Request Nos. 44 through 51 in the First Requests for Documents seek every document that relates in any way to Iams and any rendering company that is currently in the possession of Iams. More specifically, Request Nos. 43 through 51 seek "documents that list or otherwise indicate all rendering facilities with which [Iams] do[es] business for use in any brand of [Iams] pet food" since January 1, 2003, "all documents reflecting [or from] rendering companies with which [Iams] do[es] business currently [within the past 10 years]," "all documents reflecting any inspections ['good processing practice'] at any rendering company with which [Iams] do[es] business currently [and in the past 10 years]," and "all documents relating to the contents of the rendered product that you received from rendering company(ies) with which [Iams] currently do[es] business [and did business for the last (10) years], including the presence of pentobarbital, euthanized cats and dogs and dead, dying and diseased animals." Again, these documents relate to the source of raw materials, and their production requires a review of all documents associated with raw materials — from analysis of potential sources to budgets and forecasts involved with costs to tests associated with their quality. Iams does not have any documents associated with euthanized cats and dogs or the presence of pentobarbital in Iams' products. Iams has hundreds of thousands of documents that relate to raw materials. Given the

8

wide-ranging request, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession regarding rendering need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

11.    Request Nos. 90 through 115 in the First Request for Documents seeks each and every document and piece of data in Iams' possession regarding veterinarians, veterinary students, schools, offices, clinics, and/or hospitals, nutrition courses, and marketing related to veterinarian recommended products. More specifically, Request Nos. 90 and 91 seek "all documents reflecting any and all marketing representations that any of [Iams'] [sic] [or anyone in [Iams] makes, or that any of [Iams] brands of pet food are veterinarian recommended." Request Nos. 92 and 93 seeks "all communications sent to [or received from] veterinarians regarding any and all of [Iams] commercial pet food products." Request Nos. 94 through 96 seek "all documents used by sales representatives to market to veterinarians, whether employed by [Iams] or a third party on its behalf," "the names, addresses and telephone numbers of any and all sales representatives for any and all of [Iams'] commercial pet food to veterinarians," and "all documents provided to sales representatives to market to veterinarians." Request No. 97 seeks "any and all agreements entered into with veterinarians regarding [Iams'] commercial pet food." Request Nos. 98 through 1000 seek "all documents reflecting funding for professorships in nutrition in veterinary schools," "any and all materials provided to veterinary students at

9

veterinary schools regarding nutrition for cats and dogs," and "all textbooks or other materials written or provided by [Iams] to veterinary students."  Request Nos. 101 and 102 seek "all materials from seminars held for veterinarians, including but not limited to, increasing the profitability of pet food sales," and "regarding increasing the profit for veterinary offices, clinics, and/or hospitals."  Request Nos. 103 through 105 seek "documents reflecting the total amount of money donated to veterinary schools annually for the past ten (10) years [or since 1980]." Request Nos. 106 through 108 seeks "all promotional and marketing materials provided to veterinary students [teaching faculty or veterinarians and veterinary hospitals] for the past ten (10) years."  Request No. 109 seeks "all documents reflecting any amount of money received by veterinarians, veterinary clinics and veterinary hospitals from [Iams] for promoting, selling, and/or distributing any of [Iams] commercial pet food products."   Request No. 110 seeks "documents reflecting endowments at veterinary schools, including but not limited to, the University of Missouri-Columbia College of Veterinary Medicine in Columbia[,] Missouri and the American College of Veterinary Nutrition."  Request Nos. 111 through 115 seek "documents reflecting all monies spent on funding research [or nutrition course] at [all] veterinary schools," "any caveats or requirements of monies for funding nutrition courses," and "documents and/or marketing studies reflecting profits based on sales for pet food made through veterinary offices, clinics and veterinary hospitals [and sales of [Iams] pet food recommended by veterinarians]." Iams makes a product that is sold only to veterinarians.  Iams Veterinary Formulas (formerly known as Eukanuba Veterinary Diets) is not sold to consumers.  These products are used to treat specialized pet ailments, and are sold only to veterinarians who, in turn, resell them to their patients.  The markets for these products are veterinarians, veterinary clinics, and anyone

10

associated with a veterinary clinic, such as universities that have clinics connected to the college of veterinary medicine. These products are marketed, sold, and occasionally tested at veterinary schools. All of these documents may be responsive to these requests. Iams has hundreds of thousands of documents that are currently in its possession regarding veterinarians, veterinary students, schools, offices, clinics, and/or hospitals, nutrition courses, and marketing related to veterinarian recommended products. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

12.    Request No. 116 in the First Request for Documents seeks all "agreements between you and veterinarians." Iams sells veterinary products and other products to veterinarians. Every sale is subject to an agreement — a purchase order which the veterinarian agrees to pay. All of those documents may be responsive. Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to this request. Responding to these requests alone could take Iams several weeks, if not months, to gather and review the necessary information.

