UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 07-21221-CIV-ALTONAGA/BROWN

RENEE BLASZKOWSKI, et al., individually
and on behalf of others similarly situated,

                                        Plaintiffs,

vs.

MARS INC., et al.,

                                        Defendants.
_____/

**DECLARATION OF MELISSA MONICH IN SUPPORT OF DEFENDANT THE IAMS COMPANY'S MOTION FOR PROTECTIVE ORDER TO LIMIT DISCOVERY**

STATE OF OHIO            )
                         ) SS:
COUNTY OF MONTGOMERY     )

            I am making this declaration based on personal knowledge available to me in my

position with The Iams Company d/b/a P&G Pet Care ("Iams"), and I am competent to testify to

the statements of fact set forth below.

I.          BACKGROUND AND SUMMARY

            1.          I am employed by Iams as its Manager of the Research & Development

Department at Iams ("R&D Department").  The mission of Iams is to enhance the well-being of

dogs and cats by providing world-class quality foods.  The R&D Department is integral to

achieving Iams' mission.  I am responsible for developing and directing the research and

development organization within Iams to support the products, technology, and research to

enhance Company growth, to develop and direct strategic plans for nutritionally superior

CASE NO. 07-21221-CIV-ALTONAGA/BROWN
DECLARATION OF MELISSA MONICH IN SUPPORT OF DEFENDANT THE IAMS COMPANY'S
MOTION FOR PROTECTIVE ORDER TO LIMIT DISCOVERY

Exhibit H

Dockets.Justia.com

products, and to assure regulatory compliance. Any of the requests for documents relating to

ingredients, research, standards (for production and co-packers), regulatory communications, and

compliance with the state and federal governments (Food & Drug Administration ("FDA") and

United States Department of Agriculture ("USDA")) all fall within the purview of the R&D

Department. It is not an exaggeration to say that of the more than 200 people who report to me,

all of them maintain or monitor electronic and paper files that must be reviewed in order to

respond to these requests.

   2. I have reviewed the Fourth Amended Complaint ("Complaint") and I am

familiar with the allegations against Iams and others that produce and sell dog and cat food. In

addition, I have reviewed all 116 of the Documents and Things to be Produced in Plaintiffs' First

Request for Production of Documents and Things to Defendant The Iams Company ("First

Request for Documents"), all 102 of the Documents and Things to be Produced in Plaintiffs'

Second Request for Production of Documents and Things to Defendant The Iams Company

("Second Request for Documents"), and all 158 of the Documents and Things to be Produced in

Plaintiffs' Third Request for Production of Documents and Things to Defendant The Iams

Company ("Third Request for Documents").

   3. I have investigated the documents and data available to and retained by the

R&D Department to provide an estimate of the number of documents and amount of data and

employee time that would be required to produce the requested documents and data to Plaintiffs

in response to the First, Second, and Third Requests for Documents. This declaration describes

the effort and burden necessary to respond to all 376 requests in Plaintiffs' First, Second, and

Third Requests for Documents, as well as the harm that could result to the R&D Department and

the Company's business if Iams is required to respond to all of the overbroad and unduly burdensome requests

4.     To produce all documents and data responsive to comply with the 376 separate requests in the First, Second, and Third Requests for Documents, the R&D Department would be required to cease all other work for several weeks — or more — and do nothing but respond to these requests.  Given the vast number of documents and amount of data that would need to be reviewed to respond to the First, Second, and Third Requests for Documents, it is difficult to precisely estimate the cost to Iams in terms of lost time associated with the research and development aspect of Iams' business.  However, while not considering the business costs and losses to Iams associated with ceasing any R&D Department business functions, I estimate that it would cost Iams hundreds of thousands of dollars per week, or more, in out-of-pocket expenses and lost productivity in order to respond to each of the broad requests for documents and data in Plaintiffs' First, Second, and Third Requests for Documents.  Responding to each and every one of Plaintiffs' 376 separate requests for documents and data would require employees and personnel of the R&D Department to review most of the documents and data — if not every single document and every piece of data — that are currently in its possession of the R&D Department.  The R&D Department would be left in the untenable position of having no business functions other than reviewing documents and data to respond to the 376 separate requests from Plaintiffs.  Other Iams Company technical functions, including Purchasing, Quality Assurance, and Manufacturing, would also have a similar cost and lost productivity impact.