B.    Second Request for Documents

13.    Request Nos. 63 through 71 in the Second Request for Documents seeks all documents that relate in any way to the Pet Food Institute ("PFI"). I have attended quarterly

11

PFI meetings on behalf of Iams for several years and am frequently accompanied by other Iams' personnel from research and development or regulatory. We address issues of common concern to the industry. Plaintiffs basically seek each and every document and piece of data that relates in any way to PFI that is currently in the possession of Iams. Iams has tens of thousands of documents that relate to PFI. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests other than it is massive

C.    Third Request for Documents

14.    Request Nos. 7 through 11, 13, 15 through 23, 25 through 30, and 32 through 36 in the Third Request for Documents seek each and every document and piece of data that is in the possession of Iams that relates in any way to Iams' contact with any breeder. Request Nos. 7 through 9 seek "all communications sent to [or received from] breeders regarding any and all of [Iams] commercial pet food products." Request No. 10 seeks "all documents reflecting the names, addresses and telephone numbers of any and all sales representatives for any and all of [Iams'] commercial pet food to breeders." Request No. 11 seeks "all documents or any other materials provided to sales representatives to market to breeders." Request No. 13 seeks "any and all material provided to breeders at dog and cat shows regarding [Iams] pet food

12

and nutrition for cats and dogs." Request Nos. 15 through 19 seek "all materials from seminars held for breeders," "documents reflecting the breeders who have been involved in any program that [Iams] ha[s] sponsored," "all promotional and marketing materials provided to breeders," and "all documents reflecting any amount of money or any form of compensation received by breeders for promoting, selling and/or distributing any of [Iams] commercial pet food products." Request Nos. 20 and 21 seek "documents and/or marketing studies reflecting profits based on sales of pet food through breeder recommendations." Request Nos. 22, 23, and 30 seek "'agreements between [Iams] and all breeders" and "all documents reflecting any contracts [Iams] ha[s] with breeders of cats and/or dogs relating to [Iams] pet food and/or treats." Request Nos. 25, 26, 32, and 33 seek "documents indicating the amount of free samples of pet food and/ore [sic] treats provided to breeders" and "any sort of program(s) that [Iams] ha[s] with dog and/or cat breeders relating to [Iams] dog and/or cat food." Request Nos. 27 through 29 and 34 through 36 seek "all materials sent to [from or complaints made by] breeders regarding [Iams] pet food." Breeders deal directly with pet owners or prospective pet owners and frequently answer questions about dog food products or make feeding recommendations. On an annual basis, Iams has thousands of "contacts" with breeders. These contacts may include marketing materials, samples and product information, and the information could come from sales and marketing, research and development or production. To request all documents concerning any "contact" is to require Iams to review all of its documents to determine if any contact relates to a breeder. Iams has tens of thousands of documents that relate to breeders. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and

13

piece of data that is in Iams' possession may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

15.    Request Nos. 24 and 31 in the Third Request for Documents seek each and every document and piece of data that is in the possession of Iams that relates to an Iams representative attending a dog or cat show. More specifically, both Request Nos. 24 and 31 seek "all documents indicating whether any representative from [Iams] attended any dog or cat shows between May 9, 2003 to the present, including the date of the cat or dog show and the name, address and telephone number of the persons who appeared at the dog or cat show." Iams has almost a thousand employees who may have at one time attended a dog or cat show and thousands of pages of documents that indicate whether the employee attended any dog or cat show. Many Iams' employees attend dog and cat shows as part of their job responsibilities. Some employees attend many dog and cat shows annually, and others may attend only one or two during the course of their employment with Iams. Dog and cat shows are used to help employees understand more about our customers. Iams does not know how many of its employees attend these shows annually and could not make that assessment without inquiring of every employee for the past 5 years. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide

14

responses to these requests.