5.     Moreover, much of the information requested by Plaintiffs is highly proprietary and confidential.  Iams' R&D Department facility is located in Lewisburg, Ohio, and

it is a separate facility that is located approximately 20 miles from Iams' corporate office. The facility is gated and protected by external security, and an Iams' employee from the corporate office cannot gain access to the research and development facility without permission. All visitors — even if an Iams' employee — must register before being allowed to enter the facility. Research information is protected from other employees and formula information, i.e., the "recipes" for our products, are known to only a few people. If disclosed without protection (as it is likely to be to other Defendants in this matter), then it would irreparably injure Iams. This information should not be produced without an appropriate order that limits the production to Plaintiffs only, and is not disclosed to any Defendants. This matter involves virtually every one of Iams' competitors in the pet food industry as Defendants. If Iams is required to respond to the 376 requests in the First, Second, and Third Requests for Documents and disclose all of the materials requested without protection, then it would irreparably injure Iams' business. This information should not be produced without an appropriate order limiting strictly the terms of its disclosure.

II.      OVERBROAD AND UNDULY BURDENSOME REQUESTS

         A.      First Request for Documents

         6.      Request No. 10 in the First Request for Documents seeks every document Iams uses to support every advertising claim that it has made in any media for the last five years — "all documents related to internal investigations, reviews, evaluations or analyses reflecting the accuracy of [Iams'] marketing and advertising for any of [Iams'] pet food brands" since January 1, 2003. Iams markets, advertises and sells two different brands of pet food products in several different countries throughout the world. I understand from reviewing the Complaint that

Plaintiffs' allegations relate only to the "Iams™ brand" product (Complaint, ¶ 75), and is limited to advertising and products sold in the United States. The R&D Department reviews each piece of advertising, and there have been hundreds of different individual pieces of advertising for Iams pet food products in the last five years. Plaintiffs basically seek every document that relates in any way to the substantiation for every advertising claim that Iams has made in the last five years. The R&D Department, like other departments at Iams, has thousands of documents that are used to support advertising claims. Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would be responsive to this request. It is clear, however, that each and every document and piece of data in the R&D Department would need to be reviewed to respond to this request. Given the breadth and the vague nature of this request, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to this request.

    7.    Request No. 11 in the First Request for Documents seeks every document that relates in any way to any speech or presentation made about any pet food that is currently in the possession of Iams — "all speeches, presentations made or submitted to any consumer groups, government agencies, industry or trade group by [Iams] or on [Iams'] behalf" since January 1, 2003. Iams products are based on extensive research. There are many veterinarians and research scientists who conduct research related to pet food. In the past five years, Iams has also relied on third parties to assist research. These veterinarians and research scientists (and the third-party researchers) have made or contributed to numerous speeches and presentations to consumer groups, governmental agencies, and industry or trade groups. These speeches and presentations range from informal presentations to Rotary Clubs or similar groups to formal presentations

made to the FDA.  The R&D Department, like other departments at Iams, has thousands of documents that relate to speeches or presentations made about our pet food.  Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would be responsive to this request.  It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to this request.  Given the breadth and the vague nature of this request, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to this request.

8.      Request Nos. 12 through 15 in the First Request for Documents seek every document and piece of data that exists at Iams that was sent to or received from either the United States or any state government.  More specifically, Request Nos. 12 through 15 seek "all documents" since January 1, 2003, that were "sent to or received" by Iams or "any third party on [Iams'] behalf" to "any branch of the United States government" or "state government."  Iams has substantial interaction with the United States and state governments.  Much of this interaction and information, such as tax information, Equal Employment Opportunity Commission compliance information, workers' compensation, and many other categories have nothing to do with the substance of any allegations in Plaintiffs' Complaint.  In fact, Plaintiffs' request would require Iams to produce thousands of documents that have absolutely nothing to do with any allegation in Plaintiffs' Complaint.  Given the breadth and the vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by the R&D Department to provide responses to these requests.

9.      Request Nos. 32 through 34 in the First Request for Documents seek every

document and piece of data that relate in any way to Iams' standards and practices related to purchasing rendered materials that are currently in the possession of Iams. More specifically, Request Nos. 32 through 34 seek "policies and procedure manuals regarding manufacturing standards and practices for [Iams'] pet food with companies from which [Iams or any third party] purchases rendered material to be used in pet food" and "documents indicating that [Iams] has inspected the rendering facilities from which [Iams] purchased rendered materials to be used in [Iams'] pet food, including when, where, what was specifically inspected and notes, memoranda or any other documents related to such inspection" since January 1, 2003. Purchasing is not an R&D Department function; however, the R&D Department has input into the standards and ingredients that are utilized, and it is familiar with the high standards that have been developed and implemented by Iams with its suppliers. The R&D Department, like other departments at Iams, has thousands of documents that relate to Iams' standards and practices related to purchasing rendered materials. Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and the vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