16.     Request Nos. 38 through 43 in the Third Request for Documents seeks each and every document and piece of data that is in the possession of Iams that relates to pet food consumer knowledge of ingredients and nutrition. Iams engages in consumer research and some of that research involves consumer knowledge about pet food, including ingredients and nutrition. As discussed below, the research is proprietary; however, all of it "reflects" knowledge of nutrition. A relatively simple question, such as — how much do you feed your pet, is nutritionally-based because many owners overfeed their pets, which leads to nutritional ailments such as obesity. Given the wide-ranging requests, all of the consumer research must be reviewed in order to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession regarding consumer knowledge may need to be reviewed to respond to these requests. Given the breadth and the vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

17.     Request Nos. 44 through 46 in the Third Request for Documents seeks each and every document and piece of data that is in the possession of Iams regarding its relationship with advertising agencies. Request No. 44 seeks "documents reflecting all advertising agencies that [Iams] ha[s] hired to market [Iams] pet food, including the names of the individuals or companies, addresses and telephone numbers." Request Nos. 45 and 46 seek "all communications sent to [or received from] advertising agencies regarding marketing any or all of

15

[Iams] pet foods for the last ten (10) years." Iams uses advertising agencies for a variety of advertising and marketing projects. These agencies range from internet marketing and direct mail to point-of-sale and brochures to magazines, newspapers, and television. There are many agencies involved and there are many daily communications. Iams has tens of thousands of documents that are currently in its possession regarding the advertising agencies that it does business with. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession regarding advertising agencies may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

18.     Request Nos. 47 through 50, 58 through 63, 74 through 80, 87 through 92, and 102 in the Third Request for Documents seeks each and every document and piece of data in Iams' possession regarding marketing. Request No. 47 in the Third Requests for Documents seeks "all marketing materials developed or created to market any or all of [Iams'] commercial pet food whether the advertisement was intended for television, internet, print, radio or any other media, including any packaging or container used to sell pet food to consumers in the United States." Request No. 48 and 62 seeks "all marketing materials provided to any and all retail stores for the past ten (10) years relating to any and all of [Iams pet foods" and "all marketing, demonstration and sales materials used to sell and/or promote any of [Iams] pet food brands at any retail store, including employees of retail stores." Request Nos. 49 and 50 seek all marketing

16

studies that Iams conducted or obtained from any source since January 1, 2003. Request Nos. 58 and 59 seeks "all materials developed or created to market any or all of [Iams] commercial pet food for the last ten (10) years" and "documents reflecting who in [Iams] approved of all marketing materials developed or created to market any and all of [Iams] commercial pet food for the last ten (10) years." Request Nos. 60 and 61 seek "documents reflecting the organizational structure of [Iams'] sales and marketing employees" and "the names, addresses and telephone numbers of all current and former sales and marketing employees for the past five (5) years." Request Nos. 62 and 63 seek "all documents reflecting budgets for marketing any and all brands of [Iams] pet food, including grocery store brands." Request Nos. 74 through 77 and 80 seek "all marketing department reports, analyses and surveys identifying the target customer, including customer demographics, geographic areas and zip code capture," "all marketing and other incentives directed to breeders for exclusive marketing, selling and/or giving samples of [Iams] pet food to members of the public or potential customers [or offered to veterinarians, directed to shelter and rescue groups, or to retailers for exclusively selling [Iams] pet food]." Request Nos. 78 and 79 seek "any and all incentives to retailers to market any particular brand of [Iams] pet food" and "information exchanged between retailers and manufacturers regarding marketing and selling of [Iams] pet food." Request Nos. 87 and 92 seeks "all studies relating to marketing analyses indicating household income, ethnicity, age, income, and dollars spent, including per cat and dog" and "all documents, including marketing studies, analyses, reports and memoranda, regarding any brand manufactured and sold by a competitor." Request Nos. 88 through 91 seek "all documents indicating the persons responsible for approving of each brands' marketing and advertising materials, whether for written media,

17

television or any other media" and "all documents reflecting the extent of the knowledge of the highest ranking person in the marketing department [officer or veterinarian or medical scientist] of [Iams] as to what claims made in the marketing and promotional materials for each brand is supported by scientific study and research." Request No. 102 seeks "all documents reflecting any pet food and/or treats that were marketed to consumers directly, whether through providing samples or otherwise." These requests could be summarized as to provide all sales and marketing files for Iams for the past ten years as every category identified is an integral part of the marketing program for the Company. Iams has hundreds of thousands of documents that are currently in its possession regarding marketing. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests, but it is massive. It is clear, however, each and every document and piece of data that is in Iams' possession regarding marketing may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