10.    Request Nos. 35 through 40 in the First Request for Documents seek every document that relates in any way to any test on any pet food that has been performed by Iams and is currently in the possession of Iams. More specifically, Request Nos. 35 through 40 seek "documents revealing the tests [Iams] performed and information gathered on each and every

brand of pet food manufactured and produced [and every material produced] by you [a co-packer] for quality assurance, wholesomeness, to ensure that it is fit for its intended purpose and is free of any substance that could cause harm to a cat [or dog]" since January 1, 2003. Every Iams product must meet certain tests established by the Association of American Feed Control Officials ("AFFCO"). All of these test results are maintained by the R&D Department. In addition, the R&D Department is familiar with quality control and quality assurance ("QC/QA") testing that exists at every Iams production facility in the United States. Iams' R&D Department has thousands of documents that are currently in its possession that may relate to testing on any pet food. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and the vague nature of this request, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

11.     Request Nos. 43 through 51 in the First Request for Documents seek every document that relates in any way to Iams and any rendering company that is currently in the possession of Iams. More specifically, Request Nos. 43 through 51 seek "documents that list or otherwise indicate all rendering facilities with which you do business for use in any brand of [Iams] pet food" since January 1, 2003, "all documents reflecting [or from] rendering companies with which [Iams] do[es] business currently [within the past 10 years]," "all documents reflecting any inspections ['good processing practice'] at any rendering company with which [Iams] do[es] business currently [and in the past 10 years], and "all documents relating to the contents of the

rendered product that you received from rendering company(ies) with which [Iams] currently

do[es] business [or did business for the last (10) years], including the presence of pentobarbital,

euthanized cats and dogs and dead, dying and diseased animals." Again, Iams suppliers are held

to high standards and the types of responsive documents — contracts, purchaser orders, QC/QA

records, and specifications that all suppliers must follow in order to do business with Iams — are

voluminous. Iams' R&D Department has thousands of documents that are currently in its

possession that may relate to Iams and any rendering company. Other Iams technical

departments, including Quality Assurance, Purchasing, and Manufacturing, also have thousands

of documents currently in their possession that may relate to Iams and any rendering company.

Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how

much data would be responsive to these requests. It is clear, however, that each and every

document and piece of data that are in the possession of the R&D Department would need to be

reviewed to respond to these requests. Given the breadth and the vague nature of these requests,

it is impossible to determine how many documents and the amount of data that would need to be

reviewed by Iams to provide responses to these requests.

       12.    Request Nos. 52 through 70 in the First Request for Documents seeks all

documents that are currently in Iams' possession that relate in any real way to AAFCO. More

specifically, Request Nos. 52 through 70 seek "any documents reflecting membership in AAFCO

[and all documents from AAFCO] and the purpose of joining, becoming a member and/or

associating with AAFCO," "all documents sent to [and received from] AAFCO for the past (10)

years," "all documents that [Iams] have received from third parties that [Iams] provided to

AAFCO," "all documents that [Iams] have copies of that were provided by a third party to

AAFCO that relate to pet food," "mandatory [and voluntary] testing conducted by [submitted to] AAFCO and the results of such testing and the documents relating to the results of the testing," "any and all inspections of manufacturing [rendering companies with which [Iams] do[es] business by AAFCO [personnel] and documents relating to the results of the testing," and "any and all documents relating to the use of exthoxyquin [BHA and BHT] in pet food sent to or received from AAFCO. Iams does business throughout the United States and every state participates in some way with AAFCO. Essentially, these requests seek each and every communication with AAFCO. There are several persons from Iams who interact daily with AAFCO, attend AAFCO meetings, and ensure that AFFCO's standards are followed by Iams. Iams' R&D Department has thousands of documents that are currently in its possession that may relate to AAFCO. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and the vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

B.    <u>Second Request for Documents</u>

13.    Request No. 1 in the Second Request for Documents seeks "documents that reflect the ingredients for each brand of pet food for the past (10) years." Iams has thousands of documents that are currently in its possession regarding the ingredients that are in (or have been in) its pet food for the past ten years. Ingredients are studied, examined, and tested on a daily basis. Test formulations are reviewed, and changes are made to formulas. Every

person in the R&D Department is affected, directly or indirectly, by ingredients and ingredient changes. Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to this request. It is clear, however, each and every document and piece of data that is in Iams' possession may need to be reviewed to respond to this request. Given the breadth and the vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to this request.