19.    Request Nos. 51 through 55, 64 through 66, 81 through 86, and 105 through 108 in the Third Request for Documents seeks each and every document and piece of data that is in the possession of Iams regarding total sales, market share, and sales data. Request Nos. 51 through 53 seeks "all documents reflecting [Iams'] gross [and net] total sales of pet food by year from January 1, 2003 through the present [broken down by brand]." Request Nos. 54 and 55 seek "all documents that reflect [Iams'] total market share of the pet food industry by year

18

from January 1, 2003 to present [broken down by brand]." Request Nos. 64 through 66 seeks "any and all market comparisons and studies between any of [Iams'] brands of pet food and [Iams'] competitors," "any and all Euromonitor or other market studies of the pet food industry," and "all documents reflecting [Iams'] market share of the pet food industry, both as a whole and by brand, as opposed to [Iams'] competitors." Request 81 through 84 seek "all documents relating to [average] dollars per transaction [per sale] for each brand of pet food and reports and memoranda analyzing same," "relating to employee incentives to market and/or sell any brand of pet food and treats in terms of prizes, honors, bonus or money incentives," and "relating to sales staff force per hour." Request Nos. 85 and 86 seek "all records of customer target market, including names, addresses and telephone numbers, history of purchases, customer lists and lists of frequent buyers' names [sic] addresses, telephone numbers and brand of pet food and treats purchased, where purchased and when purchased," and "zip code analyses to indicate where and how to stock retail stores and demographics regarding customer bases." Request Nos. 105 through 107 seek "all internal accounting documents and reports that track profits via specific brands of [Iams] pet food" and "balance sheets for [and summaries of profits by Iams] and [Iams] pet food related companies for the past five years." Request No. 108 seeks "all studies, analyses, and other data maintained or kept by [Iams] relating to the finances of any pet food or treat competitor, including but not limited to, gross income, operating costs, marketing and advertising budget and detailed line items as to what specifically is budgeted and for what purpose, and where and how the money is intended to be spent." These documents pertain to every budget for every individual, department, organization, and entity within Iams. An individual salesperson has a budget for how he or she spends money on behalf of the Company.

19

Market share is analyzed by product, category (wet vs. dry), and brand (Eukanuba, Iams, and Iams Veterinary Formulas). Budgets exist for every function within Iams. Iams has thousands of documents that are currently in its possession regarding total sales and market share of itself and its competitors. Iams has a similar number of accounting records for each of its products. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession regarding its sales may need to be reviewed to respond to these requests, but it is massive. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

20.     Request Nos. 56, 57, and 67 through 73 in the Third Request for Documents seek each and every document and piece of data that is in the possession of Iams regarding customer research and surveys. Request No. 56 and 57 seek "all documents reflecting customer demographics for [Iams] pet food by geographic area of the United States" and "analysis of customer buying and spending habits on pet food and treats, including but not limited to, amounts spent per year on purchases of pet food by individual customers." Request Nos. 67, 70, and 71 seeks "all customer surveys that [Iams] have undertaken [conducted or requested] relating to [Iams] pet food brands and the reports and/or analyses based on those consumer surveys." Request No. 68 and 69 seeks "documents relating to any focus group that [Iams] ha[s] conducted [or requested a third party to undertake on [Iams'] behalf] relating to [Iams'] pet food brands and the reports and/or analyses based upon those customer surveys."

20

Request Nos. 72 and 73 seek "all internet based customer survey and/or focus group studies whereby [Iams] have [or requested a third party to] obtain information from individuals via the internet relating to [Iams'] brands of commercial pet foods." Again, these requests all relate to consumer research, but even more broadly than Request Nos. 38-43. Iams has hundreds of thousands of documents that are currently in its possession regarding consumer surveys. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession regarding consumer surveys may need to be reviewed to respond to these requests. Given the breadth and the vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

21.     Request Nos. 93 through 96 and 99 through 101 in the Third Request for Documents seek each and every document and piece of data that is in the possession of Iams regarding its use of sales representatives. More specifically, Request Nos. 93 and 94 seek "all documents reflecting the names, addresses and telephone numbers of any and all persons [and documents indicating the manner in which any and all persons were] paid by [Iams] to discuss and/or answer questions about [Iams] pet food and/or treats at any retail store in the United States." Request Nos. 95 and 96 seek "documents indicating the purpose for having representatives identifying themselves as having knowledge about [Iams] pet food and/or treats at retail stores," and "all manuals, hand outs, three dimensional objects or any other materials used by [Iams'] employees to train persons paid by [Iams] to discuss and/or answer questions