14.    Request Nos. 17, 23, 27, and 45 through 50 seek every research document currently in Iams' possession that deals with glucosamine, chondroitin, Omega-3 fatty acid, longevity, tartar, plaque, and the use of animal protein and vegetables in Iams' products. Request Nos. 17, 23, and 27 in the Second Request for Documents seek "all documents reflecting any benefit, long-term or otherwise, from including glucosamine [chondroitin, and Omega-3 fatty acid] in pet food" since January 1, 2003. Similarly, Request Nos. 28 seeks "any and all scientific evidence reflecting any benefit, long-term or otherwise, from including Omega-3 fatty acids in pet food and Request Nos. 29 through 32 seek "all documents reflecting that any ingredient, or combination of ingredients in [Iams] pet food will make a cat [or dog] live a long life [or prevent tartar or plaque from accumulating.]" Request Nos. 45 and 46 seek "documents reflecting any studies or analyses of the amount of meat, i.e., animal proteins [or real vegetables] that is [are] available for consumption by a cat or dog after processing." Request Nos. 47 and 48 seek "documents reflecting the source of the 'fiber' [and the basis for the use of ethoxyquin] in any of [Iams] pet foods by brand. Requests Nos. 49 and 50 seek "all documents reflecting studies conducted by [Iams] of what ingredients in [Iams] pet food appeal most to a dog [or cat]." Any

response to the above requests would require, among other things, a review by the R&D Department of every document and piece of data that relates to any clinical data, clinical reports, lab notebooks, technical summaries and reports, and claim-supporting documents. These documents are highly proprietary, as discussed below, and they are maintained the nutritionists, veterinarians, and scientists employed by Iams. In summary, all documents and data from the R&D Department would need to be reviewed. Iams' R&D Department has hundreds of thousands of documents that are currently in its possession that may relate to glucosamine, chondroitin, Omega-3 fatty acid, longevity, tartar, plaque, and the use of animal protein and vegetables in Iams' products. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and the vague nature of this request, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

15.    Request Nos. 35 through 38 and 44 through 62 in the Second Request for Documents seek every document that relates in any way to any ingredient that is currently in or has ever been in any one of Iams' pet foods that are currently in the possession of Iams. Request Nos. 35 and 36 seek "all documents reflecting that the use of soy may cause illness in a cat [or dog]." Request Nos. 37 and 38 seek "documents reflecting the nature and source of any and all 'real meat' [or 'real vegetables'] in any of [Iams] pet food by brand." Request No. 44 seeks "documents reflecting the origin by country of each and every ingredient used in [Iams] pet food by brand and by ingredient." Request Nos. 45 and 46 seek "documents reflecting any studies or

analyses of the amount of meat, i.e., animal protein [or real vegetables] that are available for consumption by a cat or dog after processing." Request Nos. 47 and 48 seek "documents reflecting the source of the 'fiber' [or basis for the use of ethoxyquin] in any of [Iams] pet foods by brand." Request Nos. 49 and 50 seek "all documents reflecting the studies conducted by [Iams] of what ingredients in [Iams] pet foods appeal most to a dog [or cat]." Request Nos. 51 and 52 seek "all documents reflecting what matter is sprayed onto each brand of [Iams] dry cat [or dog] food." Request Nos. 53 through 55 seek "all documents reflecting that the 'meat' ['vegetables,' and 'grains'] used in [Iams] pet food are non-human grade, i.e., inedible for human consumption." Request Nos. 56 and 57 seek "documents reflecting purchase(s) made by Iams [or any co-packer with which [Iams] do[es] business] for use in the manufacturing and production of pet food, including what was purchased, the quality, grade, from where it was purchased, when it was purchased and what the material was intended to be used for in the manufacture and production of any brand of [Iams] pet food." Request No. 58 seeks "documents reflecting the source of any proteins used by [Iams] or any co-packer in the production and manufacture of any brand of pet food that are not animal proteins, including the names of the non-animal type of proteins, the quantities used, and the purpose for which each non-animal protein is used." Request Nos. 59 through 62 seek "documents reflecting any and all ingredients used by [Iams] in the manufacture and production of all brands of pet food for the past five years [and between 1980 and 1995]" and "all documents reflecting any initial change(s) made in ingredients [including prior to the acquisition and/or sale of any [sic] and pet food brands that you purchased or acquired since 1975]." Iams has thousands of documents that are currently in its possession regarding the ingredients that are currently in or have ever been in any one of Iams pet foods. Given the wide-ranging requests, it is difficult to estimate exactly how many

documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession may need to be reviewed to respond to these requests. Given the breadth and the vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