21

about [Iams] pet food and/or treats at any retail store in the United States."  Request Nos. 99

through 101 seek "documents reflecting the locations of all stores where your company paid

persons to discuss and/or answer questions about [Iams] pet food and/or treats to consumers

anywhere in the United States" and "all materials provided to persons paid by [Iams] [and to

Iams from persons paid by Iams] to discuss and/or answer questions about [Iams] pet food and/or

treats at any store in the United States."  Iams has sales employees who work with a variety of

customers large and small.  These employees are trained and have a variety of materials that are

utilized to sell Iams' products.  These requests ask for all materials used by all sales people to sell

products.  Iams has tens of thousands of documents that are currently in its possession regarding

sales representatives.  Given the wide-ranging requests, it is difficult to estimate exactly how

many documents and how much data would need to be reviewed to respond to these requests.  It

is clear, however, each and every document and piece of data that is in Iams' possession

regarding sales representatives may need to be reviewed to respond to these requests.  Given the

breadth and vague nature of these requests, it is impossible to determine how many documents

and the amount of data that would need to be reviewed by Iams to provide responses to these

requests.

22.    Request Nos. 103 through 104 in the Third Request for Documents seek

each and every document filed by Iams and The Procter & Gamble Company ("Procter &

Gamble") with the Securities and Exchange Commission for the past five (5) years, and

"transcripts of all investor conferences."  Procter & Gamble is not a party to this lawsuit, and

Iams is not a publicly-traded company; thus, Iams has not filed and is not required to file any

documents with the Securities and Exchange Commission. Iams is a small part of Procter &

Gamble's overall business, and Procter & Gamble has filed hundreds of documents with the

Securities and Exchange Commission since 2003. Those documents are publicly available, and

can be obtained by Plaintiffs as easily as they can be obtained by Procter & Gamble.

    23. Request Nos. 109 and 110 in the Third Request for Documents seek each

and every document and piece of data that is in the possession of Iams regarding "the differences

between pet food purchased at grocery stores and 'premium' [and 'ultra-premium'] pet food."

Iams has thousands of documents that are currently in its possession regarding the differences in

pet food products. Iams sells its Iams brand products to groceries and all retail outlets; Iams

Veterinary Formulas are sold only to veterinarians; and Eukanuba products are sold to pet

specialty retailers. "Ultra-premium" may have many meanings, but is not a term used by Iams.

Again, this request basically asks for any and all marketing materials. Given the wide-ranging

requests, it is difficult to estimate exactly how many documents and how much data would need

to be reviewed to respond to these requests. It is clear, however, each and every document and

piece of data that is in Iams' possession regarding product sales may need to be reviewed to

respond to these requests. Given the breadth and vague nature of these requests, it is impossible

to determine how many documents and the amount of data that would need to be reviewed by

Iams to provide responses to these requests.

    24. Request Nos. 113 through 154, 156, and 157 in the Third Request for

Documents seek each and every document and piece of data that are the possession of the R&D

Department regarding testing of Iams' products or competitors' products for issues relating to

23

pentobarbital, DNA and PCR testing, testing for BHA and BHT, and ethoxyquin. Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests, but it is massive. Again, all documents and data must be reviewed to determine whether tests were conducted for any of these substances. Responding to these requests alone could take the R&D Department several weeks, if not months, to gather and review the necessary information.

III.    COMPETITIVE INFORMATION REQUESTED BY PLAINTIFFS

25.    Iams manufactures dry and wet (canned) dog and cat food. Iams sells its products through either: (i) independently owned and operated distributors that, in turn, resell the products to retailers; or (ii) large, multi-location pet specialty retailers, groceries and supermarkets, and mass-market stores that purchase directly from Iams. Iams competes directly against all dog and cat food manufacturers, including: (i) well-established manufacturers that sell to groceries and specialty retailers; (ii) manufacturers that sell to specialty retailers; and (iii) grain companies that co-pack products for others. As explained below, each of these competitors (most of which are also Defendants in this case) would be very interested in Iams' confidential business information. Iams could be irreparably injured if the information was disclosed intentionally or inadvertently.