16.     Request Nos. 63 through 71 in the Second Request for Documents seek all documents that relate in any way to the Pet Food Institute ("PFI"), including all research materials and documents relating to the use of ethoxyquin, BHA, and BHT. Plaintiffs basically seek each and every document and piece of data that relate in any way to PFI that is currently in the possession of Iams. PFI is a trade association and there are ongoing discussions between Iams and PFI on many subjects. Iams' R&D Department has thousands of documents that are currently in its possession that may relate to the PFI. Personnel from the R&D Department attend PFI meetings, depending on the issue being reviewed. Given the wide ranging requests, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

17.     Request Nos. 72 through 82 in the Second Request for Documents seek all documents that relate in any way to the FDA, including all inquires, correspondence, and investigations conducted by the Center for Veterinary Medicine, FDA, AAFCO or PFI since

January 1, 2003. Regulatory compliance is a major part of the R&D Department's work. Again, many employees work daily with the FDA, AAFCO, and PFI. Plaintiffs basically seek each and every document and piece of data that relate in any way to the FDA. Iams' R&D Department has thousands of documents that are currently in its possession that may relate to the FDA. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

18.     Request Nos. 83 through 94 in the Second Request for Documents seek all documents that relate in any way to the USDA, including all testing, inspections and/or investigations conducted by the USDA since January 1, 2003. Plaintiffs basically seek each and every document and piece of data that relates in any way to the USDA that is currently in the possession of Iams. Iams' R&D Department has thousands of documents that may relate to the USDA. Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

19.     Request Nos. 94 through 102 in the Second Request for Documents seek

all documents that relate in any way to any state agriculture department or regulatory agencies or offices, including documents provided by anyone to those departments or regulatory agencies or offices and all testing, inspections and/or investigations conducted by the USDA since January 1, 2003. These requests are broader than AAFCO because AFFCO relates only to feed officials, and agriculture is a broader category. Again, all documents would need to be reviewed to determine what is responsive. Plaintiffs basically seek each and every document and piece of data that relate in any way to the any state agriculture department or regulatory agencies or offices that are currently in its possession of Iams. Iams' R&D Department has thousands of documents that are currently in its possession that may relate to state agriculture department or regulatory agencies or offices. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would be responsive to these requests. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

  C.  <u>Third Request for Documents</u>

  20.  Request Nos. 109 through 112 in the Third Request for Documents seek each and every document and piece of data that are the possession of the R&D Department regarding testing of Iams' products or competitors' products. More specifically, Request Nos. 109 and 110 seek "all documents reflecting the difference between pet food purchased at grocery stores and "premium" [or "ultra-premium"] pet food, and Request Nos. 111 and 112 seek "all documents reflecting testing of Iams [and its competitors'] brands of pet food." In order to

compete effectively, Iams evaluates its own products and products from its competitors. All of this analysis is conducted by the R&D Department. Iams' R&D Department has thousands of documents that are currently in its possession regarding testing of Iams' products or competitors' products. Given the wide-ranging request, it is difficult to estimate exactly how many documents and how much data would be responsive to this request. It is clear, however, that each and every document and piece of data that are in the possession of the R&D Department would need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

   21. Request Nos. 113 through 158 in the Third Request for Documents seek each and every document and piece of data that is the possession of Iams regarding testing of Iams' products or competitors' products for issues relating to pentobarbital, DNA and PCR testing, testing for BHA and BHT, ethoxyguin, bioavailability, and feeding trials of pet food. Iams has thousands — if not millions — of documents that are currently in the possession regarding testing of pet food. Given the wide-ranging requests, it is difficult to estimate exactly how many documents and how much data would need to be reviewed to respond to these requests. It is clear, however, each and every document and piece of data that is in Iams' possession regarding product testing may need to be reviewed to respond to these requests. Given the breadth and vague nature of these requests, it is impossible to determine how many documents and the amount of data that would need to be reviewed by Iams to provide responses to these requests.

D.    Summary

22.    The First, Second, and Third Requests for Documents require virtually every piece of paper and electronic document generated or maintained by the R&D Department. These include the files — paper and electronic — of more than 200 current employees. Such a review could take months and the costs would be enormous. The effect on the Company's business would be devastating.