26.    Plaintiffs have requested confidential and propriety information that would be beneficial to a competitor, including Iams' marketing practices and procedures, prices, promotional strategy (First Request for Documents No. 9); internal investigations, reviews, evaluations or analyses of pet food (First Request for Documents No. 10); employee confidential

24

information (First Request for Document No. 12-15); co-packer agreements and related documents (First Request for Documents Nos. 21 through 31); manufacturing standards and practices (First Request for Documents Nos. 32 through 34); competitive tests and information (First Request for Documents Nos. 35 through 40); contracts with rendering facilities and related documents (First Request for Documents Nos. 43 through 51); ingredient information (Second Request for Documents Nos. 1, 17, 23, 27, 37, 38, and 44 through 62); product advantage/benefit studies (Second Request for Documents Nos. 17,18, 22, 23, and 26 through 32); advertising and marketing materials (Third Request for Documents Nos. 7 through 11, 13, 15 through 23, 25 through 30, 32 through 36, 44 through 46, 47 through 50, 58 through 63, 74 through 80, 87 through 92, and 102); consumer research (Third Request for Documents Nos. 38 through 43, 56, 57, and 67 through 73); sales and market share data (Third Request for Documents Nos. 51 through 55, 64 through 66, 81 through 86, 93 through 101, and 105 through 110); competitor research (Third Request for Documents Nos. 111 through 112); and product testing (Third Request for Documents Nos. 113 through 158). This confidential and proprietary information would be valuable to competitors, and Iams would be harmed irreparably if this confidential information fell into the hands of competitors or customers.

       27.    Much of the requested information is extremely confidential and proprietary to Iams, and it would be very beneficial to competing manufacturers, retailers or other vendors. If those parties had this information, then they would have an unfair advantage over Iams in the marketplace. Indeed, much of the information that has been requested is disclosed only to individuals within the highest levels of Iams' senior management, and this

information is not generally known or disclosed to others within the Company. Other information, such as sales, is disclosed only on a need-to-know basis. All of this information, if disclosed to a competitor, would be exceedingly valuable.

28.    The documents requested by Plaintiffs would show, among other things, the basis for Iams' business decisions, information that Iams has accumulated from public sources concerning its competitors, Iams' internal analysis of that information in order to identify market and industry trends, Iams' profitability, etc. This information is highly proprietary and confidential. If disclosed without protection, then it would irreparably injure Iams. This information should not be produced without an appropriate order limiting strictly the terms of its disclosure. Iams' business plans and strategy are based, in part, upon what it anticipates its large manufacturing rivals plan to do in the marketplace — what it can reasonably anticipate that Nestle Purina, Mars, Hill's, and Nutro will do. It must also consider the presence of co-packers, and product that is manufacturers by co-packers and sold by other competitors, like PetSmart and Wal-Mart. That decision-making will affect the way Iams distributes and does not distribute its products, the reasons for making changes to its distribution system, its sales, the customers that it chooses to do business with directly, negotiations with direct buying accounts, pricing, the type of information it accumulates and analyzes about its competitors, and the type of business strategies it will employ in promotions and advertising, e.g., whether advertising should be at the national level through television commercials or whether it should be at the local level, whether it should be in cooperative advertising programs, whether it should be in couponing programs, etc. The success or failure of these plans is reflected in sales information, financial statements

and internal business plans.  In competing directly against its various manufacturing rivals, all these factors must be taken into consideration, and all of this confidential and proprietary information is included in the requests identified above.

      29.    Any information of Iams that would explain, describe or suggest what it did or did not do to compete against its manufacturing rivals will be obviously of interest to its competitors.  Disclosure of this and all of the other confidential and proprietary information needs to be limited in order to avoid harming Iams irreparably.

      30.    Iams understands that it is involved in a lawsuit with Plaintiffs and other Defendants, and that many of the other Defendants are competitors of Iams.  Iams understands that discovery requests have been served and it must respond to reasonable requests for documents.  In doing so, Iams must make sure that disclosure of its proprietary and confidential information is limited.  There is great risk of harm to Iams and its employees from even an inadvertent disclosure of information.  A strict protective order is necessary in order for Iams' information to be produced.

      31.    The protective order should limit the disclosure of Iams' confidential research, development, marketing, and other proprietary commercial information.  Iams has taken this position in other lawsuits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 22, 2008.

_____
DAN RAJCZAK

28