III.    COMPETITIVE INFORMATION REQUESTED BY PLAINTIFFS

23.    Iams manufactures dry and wet (canned) dog and cat food. Iams sells its products through either: (i) independently owned and operated distributors that, in turn, resell the products to retailers; or (ii) large, multi-location pet specialty retailers, groceries and supermarkets, and mass-market stores that purchase directly from Iams. Iams competes directly against all dog and cat food manufacturers, including: (i) well-established manufacturers that sell to groceries and specialty retailers; (ii) manufacturers that sell to specialty retailers; and (iii) grain companies that co-pack products for others. As explained below, each of these competitors (most of which are also Defendants in this case) would be very interested in Iams' confidential business information. Iams could be irreparably injured if the information was disclosed intentionally or inadvertently.

24.    Plaintiffs have requested confidential and propriety information that would be beneficial to a competitor, including Iams' marketing practices and procedures, prices, promotional strategy (First Request for Documents No. 9); internal investigations, reviews, evaluations or analyses of pet food (First Request for Documents No. 10); co-packer agreements and related documents (First Request for Documents Nos. 21 through 31); manufacturing

standards and practices (First Request for Documents Nos. 32 through 34); competitive tests and information (First Request for Documents Nos. 35 through 40); contracts with rendering facilities and related documents (First Request for Documents Nos. 43 through 51); ingredient information (Second Request for Documents Nos. 1, 37, 38, and 44 through 62); product advantage/benefit studies (Second Request for Documents Nos. 17,18, 22, 23, and 26 through 32). This confidential and proprietary information would be valuable to competitors, and Iams would be harmed irreparably if this confidential information fell into the hands of competitors.

25.    Much of the requested information is extremely confidential and proprietary to Iams, and it would be very beneficial to competing manufacturers, retailers or other vendors. If those parties had this information, then they would have an unfair advantage over Iams in the marketplace. Indeed, much of the information that has been requested is disclosed only to individuals within the highest levels of Iams' senior management, and this information is not generally known or disclosed to others within the Company. Other information, such as product formulations and research, is disclosed only on a need-to-know basis. All of this information, if disclosed to a competitor, would be exceedingly valuable.

26.    The documents requested by Plaintiffs would show, among other things, the basis for Iams' business decisions, information that Iams has accumulated from public sources concerning its competitors, Iams' internal analysis of that information in order to identify market and industry trends, Iams' profitability, etc. This information is highly proprietary and confidential. If disclosed without protection, then it would irreparably injure Iams. This information should not be produced without an appropriate order limiting strictly the terms of its disclosure.

27.    Iams' business plans and strategy are based, in part, upon what it anticipates its competitors will do in the marketplace — what it can reasonably anticipate that Nestle Purina, Mars, Hill's Pet Nutrition, Nutro and others will do.  Iams also sells to retailers, such as PetSmart and Wal-Mart, which sell Iams' product next to house brands that are made for these retailers by co-packers.  Iams' assessment of competitive conditions affects new products and formulations, based upon work by research scientists, and all aspects of its business, including the customers that it chooses to do business with directly, negotiations with direct buying accounts, pricing, the type of information it accumulates and analyzes about its competitors, and the type of business strategies it will employ in promotions and advertising, e.g., whether advertising should be at the national level through television commercials, whether it should be at the local level, whether it should be in cooperative advertising programs, whether it should be in couponing programs, etc.  The success or failure of these plans is reflected in sales information, financial statements, and internal business plans.  In competing directly against its various manufacturing rivals, all of these factors must be taken into consideration, and all of this confidential and proprietary information is included in the requests identified above.

28.    Any information of Iams that would explain, describe or suggest what it did or did not do to compete against its manufacturing rivals will be obviously of interest to its competitors.  Disclosure of this and all of the other confidential and proprietary information needs to be limited in order to avoid harming Iams irreparably.

29.    Iams understands that it is involved in a lawsuit with Plaintiffs and other Defendants, and that many of the other Defendants are competitors of Iams.  While Iams believes that ultimately Plaintiffs will not prevail in this matter, it understands that discovery

requests have been served and it must respond to reasonable requests for documents. In doing so, Iams must make sure that disclosure of its proprietary and confidential information is limited. There is great risk of harm to Iams and its employees from even an inadvertent disclosure of information.

30.    The protective order should limit the disclosure of Iams' confidential research, development, marketing, and other proprietary commercial information. Iams has taken this position in other lawsuits.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 25, 2008.

_Melissa Monich_

MELISSA MONICH